JUDGE SCHOFIELD

GREGORY A. KASPER
kasperg@sec.gov
TERRY R. MILLER
millerte@sec.gov
MARK L. WILLIAMS
williamsml@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

19 CV 04355

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>COLLECTOR'S COFFEE Inc. d/b/a COLLECTORS CAFÉ), and MYKALAI KONTILAI,<br><br>Defendants. | 19 Civ.     (  )<br>**ECF CASE**<br><br>**COMPLAINT**<br><br>**JURY TRIAL<br>DEMANDED** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), for its

Complaint against defendants Collector's Coffee, d/b/a Collectors Café ("Collectors Café"), and

Mykalai Kontilai (collectively, the "Defendants"), alleges:

### SUMMARY OF ALLEGATIONS

1.      Mykalai Kontilai, through his entity Collectors Café, raised millions of dollars by

representing to investors that they would use the funds to develop a website for the auction of

collectibles such as sports memorabilia, as well as an affiliated social network and television

show.

2.      Rather than using funds as the Defendants represented to investors, Kontilai misappropriated more than $6.1 million to fund his lavish lifestyle, funneling approximately $1.9 million to his personal bank accounts, and withdrawing another $4.2 million in cash. Kontilai actively tried to conceal his misappropriation from investors by funneling their money through his associate's bank accounts and from the SEC staff by fabricating documents.

3.      In addition to these cash withdrawals and transfers, Kontilai also misappropriated investor funds to purchase a variety of luxury goods and services (including from Chanel, Louis Vuitton, and Cartier), to pay gambling expenses, and to rent an oceanfront condo in Miami.

4.      Additionally, Collectors Café and Kontilai misrepresented to investors numerous material facts about Collectors Café's business, including Kontilai's improper use of investor funds, Kontilai's personal investment in Collectors Café, the number of dealers signed up to sell inventory on its online platform, and Collectors Café's interest in certain assets, including two original contracts signed by the legendary Jackie Robinson.

5.      As a result of Collectors Café and Kontilai's fraudulent conduct they were able to raise approximately $23 million from at least 140 investors since April 2014, at least one-quarter of which Kontilai misappropriated and used for personal expenses.

## SUMMARY OF VIOLATIONS

6.      As a result of the conduct described herein, Defendants Collectors Café and Kontilai obtained money or property on the basis of false and misleading statements and omissions, and made material false and misleading statements and omissions. Accordingly, Collectors Café and Kontilai have violated and, unless restrained and enjoined, will continue to

2

violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

7.      As a result of the conduct described herein, Defendants Collectors Café and

Kontilai engaged in a scheme to defraud and have violated and unless restrained and enjoined

will continue to violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and

(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c)

thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

8.      The SEC brings this action pursuant to the authority conferred upon it by Section

20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b)] and Section 21(d) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The SEC seeks

permanent injunctions against each of the Defendants, enjoining them from future violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5]

promulgated thereunder and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)],

disgorgement of all ill-gotten gains from activity set forth in this Complaint, together with

prejudgment interest, and civil penalties pursuant to Section 20(d)(1) of the Securities Act [15

U.S.C. § 77t(d)(1)] and Section 21(d)(3)(A) [15 U.S.C. § 78u(d)(3)(A)] of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), and 27

of the Exchange Act [15 U.S.C. §§ 78u(d), and 78aa].

3

10.     Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

11.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act. Defendant Collectors Café is a private company founded, owned, and controlled by Defendant Kontilai with a principal place of business in this District, Defendant Kontilai's primary place of residence is in this District, and many of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.

12.     On or about April 1, 2019, the SEC and Defendants entered into a tolling agreement as of April 1, 2019, tolling conduct back to April 1, 2014.

## DEFENDANTS

13.     **Collector's Coffee** (d/b/a Collectors Café), is a private company founded, owned, and controlled by Kontilai with its principal place of business in New York, New York. The Company was incorporated in California on or about May 14, 2007 (as Ultimate Collector Inc.), and subsequently reorganized as a Nevada C corporation via merger on or about February 22, 2008.

14.     **Mykalai Kontilai** (f/k/a Michael Contile), age 49, is the founder, president, and chief executive officer of Collectors Café.  Kontilai's primary place of residence is New York, New York. Kontilai owns 100 percent of the voting shares of Collectors Café.

## FACTS

**I.     Kontilai Raised Money From Investors for Collectors Café.**

15.     Collectors Café was incorporated in or around 2007 with a business plan to build brick-and-mortar coffee houses at which collectors would congregate and have the ability to purchase collectibles.

16.     In or around 2009, Collectors Café moved away from its plan to build coffee houses because of the associated costs with retail stores. Collectors Café's business plan then evolved to its current plan, which involves the creation of an online website for collectibles and an associated television show. Collectors Café has described its website as a combination of an auction site and a social networking site.

17.     Between 2007 and 2013, Collectors Café raised approximately $3.75 million from investors from the sale of convertible promissory notes and Series A Preferred shares. In 2013, Collectors Café raised $4 million through Series A Convertible Notes ("Series A Notes"). Then, from approximately April 2014 through approximately December 2018, Collectors Café raised approximately $21 million from the sale of Series A Preferred shares and Series B preferred shares and $2 million from Series B Promissory Notes (collectively, the "Collectors Café Offerings").

18.     Collectors Café and Kontilai used multiple offering documents when raising funds pursuant to the Collectors Café Offerings.  In particular, Collectors Café raised money from investors through at least two different versions of a Private Placement Memorandum ("PPM"), each dated April 28, 2008.

19.     One version of the PPM was created when Collectors Café intended to build coffee houses where collectors would meet (the "Coffee House PPM"). Defendants used the Coffee House PPM with investors prior to 2014, and at least two investors in 2014 received versions of this PPM.

20.     A second version of the PPM (the "Social Media PPM") is also dated April 28, 2008, but was updated and shortened after Collectors Café moved its business plan away from constructing coffee houses.

21.     Defendants used the Social Media PPM, as modified by amendments dated February 1, 2015, October 15, 2015, April 12, 2016, and January 1, 2017, with investors who invested from 2015 forward.

II.     **Collectors Café and Kontilai Made False, Fraudulent, and Material Misrepresentations and Omissions in Connection with the Collectors Café Offerings.**

22.     In raising funds from investors pursuant to the Collectors Café Offerings, Defendants Kontilai and Collectors Café made numerous written and oral material false and misleading statements and omissions regarding, among other things, the use of investor proceeds, Kontilai's investment in Collectors Café, the number of dealers and amount of inventory on Collectors Café's website, and the extent of Collectors Café's ownership of the Jackie Robinson baseball contracts along with their value.

   A.    **Material Misrepresentations and Omissions Regarding Kontilai's Use of Investor Funds.**

23.     Defendants Collectors Café and Kontilai made material misrepresentations and omissions regarding the use of investor proceeds that were misappropriated by Kontilai.

24.     Throughout the Collectors Café Offerings, by way of written documents and disclosures sent to investors as well as oral communications made to investors, Collectors Café and Kontilai represented to investors that it would use investor funds to pursue its stated business plan.

25.     Throughout the Collectors Café Offerings, the written materials provided to investors and potential investors described the intended use of investors' money and did not disclose the type and magnitude of Kontilai's personal use of their money:

a.   Collectors Café's standard practice with potential investors was to give them a high level overview of the Company, then set up a Web-Ex through which investors could see a mock-up of the website, and then to send them offering documents, including either the Coffee House PPM or the Social Media PPM, if the investors were interested in investing.

b.   Prior to receiving a PPM, some investors, including Investors A-E, received demonstrations of Collectors Café's proposed website.

c.   Some investors, including Investor A on or about October 2, 2014, Investor F on or about September 3, 2014, Investor G on or about February 24, 2015, and Investor K on or about March 1, 2016, received a written business plan for Collectors Café ("Business Plan").

d.   At least two versions of Collector Café's Business Plan (one from 2014 and one from 2016) stated, "The offering presented in the PPM is for the General Purpose of increasing Operating Capital of the Company, in preparation for initial growth and launch of our website, national television shows and completion of the retail center and television studio at Caesar's Palace."

7

e. In an email to all investors dated April 23, 2016, which was drafted by Kontilai and sent out by his assistant on behalf of Collectors Café, Kontilai and Collectors Café stated that it sought to raise money for "the specific upcoming growth initiatives (outlined below)," which were then described as the production and distribution of a Chinese and Spanish language version of the Collectors Café TV Series and a partnership with Warner Music Group.

26.    These representations were false when made because Kontilai always intended to use investors' money for personal use, did use investors' money for personal use, and ultimately misappropriated more than 25% of the money raised, including $6.1 million in cash in addition to extravagant charges on Collectors Café's credit cards.

27.    In fact, from at least 2014 forward, Kontilai had no source of personal income other than misappropriating investor money.

28.    The monies misappropriated by Kontilai were not salary nor compensation, as there is no employment agreement between Kontilai and Collectors Café that permitted Kontilai to draw a salary or other form of compensation.

29.    Moreover, in order to induce investments, and mislead investors and potential investors into believing their investments would be used to further Collector Café's stated business goal, Collectors Café and Kontilai told investors that Kontilai did not, and would not, take a salary or other compensation from Collectors Café:

a. Kontilai told potential investors, including Investor F (orally prior to the investor's investment in or around September 2014), Investor H (orally prior to the investor's multiple investments in or around September 2016, April 2017 and April 2018), and

8

Investor G (by email on or about September 30, 2015), that he was not taking a salary or being compensated.

b. In the email to Investor G dated September 30, 2015, Kontilai wrote "I am very frugal and have not taken a dime of salary to date."

c. On a phone call soliciting investors for additional investments on or about February 6, 2017, an agent on behalf of Collectors Café and, on information and belief, under the direction of Kontilai, highlighted that Kontilai had not taken a salary in over 10 years.

30.     The investor funds misappropriated by Kontilai were also not loan repayments, as Kontilai did not loan money to Collectors Café, there were no loan agreements that permitted Kontilai to make loan repayments to himself from Collectors Café, nor was it disclosed to investors that their funds would be used to repay Kontilai for purported loan(s) he made to Collectors Café.

31.     As described more fully below, on or about May 14, 2018, Kontilai misrepresented to the SEC staff that money he misappropriated from Collectors Café was in fact legitimate transfers of money to repay Kontilai for obligations owed to him by Collectors Café. In support of his assertions, Kontilai knowingly created and presented the SEC staff with fabricated documents (an employment agreement, loan agreement, and bank statement) in an effort to mislead the SEC and further conceal his misappropriation of investor funds.

32.     A reasonable investor would have understood from Collector Café's disclosures and Defendants' statements that Kontilai's personal use of investors' funds was not an intended use of their investments.

33.     Each of the above disclosures and representations regarding Collector Café's use of investor proceeds were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the intended use of investors' money were false and misleading.

34.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding Collector Café's use of investor proceeds not misleading.

35.     The above misrepresentations and omissions as to use of investor proceeds were material to investors and potential investors because, among other things, they believed their investments would be used to further the stated business goal in order to create profits and a return on their investment, and because the company money used for personal purposes by Kontilai would necessarily decrease the amount of money available to Collectors Café to effectuate its business plan.

**B.     Material Misrepresentations and Omissions Regarding Kontilai's Personal Investment in Collectors Café.**

36.     Defendants Collectors Café and Kontilai made material misrepresentations and omissions with respect to Kontilai's personal investment (or lack thereof) in Collector's Café.

37.     Throughout the Collectors Café Offerings, Collectors Café and Kontilai represented to investors and potential investors, including Investor C (during a web-ex presentation on or about February 6, 2015), Investor E (during phone calls in our about August 2016), and Investor H (orally prior to the investor's multiple investments in or around September 2016, April 2017 and April 2018), that he had personally invested $5 million in

Collectors Café. Kontilai told other investors, such as Investor F (orally prior to his investment in or around September 2014), that he had invested a significant amount of his own money.

38.     On a phone call soliciting investors for additional investments on or about February 6, 2017, an agent on behalf of Collectors Café and, on information and belief, under the direction of Kontilai, highlighted that Kontilai had invested $5 million in Collectors Café.

39.     Each of the above representations regarding Kontilai's investment in Collectors Café was false and misleading because Kontilai did not invest (nor loan) $5 million to Collectors Café, nor did Kontilai invest or loan a significant amount of his own money to Collectors Café.

40.     In fact, as alleged above and more fully described below, in an effort to mislead the SEC and conceal his fraud, Kontilai created and produced to the SEC a fabricated loan agreement purporting to document a $5 million loan to the company.

41.     A reasonable investor would have understood from Collectors Café's disclosures and Defendants' statements that Kontilai invested $5 million of his own money into Collectors Café and that that money was available to Collectors Café to use to further its business plan, served as an incentive to Kontilai to successfully follow through on its business plan, and validated Kontilai's confidence in the future success of the business.

42.     Each of the above disclosures and representations regarding Kontilai's investment in Collector's Café were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning Kontilai's investment in Collectors' Café were false and misleading.

43.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding Kontilai's investment in Collectors' Café not misleading.

44.     The above misrepresentations and omissions as to Kontilai's investment in Collectors' Café were material to investors and potential investors because, among other things, it indicated that $5 million had been made available to Collectors Café by Kontilai to further its business plan, that Kontilai was strongly incentivized to successfully follow through on Collectors' Cafe business plan since his own money was at risk, and that Kontilai was in fact confident in the future success of the business because he invested a significant amount of money into Collectors Café.

**C.     Material Misrepresentations and Omissions Regarding Dealers and Inventory on Collectors Café's Website.**

45.     Defendants Collectors Café and Kontilai made material misrepresentations and omissions with respect to the number of dealers and the amount of inventory on Collector Café's website.

46.     Collectors Café and Kontilai represented to investors in the Collectors Café Business Plan that Collectors Café would receive 20% from the buyer and 20% from the seller on all sales made through the Collectors Café auction website.  These commissions from future sales of collectibles on Collectors Café's website was the main stated revenue driver for Collectors Café's business.

47.     Throughout the Collectors Café Offerings, Collectors Café and Kontilai touted that a large number of dealers were committed to sell a large volume of inventory of collectibles on Collectors Café's website:

a.  Kontilai stated in a short video designed to promote Collectors Café that was on its website and emailed to numerous investors that Collectors Café had a "master dealership made up of hundreds of dealers."

b.  Kontilai represented to investors, including Investor B (orally in or around March 2015), Investor C (orally in or around February 2015), Investor E (orally in or around August 2016) and Investor I (orally in or around April 2016) that there was billions of dollars of inventory available on Collectors Café's website.

c.  Kontilai told some investors, including Investors A (orally in or around October 2014) and Investor E (orally in or around August 2016), that he had hundreds of dealers signed up.

d.  Kontilai also told investors, including Investor B (orally in or around March 2015) and Investor E (orally in or around August 2016), that the dealers were signed up under 10 year contracts.

48.     These statements were false and misleading. In reality, in preparation for Collectors Café's so-called soft launch in 2016, three dealers had signed a "basic dealer agreement" that expired within 180 days of execution and did not obligate the dealer to put any specific quantity of inventory on Collector Café's website.

49.     As of August 2018, only three dealers had ever posted inventory to Collectors Café's website, the website was not active at that time and most of the inventory was non-

exclusive inventory from one dealer who also had a physical store in New York City. Inventory sold through that dealer's store or on his own website would not result in a commission for Collectors Café.

50.     At the time of these representations, Collectors Café and Kontilai knew that Collectors Café had not signed up anywhere near the number of dealers they were representing and further knew that it would have been prohibitively expensive to do so, as Collectors Café would have been responsible for hiring photographers to take photographs of the dealers' items, drafting descriptions and cataloging the items, and then uploading this information onto its website.

51.     A reasonable investor would have understood from Collector Café's disclosures and Defendants' statements that hundreds of dealers had agreed to post a large amount of collectibles on Collectors Café's website worth upwards of a billion dollars, that the anticipated volume of dealers and inventory committed to the website correlated directly with anticipated investor profit, and that the increased profits and success would increase the likelihood that a large company would be interested in acquiring Collectors Café.

52.     Each of the above disclosures and representations regarding the volume of dealers and inventory committed to Collectors Café's business were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the volume of dealers and inventory committed were false and misleading.

53.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the volume of dealers and inventory committed to Collectors Café's business not misleading.

54.     The above misrepresentations and omissions as to the volume of dealers and inventory committed to Collectors Café's business were material to investors and potential investors because, among other things, the volume of dealers and inventory committed to Collectors Café's business was directly tied to the future profits and success of the company.  In fact, it was the expected high volume of sales of collectibles on Collectors Café's website that Kontilai touted to bring Collectors Café a profit.

**D.      Material Misrepresentations and Omissions Regarding the Jackie Robinson Contracts.**

55.     Defendants Collectors Café and Kontilai made material misrepresentations and omissions with respect to the ownership and valuation of baseball contracts signed by Jackie Robinson.

56.     Collectors Café and Kontilai represented to investors and potential investors that (i) Collectors Café owned contracts signed by Jackie Robinson; and (ii) the contracts had been appraised at $36 million. Defendants representations were false and misleading and omitted material facts necessary to render these statements not false and misleading, because (i) Collectors Café did not own a 100% interest in the contracts and was not entitled to all proceeds from the sale of the contracts; and (ii) there was substantial doubt about the $36 million valuation, including an appraisal of $10 million that was provided to Collectors Café and Kontilai.

57.    Collectors Café acquired the two baseball contracts signed by Jackie Robinson in or around 2013: a contract Robinson signed with the minor league Montreal Royals in 1945 and a contract that he signed with the major league Brooklyn Dodgers in 1947.  Collectors Café acquired these contracts for approximately $2 million.

58.    Collectors Café touted the Jackie Robinson contracts as a major asset of the company:

a. In the Second Amendment to the Social Media PPM, the Company stated "The Company successfully concluded its second private capital raise in April of 2010. The company has been fully funded to complete its final launch tasks since that date. It remains in a strong financial position with a positive cash position as well as having acquired a collectibles asset which has been appraised at $36,000,000.  This asset was acquired at an undervalued price of $2,000,000 and is likely to generate millions of dollars of additional cash flow upon its liquidation in 2015."  The Social Media PPM was provided to most investors who invested after 2014 with at least 100 investors having received it.

b. Kontilai represented to at least two investors – Investor A (orally in or around October 2014) and Investor F (orally in or around August-September 2014) – that their investment was "secured" or "protected" by the valuation of the Jackie Robinson contracts.

c. Kontilai led another investor, Investor H, to believe that the value of the Jackie Robinson contracts protected his investment by describing the contracts as a tangible asset of the company that had not yet earned revenue.

16

59.     These statements were false and misleading.  In reality, Collectors Café only owned a fraction of the Jackie Robinson contracts, was only entitled to a fraction of the proceeds from the sale of the contracts and the sale of the contracts was expected to be for far less than $36 million.

60.     Defendants representations that Collectors Café owned the Jackie Robinson contracts were false and misleading and omitted material facts, because Collectors Café did not own a 100% interest in the contracts and was not entitled to 100% of the proceeds from their sale:

a.  In connection with the acquisition of these contracts in 2013, Collectors Café entered into six "Series A Notes" (as amended) that totaled $4 million and stated that the loan proceeds would be used for acquisition of the contracts and "working capital purposes."

b.  Under the terms of the Series A Notes, the holders of those notes are entitled to a return of 50% of any net proceeds from the sale of the Jackie Robinson contracts.  Net proceeds is calculated as (a) the purchase price paid by an unrelated third party buyer for the contracts less (b) the payoff amount of the Series A Notes less (c) without duplication any principal, interest, default interest, fees and costs already paid under the Series A notes less (d) any reasonable expenses associated with the contracts, but excluding their purchase price.

c.  The following year, in 2014, Collectors Café entered into two Series B Secured Promissory Notes (the "Series B Notes") that totaled $2 million, which were payable upon the sale of the Jackie Robinson contracts.

d. Once Collectors Café receives its portion of the net proceeds, it must repay the Series B Notes.

e. In addition to the Series A Notes and Series B Notes, Collectors Café has contracted to give three other parties a portion of the proceeds.

61.     Additionally, by no later than January 20, 2016, Defendants representations about the $36 million valuation were false and misleading and omitted material facts, because Kontilai had credible information indicating that the contracts were worth much less than $36 million:

a. On January 20, 2016, Kontilai received an Insurance Appraisal Report regarding the two Jackie Robinson contracts that was prepared by a confidential broker, authenticator and appraiser using final bids from several auction houses specializing in sports history and reference to high value historic documents.

b. This report values the Jackie Robinson contracts at $10 million.

c. The confidential broker, authenticator and appraiser disclosed to Kontilai that he was receiving pushback for even a $10 million valuation.

62.     Neither Collectors Café nor Kontilai disclosed to investors or prospective investors that the $36 million valuation likely overvalued the contracts, or that on or about January 20, 2016, that they received an Insurance Appraisal Report valuing the Jackie Robinson contracts for only $10 million, or that they were told that there was resistance to even a $10 million valuation.

63.     On information and belief, Kontilai was aware that the $36 million appraisal of the Jackie Robinson contracts overvalued the asset by a significant amount at the time of the appraisal and prior to receiving the $10 million appraisal.  In fact, the overvaluation of the Jackie

Robinson contracts was not only confirmed by the subsequent $10 million appraisal described above, but further borne out when the individual who appraised the contracts for $36 million offered to buy the contracts for less than $8 million, which Defendants appear to have accepted. The final documents for this sale were recently circulated to all parties for execution.  Because of Collector Café's fractional ownership and duty to repay promissory notes, it is expected to receive less than $2 million.

64.     A reasonable investor would have understood from Collector Café's and Kontilai's disclosures and statements about the ownership interest of the Jackie Robinson contracts that Collectors Café owned 100% of the contracts, were entitled to 100% of the proceeds from any sale of the contracts, and expected to receive $36 million upon the sale of the contracts.

65.     Each of the above disclosures and representations regarding the ownership and valuation of the Jackie Robinson contracts were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the ownership and valuation of the Jackie Robinson contracts were false and misleading.

66.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the ownership and valuation of the Jackie Robinson contracts not false and misleading.

67.      The above misrepresentations and omissions as to the ownership and valuation of the Jackie Robinson contracts were material to investors and potential investors because, among other things, the value of Collectors Café's assets safeguarded investors against the potential failure of the company, and because it would be important to investors to understand

that Collectors Café would receive substantially less than $36 million upon the sale of the

contracts.

        **E.**      **Collectors Café and Kontilai Are Each Liable for Their Misstatements and Omissions.**

      68.      All of the misrepresentations and omissions detailed above were made in

connection with the offer, purchase, or sale of securities issued by Collectors Café.

      69.      Collectors Café and Kontilai both obtained money by means of the

misrepresentations and omissions detailed above.

      70.      Kontilai made or directed each misrepresentation and omission detailed above.

      71.      Kontilai determined the content of and had ultimate authority over the PPMs, as

well as marketing materials, internet websites, and other documents and emails used to solicit

prospective investors. Kontilai had sole control of Collectors Café, and he personally made the

oral representations detailed above.

      72.      Similarly, Collectors Café made the representations Kontilai made. Kontilai had

authority to make representations on behalf of Collectors Café, and did in fact make

representations on behalf of Collectors Café.

      73.      At all times, Collectors Café and Kontilai acted with the requisite scienter.

**III.**      **Collectors Café and Kontilai Engaged in a Scheme to Defraud Investors.**

      74.      From no later than April 2014 through the present, Collectors Café and Kontilai

engaged in a scheme to defraud the Collectors Café investors, and engaged in numerous acts,

practices or courses of business that defrauded the Collectors Café investors. Acts in furtherance

thereof include the false and misleading statements, omissions, and other conduct described

above, and the acts described below.

A.      **Concealment of Misappropriation of Investor Funds**

75.     Despite the representations that Collectors Café would use investor money to fund specific aspects of the business and did not allow for Kontilai to use investor funds to pay personal expenditures and fund his lavish lifestyle, and despite Kontilai's representations that he was "very frugal" and was not even taking a salary, Kontilai misappropriated at least $6.1 million from Collectors Café in the form of cash withdrawals and transfers to Kontilai's personal accounts. Kontilai used these funds for personal expenses.

76.     Kontilai attempted to conceal many of these transfers by running investor funds through bank accounts of his associate.

77.     In or around 2012, Kontilai asked his associate, G.H., to set up a bank account in her name.  Kontilai told G.H. that he planned to transfer money into the account and then direct her to withdraw money from the account in cash and provide it to him.

78.     Kontilai instructed G.H. that, if a bank employee asked questions about the cash withdrawals, G.H. was to tell the bank employee that she was a consultant to Collectors Café and that the money was for the purchase of collectibles, which could be acquired at a better price if cash was used.

79.     This instruction was intended to conceal, and further, Defendants' fraudulent scheme because Collectors Café and Kontilai knew at the time of instructing G.H. to open the bank accounts, through the time of directing the withdrawals of cash, that Collectors Café would not purchase collectibles with the funds.

80.     G.H. opened a new bank account at Kontilai's instruction on March 14, 2012.

81.     From 2012 to 2014, Kontilai obtained investors' money in the form of cash in the

following manner:

    a.   Kontilai directed transfers of funds invested with Collectors Café to G.H.'s

        accounts;

    b.   Shortly after a deposit of investor money into G.H.'s account, G.H. withdrew the

        same amount by visiting bank branches in person. Kontilai accompanied G.H. in

        nearly every instance when she withdrew the money.

    c.   Kontilai directed G.H. to immediately give the cash to Kontilai after it was

        withdrawn and G.H. complied.

    d.   Between approximately the end of 2012 through March 2014, approximately $3.3

        million was pilfered in this manner. Between April 1, 2014 and December 20,

        2018, Collectors Café transferred approximately $2.1 million to Kontilai via

        G.H's accounts.

82.      In or around July 2018, Kontilai told G.H. that he again needed help to transfer

cash to himself from Collectors Café. Kontilai told his associate that he needed the money to

maintain his lifestyle and that because of an investigation by the SEC, it would not look good if

Kontilai withdrew the money himself.

83.      On or about July 10, 2018, Kontilai, through Collectors Café, transferred

$250,000 to G.H.'s personal account ("Bank Account 1").

84.      On or about July 11, 2018, G.H. obtained a cashier's check from the same bank

account for $250,000. G.H. delivered the check to Kontilai at his apartment in New York City.

85.      On or about July 11, 2018, Kontilai requested that G.H. use her account from

another bank ("Bank Account 2") to receive transfers from Collectors Café. On or about the

same day, at the direction of Kontilai, the $250,000 cashier's check from Bank Account 1 was deposited in Bank Account 2.

86.     Kontilai also instructed G.H. to open an account at a separate bank, ("Bank Account 3") to receive transfers from Collectors Café.

87.     On or about July 11, 2018, in addition to the $250,000 cashier's check deposited into Bank Account 2, Kontilai transferred $375,000 into Bank Account 2 and an additional $375,000 into Bank Account 3. These funds, belonging to Collectors Café, were subsequently misappropriated by Kontilai.

88.     In addition to withdrawing cash at the direction of Kontilai from the accounts to which he had transferred Collectors Café funds, Kontilai instructed G.H. to use the money he had transferred into the accounts to purchase gold bars online that were delivered to her apartment in New York.

89.     At Kontilai's direction, G.H. turned over all the gold bars to Kontilai.

90.     Kontilai then sold the gold bars for cash.

91.     Kontilai also used Collectors Café's credit cards and transfers from Collectors Café's account for personal expenses.

92.     These charges include rent on an oceanfront condo in Miami, tuition at a private school in Las Vegas, expenses at gentleman's clubs, stays at a luxury resort in Miami over New Year's Eve, and various personal items at high-end stores such as Chanel, Louis Vuitton, Saks Fifth Avenue, Cartier, and Rolex.

93.     Kontilai never disclosed to any of his investors or prospective investors that money he received from the sale of Collectors Café securities would be used for anything other

than the Collectors Café business, much less that he would use investor money to fund his lavish lifestyle.

**B.      Fabrication of Documents**

94.      In furtherance of his scheme to misappropriate and misuse investor money, and to conceal and obfuscate his scheme from the SEC and others, Kontilai fabricated multiple documents with the intent to create the appearance that transfers from Collectors Café to himself were legitimate.

95.      On May 14, 2018, Kontilai produced to the SEC a fabricated employment agreement that purportedly provided Kontilai the right to a salary from Collectors Café.

96.      The purported employment agreement provided to the SEC was backdated, and contains a forged signature of G.H. (who was involved in the cash transfers as described above) that misidentified her as "Chairman of the Board."

97.      G.H. never signed this purported employment agreement and never served as "Chairman of the Board."

98.      Kontilai knew the copy of the purported employment agreement produced to the SEC was fabricated at the time he produced it to the SEC.

99.      Kontilai produced the fabricated copy of the purported employment agreement to the SEC with the intent to mislead the SEC and others into believing that Collectors Café was contractually obligated to pay funds to Kontilai.

100.      Kontilai also produced to the SEC a copy of a loan agreement purporting to document a $5 million loan from Kontilai to Collectors Café.  That loan agreement was

purportedly signed by Kontilai and G.H., and again misidentified G.H. as Chairman of the

Board.

101.    Kontilai attached to the loan agreement a bank statement purporting to reflect the

$5 million deposit into a Collectors Café's account in an effort to corroborate his claim that he

leant Collectors Café $5 million.

102.    The Collectors Café bank statement produced to the SEC is a fabricated

document. The actual bank statement reflects a deposit of $1,000 into the account of Collectors

Café, not $5 million. Kontilai altered the bank statement and provided the altered version to the

SEC.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Fraud (Misstatements and Omissions): Section 10(b) of the**
**Exchange Act and Rule 10b-5(b)**
**(All Defendants)**

103.    The SEC realleges and incorporates by reference paragraphs 1 through 102, as

though fully set forth herein.

104.    Collectors Café and Kontilai, directly or indirectly, acting with scienter, by use of

the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the purchase or sale of a security, made untrue

statements of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

105.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly,

violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Fraud (Misstatements and Omissions): Section 17(a)(2) of the Securities Act
### (All Defendants)

106.    The SEC realleges and incorporates by reference paragraphs 1 through 102, as though fully set forth herein.

107.    Collectors Café and Kontilai, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Fraud (Scheme): Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (All Defendants)

109.    The SEC realleges and incorporates by reference paragraphs 1 through 102, as though fully set forth herein.

110.    Collectors Café and Kontilai, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes, or artifices to defraud; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

111.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly, each violated, and, unless restrained and enjoined, will again violate Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

### FOURTH CLAIM FOR RELIEF
**Fraud (Scheme): Section 17(a)(1) and (3) of the Securities Act**
**(All Defendants)**

112.    The SEC realleges and incorporates by reference paragraphs 1 through 102, as though fully set forth herein.

113.    Collectors Café and Kontilai, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, employed a device, scheme, or artifice to defraud and engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

114.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

### RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

27

**II.**

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining the Defendants from violating the laws and rules alleged against them in this Complaint;

**III.**

Order Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

**IV.**

Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**V.**

Grant such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Dated: May 14, 2019

Gregory A. Kasper (NY2735404; SDNY GK6596)
Terry R. Miller (*pro hac* admission pending)
Mark L. Williams (pro hac admission pending)
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000