Gregory A. Kasper
kasperg@sec.gov
Terry R. Miller
millerte@sec.gov
Mark L. Williams
williamsml@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 19 CV 04355

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>- against -<br><br>COLLECTOR'S COFFEE INC. D/B/A COLLECTORS CAFÉ AND MYKALAI KONTILAI<br><br>          Defendants. | 19 Civ.   ( )<br><br>**DECLARATION OF JACQUELINE M. MOESSNER IN SUPPORT OF *EX PARTE* EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE, FOR AN ASSET FREEZE, AND OTHER RELIEF**<br><br>**ECF CASE** |

I, JACQUELINE M. MOESSNER, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, that I am over 18 years of age and I am competent to testify to the matters stated herein:

    1.     I am an attorney and have been licensed in New York since 2007. I am employed in the Division of Enforcement in the Denver Regional Office of the Securities and Exchange Commission ("SEC") and hold the title of Senior Counsel.

    2.     Among other things, the federal securities laws authorize the SEC to conduct investigations to determine whether federal securities laws have been violated and to bring civil

actions before the United States District Courts to enforce and secure compliance with those laws.

3.        As part of my job duties, I am responsible for investigating potential violations of the federal securities laws.

4.        In conducting factual investigations, my job responsibilities generally include sending subpoenas, taking testimony, and conducting other investigative activities.

5.        I was assigned to investigate a matter captioned <u>In re Collector's Coffee Inc. d/b/a Collectors Café (D-3724)</u>. As a result of that investigation, among other things, the SEC has authorized this action seeking the relief specified in the Complaint and the SEC's Motion to which this Declaration is an exhibit.

**<u>Overview of the Investigation</u>**

6.        On September 19, 2017, the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony in the Matter of Collector's Coffee Inc. d/b/a Collectors Café ("Collectors Café" or "Company") that authorized certain members of the SEC's staff to subpoena documents and take investigative testimony.

7.        As part of my investigation, I collected, researched, and analyzed information relating to Collectors Café's offering of securities and its use of investor funds.

8.        Among other things, this analysis included a detailed review of documents provided by Collectors Café, documents provided by investors and other third parties, bank records relating to Collectors Café's and other individuals' accounts, and credit card statements for credit cards used by Collectors Café and its CEO Mykalai Kontilai ("Kontilai"). I have also interviewed and taken investigative testimony from a number of witnesses.

9.      Based on my review and analysis of the above-listed information, I identified the facts set forth below.

**Nature of Collectors Café**

10.      Collectors Café was incorporated in Nevada in 2007; its current primary place of business is New York, New York.  A different corporate entity -- Ultimate Collector Inc. – was previously incorporated in California.  Ultimate Collector Inc. changed its name to Collectors Café in August 2007, and then merged with the Collectors Café entity that had previously incorporated in Nevada.  Corporate filings reflecting these transactions are attached hereto as **Exhibits 1-3**.

11.      From the Company's inception through the present, Kontilai has served as the President and Chief Executive Officer of Ultimate Collector Inc. (n/k/a Collectors Café).  According to Collectors Café, Kontilai owns 100% of the voting shares of the Company and therefore controls it.

12.      Kontilai currently resides in New York, New York.

**Collectors Café's Business**

13.      Collectors Café's original business plan involved building brick-and-mortar coffee houses at which collectors would congregate and be able to buy collectibles.

14.      In or around 2009, Collectors Café scrapped the coffee shop idea because it was going to be too expensive to build out the retail stores. Collectors Café then modified its business plan to its current plan, which involves an online website for collectibles and an associated television show.  Collectors Café has described its website as a combination of an auction site and a social networking site.

**Collectors Café Solicits Investors and Raises Over $23 million**

15.     Shortly after it was formed in 2007, Collectors Café and Kontilai began soliciting investors.

16.     Based on an investor list produced by Collectors Café, between 2007 and 2013, Collectors Café raised approximately $3.75 million from investors, through convertible notes and Series A preferred (non-voting) shares.

17.     From at least April 1, 2014 to December 12, 2017, Collectors Café sold Series A preferred (non-voting) shares at $1-3 per share.

18.     Collectors Café later sold Series B preferred shares, in or around April 2018.  A sample email Kontilai sent to an investor pitching the Series B shares is attached hereto as **Exhibit 4.**

19.     As part of this factual investigation, I supervised an analysis of bank records, in conjunction with the investor list produced by Collectors Café.  Based upon my review of that analysis, from June 2014 through December 2018, Collectors Café has raised $23,060,824.84 from investors through the sale of preferred stock (both Series A preferred and Series B preferred stock) and the issuance of Series B Promissory Notes (Series B Notes).

20.     Collectors Café raised money from investors through at least two different versions of a Private Placement Memorandum, each dated April 28, 2008.  As described below, each PPM had subsequent amendments.

21.     An older version of the PPM, which referred to Collectors Café' coffee shop business plan, appears to have been generally used with investors prior to 2014, although at least two investors in 2014 received versions of this PPM, with amendments dated March 9, 2009, November 8, 2009, and January 31, 2010 (which amendment was later updated August 15,

2014).  A copy of this PPM sent to an investor in 2011 by Kontilai is attached hereto as **Exhibit 5**, and a version sent by Kontilai in 2014 is attached hereto as **Exhibit 6** (I will refer to these versions as the Coffee Shop PPM).

22.     There is another version of the PPM.  It is also dated April 28, 2008, but it appears to have been updated and shortened after Collectors Café changed its business plan, as it does not refer to the coffee shop idea.  It is attached hereto as **Exhibit 7**. I will refer to this version as the Social Media PPM.

23.     The Social Media PPM appears to have been generally used with investors who invested from 2015 forward.  At least 100 investors appear to have received the Social Media PPM.

24.     There are amendments to the Social Media PPM dated February 1, 2015, October 15, 2015, April 12, 2016, and January 1, 2017.  A copy of these amendments is attached hereto as **Exhibit 8**.  Which amendments an investor received generally depended on the timing of their investments (that is to say, later investors would have received all amendments that had been prepared up to the date of their investments; earlier investors do not appear to have received amendments to the PPM that occurred after their investment).

**Defendants' Representations about Kontilai's Compensation**

25.     Through oral communications and written documents sent to investors, Defendants told investors that Kontilai did not, and would not, take a salary or other compensation from Collectors Café or otherwise use investor money for his personal expenses.

26.     Collectors Café's standard practice with potential investors was to give them a high level overview of the Company, then set up a Web-Ex through which investors could see a mock-up of the website, and then to send them offering documents if the investors were

interested in investing.   Attached hereto as **Exhibit 9** is an email dated March 27, 2013 from

Kontilai describing the "Strategic Individual Introduction Process."   Attached hereto as **Exhibits**

**10 and 11** are additional emails from January 2015 involving Collectors Café's agents and

Kontilai discussing the process for the introduction of individuals to Collectors Café.

27.     Prior to receiving a PPM, some investors, including Investors A-E, received

demonstrations of Collectors Café proposed website.

28.     The written materials provided to investors described the intended use of

investors' money and did not disclose the type and magnitude of Kontilai's personal use of their

money.

29.     The chart below includes references to what investor funds would be used for

from the two versions of the PPMS:

| Section of the PPM | Social Media PPM (Exhibit 7) | Coffee Shop PPM (Exhibit 6) |
|---|---|---|
| Cover Page | "THESE SECURITIES ARE BEING OFFERED BY COLLECTOR'S COFFEE, INC. (SOMETIMES REFERRED TO HEREAFTER AS THE 'COMPANY') FOR THE GENERAL PURPOSE OF FUNDING INITIAL INFRASTRUCTURE, OPERATING CAPITAL, AND PHASE 1 EXPANSION OF THE COMPANY" (SEC-CC00039997) | "THESE SECURITIES ARE BEING OFFERED BY COLLECTOR'S COFFEE, INC. (SOMETIMES REFERRED TO HEREAFTER AS THE 'COMPANY') FOR THE GENERAL PURPOSE OF RETIRING EXISTING COMPANY DEBT AND FUNDING INITIAL INFRASTRUCTURE, OPERATING CAPITAL AND PHASE ONE EXPANSION OF THE COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES" (SEC-CHAP00012825) |
| The Offering. | The monies raised will be primarily used for developing the Company infrastructure, related legal costs, and to develop and growth (sic) the integrated social network and auction portal.  Funds may also be used for broad purposes of general growth opportunities at the election of the | The monies raised will primarily be used for retiring existing Company debt, and developing the infrastructure of the Company and its Subsidiary Entities (see Section 4) to manage growth in the coffeehouse franchise, mass-retail and collectibles segments of operations.  Further, in the event that |

| Section of the PPM | Social Media PPM (Exhibit 7) | Coffee Shop PPM (Exhibit 6) |
|---|---|---|
| | CEO. Further, in the event the Company does not first secure an underwriting commitment to fund remaining production of the first season of the *Collectors Café TM* TV series.<br><br>Management anticipates that the branding achieved relative to coffee operations will be equally potent relative to both the auction and retail aspects of the collectibles industry. The association of Collector's Coffee, Inc. and its Collector's Café TM brand name, with leading appraisers and dealers in the industry should open a world of opportunity for establishing periodic or regular auction events, opening retail collectibles stores and/or expanding the Company's e-commerce model. (SEC-CC00040004) | Public Media does not first secure an underwriting commitment to fund remaining production of the first season of the *Collectors Café TM* series, funds may also be directed to fund a short term loan to Public Media, Inc. – insuring that the show debuts at a time when the company is fully prepared to launch the brand. The loan will be repaid from underwriting funds upon receipt of same from Public Media (see Sections 10 and 15). As the Company expands roasting operations and the auction/retail business model, a second stage (Phase 2) offering will likely occur. The size of that funding is yet to be determined. (SEC-CHAP00012837) |
| Organizational structure of Collector's Coffee Inc. | | States that "projected salaries and compensation are described at Appendix 4 – Financial Projections." [Not included in PPM]<br><br>Also states "The license agreement with Public Media, Inc. and compensation agreements involving executives are designed to defer much of their compensation until the Company is properly capitalized or certain production levels have been achieved. However, upon funding of this MEMORANDUM, CEO, Mykalai Kontalai [sic] shall receive three hundred thousand and 00/100 dollars ($300,000.00), and a stock bonus plan, as compensation for past services. Other compensation agreements provide for certain ceilings and are primarily based upon performance factors tied to the production of the |

| Section of the PPM | Social Media PPM (Exhibit 7) | Coffee Shop PPM (Exhibit 6) |
|---|---|---|
| | | Company." (SEC-CHAP00012846) |
| Investment Proposal | "NOTE: After reviewing this Investment Proposal and Use of Proceeds (Section 10), if you are uncertain as to what you are purchasing for your investment and what your money is to be used for, DO NOT MAKE AN INVESTMENT" (SEC-CC00023515) | "NOTE: After reviewing this Investment Proposal and Use of Proceeds (Section 10), if you are uncertain as to what you are purchasing for your investment and what your money is to be used for, DO NOT MAKE AN INVESTMENT"<br><br>"Funds will be used primarily in connection with the retirement of existing Company debt, and the commencement of operations of the parent entity, Collector's Coffee, Inc. and its wholly owned Subsidiary Entities (Section 4). (SEC-CHAP00012863) |
| | Section 9 of PPM is Use of Funds and Recommended Counsel from Outside Advisors.<br><br>"NOTE: THE COMPANY RESERVES THE RIGHT TO USE REASONABLE DISCRETION IN ALLOCATING THE USE OF PRIVATE OFFERING PROCEEDS IN A MANNER THAT IT DEEMS APPROPRIATE. THERE MAY BE SOME REASONABLE VARIATION IN THE PROJECTED USE OF PRIVATE OFFERING AND ACTUAL ALLOCATION BASED SOLELY UPON THE BEST JUDGMENT OF MANAGEMENT. (SEC-CC00023515) | Section 11 of PPM Use of Proceeds<br><br>"A general summary of the Use of Proceeds of the funding under this private offering is set forth at Appendix 3 attached hereto."<br><br>"'Other capex' as set forth in the Use of Proceeds Summary includes, generally, IT systems and consultancy and POS system development and implementation."<br><br>NOTE: THE COMPANY RESERVES THE RIGHT TO USE REASONABLE DISCRETION IN ALLOCATING THE USE OF PRIVATE OFFERING OR LOAN PROCEEDS IN A MANNER THAT IT DEEMS APPROPRIATE. THERE MAY BE SOME VARIATION IN THE PROJECTED USE OF PRIVATE OFFERING OR LOAN PROCEEDS, AND ACTUAL ALLOCATION, BASED SOLELY UPON THE BEST JUDGEMENT OF MANAGEMENT. THE COMPANY MAY USE SOME OF THE PRIVATE OFFERING PROCEEDS FOR (1) |

| Section of the PPM | Social Media PPM (Exhibit 7) | Coffee Shop PPM (Exhibit 6) |
|---|---|---|
| | | STOCK REDEMPTION FOR SHAREHOLDERS OTHER THAN OFFICERS AND DIRECTORS AND (2) SATISFACTION OF OUTSTANDING COMPANY DEBT IN THE FORM OF PROMISSORY NOTES HELD BY INDIVIDUALS, INCLUDING OFFICERS AND DIRECTORS, AS IT DEEMS APPROPRIATE." (SEC-CHAP00012864) |
| | | "Mykalai Kontilai has also personally funded the majority of other Collector's Coffee Inc. activities to date. The majority of the funds have been provided to the Company pursuant to convertible Promissory Notes, which notes are now past due. Kontilai has not made a final determination as to which, if any of the notes shall be converted and which shall be redeemed. As of the issuance of this MEMORANDUM , Kontilai has approximately $600,000 in Promissory notes outstanding. Moreover, should the company not raise additional operating capital at a rate necessary to continue operations; Kontilai may provide additional funds to the Company pursuant to additional Promissory Notes. He reserves the right to redeem or convert any outstanding notes as he deems appropriate.

Moreover, in the event that the Company should not raise additional operating capital at a rate necessary to continue operations, OTHER FOUNDING SHAREHOLDERS SHALL BE PRESENTED WITH AN OPPORTUNITY TO PROVIDE SHORT TERM DEBT FINANCING |

| Section of the PPM | Social Media PPM (Exhibit 7) | Coffee Shop PPM (Exhibit 6) |
|---|---|---|
| | | TO THE COMPANY UPON TERMS CONSITANT WITH THE HISTORICAL TERMS MADE AVAILABLE TO KONTILAI IN PRIOR FUNDING TRANSACTIONS." (SEC-CHAP00012873-74) |

30.     A Third Amendment to the Social Media PPM, dated October 15, 2015, which numerous investors received stated:  "The Company has elected to raise an additional $9,000,000+[1] through the sale of an additional 2,500,000 shares of Series A Preferred Shares for the purposes of growth capital [sic] to execute on various initiatives including but not limited to a pending partnership with the Warner Music Group."   It also stated: "Due to the continued growth and subsequent opportunities, which have presented themselves to the Company, the Company continues to raise growth capital."   A copy of this Amendment is included within **Exhibit 8** attached hereto.

31.     A Fourth Amendment to PPM dated April 12, 2016, which numerous investors received, also states, "Due to the continued growth and subsequent opportunities [sic] which have presented themselves to the Company, the Company continues to raise growth capital."   A copy of this Amendment is included within **Exhibit 8** attached hereto.

32.     Some investors, including Investor A on October 2, 2014, Investor F on September 3, 2014, Investor G on February 24, 2015, and Investor K on March 1, 2016, received a written business plan for Collectors Café (the "Business Plan"), which was a separate document from the PPM that described Collectors Café's business.

---

[1] Earlier versions of this Third Amendment to the Social Media PPM stated 5,000,000 million not 9,000,000+.

33.     At least two versions of the Business Plan (one from 2014 and one from 2016) stated on the first page that "The offering presented in the PPM is for the General Purpose of increasing Operating Capital of the Company, in preparation for initial growth and launch of our website, national television shows and completion of the retail center and television studio at Ceasar's Palace." A copy of the 2014 Business Plan is attached hereto as **Exhibit 12**. A copy of the 2016 Business Plan is attached hereto as **Exhibit 13**.

34.     In an email to all investors dated April 23, 2016, that was drafted by Kontilai and sent out by his assistant, Collectors Café stated that it sought to raise money for "the specific upcoming growth initiatives (outlined below)," which were then described as the production and distribution of a native Chinese and Spanish language versions of the Collectors Café TV Series and a partnership with Warner Music Group. A copy of the email sent to investors is attached hereto as **Exhibit 14**.

35.     Kontilai told potential investors, including Investor C (during a web-ex presentation on or around February 6, 2015), Investor E (during phone calls on or around August 2016), and Investor H (orally prior to the investor's multiple investments in September 2016, April 2017, and April 2018), that he had personally invested $5 million in Collectors Café. Kontilai told other investors, such as Investor F (orally prior to his investment in September 2014), that he had invested a significant amount of his own money.

36.     On a phone call soliciting investors for additional investments on February 6, 2017, an agent for Collectors Café highlighted that Kontilai had invested $5 million initially.

37.     Kontilai told potential investors, including Investor F (orally prior to the investor's investment in September 2014) Investor H (orally prior to the investor's multiple investments in September 2016, April 2017, and April 2018) and Investor G (by email on

September 30, 2015), that he was not taking a salary.  In the email to Investor G, Kontilai wrote "I am very frugal and have not taken a dime of salary to date."

38.     In the SEC's investigation, Kontilai testified that he had signed an employment agreement in 2007 that entitled him to $300,000 for the first year of his service, and $500,000 a year thereafter.

39.     During the SEC's investigation, just a few days prior to his testimony, Kontilai through counsel, produced a copy of a document that purported to be an employment agreement between Kontilai and Collectors Café.  A copy of this document is attached hereto as **Exhibit 15**. The document was purportedly signed by Gail Holt, and the document identified Holt as Collectors Café's "Chairman."

40.     The purported employment agreement appears to be dated May 14, 2007, but also has a watermark on the last page that said "@2002-2018 LawDepot.com."  Months after Kontilai's testimony, counsel brought to the attention of the staff that the employment agreement had that watermark.

41.     To explain the watermark, counsel for Holt, with counsel for Collectors Café and Kontilai on the telephone line as well, told staff that the purported agreement had been "recreated" by Holt, whom Kontilai had asked for a copy of the agreement.  Counsel for Holt stated that Holt then went back to the same website she had used in 2007 to create the agreement when she was Chairman of the Board.

42.     In a subsequent interview, with new counsel for Holt and without counsel for Kontilai present, Holt told the staff that she was never Chairman of the Board, she did not recreate the purported employment agreement, and that the purported signature on the agreement

was not her signature. She also told the staff that Kontilai had previously been telling her what to say to counsel.

43. In the SEC's investigation, Kontilai testified that he had loaned $5 million to Collectors Café in 2007.

44. In response to the SEC staff's questions about certain large cash withdrawals from Collectors Café accounts, Kontilai further testified that he withdrew these funds to repay the purported loan made by himself to Collectors Café.

45. Some of those large cash withdrawals included notes that they were for collectibles purchases. However, during testimony, Kontilai confirmed that Collectors Café had not bought and did not own collectibles other than original contracts signed by Jackie Robinson (these are discussed more below).

46. During the SEC's investigation, just a few days prior to his testimony, Kontilai through counsel, also produced to the SEC staff a loan agreement purporting to document a $5 million loan to the Company. That loan agreement was purportedly signed by Gail Holt as Chairman of the Board and Kontilai. Attached to the loan agreement was a bank statement purporting to reflect the $5 million deposit into Collectors Café's account. A copy of this purported loan agreement is attached hereto as **Exhibit 16**.

47. The bank statement attached to the loan agreement appeared altered due to a number of inconsistencies on the face of the document.

48. The SEC staff obtained a copy of the original statement from the bank. A copy of the statement obtained from the bank is attached hereto as **Exhibit 17**. The statement produced by the bank shows only a $1000 deposit, not a $5 million deposit.

49. Holt also told the SEC staff that she had never seen the purported loan agreement between Kontilai and the Company and did not sign the loan agreement as Chairman of the Board.

50. In an apparent attempt to justify payments Collectors Café made to Holt, Kontilai also testified in the SEC's investigation that Holt came from a very wealthy family in Zimbabwe and she had loaned millions of dollars to Collectors Café. As set forth in the Declaration of Gail Holt attached to the SEC's Motion ("Holt Declaration"), neither Holt nor her family loaned any money to Collectors Café.

**Kontilai Misappropriated Investors' Money**

51. As part of our investigation, the SEC staff obtained business records including statements, deposits, credits, wire transfer, and account authority information for the following bank accounts of Collectors Café:

| Account Number Ending | Date Range of Account Statements |
|---|---|
| xxxxx6554 | 1/2013-12/2013 |
| xxxxx6602 | 1/2013-09/2013 |
| xxxxx3984 | 1/2013-06/2014 |
| xxxxxx5809 | 5/30/2014-7/31/2014 |
| xxxxxx5906 | 5/30/2014 - 7/31/2014 |
| xxxxxx1553 | 6/30/2014 - 7/31/2014 |
| xxxxx0389 | 8/8/2014-2/29/2016 |
| xxxxx2497 | 10/9/2015 - 2/29/2016 |
| xxxx8654 | 2/03/16 - 12/31/2017 |
| xxxx8662 | 2/03/2016 - 12/31/2017 |
| xxxx9887 | 10/20/2016 - 12/31/2017 |
| xxxxxx9528 | 03/31/2018 - 06/30/2018 |
| xxxxxx9081 | 03/09/2018 - 06/01/2018 |
| xxxxxx5255 | 5/21/2018 - 12/31/2018 |
| xxxxxx5298 | 5/21/2018 - 12/31/2018 |

52.     Kontilai was the sole authorized signatory on all of these accounts.

53.     As part of our investigation, the SEC staff obtained business records, including statements, deposits, credits, wire transfer, and account authority information for the following bank accounts of Gail Holt:

| Account Number Ending | Date range of account statements |
|---|---|
| xxxxxx3779 | 2/29/2012 - 3/25/2016 |
| xxxxxx4602 | 12/29/2012 - 10/26/2018 |
| xxxxxxxx1225 | 12/8/2012 - 12/9/2014 |
| xxxxxxxx4587 | 12/22/2012 -12/23/2014 |
| xxxxxx8572 | 4/9/2015-11/30/2015 |
| xxxxxx9069 | 3/2/2016 – 10/26/2018 |

54.     As part of our investigation, the SEC staff obtained business records, including statements, deposits, credits, wire transfer and account authority information for the following bank accounts of Kontilai:

| Account Number Ending | Date range of account statements |
|---|---|
| xxxxx6139 | 12/25/2012-06/24/2013 |
| xxxxx0435 | 8/27/2014 - 02/05/2016 |
| xxxxx1032 | 12/04/2014 – 09/30/2015 |
| xxx7289 | 03/26/2014-06/19/2014 |
| xxxxxx1375 | 8/8/2016-06/11/2018 |
| xxxxx9879 | 10/20/2016-1/6/2018 |
| xxxxxx4999 | 12/19/2017-05/29/2018 |

55.     I supervised a contract financial analyst employed by the Securities and Exchange Commission, Division of Enforcement to analyze the bank records received.

56.     Based upon the financial analyst's review and analysis of the Collectors Café bank accounts listed above, **approximately $2.1 million** in net cash was withdrawn from Collectors Café's bank accounts between April 1, 2014 and December 21, 2018.  A summary of these transactions prepared by the financial analyst at my instruction is attached hereto as **Exhibit 18.**

57.     Based upon the financial analyst's review and analysis of the Collectors Café bank accounts listed above, **approximately $1.9 million** was transferred to Mykalai Kontilai between April 1, 2014 and December 21, 2018.  A summary of these transactions prepared by the financial analyst at my instruction is attached hereto as **Exhibit 19**.

58.     Based upon the financial analyst's review and analysis of Collectors Café's and Holt's bank accounts and the Holt Declaration, **at least $5.5 million** was transferred from Collectors Café to Holt between the end of 2012 and July of 2018.  Between April 1, 2014 and December 20, 2018, Collectors Café transferred **approximately $2.1 million** to Holt**.**

59.     Based upon the financial analyst's review and analysis of Holt's bank accounts, Holt very quickly, within a matter of days, withdrew in cash withdrawals from tellers at bank branches an amount of money equal to what Collectors Café had transferred to her.  A summary of transactions from Collectors Café to Holt and corresponding large cash withdrawals from Holt's accounts based on the analysis that the financial analyst did is attached hereto as **Exhibit 20.**

60. As detailed in the Holt Declaration, she had not loaned Collectors Café any money and the millions of dollars that Collectors Café transferred to her was, in turn, handed back over to Kontilai.

61. Based on the financial analyst's review and analysis of Collectors Café's bank accounts, Collectors Café paid approximately $3.7 million for credit card charges between April 1, 2014 and December 21, 2018, the vast majority of which appear to have been made by Kontilai.

62. There were numerous obviously personal charges on Collectors Café's credit cards and transfers from Collectors Café's account.

63. These charges include paying rent on an oceanfront condo in Miami, tuition at a private Catholic school in Las Vegas, expenses at gentleman's clubs, stays at a luxury resort in Miami over New Year's Eve, and various personal items at high-end stores such as Chanel, Louis Vuitton, Saks Fifth Avenue, Cartier, and a Rolex boutique.

64. Based upon the financial analyst's review and analysis of Kontilai's bank accounts at my direction, Kontilai does not appear to have any source of regular income other than funds from Collectors Café.

**Misrepresentations Regarding Dealers Signed Up to Sell their Inventory On Collectors Café's Website**

65. Commissions from future sales of collectibles on Collectors Café's website was the main stated revenue driver for Collectors Café's business.

66. Kontilai told investors that Collectors Café would receive 20% from the buyer and 20% from the seller on all sales made through the Collectors Café auction website.

67. As described in the business plan,

"Through its online auction business, Collectors café will collect commissions, (approximately 20% from buyers and 20% from dealers/sellers) each time a collectible sells through our portal. Most importantly, this happens with NO COST OF GOODS. Collectors Café will also produce and sell limited edition replicates to an avid collectors base worldwide.

Collectors Café already has a massive inventory of exclusive collectibles and memorabilia under contract through its recognized, expert-master dealers. This inventory is "pre-authenticated," and "pre-insured" and ready for sale via the global website and national television shows, shipped directly from the master-dealers. This creates a tremendous profit center from buyer/seller commissions that could lead to hundreds of millions of dollars for the company and its shareholders in the very first year."

A copy of this business plan is attached hereto as **Exhibit 12**.

68. Because the business plan envisioned a TV show to drive viewers to the website, Collectors Café's profits would be driven by the transactions completed on its website. Accordingly, the anticipated volume of dealers and inventory committed to the website correlated directly with anticipated investor profit: profits increased with increases in dealers and inventory committed to the website. Increased profits and success would also increase the likelihood that another company would be interested in acquiring Collectors Café. The volume of dealers and inventory was thus important to the success of the Company and therefore important to potential investors.

69. Kontilai is on a video "sizzle reel" (a short video designed to promote Collectors Café that was on its website for a while and emailed to investors) stating that Collectors Café has a "master dealership made up of hundreds of dealers."

70. Kontilai told investors, including Investor B (orally in March 2015), Investor C (orally in or around February 2015), Investor E (orally in or around August 2016), and Investor I (orally in or around April 2016) that there was billions of dollars of inventory available on Collectors Café's website. Kontilai's oral representations regarding Collectors Café's inventory appear to have varied, and ranged from $2 billion to $4 billion.

71.     Kontilai also told some investors, including Investor A (orally in or around October 2014) and Investor E (orally in or around August 2016), that he had hundreds of dealers signed up.

72.     Kontilai also told investors, including Investors B (orally in March 2015) and E (orally in or around August 2016), that the dealers were signed up under 10 year contracts.

73.     In preparation for Collectors Café's so-called soft launch in 2016, three dealers signed a "basic dealer agreement" that expired within 180 days of execution and did not obligate the dealer to put any specific quantity of inventory on Collector Café's website.

74.     As of August 2018, only three dealers had ever posted inventory to Collectors Café's website, the website was not active at that time, and most of the inventory was non-exclusive inventory from one dealer who also had a physical store in New York City.

75.     In the SEC's investigation, Kontilai testified that Collectors Café had not signed up many dealers because it was waiting to launch the television show, and it would be too expensive to load all of the dealers items up and take pictures of all their items.

**Misrepresentations and Omissions Regarding Collectors Café's Interest in the Jackie Robinson Contracts**

76.     In 2013, Collectors Café acquired two baseball contracts signed by Jackie Robinson. These contracts include a contract Robinson signed with the minor league Montreal Royals in 1945 and a contract that he signed with the major league Brooklyn Dodgers in 1947.

77.     Collectors Café acquired these contracts for $2 million.

78.     In connection with the acquisition of these contracts, Collectors Café entered into six Series A Convertible Secured Promissory Notes (the "Series A Notes") (as amended) that totaled $4 million (which stated that the loan proceeds would be used for acquisition of the contracts and "working capital purposes").

79.     The following year, in 2014, Collectors Café entered into two Series B Secured Promissory Notes (the "Series B Notes") that totaled $2 million, which were payable upon the sale of the Jackie Robinson contracts.

80.     Under the terms of the Series A Notes, the holders of those notes are entitled to a return of 50% of any net proceeds from the sale of the Jackie Robinson contracts. Collectors Café is entitled to the other 50% of the net proceeds. Net proceeds is calculated as (a) the purchase price paid by an unrelated third party buyer for the contracts less (b) the Payoff Amount less (c) without duplication any principal, interest, default interest, fees and costs already paid under the Series A notes less (d) any reasonable expenses associated with the Contracts, but excluding the purchase price of the contract.

81.     Once Collectors Café receives its portion of the net proceeds, it must repay the Series B Notes.

82.     In addition to the Series A Notes and Series B Notes, Collectors Café has contracted to give three other parties a portion of its proceeds from any sale of the Jackie Robinson contracts.

83.     In the SEC's investigation, Kontilai testified that he believed the other parties that were contractually entitled to a portion of the proceeds were not entitled to any of the proceeds because they were in breach of contract.

84. In November 2013, Collectors Café obtained a letter from Christie's, a leading British auction house for auctions involving all areas of fine and decorative arts, jewelry, photographs, collectibles and more, stating that it would be willing to offer the Jackie Robinson contracts for private sale at a valuation of $25 million.

85. In late 2014 to early 2015, Collectors Café obtained an appraisal of the Jackie Robinson contracts for $36 million from Seth Kaller.

86. Collectors Café touted the Jackie Robinson contracts as a major asset of the Company.

87. In the Second Amendment to the Social Media PPM, the Company stated "The Company successfully concluded its second private capital raise in April of 2010. The Company has been fully funded to complete its final launch tasks since that date. It remains in a strong financial position with a positive cash position as well as having acquired a collectibles asset which has been appraised at $36,000,000. This asset was acquired at an undervalued price of $2,000,000 and is likely to generate millions of dollars of additional cash flow upon its liquidation in 2015." A copy of this amendment is included in **Exhibit 8** attached hereto.

88. On January 20, 2016, Kontilai received an Insurance Appraisal Report regarding the two Jackie Robinson contracts for $10 million that was prepared by Larry Lester, a confidential broker, authenticator and appraiser using final bids from several auction houses specializing in sports history and reference to high value historic documents.

89. Kontilai told at least two investors, Investor A (orally in or around October 2014) and Investor F (orally in or around August-September 2014), explicitly that their investment was "secured" or "protected" by the value of the Jackie Robinson contracts.

90. Another investor, Investor H, assumed that the value of the contracts protected his investment.

91. Prior to investors' investments in Collectors Café, Collectors Café and Kontilai did not disclose that Collectors Café would need to repay promissory notes in connection to the sale of the Jackie Robinson contracts, and it omitted disclosing that anyone else had an interest in proceeds of the sale of the Jackie Robinson contracts.

92. While the Second Amendment to the Social Media PPM disclosed that the "company in partnership with a separate investment made by some of its senior investors purchased the contracts" that disclosure omitted material information concerning Collectors Café's minority interest in proceeds from any sale of the Jackie Robinson contracts.

93. Investors have told the SEC staff that it would have been important to them to understand if Collectors Café was not entitled to all proceeds from the sale of the Jackie Robinson contracts.

**Current Sale of the Jackie Robinson Contracts and Kontilai's Assets**

94. On Monday, April 22, 2019, the SEC staff learned that final drafts of an Asset Purchase Agreement, a Bill of Sale, and a Supplement to Asset Purchase agreement had been circulated to all potential parties to such a sale.

95. Under the terms of the proposed deal, the sale price for the Jackie Robinson contracts is $7,975,000, which will be paid in two payments, the final of which will be made after certain conditions precedent are met, which include obtaining consents from Major League Baseball, the Los Angeles Dodgers, and the Jackie Robinson Foundation.

96. Under the terms of the proposed deal, Collectors Café and Kontilai would receive $1.5 million upon closing of the deal.

97.     In the SEC investigation, Kontilai testified that he personally is an avid collector and that he has a "vast, large collection of items that are actually insured for close to 9 million dollars right now. So I've had a personal collection for many years so it's items that I've been collecting."

98.     In the SEC investigation, Kontilai also testified that his personal items are stored in storage units that Collectors Café has used and that "over half" the storage units are used for his personal items.

**Current Contact Information for Kontilai and Collectors Café**

99.     In connection with his SEC testimony, Kontilai submitted a background questionnaire to the staff.  That background questionnaire was filled out by Kontilai and Kontilai testified that to the best of his recollection everything in the background questionnaire was true and complete.  The background questionnaire includes one Collectors Café business email addresses used by Kontilai and three personal email addresses that he currently uses.

100.    Collectors Café is currently represented by William Fleming, Esq.  The staff has Mr. Fleming's email address.

101.    Kontilai is currently represented by Edward Little, Esq.  The staff has Mr. Little's email address.


I declare under the penalty of perjury that the foregoing is true and correct.


Dated:  May 13, 2019                    _Jacqueline M. Moessner_
                                                          Jacqueline M. Moessner