TERRY R. MILLER
millerte@sec.gov
MARK L. WILLIAMS
williamsml@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>COLLECTOR'S COFFEE, INC. (d/b/a COLLECTORS CAFÉ), and MYKALAI KONTILAI,<br><br>Defendants, and<br><br>VERONICA KONTILAI,<br><br>Relief Defendant | **19-cv-04355-LGS-GWG**<br>**ECF CASE**<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL**<br>**DEMANDED** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), for its

Amended Complaint against defendants Collector's Coffee, d/b/a Collectors Café ("Collectors

Café"), Mykalai Kontilai (together with Collectors Café, the "Defendants") and relief defendant

Veronica Kontilai, alleges:

### SUMMARY OF ALLEGATIONS

1.       Mykalai Kontilai, through his entity Collectors Café, raised millions of dollars by

representing to investors that they would use the funds to develop a website for the auction of

collectibles such as sports memorabilia, as well as an affiliated social network and television show.

2.      Rather than using funds as the Defendants represented to investors, Kontilai misappropriated more than $6.1 million to fund his lavish lifestyle, funneling approximately $1.9 million to his personal bank accounts, and withdrawing another $4.2 million in cash. Kontilai actively tried to conceal his misappropriation from investors by funneling their money through his associate's bank accounts and from the SEC staff by fabricating documents.

3.      In addition to these cash withdrawals and transfers, Kontilai also misappropriated investor funds to purchase a variety of luxury goods and services (including from Chanel, Louis Vuitton, and Cartier), to pay gambling expenses, and to rent an oceanfront condo in Miami.

4.      Additionally, Collectors Café and Kontilai misrepresented to investors numerous material facts about Collectors Café's business, including Kontilai's improper use of investor funds, Kontilai's personal investment in Collectors Café, the number of dealers signed up to sell inventory on its online platform, and Collectors Café's interest in certain assets, including two original contracts signed by the legendary Jackie Robinson.

5.      As a result of Collectors Café and Kontilai's fraudulent conduct they were able to raise approximately $23 million from at least 140 investors since April 2014, at least one-quarter of which Kontilai misappropriated and used for personal expenses.

6.      While engaging in this fraudulent conduct, Collectors Café and Kontilai took actions to prevent investors from communicating directly with SEC about their securities laws violations. In at least two instances, Collectors Café and Kontilai attempted to resolve investor allegations of wrongdoing against them by conditioning the return of investor money on the

2

agreement of the investors to confidentiality clauses prohibiting the investors from communicating with law enforcement, including the SEC, about the alleged securities law violations. In one of these instances, Collectors Café and Kontilai even went so far as to file a lawsuit claiming that the victims breached the confidentiality provision by communicating with SEC staff about possible securities law violations. Collectors Café and Kontilai sought punitive and compensatory damages in that action, including repayment of the money paid to settle claims of securities fraud. Collectors Café and Kontilai then flaunted to other investors the fact that they had sued investors for communicating with the SEC.

7.      Following the filing of the SEC's action in May 2019, Collectors Café and Kontilai have continued to misrepresent to investors material facts about Collectors Café's business and the reasons why Kontilai took money from the company for personal expenses, including continuing to tell investors that he loaned Collector's Café millions of dollars in the late 2000s when, in reality, he never lent the company money.

8.      Finally, Relief Defendant Veronica Kontilai received illicit funds from Collectors Café and Kontilai to which she has no legitimate claim.  Specifically, she received from Collectors Café and Mykalai Kontilai over $300,000 of investor funds that she used for personal expenses.

## SUMMARY OF VIOLATIONS

9.      As a result of the conduct described herein, Defendants Collectors Café and Kontilai obtained money or property on the basis of false and misleading statements and omissions, and made material false and misleading statements and omissions. Accordingly, Collectors Café and Kontilai have violated and, unless restrained and enjoined, will continue to

3

violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

10.    As a result of the conduct described herein, Defendants Collectors Café and

Kontilai engaged in a scheme to defraud and have violated and unless restrained and enjoined

will continue to violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and

(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c)

thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

11.    As a result of the conduct described herein, Defendants Collectors Café and

Kontilai took actions to impede individuals from communicating directly with SEC staff about

possible securities law violations, including by enforcing and threatening to enforce

confidentiality agreements with respect to such communications.  These defendants have thereby

violated, and unless restrained and enjoined will continue to violate, Rule 21F-17 of the

Exchange Act [17 C.F.R. § 240.21F-17].

12.    As a result of the conduct described herein, Veronica Kontilai received illicit

proceeds from the fraud of Collectors Café and Mykalai Kontilai to which she has no legitimate

claim and under circumstances in which it is not just, equitable, or conscionable for her to retain

the funds or assets, and therefore has been unjustly enriched.

### NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

13.    The SEC brings this action pursuant to the authority conferred upon it by Section

20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b)] and Section 21(d) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The SEC seeks

preliminary and permanent injunctions against Collectors Café and Mykalai Kontilai, enjoining

them from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)],

Rules 10b-5 [17 C.F.R. § 240.10b-5] and 21F-17 [17 C.F.R. § 240.21F-17] promulgated

thereunder and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], disgorgement of all ill-

gotten gains from activity set forth in this Amended Complaint, together with prejudgment

interest, and civil penalties pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. §

77t(d)(1)] and Section 21(d)(3)(A) [15 U.S.C. § 78u(d)(3)(A)] of the Exchange Act.

14.     The SEC seeks a final judgment ordering Veronica Kontilai to disgorge ill-gotten

gains held in her accounts or otherwise received by her, and to pay prejudgment interest thereon.

## **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), and 27

of the Exchange Act [15 U.S.C. §§ 78u(d), and 78aa].

16.     Defendants, directly or indirectly, made use of the means or instruments of

transportation or communication in interstate commerce, the means and instrumentalities of

interstate commerce, or of the mails, in connection with the acts, practices, and courses of

business set forth in this Amended Complaint.

17.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act and

Section 27(a) of the Exchange Act. Defendant Collectors Café is a private company founded,

owned, and controlled by Defendant Kontilai with a principal place of business in this District,

and many of the acts, practices, transactions, and courses of business alleged in this Amended

Complaint occurred within this District.

18.     On or about April 1, 2019, the SEC, Collectors Café and Mykalai Kontilai entered into a tolling agreement tolling conduct back to April 1, 2014.

## DEFENDANTS

19.     **Collector's Coffee** (d/b/a Collectors Café), is a private company founded, owned, and controlled by Kontilai with its principal place of business in New York, New York. The Company was incorporated in California on or about May 14, 2007 (as Ultimate Collector Inc.), and subsequently reorganized as a Nevada C corporation via merger on or about February 22, 2008.

20.     **Mykalai Kontilai** (f/k/a Michael Contile), age 49, resides in Las Vegas, Nevada. He is the founder, president, and chief executive officer of Collectors Café. Kontilai owns 100 percent of the voting shares of Collectors Café.

## RELIEF DEFENDANT

21.     **Veronica Kontilai**, age 46, resident of Miami, Florida, purports to be Mykalai Kontilai's wife. Veronica Kontilai has no employment or other professional involvement in Collectors Café's business.

## FACTS

I.     **Mykalai Kontilai Raised Money From Investors for Collectors Café.**

22.     Collectors Café was incorporated in or around 2007 with a business plan to build brick-and-mortar coffee houses at which collectors would congregate and have the ability to purchase collectibles.

23.     In or around 2009, Collectors Café moved away from its plan to build coffee houses because of the associated costs with retail stores. Collectors Café's business plan then evolved to its current plan, which involves the creation of an online website for collectibles and

an associated television show. Collectors Café has described its website as a combination of an auction site and a social networking site.

24.    Between 2007 and 2013, Collectors Café raised approximately $3.75 million from investors from the sale of convertible promissory notes and Series A Preferred shares. In 2013, Collectors Café raised $4 million through Series A Convertible Notes ("Series A Notes"). Then, from approximately April 2014 through approximately December 2018, Collectors Café raised approximately $21 million from the sale of Series A Preferred shares and Series B preferred shares and $2 million from Series B Promissory Notes (collectively, the "Collectors Café Offerings").

25.    Collectors Café and Kontilai used multiple offering documents when raising funds pursuant to the Collectors Café Offerings.  In particular, Collectors Café raised money from investors through at least two different versions of a Private Placement Memorandum ("PPM"), each dated April 28, 2008.

26.    One version of the PPM was created when Collectors Café intended to build coffee houses where collectors would meet (the "Coffee House PPM"). Defendants used the Coffee House PPM with investors prior to 2014, and at least two investors in 2014 received versions of this PPM.

27.    A second version of the PPM (the "Social Media PPM") is also dated April 28, 2008, but was updated and shortened after Collectors Café moved its business plan away from constructing coffee houses.

28.     Defendants used the Social Media PPM, as modified by amendments dated February 1, 2015, October 15, 2015, April 12, 2016, and January 1, 2017, with investors who invested from 2015 forward.

II.    **Collectors Café and Kontilai Made False, Fraudulent, and Material Misrepresentations and Omissions in Connection with the Collectors Café Offerings.**

29.     In raising funds from investors pursuant to the Collectors Café Offerings, Defendants Kontilai and Collectors Café made numerous written and oral material false and misleading statements and omissions regarding, among other things, the use of investor proceeds, Kontilai's investment in Collectors Café, the number of dealers and amount of inventory on Collectors Café's website, and the extent of Collectors Café's ownership of the Jackie Robinson baseball contracts along with their value.

A.    **Material Misrepresentations and Omissions Regarding Kontilai's Use of Investor Funds.**

30.     Defendants Collectors Café and Kontilai made material misrepresentations and omissions regarding the use of investor proceeds that were misappropriated by Kontilai.

31.     Throughout the Collectors Café Offerings, by way of written documents and disclosures sent to investors as well as oral communications made to investors, Collectors Café and Kontilai represented to investors that it would use investor funds to pursue its stated business plan.

32.     Throughout the Collectors Café Offerings, the written materials provided to investors and potential investors described the intended use of investors' money and did not disclose the type and magnitude of Kontilai's personal use of their money:

8

a.  Collectors Café's standard practice with potential investors was to give them a high level overview of the Company, then set up a Web-Ex through which investors could see a mock-up of the website, and then to send them offering documents, including either the Coffee House PPM or the Social Media PPM, if the investors were interested in investing.

b.  Prior to receiving a PPM, some investors, including Investors A-E, received demonstrations of Collectors Café's proposed website.

c.  Some investors, including Investor A on or about October 2, 2014, Investor F on or about September 3, 2014, Investor G on or about February 24, 2015, and Investor K on or about March 1, 2016, received a written business plan for Collectors Café ("Business Plan").

d.  At least two versions of Collector Café's Business Plan (one from 2014 and one from 2016) stated, "The offering presented in the PPM is for the General Purpose of increasing Operating Capital of the Company, in preparation for initial growth and launch of our website, national television shows and completion of the retail center and television studio at Caesar's Palace."

e.  In an email to all investors dated April 23, 2016, which was drafted by Kontilai and sent out by his assistant on behalf of Collectors Café, Kontilai and Collectors Café stated that it sought to raise money for "the specific upcoming growth initiatives (outlined below)," which were then described as the production and distribution of a Chinese and Spanish language version of the Collectors Café TV Series and a partnership with Warner Music Group.

33.     These representations were false when made because Kontilai always intended to use investors' money for personal use, did use investors' money for personal use, and ultimately misappropriated more than 25% of the money raised, including $6.1 million in cash in addition to extravagant charges on Collectors Café's credit cards.

34.     In fact, from at least 2014 forward, Kontilai had no source of personal income other than misappropriating investor money.

35.     The monies misappropriated by Kontilai were not salary nor compensation, as there is no employment agreement between Kontilai and Collectors Café that permitted Kontilai to draw a salary or other form of compensation.

36.     Moreover, in order to induce investments, and mislead investors and potential investors into believing their investments would be used to further Collector Café's stated business goal, Collectors Café and Kontilai told investors that Kontilai did not, and would not, take a salary or other compensation from Collectors Café:

a.  Kontilai told potential investors, including Investor F (orally prior to the investor's investment in or around September 2014), Investor H (orally prior to the investor's multiple investments in or around September 2016, April 2017 and April 2018), and Investor G (by email on or about September 30, 2015), that he was not taking a salary or being compensated.

b.  In the email to Investor G dated September 30, 2015, Kontilai wrote "I am very frugal and have not taken a dime of salary to date."

c. On a phone call soliciting investors for additional investments on or about February 6, 2017, an agent on behalf of Collectors Café and, on information and belief, under the direction of Kontilai, highlighted that Kontilai had not taken a salary in over 10 years.

37. The investor funds misappropriated by Kontilai were also not loan repayments, as Kontilai did not loan money to Collectors Café, there were no loan agreements that permitted Kontilai to make loan repayments to himself from Collectors Café, nor was it disclosed to investors that their funds would be used to repay Kontilai for purported loan(s) he made to Collectors Café.

38. As described more fully below, on or about May 14, 2018, Kontilai misrepresented to the SEC staff that money he misappropriated from Collectors Café was in fact legitimate transfers of money to repay Kontilai for obligations owed to him by Collectors Café. In support of his assertions, Kontilai knowingly created and presented the SEC staff with fabricated documents (an employment agreement, loan agreement, and bank statement) in an effort to mislead the SEC and further conceal his misappropriation of investor funds.

39. A reasonable investor would have understood from Collector Café's disclosures and Defendants' statements that Kontilai's personal use of investors' funds was not an intended use of their investments.

40. Each of the above disclosures and representations regarding Collector Café's use of investor proceeds were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the intended use of investors' money were false and misleading.

41.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding Collector Café's use of investor proceeds not misleading.

42.    The above misrepresentations and omissions as to use of investor proceeds were material to investors and potential investors because, among other things, they believed their investments would be used to further the stated business goal in order to create profits and a return on their investment, and because the company money used for personal purposes by Kontilai would necessarily decrease the amount of money available to Collectors Café to effectuate its business plan.

**B.    Material Misrepresentations and Omissions Regarding Kontilai's Personal Investment in Collectors Café.**

43.    Defendants Collectors Café and Kontilai made material misrepresentations and omissions with respect to Kontilai's personal investment (or lack thereof) in Collector's Café.

44.    Throughout the Collectors Café Offerings, Collectors Café and Kontilai represented to investors and potential investors, including Investor C (during a web-ex presentation on or about February 6, 2015), Investor E (during phone calls in our about August 2016), and Investor H (orally prior to the investor's multiple investments in or around September 2016, April 2017 and April 2018), that he had personally invested $5 million in Collectors Café.  Kontilai told other investors, such as Investor F (orally prior to his investment in or around September 2014), that he had invested a significant amount of his own money.

45.    On a phone call soliciting investors for additional investments on or about February 6, 2017, an agent on behalf of Collectors Café and, on information and belief, under the direction of Kontilai, highlighted that Kontilai had invested $5 million in Collectors Café.

46.    Each of the above representations regarding Kontilai's investment in Collectors Café was false and misleading because Kontilai did not invest (nor loan) $5 million to Collectors Café, nor did Kontilai invest or loan a significant amount of his own money to Collectors Café.

47.    In fact, as alleged above and more fully described below, in an effort to mislead the SEC and conceal his fraud, Kontilai created and produced to the SEC a fabricated loan agreement purporting to document a $5 million loan to the company.

48.    A reasonable investor would have understood from Collectors Café's disclosures and Defendants' statements that Kontilai invested $5 million of his own money into Collectors Café and that that money was available to Collectors Café to use to further its business plan, served as an incentive to Kontilai to successfully follow through on its business plan, and validated Kontilai's confidence in the future success of the business.

49.    Each of the above disclosures and representations regarding Kontilai's investment in Collector's Café were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning Kontilai's investment in Collectors' Café were false and misleading.

50.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding Kontilai's investment in Collectors' Café not misleading.

51.    The above misrepresentations and omissions as to Kontilai's investment in Collectors' Café were material to investors and potential investors because, among other things, it indicated that $5 million had been made available to Collectors Café by Kontilai to further its business plan, that Kontilai was strongly incentivized to successfully follow through on

Collectors' Cafe business plan since his own money was at risk, and that Kontilai was in fact

confident in the future success of the business because he invested a significant amount of

money into Collectors Café.

       **C.**     **Material Misrepresentations and Omissions Regarding Dealers and Inventory on Collectors Café's Website.**

     52.     Defendants Collectors Café and Kontilai made material misrepresentations and

omissions with respect to the number of dealers and the amount of inventory on Collector Café's

website.

     53.     Collectors Café and Kontilai represented to investors in the Collectors Café

Business Plan that Collectors Café would receive 20% from the buyer and 20% from the seller

on all sales made through the Collectors Café auction website.  These commissions from future

sales of collectibles on Collectors Café's website was the main stated revenue driver for

Collectors Café's business.

     54.     Throughout the Collectors Café Offerings, Collectors Café and Kontilai touted

that a large number of dealers were committed to sell a large volume of inventory of collectibles

on Collectors Café's website:

    a.    Kontilai stated in a short video designed to promote Collectors Café that was on its

        website and emailed to numerous investors that Collectors Café had a "master dealership

        made up of hundreds of dealers."

    b.    Kontilai represented to investors, including Investor B (orally in or around March 2015),

        Investor C (orally in or around February 2015), Investor E (orally in or around August

        2016) and Investor I (orally in or around April 2016) that there was billions of dollars of

        inventory available on Collectors Café's website.

c.  Kontilai told some investors, including Investors A (orally in or around October 2014) and Investor E (orally in or around August 2016), that he had hundreds of dealers signed up.

d.  Kontilai also told investors, including Investor B (orally in or around March 2015) and Investor E (orally in or around August 2016), that the dealers were signed up under 10 year contracts.

55.    These statements were false and misleading.  In reality, in preparation for Collectors Café's so-called soft launch in 2016, three dealers had signed a "basic dealer agreement" that expired within 180 days of execution and did not obligate the dealer to put any specific quantity of inventory on Collector Café's website.

56.    As of August 2018, only three dealers had ever posted inventory to Collectors Café's website, the website was not active at that time and most of the inventory was non-exclusive inventory from one dealer who also had a physical store in New York City. Inventory sold through that dealer's store or on his own website would not result in a commission for Collectors Café.

57.    At the time of these representations, Collectors Café and Kontilai knew that Collectors Café had not signed up anywhere near the number of dealers they were representing and further knew that it would have been prohibitively expensive to do so, as Collectors Café would have been responsible for hiring photographers to take photographs of the dealers' items, drafting descriptions and cataloging the items, and then uploading this information onto its website.

58.    A reasonable investor would have understood from Collector Café's disclosures and Defendants' statements that hundreds of dealers had agreed to post a large amount of collectibles on Collectors Café's website worth upwards of a billion dollars, that the anticipated volume of dealers and inventory committed to the website correlated directly with anticipated investor profit, and that the increased profits and success would increase the likelihood that a large company would be interested in acquiring Collectors Café.

59.    Each of the above disclosures and representations regarding the volume of dealers and inventory committed to Collectors Café's business were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the volume of dealers and inventory committed were false and misleading.

60.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the volume of dealers and inventory committed to Collectors Café's business not misleading.

61.    The above misrepresentations and omissions as to the volume of dealers and inventory committed to Collectors Café's business were material to investors and potential investors because, among other things, the volume of dealers and inventory committed to Collectors Café's business was directly tied to the future profits and success of the company.  In fact, it was the expected high volume of sales of collectibles on Collectors Café's website that Kontilai touted to bring Collectors Café a profit.

**D.**    **Material Misrepresentations and Omissions Regarding the Jackie Robinson Contracts.**

62.    Defendants Collectors Café and Kontilai made material misrepresentations and omissions with respect to the ownership and valuation of baseball contracts signed by Jackie Robinson.

63.    Collectors Café and Kontilai represented to investors and potential investors that (i) Collectors Café owned contracts signed by Jackie Robinson; and (ii) the contracts had been appraised at $36 million. Defendants representations were false and misleading and omitted material facts necessary to render these statements not false and misleading, because (i) Collectors Café did not own a 100% interest in the contracts and was not entitled to all proceeds from the sale of the contracts; and (ii) there was substantial doubt about the $36 million valuation, including an appraisal of $10 million that was provided to Collectors Café and Kontilai.

64.    Collectors Café acquired the two baseball contracts signed by Jackie Robinson in or around 2013: a contract Robinson signed with the minor league Montreal Royals in 1945 and a contract that he signed with the major league Brooklyn Dodgers in 1947.  Collectors Café acquired these contracts for approximately $2 million.

65.    Collectors Café touted the Jackie Robinson contracts as a major asset of the company:

a.    In the Second Amendment to the Social Media PPM, the Company stated "The Company successfully concluded its second private capital raise in April of 2010.  The company has been fully funded to complete its final launch tasks since that date.  It remains in a strong financial position with a positive cash position as well as having acquired a

17

collectibles asset which has been appraised at $36,000,000.  This asset was acquired at an undervalued price of $2,000,000 and is likely to generate millions of dollars of additional cash flow upon its liquidation in 2015."  The Social Media PPM was provided to most investors who invested after 2014 with at least 100 investors having received it.

b.  Kontilai represented to at least two investors – Investor A (orally in or around October 2014) and Investor F (orally in or around August-September 2014) – that their investment was "secured" or "protected" by the valuation of the Jackie Robinson contracts.

c.  Kontilai led another investor, Investor H, to believe that the value of the Jackie Robinson contracts protected his investment by describing the contracts as a tangible asset of the company that had not yet earned revenue.

66.    These statements were false and misleading.  In reality, Collectors Café only owned a fraction of the Jackie Robinson contracts, was only entitled to a fraction of the proceeds from the sale of the contracts and the sale of the contracts was expected to be for far less than $36 million.

67.    Defendants representations that Collectors Café owned the Jackie Robinson contracts were false and misleading and omitted material facts, because Collectors Café did not own a 100% interest in the contracts and was not entitled to 100% of the proceeds from their sale:

a.  In connection with the acquisition of these contracts in 2013, Collectors Café entered into six "Series A Notes" (as amended) that totaled $4 million and stated that the loan proceeds would be used for acquisition of the contracts and "working capital purposes."

b. Under the terms of the Series A Notes, the holders of those notes are entitled to a return of 50% of any net proceeds from the sale of the Jackie Robinson contracts. Net proceeds is calculated as (a) the purchase price paid by an unrelated third party buyer for the contracts less (b) the payoff amount of the Series A Notes less (c) without duplication any principal, interest, default interest, fees and costs already paid under the Series A notes less (d) any reasonable expenses associated with the contracts, but excluding their purchase price.

c. The following year, in 2014, Collectors Café entered into two Series B Secured Promissory Notes (the "Series B Notes") that totaled $2 million, which were payable upon the sale of the Jackie Robinson contracts.

d. Once Collectors Café receives its portion of the net proceeds, it must repay the Series B Notes.

e. In addition to the Series A Notes and Series B Notes, Collectors Café has contracted to give three other parties a portion of the proceeds.

68.     Additionally, by no later than January 20, 2016, Defendants representations about the $36 million valuation were false and misleading and omitted material facts, because Kontilai had credible information indicating that the contracts were worth much less than $36 million:

a. On January 20, 2016, Kontilai received an Insurance Appraisal Report regarding the two Jackie Robinson contracts that was prepared by a confidential broker, authenticator and appraiser using final bids from several auction houses specializing in sports history and reference to high value historic documents.

b. This report values the Jackie Robinson contracts at $10 million.

    c.   The confidential broker, authenticator and appraiser disclosed to Kontilai that he was receiving pushback for even a $10 million valuation.

69.    Neither Collectors Café nor Kontilai disclosed to investors or prospective investors that the $36 million valuation likely overvalued the contracts, or that on or about January 20, 2016, that they received an Insurance Appraisal Report valuing the Jackie Robinson contracts for only $10 million, or that they were told that there was resistance to even a $10 million valuation.

70.    On information and belief, Kontilai was aware that the $36 million appraisal of the Jackie Robinson contracts overvalued the asset by a significant amount at the time of the appraisal and prior to receiving the $10 million appraisal.  In fact, the overvaluation of the Jackie Robinson contracts was not only confirmed by the subsequent $10 million appraisal described above, but further borne out when the individual who appraised the contracts for $36 million offered to buy the contracts for less than $8 million, which Defendants appear to have accepted. The final documents for this sale were recently circulated to all parties for execution.  Because of Collector Café's fractional ownership and duty to repay promissory notes, it is expected to receive less than $2 million.

71.    A reasonable investor would have understood from Collector Café's and Kontilai's disclosures and statements about the ownership interest of the Jackie Robinson contracts that Collectors Café owned 100% of the contracts, were entitled to 100% of the proceeds from any sale of the contracts, and expected to receive $36 million upon the sale of the contracts.

72.     Each of the above disclosures and representations regarding the ownership and valuation of the Jackie Robinson contracts were false when made, and Defendants knew, were reckless in not knowing, or should have known, that their statements concerning the ownership and valuation of the Jackie Robinson contracts were false and misleading.

73.     Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the ownership and valuation of the Jackie Robinson contracts not false and misleading.

74.     The above misrepresentations and omissions as to the ownership and valuation of the Jackie Robinson contracts were material to investors and potential investors because, among other things, the value of Collectors Café's assets safeguarded investors against the potential failure of the company, and because it would be important to investors to understand that Collectors Café would receive substantially less than $36 million upon the sale of the contracts.

**E.     Collectors Café and Kontilai Are Each Liable for Their Misstatements and Omissions.**

75.     All of the misrepresentations and omissions detailed above were made in connection with the offer, purchase, or sale of securities issued by Collectors Café.

76.     Collectors Café and Kontilai both obtained money by means of the misrepresentations and omissions detailed above.

77.     Kontilai made or directed each misrepresentation and omission detailed above.

78.     Kontilai determined the content of and had ultimate authority over the PPMs, as well as marketing materials, internet websites, and other documents and emails used to solicit

prospective investors. Kontilai had sole control of Collectors Café, and he personally made the oral representations detailed above.

79.     Similarly, Collectors Café made the representations Kontilai made. Kontilai had authority to make representations on behalf of Collectors Café, and did in fact make representations on behalf of Collectors Café.

80.     At all times, Collectors Café and Kontilai acted with the requisite scienter.

**III.    Collectors Café and Kontilai Engaged in a Scheme to Defraud Investors.**

81.     From no later than April 2014 through the present, Collectors Café and Kontilai engaged in a scheme to defraud the Collectors Café investors, and engaged in numerous acts, practices or courses of business that defrauded the Collectors Café investors. Acts in furtherance thereof include the false and misleading statements, omissions, and other conduct described above, and the acts described below.

**A.    Concealment of Misappropriation of Investor Funds**

82.     Despite the representations that Collectors Café would use investor money to fund specific aspects of the business and did not allow for Kontilai to use investor funds to pay personal expenditures and fund his lavish lifestyle, and despite Kontilai's representations that he was "very frugal" and was not even taking a salary, Kontilai misappropriated at least $6.1 million from Collectors Café in the form of cash withdrawals and transfers to Kontilai's personal accounts. Kontilai used these funds for personal expenses.

83.     Kontilai attempted to conceal many of these transfers by running investor funds through bank accounts of his associate.

84.     In or around 2012, Kontilai asked his associate, G.H., to set up a bank account in her name.  Kontilai told G.H. that he planned to transfer money into the account and then direct her to withdraw money from the account in cash and provide it to him.

85.     Kontilai instructed G.H. that, if a bank employee asked questions about the cash withdrawals, G.H. was to tell the bank employee that she was a consultant to Collectors Café and that the money was for the purchase of collectibles, which could be acquired at a better price if cash was used.

86.     This instruction was intended to conceal, and further, Defendants' fraudulent scheme because Collectors Café and Kontilai knew at the time of instructing G.H. to open the bank accounts, through the time of directing the withdrawals of cash, that Collectors Café would not purchase collectibles with the funds.

87.     G.H. opened a new bank account at Kontilai's instruction on March 14, 2012.

88.     From 2012 to 2014, Kontilai obtained investors' money in the form of cash in the following manner:

a.  Kontilai directed transfers of funds invested with Collectors Café to G.H.'s accounts;

b.  Shortly after a deposit of investor money into G.H.'s account, G.H. withdrew the same amount by visiting bank branches in person. Kontilai accompanied G.H. in nearly every instance when she withdrew the money.

c.  Kontilai directed G.H. to immediately give the cash to Kontilai after it was withdrawn and G.H. complied.

d.  Between approximately the end of 2012 through March 2014, approximately $3.3 million was pilfered in this manner. Between April 1, 2014 and December 20, 2018, Collectors Café transferred approximately $2.1 million to Kontilai via G.H's accounts.

89.    In or around July 2018, Kontilai told G.H. that he again needed help to transfer cash to himself from Collectors Café. Kontilai told his associate that he needed the money to maintain his lifestyle and that because of an investigation by the SEC, it would not look good if Kontilai withdrew the money himself.

90.    On or about July 10, 2018, Kontilai, through Collectors Café, transferred $250,000 to G.H.'s personal account ("Bank Account 1").

91.    On or about July 11, 2018, G.H. obtained a cashier's check from the same bank account for $250,000. G.H. delivered the check to Kontilai at his apartment in New York City.

92.    On or about July 11, 2018, Kontilai requested that G.H. use her account from another bank ("Bank Account 2") to receive transfers from Collectors Café. On or about the same day, at the direction of Kontilai, the $250,000 cashier's check from Bank Account 1 was deposited in Bank Account 2.

93.    Kontilai also instructed G.H. to open an account at a separate bank, ("Bank Account 3") to receive transfers from Collectors Café.

94.    On or about July 11, 2018, in addition to the $250,000 cashier's check deposited into Bank Account 2, Kontilai transferred $375,000 into Bank Account 2 and an additional $375,000 into Bank Account 3. These funds, belonging to Collectors Café, were subsequently misappropriated by Kontilai.

95.    In addition to withdrawing cash at the direction of Kontilai from the accounts to which he had transferred Collectors Café funds, Kontilai instructed G.H. to use the money he had transferred into the accounts to purchase gold bars online that were delivered to her apartment in New York.

96.    At Kontilai's direction, G.H. turned over all the gold bars to Kontilai.

97.    Kontilai then sold the gold bars for cash.

98.    Kontilai also used Collectors Café's credit cards and transfers from Collectors Café's account for personal expenses.

99.    These charges include rent on an oceanfront condo in Miami, tuition at a private school in Las Vegas, expenses at gentleman's clubs, stays at a luxury resort in Miami over New Year's Eve, and various personal items at high-end stores such as Chanel, Louis Vuitton, Saks Fifth Avenue, Cartier, and Rolex.

100.    Kontilai never disclosed to any of his investors or prospective investors that money he received from the sale of Collectors Café securities would be used for anything other than the Collectors Café business, much less that he would use investor money to fund his lavish lifestyle.

**B.    Fabrication of Documents**

101.    In furtherance of his scheme to misappropriate and misuse investor money, and to conceal and obfuscate his scheme from the SEC and others, Kontilai fabricated multiple documents with the intent to create the appearance that transfers from Collectors Café to himself were legitimate.

102.    On May 14, 2018, Kontilai produced to the SEC a fabricated employment agreement that purportedly provided Kontilai the right to a salary from Collectors Café.

103.    The purported employment agreement provided to the SEC was backdated, and contains a forged signature of G.H. (who was involved in the cash transfers as described above) that misidentified her as "Chairman of the Board."

104.    G.H. never signed this purported employment agreement and never served as "Chairman of the Board."

105.    Kontilai knew the copy of the purported employment agreement produced to the SEC was fabricated at the time he produced it to the SEC.

106.    Kontilai produced the fabricated copy of the purported employment agreement to the SEC with the intent to mislead the SEC and others into believing that Collectors Café was contractually obligated to pay funds to Kontilai.

107.    Kontilai also produced to the SEC a copy of a loan agreement purporting to document a $5 million loan from Kontilai to Collectors Café.  That loan agreement was purportedly signed by Kontilai and G.H., and again misidentified G.H. as Chairman of the Board.

108.    Kontilai attached to the loan agreement a bank statement purporting to reflect the $5 million deposit into a Collectors Café's account in an effort to corroborate his claim that he leant Collectors Café $5 million.

109.    The Collectors Café bank statement produced to the SEC is a fabricated document. The actual bank statement reflects a deposit of $1,000 into the account of Collectors

Café, not $5 million. Kontilai altered the bank statement and provided the altered version to the SEC.

**IV.    Kontilai and Collectors Café Took Actions to Impede Investors from Communicating with SEC Staff.**

110.    In 2015 and 2017 certain investors asserted alleged that Collectors Café and Mykalai Kontilai were engaged in fraud.

111.    Collectors Café and Mykalai Kontilai responded to allegations of fraud by, among other things, drafting, creating, and signing a 2015 Stock Purchase Agreement ("2015 SPA") and a 2017 Settlement Agreement ("2017 Settlement Agreement") that contained explicit provisions impeding investors from communicating with the SEC.

**A.    Collectors Café and Mykalai Kontilai Paid Investors Money on Condition That They Refrain From Communicating With Law Enforcement.**

112.    In 2015, Collectors Café investors communicated concerns about their investments and the progress of Collectors Café in relation to claims by Kontilai that the company would launch in early 2015.

113.    In an email sent to Kontilai on July 30, 2015, one of these investors confronted Kontilai about representations he made about the company with, among other things, the following: "What happened to that 25 million artifact? Did you get a buyer? Why do you say one thing and not really follow through? …. You are not a person of integrity. You are not a person of honesty. You don't tell the truth."

114.    In October 2015, Kontilai arranged for those investors' shares in Collectors Café ostensibly to be repurchased by his sister-in-law. The investors sold their shares of Collectors

Café stock purportedly to Kontilai's sister-in-law for a purchase price of $50,000 pursuant to the

2015 SPA, dated October 8, 2015.

115.    Collectors Café was a party to the 2015 SPA, and Kontilai signed the agreement

on behalf of the company.

116.    The 2015 SPA states the following:

> "[Investors] . . . warrant and affirm that they have not, directly or
> indirectly, individually, collectively or otherwise, as of the date of
> execution of this Agreement, contacted any third-party, including but not
> limited to governmental or administrative agencies or enforcement
> bodies, for the purpose of commencing or otherwise prompting
> investigation or other action relative to [Collectors Café] or the subject
> herein**. [Investors] … further warrant and affirm that. . . they will
> not, directly or indirectly, individually, collectively or otherwise,
> contact any third-party, including, but not limited to governmental
> or administrative agencies or enforcement bodies, for the purpose of
> commencing or otherwise prompting investigation or other action
> relative to [Collectors Café] or the subject matter herein.** The parties
> agree that the terms of this provision are not designed or intended to
> accomplish any improper purpose, but rather, are included as material
> consideration in light of the time and expense which could be incurred
> by all parties, if investigation or other third-party action were to arise
> regarding the subject matter herein…." (Emphasis added.)

117.    The SEC is a governmental agency that investigates the type of misconduct raised

by the investors prior to execution of the 2015 SPA.

**B.    Collectors Café and Mykalai Kontilai Agreed To Resolve Allegations of
Fraud on Condition That Investors Refrain From Communicating With The
SEC.**

118.    In March 2017, two investors sent Collectors Café a letter alleging that Collectors

Café made material misrepresentations and omissions that supported claims under the antifraud

provisions of the federal securities laws, and sought return of their investment from Collectors Café, interest, and attorney fees.

119.    Collectors Café did not repay the investors, and on May 18, 2017, the investors filed a lawsuit against Collectors Café alleging securities fraud, among other things (the "2017 Investor Case").

120.    On June 26, 2017, Collectors Café, Kontilai, and the two investors entered into a confidential settlement agreement to resolve the 2017 Investor Case ("Settlement Agreement").

121.    The Settlement Agreement states:

> "The Shareholders, for themselves and their counsel and advisors, confirm that they are not aware of, and have not had to date, and **will not initiate on a going forward basis, any communications with any regulatory agencies such as the United States Securities and Exchange Commission or any other Federal, State, or Local governmental agency concerning the matters related to this Agreement**. Nothing herein would prevent the parties from responding to, and/or fully complying with, a subpoena or other governmental and or regulatory compulsory process." (Emphasis added.)

122.    The Settlement Agreement provided for the return of the investors' principal investment in Collectors Café in three payments over a year: $750,000 by June 27, 2017; $384,375 by December 27, 2017; $393,750 by June 27, 2018.

123.    On June 27, 2017, Kontilai made the initial payment of $750,000 to the investors.

124.    At or around the time the parties were executing the Settlement Agreement, SEC staff contacted the investors' counsel to obtain information regarding their complaint in the 2017 Investor Case.

125.    After the parties executed the Settlement Agreement and after the initial payment to investors, the investors' counsel responded to multiple requests from the SEC staff.

126.    The investors' counsel reported to SEC staff that his clients' case against Kontilai and Collectors Café had been resolved and that a confidentiality agreement prevented his clients from speaking to SEC staff voluntarily. The investors did not provide the SEC information until after the SEC served their counsel with subpoenas.

127.    By letter dated January 4, 2018 from counsel for Collectors Café and Kontilai to the investors' counsel, Collectors Café and Kontilai stated that they "have reason to believe" that one or more of the investors or their counsel had been in communication with the SEC about Collectors Café and Kontilai.

128.    In the January 4 letter, Collectors Café and Kontilai claimed that the provision prohibiting communications with the SEC was a "material terms [sic] of the Settlement Agreement and pivotal to [Collectors Café and Kontilai] settling the dispute … and entering into the Settlement Agreement and paying the compensation outlined" in the Settlement Agreement.

129.    On April 26, 2019, Collectors Café and Kontilai filed a lawsuit against the investors ("2019 Lawsuit").

130.    In the 2019 Lawsuit, Collectors Café and Kontilai asserted claims for fraud, breach of contract, unjust enrichment, intentional interference with contractual relations, civil conspiracy, and breach of implied covenant of good faith and fair dealing.

131.    Each of the claims asserted in the 2019 Lawsuit are based on the factual allegation that the investors communicated with the SEC about Collectors Café and Kontilai.

132.    Collectors Café and Kontilai claimed that contact with the SEC could have jeopardized Collectors Café's entire business:

> Due to Defendants' actions, some of Plaintiffs' investors have been contacted by the SEC and there is a potential that the entire enterprise

developed since 2007 could be jeopardized, with the entire value of the enterprise at risk, including the initial investments of approximately $30,000,000 and the current stock valuation which far exceed the value of the initial investments.

133.    Collectors Café and Kontilai requested punitive and compensatory damages in their complaint.

134.    In a phone call with all investors on June 18, 2019, Kontilai repeatedly referenced this lawsuit to the investors, touting the damages that he had claimed and that he intended to amend this lawsuit to include others whom he viewed as the source of the company's troubles.

135.    Collectors Café's and Kontilai's 2019 Lawsuit was dismissed without prejudice on September 26, 2019, because Collectors Café and Kontilai failed to effect service on the investors.

136.    As a result of the above, Collectors Café and Kontilai took actions to impede investors from communicating directly with SEC staff about a possible securities law violation, including by enforcing and threatening to enforce confidentiality agreements.

**V.    Mykalai Kontilai and Collectors Café Continue to Make Misrepresentations and Omissions to Investors.**

137.    After the SEC filed its complaint, on June 18, 2019, Collectors Café and Mykalai Kontilai held a telephonic meeting that was open to investors. Numerous Collectors Café investors participated in the call.

138.    During the call Defendants made efforts to convince investor-victims they had not been victimized by Defendants' fraud in order to persuade those victims to refrain from demanding return of their investments and to support Defendants' plan to request a release of

money from the asset freeze purportedly to continue business operations. Kontilai characterized the allegations in the complaint in this case as "all falsehoods, all lies, all bullshit."

139.    Collectors Café and Mykalai Kontilai then made numerous false and misleading statements, and omitted material facts, during this June 18 call with investors.

140.    First, Kontilai and Collectors Café stated that the SEC wrongfully filed its lawsuit at least in part because the SEC did not have – and purposefully did not seek to obtain – all of the company's bank statements for periods prior to April 2014. Kontilai stated, with counsel of record on the call, that the SEC did not subpoena "the first seven years of records," including "years that [Kontilai] put money in the company [in] 2007, '8, '9, [and] '10," and that "[the SEC] intentionally did not subpoena all of the years of bank records that show the money that I put in."

141.    The implication of Kontilai' s statements was that these bank statements would show that Kontilai loaned the company money and, as a result, his personal use of company money constituted partial repayment of those loans and therefore was a legitimate company obligation.

142.    These statements are false and misleading because, among other things, Kontilai and Collectors Café omitted the material facts that (i) no bank statement will support the claim that Kontilai was entitled to the company's money because Kontilai never loaned the company the amounts that he purports to claim he loaned; (ii) Kontilai and Collectors Café fabricated documents to evidence purported loans because they know no such loans were ever made; (iii) the company's PPMs told potential investors throughout the life of the company that the company owed no debts; (iv) the SEC requested by subpoena to the company all of its bank

records dating back to 2008 and all records related to any claim that transfers from the company to Kontilai were legitimate; and (v) prior to the phone call, the SEC produced to Defendants copies of bank records it received pursuant to subpoenas, which included all statements from the Bank of America account Kontilai used to fabricate a bank statement from the time the account opened in June 2007 to the time it closed in June 2008.

143.    During the June 18 call, Kontilai also stated that their delivery and use of a fabricated employment agreement to the SEC was the fault of G.H. and their previous counsel. Collectors Café and Kontilai stated that G.H. provided Kontilai with copies of his employment agreement, a promissory note, and a bank statement prior to his testimony in the SEC's investigation.

144.    These statements falsely implied that G.H. or the Defendants' previous counsel had fabricated Kontilai's employment agreement, promissory note, and bank statement. These statements were false because G.H. never provided Kontilai with copies of these purported documents and because these documents never existed.  Collectors Café and Kontilai knew at all relevant times that these documents never existed.

145.    In fact, Kontilai and Collectors Café knowingly fabricated the documents they claim G.H. provided them, including the employment agreement, which purported to memorialize terms of agreements that never existed.

146.    During the June 18 call, when confronted with the claim from a participant on the call that the company does not own a tangible asset, Kontilai and Collectors Café stated that the company has "a massive intellectual property portfolio with close to 100 trademarks pending patent authenticity insurance."

147.    This statement is false and misleading because the company's patent applications were abandoned no later than June 22, 2018. The statement also is misleading because Kontilai and Collectors Café omitted the fact that the company has been dormant for over 18 months and, therefore, could not have been using any valid trademarks or policing those marks during that time. Disclosure of these facts was necessary to correct the impression of the Defendants' statement that the company had a valuable intellectual property portfolio.

148.    During the June 18 call, Kontilai also referenced a claim that Collector's Café has "hundreds of dealers committed to putting inventory on the [Collector's Café] [web]site" claiming it to be true.

149.    This statement is false and misleading because, as outlined in paragraphs 52-61, Collector's Café did not have hundreds of dealers committed to putting inventory on its website, in fact, as of August 2018, only three dealers had ever posted inventory to Collectors Café's website, the website was not active at that time and most of the inventory was non-exclusive inventory from one dealer who also had a physical store in New York City.

150.    Kontilai also stated on the call that two things need to happen for the company to use proceeds from the sale of the Jackie Robinson contract: (1) the assets need to be unfrozen (something for which Kontilai and Collectors Café were soliciting support from investors); and (2) the Los Angeles Dodgers need to agree to the sale.

151.    This statement is misleading because Kontilai and Collectors Café omitted the material facts that the Los Angeles Dodgers claim to own the contracts, they refuse to agree to the sale, and the only potential buyer known at the time of the investor call would not proceed with the sale unless and until the claim asserted by the Los Angeles Dodgers no longer clouds

34

title to the contracts. Omission of these facts left the false impression that an actual sale is imminent but for the order freezing Defendants' assets.

152.    The purpose of the June 18 call, executed through Defendants' misstatements and omissions, was to lull investor-victims into falsely believing that they had not been victimized; that the SEC had engaged in misconduct and brought false allegations of fraud against Defendants; that Collector's Café had value and assets, which would be lost if investor-victims did not support Defendants' request to the Court that it unfreeze assets; and that investor-victims could still expect a return on their investment if the Court unfroze assets.

## VI.    Veronica Kontilai Received Ill-Gotten Gains.

153.    Veronica Kontilai has not earned income in over 30 years.

154.    Veronica Kontilai has received no income since, at least, 2007.

155.    Veronica Kontilai has not filed tax returns since, at least, 2007.

156.    Veronica Kontilai has provided no recognizable consideration to Collectors Café, such as services, employment or otherwise.

157.    Mykalai Kontilai has had no employment or material sources of income other than his work for Collectors Café since 2007.

158.    Since April 1, 2014, Veronica Kontilai received more than $275,000 in cash deposits to her personal bank accounts. These funds belonged to Collectors Café and Veronica Kontilai has no legitimate claim to the cash deposited into her personal bank accounts.

159.    The cash deposited into Veronica Kontilai's personal bank accounts are proceeds from the fraud alleged above.

160.    Since April 1, 2014, Veronica Kontilai received at least $14,653 from Mykalai Kontilai's bank accounts.

161.    Veronica Kontilai has no legitimate claim to the funds transferred into her personal bank accounts from the accounts of Mykalai Kontilai.

162.    The funds transferred into Veronica Kontilai's personal bank accounts from the accounts of Mykalai Kontilai are proceeds from the fraud alleged above.

163.    Veronica Kontilai spent at least $23,622 on Collectors Café's credit cards.

164.    The credit card charges by Veronica Kontilai on Collectors Café's credit cards were used to make, among other things, payments to a private school, rental car companies, taxis, movies, restaurants, and storage units.

165.    Veronica Kontilai had no legitimate right to use Collectors Café's credit cards to pay for her personal expenses.

166.    The property acquired and other expenses incurred by Veronica Kontilai through use of Collectors Café's credit cards are proceeds from the fraud alleged above.

167.    Mykalai Kontilai used Collectors Café funds to purchase custom suits for Veronica Kontilai.

168.    Veronica Kontilai has no legitimate claim to the custom suits purchased by Mr. Kontilai.

169.    The custom suits are proceeds from the fraud alleged above.

170.    As a result of the above, Veronica Kontilai benefited directly from Collectors Café's and Mykalai Kontilai's fraudulent conduct and she would be unjustly enriched if not

compelled to disgorge the funds received or expended on her behalf as a direct result of the misconduct.

## FIRST CLAIM FOR RELIEF
### Fraud (Misstatements and Omissions): Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Collectors Café and Mykalai Kontilai)

171.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as though fully set forth herein.

172.    Collectors Café and Kontilai, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Fraud (Misstatements and Omissions): Section 17(a)(2) of the Securities Act
### (Collectors Café and Mykalai Kontilai)

174.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as though fully set forth herein.

175.    Collectors Café and Kontilai, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or

property by means of an untrue statement of material fact or omission to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

176.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly,

violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities

Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Fraud (Scheme): Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (Collectors Café and Mykalai Kontilai)

177.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as

though fully set forth herein.

178.    Collectors Café and Kontilai, directly or indirectly, acting with scienter, by use of

the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange, in connection with the purchase or sale of a security: employed

devices, schemes, or artifices to defraud; or engaged in acts, practices, or courses of business

which operated or would operate as a fraud or deceit upon another person.

179.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly,

each violated, and, unless restrained and enjoined, will again violate Section 10(b) [15 U.S.C.

§ 78j(b)] of the Exchange Act and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]

thereunder.

## FOURTH CLAIM FOR RELIEF
### Fraud (Scheme): Section 17(a)(1) and (3) of the Securities Act
### (Collectors Café and Mykalai Kontilai)

180.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as though fully set forth herein.

181.    Collectors Café and Kontilai, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, employed a device, scheme, or artifice to defraud and engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

182.    By virtue of the foregoing, Collectors Café and Kontilai, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## FIFTH CLAIM FOR RELIEF
### Impeding: Rule 21F-17 of the Exchange Act
### (Collectors Café and Mykalai Kontilai)

183.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as though fully set forth herein.

184.    Collectors Café and Kontilai took actions to impede individuals from communicating directly with the SEC staff about a possible securities law violation, including by enforcing and threatening to enforce confidentiality agreements with respect to such communications.

185.    By virtue of the foregoing, Collectors Café and Kontilai violated and, unless restrained and enjoined, will again violate Rule 21F-17 of the Exchange Act [17 C.F.R. § 240.21F-17].

**SIXTH CLAIM FOR RELIEF**
**Equitable Disgorgement**
**(Relief Defendant Veronica Kontilai)**

186.    The SEC realleges and incorporates by reference paragraphs 1 through 170, as though fully set forth herein.

187.    Relief Defendant Veronica Kontilai obtained money, property and assets which are the proceeds, or are traceable to the proceeds, of the violations of the securities laws by Defendants Collectors Café's and Mykalai Kontilai.

188.    Relief Defendant Veronica Kontilai received gifts and other assets purchased from the proceeds, or that are traceable to the proceeds, of the violations of the securities laws by Defendants Collectors Café's and Mykalai Kontilai.

189.    Relief Defendant Veronica Kontilai received these funds and assets under circumstances in which it is not just, equitable, or conscionable for her to retain the funds or assets, and therefore has been unjustly enriched.

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that Defendants Collectors Café and Mykalai Kontilai violated the securities laws and rules promulgated thereunder as alleged against them herein;

**II.**

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently restraining and enjoining the Defendants Collectors Café and Mykalai Kontilai from violating the laws and rules alleged against them in this Amended Complaint;

**III.**

Order Defendants Collectors Café and Mykalai Kontilai and Relief Defendant Veronica Kontilai to disgorge all of the ill-gotten gains from the violations alleged in this Amended Complaint, and order them to pay prejudgment interest thereon;

**IV.**

Order Defendants Collectors Café and Mykalai Kontilai to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**V.**

Grant such other and further relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

The SEC demands a trial by jury on all claims so triable.

Dated: November 4, 2019

                       */s/ Terry R. Miller*            
                       Terry R. Miller (*pro hac*)
                       Mark L. Williams (pro hac)
                       Attorneys for Plaintiff
                       UNITED STATES SECURITIES AND
                       EXCHANGE COMMISSION