**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES SECURITIES
AND EXCHANGE
COMMISSION,

                Plaintiff,

  – against –

COLLECTOR'S COFFEE, INC., *et al*.,

            Defendants.

Civil Action No.19-cv-04355-VM-GWG

**DEFENDANT MYKALAI KONTILAI'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO CLARIFY ASSET FREEZE**

## TABLE OF CONTENTS

Introduction ................................................................................................................ 3

Background.................................................................................................................. 5

    I.      The Terms of the TRO and the Stipulated Order................................................ 5

    II.     The Previous Sanctions Proceedings .................................................................. 7

    III.    The Malpractice Suit .......................................................................................... 9

    IV.    The Wrongful Death Suit.................................................................................. 10

Analysis .................................................................................................................... 13

    I.      The Filing of Lawsuits, Including But Not Limited to the Malpractice Suit, the Wrongful Death Suit, and Any Future Lawsuit, Is Permitted by the TRO, Which Does Not Cover After-Acquired Assets .......................................................... 15

    II.     In the Alternative, this Court Should Clarify that Mr. Kontilai Has Made the Proper Showing to Continue Litigating the Malpractice Suit and the Wrongful Death Suit.......................................................................................................... 26

Conclusion ............................................................................................................... 29

Certificate of Service .............................................................................................. 31

COMES NOW Defendant Mykalai Kontilai, by and through undersigned counsel, and in support of his motion for an Order clarifying the terms of the asset freeze in this case, states as follows:

**INTRODUCTION**

Defendant Mykalai Kontilai ("Mr. Kontilai") seeks an order from this Court clarifying the terms of the Temporary Restraining Order Freezing Assets and Providing for Other Ancillary Relief, entered by Judge Schofield on May 16, 2019, Docket No. 12 (the "TRO"), and this Court's Stipulated Order on Renewed Motion for Preliminary Injunction, entered on December 9, 2019, Docket No. 175 (the "Stipulated Order").

Mr. Kontilai first seeks to clarify that he is permitted to proceed with the filing and litigation, as a plaintiff, of any lawsuits he may have, provided that they are pursued on a contingent fee basis and with his lawyers advancing costs, such that there is no substantial risk to any frozen assets.

The plain language of this Court's orders supports such an interpretation in precluding only lawsuits that may "impact the property and assets subject to" the TRO, and, even then, only to the extent that such action "interfere[s] with the asset freeze." TRO, Docket No. 12, at 5. Filing and pursuing lawsuits to obtain additional funds with little or no risk to available funds cannot reasonably be said to "impact the property and assets" or "interfere with the asset freeze." This Court has previously given heed to this analysis, stating, "[t]he term 'impact' could reasonably be understood to not include a suit that was intended to increase assets given that the term was used in an order obviously seeking to prevent any diminishment in the value of assets — not to prevent their increase." Report, Docket No. 767 at 26.

Even setting the plain language of this Court's orders aside, the spirit and intent of the asset freeze is to preserve any *allegedly* ill-begotten funds for investors.  Filing and protecting claims against third parties is in the best interest of all involved.  As noted above, this Court has previously stated that such a lawsuit's "only effect would seem to be to increase the assets available to the SEC." Report, Docket No. 767 at 26.

Mr. Kontilai further requests clarification that any assets acquired *after* the entry of this Court's asset freeze are *not* frozen.  Again, this is evident from the plain language of this Court's Orders.  As this Court has previously held:

> the freeze "applies to assets that are 'held' by Mykalai/CCI (TRO ¶ I.A) and refers to any assets that are 'presently held by them' in whatever form the assets may 'presently exist.' *Id.*  The definition of 'presently' refers to 'assets held at 'present', meaning 'the time of the statement or writing, and not later.'

Report, Docket No. 767 at 19.  Thus, under the plain language of the asset freeze, after-acquired assets (like any lawsuit settlements funds received after the Court's freeze orders) are *not* subject to the freeze.[1]

Although the clarifications sought herein are somewhat broader, there are two pending lawsuits which give rise to the present motion: a legal malpractice suit filed in the U.S. District Court for the District of Columbia, *CCI, Kontilai v. Debevoise & Plimpton, Andrew Cresney, et al.*, Case No. 20-CV-2988, which has been pending since October 17, 2020 (the "Malpractice Suit"), and a wrongful death suit filed in the Circuit Court of the Eleventh Judicial Circuit of the State of Illinois, in the County of McLean, *Maria Contile, et al. vs. Air & Liquid Systems Corp.*

---

[1] Indeed, any other interpretation would be constitutionally infirm as the Court's orders would leave no room for Mr. Kontilai to pay criminal defense counsel in violation of the 5th and 6th Amendments or to eat, shelter himself and obtain medical care in violation of the due process clause of the 14th Amendment. *See, e.g., Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1095, 194 L. Ed. 2d 256 (2016).

*et. al.*, Case No. 2018L0000105, which has been pending since August 9, 2018 (the "Wrongful Death Suit").

The Malpractice Suit involves a legal malpractice claim filed against certain of Mr. Kontilai's prior lawyers.  The parties have extended the time for an Answer or responsive pleading to be filed by the defense in the Malpractice Suit through November 10, 2021, so very little of substance has happened since the filing of the Malpractice Suit.

The Wrongful Death Suit, *which predates the asset freeze in this matter*, is ongoing and settlements have been reached with certain defendants and disclosed to the SEC.  The Wrongful Death Suit involves an Estate and Mr. Kontilai's nephew as co-plaintiffs with Mr. Kontilai and relates to the death of Mr. Kontilai's mother from asbestos-related diseases.

All funds due to Mr. Kontilai from settlements reached after the asset freeze remain in the trust account of the Illinois law firm handling the Wrongful Death Suit.  The Illinois firm is well aware of the terms of this Court's orders.  *None of these funds will be distributed to Mr. Kontilai or on his behalf absent leave of this Court and/or the clarification sought herein.*

## BACKGROUND

**I.**    **The Terms of the TRO and the Stipulated Order.**

Upon the filing of this action, Plaintiff United States Securities and Exchange Commission ("SEC") submitted an *ex parte* request for a temporary restraining order.  Docket No. 8.  Judge Schofield entered the TRO on May 16, 2019.  Docket No. 12.  The TRO froze the assets then "*held by or under the direct or indirect control*" of Mr. Kontilai and Defendant Collector's Coffee Inc., up to $46 million:

> The assets, funds, or other property held by or under the direct or indirect control of Defendants Collectors Café or Mykalai Kontilai, whether held in any of their names or for their direct or indirect beneficial interests, wherever located, up to the amount of **$46,121,649.68**, are frozen …

5

TRO, Docket No. 12, at 3 (emphasis in original).  The TRO required other parties, including

attorneys, to hold any assets belonging to Mr. Kontilai in their control during the duration of the

TRO:

> Any bank, financial or brokerage institution, storage facility, or other person or
> entity holding any funds, securities or other assets of Defendants Collectors Café
> and Mykalai Kontilai, up to the amounts identified in paragraph I.A, held in the
> name of, for the benefit of, or under the control of Defendants Collector's Coffee
> and Mykalai Kontilai, or their officers, directors, successor corporations,
> subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those
> persons in active concert or participation with them, and each of them, shall hold
> and retain within their control and prohibit the withdrawal, removal, transfer or
> other disposal of any such funds or other assets …

TRO, Docket No. 12, at 4-5.  The TRO prohibited the filing of any lawsuit that would "interfere

with the asset freeze":

> No person or entity, including Defendants Collector's Coffee or Mykalai Kontilai,
> or any creditor or claimant against the Defendants, or any person acting on behalf
> of such creditor or claimant, shall take any action to interfere with the asset
> freeze, including, but not limited to, the filing of any lawsuits, liens, or
> encumbrances, or bankruptcy cases to impact the property and assets subject to
> this order …

TRO, Docket No. 12, at 5.  The TRO included an exception from the prohibition of lawsuits,

lines, encumbrances, or bankruptcy cases as "any party or non-party may seek leave from this

order upon a proper showing." *Id*.

The SEC filed a Renewed Motion for a Preliminary Injunction on November 12, 2019.

Docket No. 141.  This Court held a conference with the parties, and the Court then entered its

Stipulated Order on December 9, 2019. Docket No. 175.  The Stipulated Order contained various

provisions prohibiting fraudulent conduct pursuant to the Exchange Act and the Securities Act,

as well as an asset freeze pertaining to Defendant Veronica Kontilai ("Mrs. Kontilai"): "The

assets, funds, or other property held by or under the direct or indirect control of Relief Defendant

Veronica Kontilai, whether held in her name or for her direct or indirect beneficial interests, wherever located, up to the amount of **$313,622**, are frozen." Stipulated Order, Docket No. 175 at 4 (emphasis in original).

The Stipulated Order contained an identical provision related to lawsuits pertaining to Mrs. Kontilai as the prohibition pursuant to the original TRO:

> No person or entity, including Relief Defendant Veronica Kontilai, or any creditor or claimant against Relief Defendant Veronica Kontilai, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order; provided, however, that any party or non-party may seek leave from this order upon a proper showing.

Stipulated Order, Docket No. 175, at 5.

The Stipulated Order additionally clarified that this Court would "retain jurisdiction of this matter for all purposes." Stipulated Order, Docket No. 175, at 6. On January 27, 2021, after the SEC filed a motion for contempt and sanctions, which is discussed in Section II below, this Court clarified that the Stipulated Order did not supersede the TRO, which "is now in effect and will continue to remain in effect unless a court order issues stating otherwise." January 27, 2021 Order, Docket No. 769 at 1.

## II.      The Previous Sanctions Proceedings.

On July 17, 2020, the SEC filed a Motion for Contempt and Sanctions against Mr. and Mrs. Kontilai. *See* Docket No. 452, 453. This Court held a two-day hearing on the SEC's motion on December 7 and 8, 2020, and issued its Report and Recommendation, refusing to hold Mr. Kontilai in contempt for the filing of the Malpractice Suit, on January 27, 2021 (the "Report"). *See* Docket No. 767.

In their post-hearing brief, submitted on December 15, 2020, the SEC asked this Court to find that Mr. Kontilai violated the TRO by "fil[ing] a lawsuit asserting claims against his former counsel, including claims of negligence, breach of contract, breach of fiduciary duties, fraud, and civil conspiracy." Pl.'s Br., Docket No. 722 at 40. The SEC rationalized that the "claims asserted in the lawsuit belong to CCI and Mykalai," and therefore should be considered to be "assets subject to the asset freeze order." *Id*. Therefore, under the SEC's interpretation of the terms of the TRO, Mr. Kontilai was obligated "to seek relief from the Court before filing the lawsuit," because Mr. Kontilai allegedly "encumbered the value of the asset … by conveying a right to a contingency fee to his counsel." *Id*. at 41.

In the Report, this Court noted that Mr. Kontilai, "[a]t some point, [had] authorized the filing of a lawsuit against Debevoise & Plimpton on behalf of himself personally." Report, Docket No. 767 at 7. This Court agreed that Mr. Kontilai's right to file the lawsuit "necessarily comes within the definition of 'asset' in the TRO as a legal matter" because "the right to file [the lawsuit] accrued prior to the entry of the TRO." *Id*. at 25. However, this Court also noted that "there certainly could have been reasonable 'uncertainty' in Mykalai's mind that the mere filing of that lawsuit and the making of the contingency fee arrangement violated the TRO." *Id*. In so holding, the Court relied on precisely the arguments made herein for clarification of these issues in Mr. Kontilai's favor.

This Court ultimately determined that the TRO did not clearly and unambiguously give notice to Mr. Kontilai that he was prohibited from filing a lawsuit "whose only effect would seem to be to increase the assets available to the SEC," and that therefore the filing of the lawsuit itself was not contemptuous. *Id*. at 26. Similarly, this Court declined to find contempt regarding the making of the contingent fee arrangement, as the SEC failed to provide "any admissible

evidence as to what the contingent fee arrangement was," and "a contingent fee arrangement at the going market rate arguably would not diminish the value of the lawsuit." *Id*. at 25.

Shortly thereafter, Mr. Kontilai filed a pre-motion letter with this Court regarding an anticipated motion to "seek a ruling that Defendants Collector's Coffee, Inc. and Kontilai, acting as its CEO and individually (as a majority shareholder) may move forward with their litigation in the U.S. District Court for the District of Columbia, case *CCI, Kontilai v. Debevoise & Plimpton, Andrew Cresney, et al.*, case 20-CV-2988, pending since October 17, 2020." Memorandum Endorsement, Docket No. 806 at 1. Mr. Kontilai noted that the pre-motion letter was being filed pursuant to the SEC's position "that Defendants must get a clearance from this Court as a condition for proceeding with that case." *Id*.  Mr. Kontilai requested permission from this Court to proceed with the lawsuit while maintaining that "[t]he District of Columbia action is … in no way prohibited under the terms of the TRO" as the TRO "did not provide any prohibition against either suing for damages or preserving future assets on behalf of CCI investors … all without using any of the assets of either CCI or Kontilai." *Id*. at 2.

In response, this Court issued a Memorandum Endorsement which stated that "[a]ny party … is permitted to file any motion it wants on this question, though it is certainly incumbent on that party to specify precisely what body of law it relies on in seeking relief." *Id*. at 4.

## III.   **The Malpractice Suit.**

On October 17, 2020, Collector's Coffee Inc. along with Mr. Kontilai, in his official capacity as Chief Executive Officer, and Mr. Kontilai, in his individual capacity as majority shareholder (the "Malpractice Plaintiffs"), filed suit against Debevoise & Plimpton LLP, Andrew J. Ceresney, Dustin Brockner, and Miheer Mhatre, pleading several causes of action including malpractice, breach of contract, breach of fiduciary duties, fraudulent concealment, fraud, and

misrepresentation. Exhibit A (Malpractice Complaint). The case arose out of the defendants'

legal representation of the Malpractice Plaintiffs. *Id*. at 14-32.

On February 22, 2021, the defendants filed a Motion to Extend Deadlines for 60 days,

seeking an extension of their time to respond to Mr. Kontilai's complaint.  Exhibit B (Motion to

Extend). The motion justified the request by asserting that "Plaintiffs currently are defendants in

a related lawsuit filed by the [SEC] pending in the U.S. District Court for the Southern District of

New York," and citing the SEC's contention that Mr. Kontilai's filing of the lawsuit "violates

[the TRO's] asset freeze" to contend that this Court needed to resolve "the SEC, Kontilai, and

CCI's assertions concerning the effect of that court's TRO and asset freeze on this lawsuit"

before the case could move forward.  *Id*. at 1-3. There have since been two more requests for

extensions of the defendants' time to answer, with the most recent request jointly filed by the

parties on July 29, 2021. The District of Columbia court granted the most recent request for

extension and the current deadline for the defendants to respond is November 10, 2021.

## IV.    <u>The Wrongful Death Suit</u>.

The Wrongful Death Suit arose from the wrongful death of Mr. Kontilai's mother, Sylvia

Contile, who contracted mesothelioma after exposure to asbestos.  Mr. Kontilai's father,

Giacomo Contile, worked at various companies where asbestos was present in the 1960s through

the late 1970s. *See* Exhibit C (First Amendment to Complaint) at 2.  The asbestos then traveled

on Giacomo Contile's hair, clothing, and person to his home, where he lived with Sylvia Contile.

*Id*. at 3.  As a result of the exposure to asbestos, Sylvia Contile contracted mesothelioma and

ultimately died of the disease on June 24, 2006.  When she passed away, Sylvia Contile's next of

kin were her children, Mr. Kontilai and his sister Maria Contile. *Id*. at 5.

On August 9, 2018, Mr. Kontilai and Maria Contile filed a motion in the Circuit Court of the Eleventh Judicial Circuit of Illinois, McLean County, seeking to be appointed as co-special administrators of Sylvia Contile's estate for the purpose of pursuing the Wrongful Death Suit. Exhibit D (Motion for Appointment) at 1.  Mr. Kontilai and Maria Contile, as the next of kin of Sylvia Contile, agreed to equally divide all amounts received in the suit, after the deduction of fees and costs. Exhibit E (Consent to Division).  Maria Contile was later replaced as co-special administrator by her son, David Spaulding, after Maria Contile's passing on January 19, 2021. Exhibit F (Motion to Substitute) at 1.

Mr. Kontilai and Maria Contile and/or David Spaulding (the "Wrongful Death Plaintiffs") have been successful in their pursuit of the case, successfully settling with multiple defendants to date.  For example, the Wrongful Death Plaintiffs settled with Defendant Blue Bird Body Company for $100,000.00 on or about July 15, 2020. Exhibit G (Blue Bird Release).  The Wrongful Death Plaintiffs settled with Defendant McMaster-Carr Supply Company for $100,000.00, Defendants Union Carbide Corporation and Amchem Products Inc. for an additional $100,000.00, and Defendant Honeywell International, Inc. for $400,000.00 on or about October 6, 2020. Exhibit H (McMaster General Release); Exhibit I (Union Carbide Settlement Agreement); Exhibit J (Honeywell Good Faith Release).  The Wrongful Death Plaintiffs settled with Defendant Arvinmeritor, Inc. for $100,000.00 and Defendants Genuine Parts Company and National Automotive Parts Association for $100,000.00 on or about July 23, 2021. Exhibit K (Arvinmeritor Good Faith Release); Exhibit L (Genuine Parts Release).  The case is still proceeding against the remaining defendants.

Illinois counsel are experienced asbestos lawyers.  They advise that settlements must be quickly consummated when offered because once asbestos companies run out of settlement

funds they declare bankruptcy.  As they are often simultaneously settling with numerous plaintiffs across the country, a litigant never knows when the well may run dry.  As a result, protecting these claims for the Estate, Mr. Kontilai and his nephew requires swift and decisive action.

Moreover, Illinois counsel advises that asbestos settlements such as those at issue here must be approved by the Court in Illinois.  This fact, the involvement of experienced asbestos lawyers and third-party plaintiffs like the Estate and Mr. Kontilai's nephew, and the public nature of the proceedings, leave no room for any of the sort of misdeeds the SEC is often quick to wrongly ascribe to Mr. Kontilai.

In fact, the SEC has had the opportunity, facilitated by the undersigned, to speak directly with Wrongful Death Counsel in Illinois and to review all of the reasonably-requested documents, including the lawsuit and various settlement paperwork.

Mr. Kontilai has been called on to sign settlement sheets allowing for the distribution of funds due to others as well as a reaffirmation of the 50/50 sharing agreement between Mr. Kontilai and his nephew (now in the shoes of Mr. Kontilai's deceased sister).  Out of an abundance of caution, Mr. Kontilai has elected not to do so in order to seek the present clarification from the Court.

As noted above, *no proceeds from the lawsuit have been distributed to or on behalf of Mr. Kontilai since this Court's asset freeze; Illinois counsel handling the Wrongful Death Case are aware of this Court's orders; and no such monies will be distributed absent order of this court and/or the clarifications sought here*.

## ANALYSIS

Mr. Kontilai respectfully requests a clarification of the terms of the asset freeze.  *See ONE11 Imports Inc. v. NuOp LLC*, No. 16-CV-7197 (JPO), 2016 WL 7338422, at *1 (S.D.N.Y. Dec. 19, 2016) (quoting *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998)) ("It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.' "); *see also N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984) ("Clarifications of orders previously issued, which may be obtained on motion or made *sua sponte* by the court, add certainty to an implicated party's efforts to comply with the order and provide fair warning as to what future conduct may be found contemptuous."); *Paramount Pictures Corp. v. Carol Pub. Grp.*, Inc., 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) ("the … objective of clarity supports the entry of a supplemental order."); *Am. ORT, Inc. v. ORT Israel*, No. 07 CIV.2332(RJS), 2009 WL 233950, at *3 (S.D.N.Y. Jan. 22, 2009) (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15, 65 S.Ct. 478, 89 L.Ed. 661 (1945)) ("Clarification of a prior order is within the sound discretion of the Court.").

Mr. Kontilai asks that this Court interpret the terms of the TRO as follows: (1) that the filing and litigation of lawsuits, including but not limited to the Malpractice Suit, the Wrongful Death Suit, and any future lawsuit that Mr. Kontilai seeks to pursue, is permitted under the current terms of the TRO; (2) that the asset freeze does not apply to after-acquired assets of any type; and (3) in the alternative, that Mr. Kontilai has made a proper showing for this Court to grant him leave to continue litigating the Malpractice Suit and the Wrongful Death Suit – to whatever extent such leave is required.

Clarification is necessary and desirable as this Court recognized, but did not resolve, several questions regarding the interpretation of the TRO's terms. Additionally, this Court acknowledged that the plain terms of the TRO could have created "reasonable 'uncertainty' in Mykalai's mind" regarding what actions are prohibited and which are permitted under its terms. Report, Docket No. 767 at 25.

For example, this Court noted that "the TRO was certainly not 'clear and unambiguous'" regarding whether "after-acquired" assets were covered by the TRO, and this Court accepted that "Mykalai and Veronica would be left with 'uncertainty' as to whether the TRO covered assets acquired after the date of the TRO." *Id*. at 19. However, despite this Court's acknowledgment that Mr. Kontilai may reasonably be uncertain about the scope of the TRO, this Court did "not find it necessary to resolve the question of whether such 'after-acquired' assets are covered by the TRO's asset freeze" for the purpose of resolving the SEC's motion for sanctions. *Id*.

Similarly, this Court acknowledged that the terms of the TRO are unclear on whether Mr. Kontilai is permitted to file lawsuits against third parties, as "there certainly could have been reasonable 'uncertainty' in Mykalai's mind that the mere filing of that lawsuit and the making of the contingency fee arrangement violated the TRO." *Id*. at 25. But this Court did not resolve the issue of whether the filing of the Malpractice Suit and/or the making of a contingency fee agreement did, in fact, violate the terms of the TRO, "conclude[ing] only that these actions should not be punished through the blunt instrument of contempt." *Id*. at 27.

Accordingly, Mr. Kontilai seeks this clarification to ensure that all parties are clear on the interpretation of the terms and the scope of the asset freeze.

I.      **The Filing of Lawsuits, Including But Not Limited to the Malpractice Suit, the Wrongful Death Suit, and Any Future Lawsuit, Is Permitted by the TRO, Which Does Not Cover After-Acquired Assets.**

In *City of Hartford v. Chase*, 942 F.2d 130, 134-135 (2d. Cir. 1991), the court interpreted a Confidentiality Order which was part of a court-approved agreement.  Similarly, here, the asset freeze was entered by conditional consent.  In *Harford*, the court noted that such agreed orders, "must be construed according to general principles of contract law" with "deference…to be paid to the plain meaning of the language ... and the normal usage of the terms selected."  *See also U.S. v. ITT Continental Baking Co*. 420 U.S. 223, 236 (1975)(construing consent decrees and orders under contract principles); *In re Dynegy Inc.*, 486 B.R. 585, 591, 92 (Bankr. S.D.N.Y. 2013) ("When interpreting orders, [a court] should look first to the plain meaning of the language of the order.")

The terms of the TRO prohibit the "filing of any lawsuits" that may "impact the property and assets subject to" the TRO, but only to the extent that such action "interfere[s] with the asset freeze." TRO, Docket No. 12, at 5.  If any party sought to file a lawsuit that would *interfere* with the asset freeze, that party is obligated to "seek leave" from the terms of the TRO "upon a proper showing." *Id*.

Neither the filing of the Malpractice Suit or the filing of the Wrongful Death Suit violated the TRO, and the pursuit of lawsuits such as the Malpractice Suit and the Wrongful Death Suit are permitted by the TRO.

The express terms of the TRO clearly contemplate that the lawsuits would be brought by any party *against* Mr. Kontilai's property and assets.  This is clear from the plain wording of the TRO, which specifies that the prohibition is against *actions that interfere with the asset freeze*, specifically any cases that *impact the property and assets* of Mr. Kontilai.  The provision

contemplates actions taken by creditors or other third-party claimants who seek to institute proceedings against Mr. Kontilai to claim his property or assets, or a proceeding by Mr. Kontilai in bankruptcy, seeking a discharge of debt that would necessarily result in the dispensation of Mr. Kontilai's assets:

> No person or entity, including Defendants Collector's Coffee or Mykalai Kontilai, or any creditor or claimant against the Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this order …

TRO, Docket No. 12, at 5.

*Nothing* in the plain language of the TRO contemplates prohibiting Mr. Kontilai from filing a claim against another party or entity seeking to recover money damages for harms suffered by him. Such an action would not "interfere with the asset freeze," as required to violate the TRO.

The SEC contended that Mr. Kontilai's injuries—indeed, the claims themselves—should be considered an "asset" under the TRO. Using the example of the Wrongful Death Suit, the SEC's theory would mean that Mr. Kontilai's interest as next-of-kin in the tragic circumstances of his mother's death would be an "asset" subject to the TRO. That "asset" would then be "encumbered" by Mr. Kontilai's conveyance of the percentage of a possible recovery under a contingency fee agreement. *See* Pl.'s Br., Docket No. 722 at 40-41.

This Court agreed that the cause of action itself—the injury and potential claim—fell within the definition of "asset" because "the right to file [the lawsuit] accrued prior to the entry of the TRO." Report, Docket No. 767 at 25. However, this Court did not find that the filing of a lawsuit would "interfere" with or "impact" the asset, as would be required for the action to be prohibited by the terms of the TRO.

Such a prohibitive reading of the TRO would necessarily deprive Mr. Kontilai and the SEC of potential assets and would cut against the *purpose* of the asset freeze.  The purpose of the TRO is to ensure that Mr. Kontilai does not "dissipate, conceal, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil monetary penalties in this action." TRO, Docket No. 12, at 2.  That means that the purpose of the TRO is to prevent Mr. Kontilai from losing assets that could be subject to a future court order in this case, either by dissipation or by concealment or because of devaluation of those assets. The TRO is *not* for the purpose of preventing Mr. Kontilai from *obtaining more assets* that could be subject to a future court order, which would not be in the interest of any of the parties.

If this Court finds that the TRO prohibits the filing of any lawsuit against a third party arising out of an injury to Mr. Kontilai, then Mr. Kontilai would be barred from pursuing any monetary award that he might be entitled to as a result of the injury. A potential claim is only an "asset" insofar as the party subsequently proceeds to successfully pursue suit—otherwise the "asset" is worthless and unrecoverable.

This outcome would not be beneficial to any of the parties, *including* the SEC. The ultimate goal of the TRO—and the SEC, in seeking the asset freeze—is to "protect this Court's ability to award equitable relief in the form of disgorgement of [any alleged] illegal profits from fraud and civil penalties." TRO, Docket No. 12 at 2 (parenthetical supplied).  To this end, it is nonsensical for the SEC to request that this Court strictly limit Mr. Kontilai's ability to obtain additional assets, as the more assets Mr. Kontilai obtains, the greater the likelihood of the SEC's success in enforcing any potential future disgorgement order or civil penalty judgment.

Actions that only *create* or *increase* assets should not be prohibited by the TRO, as an increase furthers the SEC's interest in ensuring a greater likelihood of enforcing any potential equitable relief ordered by the Court in this case and an increase furthers Mr. Kontilai's personal interest in increasing the value of his assets for his own benefit, in the event that he succeeds in this case, or increasing the value of his assets to satisfy any relief ordered against him if he does not. There is *no party* involved in this case that would be disadvantaged by an *increase* in Mr. Kontilai's assets. Accordingly, as it is in the best of interest of all parties—*including the SEC*— for Mr. Kontilai to create additional assets or increase his current assets, and such a creation or increase would further the purpose of the TRO in ensuring the "protect[ion of] this Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties," this Court should clarify that any action that creates or increases assets falls outside the scope of the asset freeze and is permitted pursuant to the terms of the TRO. TRO, Docket No. 12 at 2.

When Mr. Kontilai filed a pre-motion letter with this Court regarding an anticipated motion to "seek a ruling that Defendants Collector's Coffee, Inc. and Kontilai, acting as its CEO and individually (as a majority shareholder) may move forward with their litigation" in the Malpractice Suit, the SEC filed a letter in response. Memorandum Endorsement, Docket No. 806 at 1. The SEC opposed Mr. Kontilai's request to continue litigating the Malpractice Suit on the basis that "the limited information Kontilai has provided fails to show that his plan to proceed with the Lawsuit will adequately protect the value of Defendants' remaining assets." SEC Letter, Docket No. 804 at 1. The SEC alleged that "it is unclear how the Lawsuit is or will be funded." *Id*. The SEC also took aim at the merits of the Malpractice Suit, claiming that the lawsuit "does not appear to reflect a sober assessment of Defendants' likelihood of success" and speculating

about a possible counterclaim or default judgment. *Id*. at 2. The SEC then urged this court to

"question whether it can rely on Kontilai's current counsel" in the Malpractice Suit "to protect

faithfully Defendants' assets," and speculated about the attorney-client relationship between Mr.

Kontilai's counsel and CCI, broadly claiming that "Kontilai's personal counsel cannot provide

CCI advice on whether it is in CCI's interest in the Lawsuit to allege" certain claims and that this

Court "cannot reasonably rely on Defendants' current counsel's assurances that the Lawsuit is in

the best interest of CCI." *Id*. at 2-3.

      Mr. Kontilai interprets the SEC's objections as challenging (1) the funding of the lawsuit,

(2) the likelihood of success for the lawsuit weighed against the potential costs, and (3) the

reliability of Mr. Kontilai's counsel.

      The SEC's second and third contentions relate to whether Mr. Kontilai should be

permitted to litigate the Malpractice Suit in particular. The SEC's first contention, however,

raises a general issue regarding the funding of any lawsuit Mr. Kontilai may seek to pursue,

including but not limited to the Malpractice Suit. However, as any lawsuit that Mr. Kontilai

pursues under a contingency fee agreement does not "interfere" with or "impact" the asset,

contingency fee lawsuits are permitted pursuant to the TRO.

      As Mr. Kontilai has already stated, he has executed a contingency fee agreement with his

counsel for the Malpractice Suit. "The contingent-fee arrangement is 30% (thirty percent) of the

recovery, which falls within the D.C. Rule of Pr. Cond. 1.5(e)(2), the ethics Rules of the District

of Columbia Bar, and likewise, those of many other jurisdictions." Memorandum Endorsement,

Docket No. 806 at 3.

      As the notes to the D.C. Rules of Professional Conduct make clear, "contingent fees are

permissible in all civil cases." DC R RPC Rule 1.5. Courts in the District of Columbia have

continuously found contingency fee agreements for more than 30% to be reasonable. *See Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 85–87 (D.D.C. 2008) (finding that "[t]he ABA's annotated Model Rules include examples of permissible contingent fee agreements similar to or in excess of 35%" and noting that "contingent fee arrangements are *intended* to generate relatively large fees in successful cases, because firms who utilize contingent fee arrangements must compensate for unsuccessful cases in which no fees are generated" in coming to the conclusion that 35% contingency fee was reasonable); *Greenberg v. Sher*, 567 A.2d 882, 882 (D.C. 1989) (affirming trial court judgment awarding full fee for "a one-third contingent fee under a retainer agreement.").

The contingent fee agreement for the Wrongful Death Suit is 40%, which is a reasonable contingent fee in Illinois for asbestos work of this nature. As the Settlement Sheets submitted to Mr. Kontilai for approval demonstrate, each of the settlements received are subject to a 40% contingent attorney fee. Exhibit M (Settlement Sheets).

The SEC stated in their letter that "Kontilai has not produced a copy of the contingency fee agreement [for the Malpractice Suit] – despite his counsel's promise to do so in October 2020." SEC Letter, Docket No. 804 at 2. On March 1, 2021, George Lambert, as Mr. Kontilai's counsel, emailed SEC counsel providing a password protected copy of the engagement letter in the Malpractice Suit. Exhibit N (Email). Mr. Lambert wrote that the engagement letter was "being submitted" as a password protected file, with "[t]he password … provided by a separate email to the SEC counsel only." *Id.* at 2.

Pursuant to a contingent fee agreement, the attorney advances fees and expenses during the pendency of the case, with those "expenses to be deducted from the recovery." DC R RPC Rule 1.5(c). Contingency fee agreements are typically a substantial portion of the potential

recovery because the attorney is taking the risk of performing the legal work and advancing fees

and expenses but recovering nothing if the case is not successful.

In other words, the financial risk posed by the potential loss of the litigation is borne by

the *attorney*, and not the *client*, and as a result the fees paid upon success may be higher than the

standard hourly fee rate.  The way that this type of fee arrangement works was encapsulated by

Mr. Kontilai's statement that "Defendants have paid, precisely, zero dollars and zero cents, and

will continue to pay, likewise, zero dollars and zero cents in that action in the future, including

any fees or costs of litigation." Memorandum Endorsement, Docket No. 806 at 2.

The SEC is correct that "litigation is, unfortunately, not free." SEC Letter, Docket No.

804 at 1. But the SEC is incorrect in its interpretation of how contingency fee agreements work.

The expenses and up-front costs are advanced by the attorney, including, but not limited to,

expert witness fees.  In exchange, the attorney accepts a percentage of the overall recovery,

which may—or may not—ultimately amount to higher fees than a flat hourly rate.  Thus, the risk

to Mr. Kontilai's current assets is zero: Mr. Kontilai is not responsible for paying any out-of-

pocket litigation costs as they are incurred.  If the litigation does not succeed, Mr. Kontilai

simply does not recover.

In the event that the litigation succeeds, costs advanced by the lawyers and fees are

recovered from the proceeds of the lawsuit.  The SEC will have the opportunity to contest any

costs or fees that it deems to be unreasonable, if it has any basis for that contention.  After a

money judgment is awarded in a contingent fee case, but before money is set aside for

distribution to the parties, the attorney is obligated to provide a full accounting of the advanced

costs and expenses that the attorney is claiming he is due. This is a full accounting of the out-of-

pocket expenses advanced by the attorney and the law firm, including expert witness fees.

Mr. Kontilai will provide a copy of this accounting to the SEC prior to approving the payment of those fees, affording the SEC the opportunity to raise before the Court any contention that any expense was inappropriately billed.  Thus, the SEC's interests are completely protected: Mr. Kontilai is not paying out-of-pocket for any expense in connection with the litigation, and the SEC will have the opportunity to review and contest any expense advanced by the attorney handling the case prior to the reimbursement of those fees out of any money judgment awarded.  Thus, the contingency fee agreement itself "adequately protect[s] the value of Defendants' remaining assets," as the very function of such an agreement shifts the financial risk and expense of litigation from the parties themselves to their attorney. SEC Letter, Docket No. 804 at 1.

Given that Mr. Kontilai is not paying out-of-pocket for litigation expenses, there can be no interference with or impact on Mr. Kontilai's assets that are within the scope of the TRO, as none of those assets would be used or otherwise diminished for the purpose of litigating the suit. The contingency fee agreement itself, similarly, does not interfere with or impact the asset as the SEC claimed: if Mr. Kontilai were to choose not to litigate the claim at all, there would be no recovery and the "asset" claim would be worth nothing.  If Mr. Kontilai chose to litigate the claim subject to a contingency fee agreement, then the "asset" claim is worth the amount of recovery minus the reasonable contingency fee and costs. Therefore, as this Court previously noted, the only possible outcomes are either *no recovery at all*, which would occur both where Mr. Kontilai did not file the claim at all and where Mr. Kontilai filed the claim pursuant to a contingency fee agreement and lost—or an "increase [of] the assets available to the SEC," if Mr. Kontilai successfully recovered. Report, Docket No. 767 at 26.

The plain terms of the asset freeze clearly do not contemplate prohibiting Mr. Kontilai from filing a lawsuit arising out of an injury he suffered due to the actions of a third party.  Even if the terms did contemplate such a prohibition, the terms of the TRO only prohibit the filing of an action that interferes with the asset freeze or otherwise impacts the subject assets.  As the filing of lawsuits arising out of injury for which Mr. Kontilai may be owed monetary damages do not impact any assets under the TRO or otherwise interfere with the asset freeze, other than to result in the award of money damages that would *increase* the assets subject to the freeze, such lawsuits are permitted by the TRO.

Further, with respect to future lawsuits that may be filed and litigated by Mr. Kontilai, this Court has noted specifically that only lawsuits that "accrued prior to the entry of the TRO" "necessarily come[] within the definition of 'asset' in the TRO as a legal matter." Report, Docket No. 767 at 25. Any lawsuit that arises out of injury that accrued after the entry of the TRO is not prohibited by the TRO because the potential claim is not an "asset" subject to the TRO. Additionally, any money judgments or settlements that arise *after* the entry of the TRO are similarly after-acquired assets that are not subject to the asset freeze.

Although this Court did not previously "find it necessary to resolve the question of whether such 'after-acquired' assets are covered by the TRO's asset freeze," this Court indicated that it was unlikely that the TRO covered such assets. Report, Docket No. 767 at 19. The plain text of the TRO "applies to assets that are 'held' by Mykalai/CCI (TRO ¶ I.A) and refers to any assets that are 'presently held by them' in whatever form the assets may 'presently exist.'" *Id*. The definition of "presently" refers to "assets held at 'present'", meaning "the time of the statement or writing, and not later." *Id*.

Indeed, the purpose of the TRO is to "preserve the *status quo*"—in other words, preserve the status of Mr. Kontilai's assets *at the time the TRO was entered*. TRO, Docket No. 12 at 2. Under the TRO, Mr. Kontilai is obligated to "hold and retain within [his] control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of [his] funds or other assets or things of value ***presently held by*** [him.]" *Id*. at 4 (emphasis added).

Therefore, the asset freeze does not apply to assets that are later acquired, such as any settlement funds.  The after-acquired proceeds received from the Wrongful Death Suit are an excellent example.  Funds from the settlements that fell after the asset freeze are not subject to the freeze.  *See* Exhibit G (Blue Bird Release); Exhibit H (McMaster General Release); Exhibit I (Union Carbide Settlement Agreement); Exhibit J (Honeywell Good Faith Release); Exhibit K (Arvinmeritor Good Faith Release); Exhibit L (Genuine Parts Release).  Accordingly, as these funds had not been received as of the May 2019 asset freeze, they are not subject to the freeze.

There is no rational argument that these funds were "presently held by" Mr. Kontilai at the time of entry of the order, and Mr. Kontilai had no accrued right to those funds at that time. TRO, Docket No. 12 at 4.  Accordingly, even if this Court finds that the claim itself is an "asset" within the definition of the TRO, any settlement funds that arise out of the action are "after-acquired" assets that are outside the scope of the TRO.

The plain language of the Court's orders is clear and the Court need not go beyond that language for interpretation purposes.  Nevertheless, it bears noting that interpreting the scope of the asset freeze so broadly as to include after-acquired assets and other untainted funds would be contrary to settled case law. "The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be

24

preserved to satisfy a potential money judgment." *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988).  A TRO cannot freeze assets that come into existence after the entry of the asset freeze, especially where those assets are not derived from illegal acts in violation of the conduct prohibited by the TRO.  *See In re Dolen*, 265 B.R. 471, 484 (Bankr. M.D. Fla. 2001) ("To the extent that the [FTC] seeks to enforce the preliminary injunction to enjoin the debtor's use of her post-petition earnings, it goes beyond 'a reasonable measure to preserve the status quo pending final determination' of the merits of the district court action.") (quoting *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940)).

The Supreme Court recently noted that while the principles of equity seek to ensure that a wrongdoer does not "make a profit out of his own wrong," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020) (quoting *Root v. Railway Co.*, 105 U.S. 189, 207, 26 L.Ed. 975 (1882)), equity principles simultaneously establish that a "wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu*, 140 S. Ct. at 1943 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146, 8 S.Ct. 894, 31 L.Ed. 664 (1888)). The remedy, therefore, is "tethered to a wrongdoer's net unlawful profits," and does not extend beyond that strictly limited scope. *Id*.  As Courts cannot use their equitable powers to ensure that a potential remedy at law is collectible, *see Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), and the SEC cannot seek an equitable remedy such as disgorgement beyond the alleged unlawful profits at issue, the TRO cannot freeze assets that are untainted by the claims alleged by the SEC in this case and/or assets that were acquired by Mr. Kontilai after the entry of the TRO.

Accordingly, this Court should clarify that: 1) pursuant to the express terms of the TRO, Mr. Kontilai is permitted to file and litigate lawsuits against third parties, including but not

limited to the Malpractice Suit, the Wrongful Death Suit, and any future lawsuit that Mr. Kontilai

may choose to file; and 2) that after-acquired assets, including lawsuit settlements, are not

subject to the plain language of the asset freeze.

**II.      In the Alternative, this Court Should Clarify that Mr. Kontilai Has Made the Proper
         Showing to Continue Litigating the Malpractice Suit and the Wrongful Death Suit.**

Pursuant to the terms of the TRO, this Court may grant leave for a party to pursue a

lawsuit otherwise prohibited by the TRO.  TRO, Docket No. 12, at 5.  While asserting his good

faith belief that the asset freeze operates as detailed above herein, if this Court finds such

permission necessary, Mr. Kontilai hereby requests leave to pursue the Wrongful Death Suit and

the Malpractice Suit.

In its response to Mr. Kontilai's pre-motion letter on this topic, the SEC raised two

arguments against permitting Mr. Kontilai to pursue the Malpractice Suit that related to the

substance of the suit itself: (1) the likelihood of success for the lawsuit weighed against the

potential costs and (2) the reliability of Mr. Kontilai's counsel.

In asserting that Mr. Kontilai does not have a substantial likelihood of success, the SEC

speculates broadly about "the fact that [Defendants] face a counterclaim for extensive unpaid

fees" or a "risk of a default judgment (or other sanction) if Kontilai is ordered to return to the

United States and refuses to do so." SEC Letter, Docket No. 804 at 2.  These statements are

nothing more than plain speculation without any support.  Although the Malpractice Plaintiffs

originally filed suit on October 17, 2020, the defendants have not yet responded, and are not

required to respond until November 10, 2021.

It is far from clear whether (1) the defendants will file any counterclaim, much less the

very specific counterclaim for unpaid fees that the SEC alleges, or (2) at any stage of the

litigation the court would require Mr. Kontilai to attend in person, which is unlikely given the

current pandemic and most courts conducting electronic hearings, and if so, whether Mr. Kontilai refused to attend, and if he did, whether the court would impose the harsh sanction of a default judgment.  While the SEC claims that it "is not correct" that it has "object[ed] to the Lawsuit to protect former SEC officials," the SEC simultaneously claims to have considerable knowledge of the defendants' planned litigation strategy. SEC Letter, Docket No. 804 at 1.

It is not reasonable to require Mr. Kontilai to respond to arguments on counterclaims and default judgment issues that have not been pled by the defendants and have not been raised by the court in the Malpractice Suit. This Court should not prohibit Mr. Kontilai from pursuing a legitimate suit on the basis of raw, unsupported speculation proposed by an entity that is not party to suit.  Mr. Kontilai filed a complaint with nearly twenty pages of facts supporting Mr. Kontilai's claims that defendants' negligently represented Mr. Kontilai.  *See* Exhibit A (Malpractice Complaint) at 14-32.  Mr. Kontilai contends that those facts will be proven during discovery.  Based on the thorough complaint filed in the case, this Court should permit Mr. Kontilai to pursue those claims.

Mr. Kontilai's likelihood of success in the Wrongful Death Suit, a suit that has progressed much further than the Malpractice Suit, is clearly demonstrable. The Wrongful Death Plaintiffs have successfully negotiated several settlements in the case and achieved a total settlement amount so far of just under $1 million.  *See* Exhibit G (Blue Bird Release); Exhibit H (McMaster General Release); Exhibit I (Union Carbide Settlement Agreement); Exhibit J (Honeywell Good Faith Release); Exhibit K (Arvinmeritor Good Faith Release); Exhibit L (Genuine Parts Release).  Mr. Kontilai is entitled to a share of that recovery after it is split with his co-plaintiff and after attorneys' fees and costs are deducted.  Exhibit E (Consent to Division).

The case is still pending against the remaining defendants, and there is a substantial likelihood of success in those claims and/or in negotiating more settlement agreements. Accordingly, as there is a substantial likelihood that Mr. Kontilai would obtain further monetary recovery if he were permitted to continue to litigate the suit, this Court should permit Mr. Kontilai to continue pursuing his claims.

The SEC's final allegation in their letter was that Mr. Kontilai's counsel is not reliable, either to "inform this Court accurately about the progress of the Lawsuit" or to "provide CCI advice on whether it is in CCI's interest in the Lawsuit to allege" certain facts.  SEC Letter, Docket No. 804 at 2.  First, there is nothing in the TRO that grants the SEC the authority to select counsel for either Mr. Kontilai or CCI, and nothing that entitles the SEC to intrude on Mr. Kontilai or CCI's attorney/client privilege and learn what their counsel has advised or change their litigation strategy.

Further, all of the SEC's arguments regarding counsel are directed at George Lambert, who is identified by name by the SEC in a transcript citation intended to demonstrate to this Court that Mr. Lambert was "less than forthright with the Court."  SEC Letter, Docket No. 804 at 3.

On July 22, 2021, Mr. Lambert filed a motion to withdraw from his representation of Mr. Kontilai in this matter.  Motion to Withdraw, Docket No. 941.  Although this Court denied Mr. Lambert's motion without prejudice, pending a statement from Mr. Lambert regarding whether he is asserting a retaining or charging lien, *see* Memorandum Endorsement, Docket No. 943 at 2, it is clear that Mr. Kontilai is represented by counsel who are fully capable of "inform[ing] this Court accurately about the progress of the Lawsuit," including the undersigned. SEC Letter, Docket No. 804 at 2.

28

Finally, the SEC has been, and will be, kept informed of all material and non-privileged documents filed and any funds received in both suits (not to mention the fact that the cases are public matters which the SEC is free to follow on the courts' dockets independently).  In the absence of a ruling that such after-received funds are not subject to the asset freeze, any funds received that are due to Mr. Kontilai as a result of either lawsuit will be retained in attorney trust accounts subject to further order of this Court.  Accordingly, there is no risk of interference with any assets of Mr. Kontilai which are subject to the freeze in the continued litigation of either suit, and a substantial likelihood of obtaining increased assets.  Therefore, this Court should clarify that Mr. Kontilai is permitted to continue litigating the Wrongful Death Suit and the Malpractice Suit pursuant to the TRO.

## CONCLUSION

Wherefore, for the foregoing reasons, Defendant Mykalai Kontilai respectfully requests that this Honorable Court enter an Order clarifying that: 1) Mr. Kontilai is permitted under the terms of the Temporary Restraining Order Freezing Assets and Providing for Other Ancillary Relief, Docket No. 12, to file and litigate lawsuits against third parties, including, but not limited to, the Malpractice Suit, the Wrongful Death Suit, and any other future lawsuit that Mr. Kontilai may be entitled to pursue; and 2) any after-acquired assets are not subject to the asset freeze; or, in the alternative, that Mr. Kontilai has leave to continue litigating the Malpractice Suit and the Wrongful Death Suit.

Respectfully submitted,

HANSEL LAW, PC

October 1, 2021

_____/s/_____
Cary J. Hansel (*pro hac vice*)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:    301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

*Counsel for Mykalai Kontilai*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, I caused the foregoing to be electronically filed by using the CM/ECF system. I further certify that a copy of the foregoing was served upon the following counsel of record via the Court's CM/ECF system:

Seth Eliot Spitzer, Esquire
Cristina Isabel Calvar, Esquire
Winston & Strawn LLP
200 Park Ave
New York, NY 10166
sspitzer@winston.com
ccalvar@winston.com
Counsel for the Intervenor-Defendant
Jackie Robinson Foundation

Mark L. Williams, Esquire
Terry Ryan Miller, Esquire
Stephen C. McKenna, Esquire
U.S. Securities and Exchange Commission
1961 Stout St., Suite 1700
Denver, CO 80294
williamsm@sec.gov; millerte@sec.gov
Counsel for the Plaintiff, SEC

Stanley C. Morris, Esquire
12300 Wilshire Blvd., Suite 210
Los Angeles, CA 90025
Phone: 310-394-2900
Email: scm@cormorllp.com
Counsel for Defendant CCI

George Lambert, Esquire
The Lambert Law Firm
1025 Connecticut Ave., 1000 NW,
Washington, D.C., 20036
lawdc10@gmail.com
Counsel for Veronica Kontilai

Robert G. Heim, Esquire
Tarter Krinsky & Drogin LLP
1350 Broadway | New York | NY | 10018
rheim@tarterkrinsky.com
Counsel for Mykalai Kontilai

Richard A. Schonfeld, Esquire
Chesnoff & Schonfeld
520 South Florida Street
Las Vegas, Nevada 89101
rschonfeld@cslawoffice.net
Counsel for Intervenor-Plaintiffs


_____/s/_____
Cary J. Hansel (*pro hac vice*)
*Counsel for Mykalai Kontilai*