UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES SECURITIES AND          :
EXCHANGE COMMISSION,
                                      :

              Plaintiff,              :

        -v.-                          :
                                                19 Civ. 4355 (VM) (GWG)
COLLECTOR'S COFFEE INC., et al.,      :

              Defendants.             :
------------------------------------------------------------x

## REPORT AND RECOMMENDATION COMBINED WITH OPINION AND ORDER

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

This case was brought by the Securities and Exchange Commission ("SEC") against

Collector's Coffee Inc., d/b/a Collectors Café ("CCI"), and Mykalai Kontilai ("Kontilai"), the

President and Chief Executive Officer of CCI, alleging that the defendants violated

federal securities laws by defrauding investors.  See Amended Complaint, filed Nov. 4, 2019

(Docket # 134).  Before the Court are two motions — both of which relate to litigation filed by

Kontilai and/or CCI after this lawsuit was instituted.  One is a motion by Kontilai to clarify the

terms of the "Temporary Restraining Order Freezing Assets and Providing for Other Ancillary

Relief" ("TRO") issued at the beginning of this case and later stipulated to by the parties.[1]  The

other is a motion by the SEC to enforce the TRO.[2]  As to the first motion, the Court grants the

---

[1]  See Kontilai's Pre-Motion Letter, filed Feb. 15, 2021 (Docket # 801) ("Def. Letter");
SEC's Reply Letter, filed Feb. 17, 2021 (Docket # 804) ("SEC Letter"); Kontilai's Motion to
Clarify the Terms of the Asset Freeze, filed Oct. 1, 2021 (Docket # 958) ("Def. Mot.");
Memorandum of Law in Support of Def. Mot., annexed as Ex. A to Def. Mot. ("Def. Mem.");
SEC's Opposition to Motion to Clarify, filed Oct. 8, 2021 (Docket # 961) ("SEC Opp.");
Kontilai's Reply Brief, filed Oct. 15, 2021 ("Def. Reply") (Docket # 964).

[2]  See Motion to Enforce the Asset Freeze Order, filed Oct. 29, 2021 (Docket # 970)
("SEC Mot."); Memorandum of Law in Support of Motion to Enforce the Asset Freeze Order,

motion to clarify.  As to the second motion, the Court recommends the issuance of certain orders to enforce the TRO.

I. <u>BACKGROUND</u>

    A.  <u>Procedural History</u>

The SEC filed the complaint in this case on May 14, 2019, alleging various causes of action for securities fraud.  <u>See</u> Complaint, filed May 14, 2019 (Docket # 1).  At the time the SEC filed the complaint, it presented to the district judge an ex parte motion for a temporary restraining order.  <u>See</u> Ex Parte Motion for Temporary Restraining Order, filed May 15, 2019 (Docket # 8); Ex Parte Memorandum in Support, filed May 15, 2019 (Docket # 9); Affidavit of Jacqueline M. Moessner, filed May 15, 2019 (Docket # 10); Notice of Certification of Terry R. Miller, filed May 15, 2019 (Docket # 11).  Judge Schofield, who was then assigned to the case, signed the temporary restraining order that same day.  <u>See</u> Temporary Restraining Order, filed May 16, 2019 (Docket # 12) ("TRO").  The order provided that the "assets, funds, or other property held by or under the direct or indirect control of Defendants Collectors Café or Mykalai Kontilai . . . wherever located, up to the amount of $46,121,649.68, are frozen."  TRO ¶ I.A.

The TRO also required CCI and Kontilai to

> hold and retain within their control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist . . . up to [$46,121,649.68].

<u>Id.</u> ¶ I.B.  In a separate paragraph, the TRO ordered CCI and Kontilai to refrain from "tak[ing] any action to interfere with the asset freeze, including, but not limited to, the filing of any

---

filed Oct. 29, 2021 (Docket # 971) ("SEC Mem."); Defendants' Memorandum of Law in Opposition to Motion to Enforce the Asset Freeze Order, filed Nov. 19, 2021 (Docket # 977) ("Def. Opp."); Reply Memorandum of Law in Support of Motion to Enforce the Asset Freeze Order, filed Dec. 3, 2021 (Docket # 978) ("SEC Reply").

lawsuits, liens, or encumbrances . . . to impact the property and assets subject to this order;

provided, however, that any party or non-party may seek leave from this order upon a proper

showing." Id. ¶ I.D.  Later, the parties stipulated to the relief sought in the TRO "pending a

hearing on a preliminary injunction," Joint Letter at 3, filed Dec. 9, 2020 (Docket # 174) — a

hearing that has not yet taken place.  At the same time, the Court entered a stipulated order which

enjoined defendants from committing future securities law violations and which extended the

TRO's prohibitions to Kontilai's wife.  See Stipulated Order, filed Dec. 9, 2019 (Docket # 175).

On June 25, 2020, the SEC filed a motion for contempt.  See Motion for Sanctions and

Order Finding Contempt, filed June 25, 2020 (Docket # 414). The SEC alleged, among other

things, that Kontilai violated the TRO by filing a malpractice suit against his former attorneys

and the law firm of Debevoise & Plimpton LLP (the "malpractice action").  See SEC's Post-

Hearing Brief in Support, filed Dec. 15, 2020 (Docket # 722), at 40.  The SEC contended that, by

filing the malpractice action and agreeing to a contingency fee arrangement for the attorney

representing him in that matter, Kontilai had violated the TRO.  Id.  The Court denied that relief

on the ground that the obligation not to pursue the malpractice action was not clear from the

TRO and thus the SEC had not proven by clear and convincing evidence that Kontilai had

intentionally violated the TRO.  See SEC v. Collector's Coffee Inc., 2021 WL 266284, at *1

(S.D.N.Y. Jan. 27, 2021).

While the SEC's contempt motion was pending, Kontilai filed a letter styled as an

"Emergency Motion to Lift Preliminary Injunction and Asset Freeze."  Letter Motion to Lift

Asset Freeze, filed Nov. 1, 2020 (Docket # 612).  That letter sought clarification that the asset

freeze did not "cover untainted funds acquired by Kontilai after the asset freeze was entered," id.

at 3, both as a general matter and for the purpose of mounting a defense to criminal charges

against Kontilai, see id. at 1.  Kontilai represented that the purportedly untainted funds he hoped

to obtain included "payment from Kontilai's deceased mother's estate, which may be entitled to

funds in the future."  Id. at 2.  Judge Schofield issued an order construing the letter as seeking

"leave from th[e] [TRO] upon a proper showing."  See Order of November 20, 2020 (Docket

# 658), at 1 (citing TRO ¶ I.D).  Judge Schofield denied Kontilai's motion, concluding that

Kontilai's rights under the Sixth Amendment had not yet attached, and that, in any event,

Kontilai had not shown that the funds he sought to acquire were untainted.  See id. at 4-5.

   B.  The Lawsuits at Issue

       1.  Malpractice Action

On January 10, 2018, long before the SEC filed this lawsuit, Kontilai, acting on behalf of

CCI, entered into a retainer agreement with Debevoise & Plimpton LLP ("Debevoise") to

represent CCI in the SEC investigation that preceded the filing of the complaint.  See

Engagement Letter from Andrew J. Ceresney, dated Jan. 10, 2018, annexed as Ex. 1 to

Malpractice Complaint, filed Oct. 14, 2020, annexed as Ex. A to Def. Mot.  The complaint in the

malpractice action alleges that Debevoise represented not only CCI but also Kontilai during the

SEC's investigation.  See Malpractice Complaint ¶¶ 56-136.  Kontilai and CCI have alleged that

Debevoise withdrew from this representation after settlement discussions with the SEC collapsed

in or around October 2018.  See Malpractice Complaint ¶¶ 129-36.

On August 24, 2020, long after the TRO was issued, Kontilai entered a retainer

agreement with George Lambert of the Lambert Law Firm to represent Kontilai in a malpractice

action against Debevoise.  See Engagement Letter from George Lambert, dated Aug. 24, 2020,

annexed as Ex. 1 to SEC Mem. ("Lambert Engagement Ltr.").  The retainer agreement provided

that "all and any fees and costs for the above representation are to be on contingency, namely

subject to prevailing in litigation till a judgment and/or settlement."  Id. at 2.  Lambert's

contingency fee was set at 20% of any settlement reached within 8 months and 30% of any

settlement or judgment paid after 8 months.  Id.  The agreement also provided that "[a]t no time

will [Kontilai] be responsible personally for paying any legal fees relating to any litigation filed

by [Lambert]," and that "[a]ny share of payments or disbursements due to [Kontilai] by Defendants relating to any settlements or favorable verdicts on behalf of [Kontilai] shall be paid directly to [Kontilai]." Id. As the SEC notes, see SEC Mem. at 5, the retainer agreement applies only to Kontilai, not to CCI. Accordingly, it is unclear whether CCI is party to a second retainer agreement with Lambert, and what the terms of such an agreement may be. See SEC Reply at 7. The defendants have stated in their memorandum that, as to the malpractice action, "there is one case, handled by one lawyer and the arrangements are the same for both CCI and Mr. Kontilai," though they provide no proof of this. Def. Opp. at 17.

On October 14, 2020, CCI and Kontilai filed the malpractice action against Debevoise and several of its attorneys in the United States District Court for the District of Columbia. See Malpractice Complaint. On the same day CCI and Kontilai filed the malpractice action, they filed a motion to seal the case and the complaint, arguing that they would have more leverage in extracting a settlement if the case remained sealed. See Order of October 15, 2020 in Collector's Coffee, Inc. v. Debevoise & Plimpton LLP, No. 20-cv-2988 (D.D.C.), annexed as Ex. 1 to Letter from George Lambert, dated Oct. 23, 2020 (Docket # 601). The District of Columbia court denied that motion, finding that "plaintiffs' belief that sealing this suit may provide some leverage in settlement and help avoid protracted litigation and media attention is . . . insufficient reason for sealing a civil lawsuit." Id. at 4. Neither this Court nor the SEC were provided advance notice of CCI and Kontilai's intention to file the malpractice action. See SEC Letter at 3; SEC Mem. at 6.

Debevoise is represented in the malpractice action by the law firm of Williams & Connolly. See Letter of David S. Blatt, dated Oct. 22, 2020, annexed as Ex. 4 to SEC Mem. On October 27, 2020, Lambert sent an e-mail to Williams & Connolly stating that CCI and Kontilai were "open to reasonable settlement negotiations," and seeking to learn whether Debevoise

"would like to make a settlement proposal before the full-scale litigation." See E-mail from George Lambert, dated October 27, 2020, annexed as Ex. 2 to SEC Mem.

According to a letter filed by Kontilai, the SEC met with Kontilai and his counsel to discuss the malpractice action on February 8, 2021. See Def. Letter at 1. Although the letter is unclear as to what transpired during this meeting, the SEC later confirmed that it believed Kontilai would need to file a motion to modify the asset freeze in order to pursue the malpractice action, and represented that, at the February 8, 2021 meeting, the SEC had "asked for information about the lawsuit that would allow it to take a position on such a request." SEC Letter at 1. Because it had not received such information, the SEC expressed an intention to oppose any such motion. Id. at 2-3.

On March 1, 2021, Lambert sent an e-mail to the SEC with the stated purpose of addressing the SEC's "requests for disclosures" regarding the malpractice action so that the SEC would withdraw its objections to the suit. See E-mail from George Lambert, dated Mar. 1, 2021, annexed as Ex. N to Def. Mot., at 2 ("Lambert 3/1/21 E-mail"). Lambert's e-mail stated that he attached a password-protected copy of his engagement letter with Kontilai for the malpractice action. Id. It also stated that he was seeking "additional qualified counsel" to assist with the malpractice action. Id. The e-mail confirmed that Kontilai's attorneys would be "self-financing all the costs in the case, to address [the SEC's] objection, to avoid any financial debt outstanding to CCI," though it placed a $200,000 limit on Lambert's liability for such costs. Id. The e-mail also stated that, "[i]n the event a monetary judgment is entered against the defendants in the SEC case before the [malpractice action] is concluded, both CCI and [Kontilai] will agree to put any funds awarded either by judgment or settlement in the [malpractice action] into an escrow account." Id.

In September and October of 2021, Kontilai met with the SEC to discuss the filing of a motion to clarify or modify the asset freeze but the parties were unable to "reach consensus on[]"

a proposed joint order" that would allow Kontilai to continue litigating the malpractice and wrongful death actions.  See Def. Mot. at 3.

Although Debevoise's answer in the malpractice action was originally due on March 15, 2021, the parties have repeatedly sought extensions of this deadline, which was most recently extended to May 9, 2022.  See Minute Order of Jan. 24, 2022 in Collector's Coffee, Inc. v. Debevoise & Plimpton LLP, No. 20-cv-2988 (D.D.C.).  The parties' joint requests for extensions have been based on the overlap in subject matter between that case and this one, as well as the legal uncertainty as to whether Kontilai and CCI violated the TRO by initiating and litigating the malpractice action.  See Joint Motion for Extension of Time to File Answer, filed Jan. 19, 2022 in Collector's Coffee, Inc. v. Debevoise & Plimpton LLP, No. 20-cv-2988 (D.D.C.) (Docket # 12).  No substantive motions have been filed.  The SEC has produced a letter from Williams & Connolly indicating that, if the malpractice action proceeds, "Debevoise would file a counterclaim for unpaid fees."  See Letter of David S. Blatt, at 1.

### 2. Wrongful Death Action

Kontilai's mother, Sylvia Contile, died on June 24, 2006.  See Amended Complaint in Maria Contile v. Air & Liquid Systems Corp. et al., No. 2018-L-105 (Ill. Cir. Ct.), dated May 23, 2019, annexed as Ex. C to Def. Mot. ("WD Comp.").[4]  On August 9, 2018, a complaint was filed in Illinois state court on behalf of Sylvia Contile's estate against a group of manufacturers of asbestos and asbestos containing products.  The complaint indicates that the plaintiffs are "Maria Contile and Mykalai Kontilai as Co-Special Administrators of the Estate of Sylvia Contile."  Id.

---

[4]  The parties have not produced a copy of the original complaint in the wrongful death action.  However, the Court's review of Illinois state court records confirms that the complaint was filed on August 9, 2018.  The Court utilized the Public Access Civil Search System provided by McLean County, Illinois, available at https://publicaccess.mcleancountyil.gov/PubAC_SearchCivil.aspx.  The wrongful death action may be accessed by searching the case number "2018L0000105".

The complaint alleged that the defendants' negligent conduct proximately caused Sylvia Contile's death from mesothelioma due to exposure to asbestos.  See id. ¶¶ 6-18.  That same day, Kontilai and his sister filed a motion with the Illinois state court seeking to be appointed co-special administrators of Sylvia Contile's estate.  See Motion for Appointment of Special Administrators, dated Aug. 9, 2018, annexed as Ex. D to Def. Mot.  An undated filing indicates that Kontilai signed a Consent to Division and Distribution providing that his mother's estate would be divided evenly between him and his sister.  See Consent to Division, annexed as Ex. E to Def. Mot.[5]

On July 15, 2020, Kontilai and his sister, acting as co-special administrators of Sylvia Contile's estate, settled the wrongful death claims against one of the defendants, the Blue Bird Body Company, for $100,000.  See Settlement Agreement with Blue Bird Body Company, annexed as Ex. G to Def. Mot.  On October 6, 2020, Kontilai and his sister executed a settlement with Honeywell International, Inc., for $400,000.  See Settlement Agreement with Honeywell, annexed as Ex. J to Def. Mot.  Also on October 6, 2020, Kontilai executed a settlement agreement with Union Carbide Corporation for $100,000, which his sister executed on November 2, 2020.  See Settlement Agreement with Union Carbide, annexed as Ex. I to Def. Mot.  On November 2, 2020, Kontilai and his sister executed a settlement agreement with McMaster-Carr Supply Company for $100,000.  See Settlement Agreement with McMaster-Carr, annexed as Ex. H to Def. Mot.  On July 23, 2021, Kontilai executed a settlement agreement with Genuine Parts Company for $100,000, see Settlement Agreement with Genuine Parts Company, annexed as Ex. L to Def. Mot., and with ArvinMeritor, Inc., for $100,000, see Settlement Agreement with ArvinMeritor, annexed as Ex. K to Def. Mot.

---

[5] Maria Contile died on January 19, 2021.  See Motion to Substitute Administrator, dated June 25, 2021, annexed as Ex. F to Def. Mot., at 1.  David Spaulding, Maria's only son and Kontilai's nephew, filed a motion to be substituted as a special administrator.  Id.

Kontilai first divulged to the Court that he might receive funds from the wrongful death action in his November 1, 2020 letter motion to lift the asset freeze, in which he stated that he may soon receive funds via "payment from Kontilai's deceased mother's estate, which may be entitled to funds in the future." See Letter Motion to Lift Asset Freeze at 1-2. The SEC's briefing suggests that the SEC did not learn of the wrongful death action until this filing. See SEC Mem. at 11; SEC Reply at 10-11.

On August 6, 2021, Cary Hansel, now counsel for Kontilai in this matter, sent an e-mail to the SEC disclosing the progress of the wrongful death action. See E-mail from Cary Hansel, dated Aug. 6, 2021, annexed as Ex. A to Def. Reply ("Aug. 6 E-mail"). Hansel referred to having two previous telephone conversations with the SEC regarding "settlements related to an asbestos claim for the death of Mr. Kontilai's mother as a potential source of untainted funds for living expenses." Id. The e-mail explained that Kontilai was being represented in the wrongful death action by Chip Corwin of Wylder Corwin Kelly LLP ("WCK"). Id. at 1-2. The e-mail disclosed that WCK held in trust $658,500.10 that was received from settlements between Kontilai and the wrongful death defendants. Id. at 2. Hansel's e-mail provided the SEC with several settlement agreements already executed by Kontilai, sheets reflecting the proposed disbursement of contingent fees to WCK, and an unsigned agreement dividing the estate between Kontilai and his nephew. See generally id. Hansel described two settlement agreements specifically, saying that "[s]ometime prior to November 13, 2020, settlements in principle were reached with ArvinMeritor and Genuine Parts Company for $100,000 each" and that the "releases related to those claims were recently executed" because WCK had warned that the defendant entities were at risk of declaring bankruptcy. Id. at 2. Hansel indicated that funds from these settlements, in his understanding, had "not been received to date," but that they would be held in trust and not released to Kontilai absent a court order. Id. at 2-3. Hansel requested that the SEC indicate whether it objected to Kontilai executing (1) a settlement sheet to allow

payment of WCK's contingent fees, and (2) an agreement to divide the proceeds of the estate equally between Kontilai and his nephew, in light of his sister's death.  Id. at 3.  Defendants have represented that Hansel coordinated an August 12, 2021 video teleconference between Chip Corwin and the SEC, during which the SEC questioned Corwin for over an hour.  See Def. Reply at 16.

Apparently not having received a reply to his previous e-mail, Hansel sent a second e-mail to SEC counsel on September 24, 2021, asking again whether the SEC objected to Kontilai's execution of these documents.  See E-mail from Cary Hansel, dated Sept. 24, 2021, annexed as Ex. B to Def. Reply.

The Court has not been provided the retainer agreement between Kontilai and his counsel in the wrongful death action, Chip Corwin.  Kontilai has represented in his pleadings that the agreement provides for a 40% contingent fee.  See, e.g., Def. Reply at 16.  The settlement sheets WCK sought to have Kontilai approve indicate that WCK is owed 40% of all settlement proceeds plus their costs, which the firm appears to be advancing on behalf of Kontilai and the Estate.  See Settlement Sheets, annexed as Ex. M to Def. Mot.

Illinois court records indicate that the wrongful death action is still being actively litigated, with two defendants filing motions for summary judgment in January 2022.

C. The Current Motions

Kontilai has filed a "motion to clarify" to permit his continuation of the malpractice action and the wrongful death action.  See generally Def. Mot.  He also seeks a more general ruling "that the asset freeze does not apply to after-acquired assets of any type."  Def. Mem. at 13.  The SEC maintains that, like any other asset, Kontilai is required to obtain court approval before he may settle, or "liquidate," his legal claims.  SEC Opp. at 2.  The SEC also argues that the Court's November 20, 2020 Order already clarified that funds from Kontilai's mother's estate were frozen.  Id. at 3 (citing Order of November 20, 2020 (Docket # 658)).  The SEC

suggests that Kontilai may in fact be seeking "modification" of the asset freeze and asks this Court to deny any such request because it "is still unsupported by necessary information." Id.

Shortly after briefing on Kontilai's motion was completed, the SEC filed a motion to "enforce" the asset freeze, relying largely on the same arguments it made in opposition to Kontilai's motion to clarify. See SEC Mot. The SEC argues that the right to file a lawsuit is an asset, that the causes of action underlying the malpractice and wrongful death actions are subject to the asset freeze, and that Kontilai has violated the asset freeze through his litigation activity. See SEC Mem. at 8-9. The SEC asks that Kontilai be enjoined from continuing to litigate the malpractice action without leave of this Court, which the SEC asks be granted only if Kontilai makes "a showing that the Malpractice Action is a prudent use of resources that accounts for all the costs and risks associated with the planned litigation, including the fact that the defendants in the Malpractice Action will file a counterclaim for unpaid legal fees if the Malpractice Action proceeds." Id. at 12. The SEC asks that the Court take steps to ensure that CCI and Kontilai "are represented by competent and conflict free counsel under written engagement letters that clearly define responsibility for costs." Id. The SEC also asks that Kontilai be enjoined from litigating the wrongful death action without leave of this Court. Id. at 13-14. It asks for a number of orders that would allow court monitoring of the wrongful death action, including approving settlements and forbidding the distribution of settlement funds to any party without Court approval. Id. at 13-15.

In opposition, the defendants reiterate their arguments in support of Kontilai's motion to clarify — namely, that the TRO does not cover the filing of the lawsuit. Def. Opp. at 3-5. They argue that failing to litigate the malpractice and wrongful death actions would have violated the TRO since allowing the statutes of limitations to run would have rendered the claims worthless. Id. at 4. The defendants oppose the specific enforcement measures proposed by the SEC on the ground that the power to litigate the lawsuits — including the power to retain attorneys and enter

into settlements — was already granted by the TRO, and that it is unnecessary for the Court to play any further role.  See id. at 20-23.  They also contend that to involve the Court would unnecessarily impede the progress of the suits and, in the case of the wrongful death action, would affect other parties.

Because the motion to clarify seeks a ruling regarding the parties' interim settlement as to the SEC's motion for a preliminary injunction (that is, the TRO), and because the parties consented to disposition by the undersigned of that motion and related motions (Docket # 59), the motion to clarify is decided herein by means of an Opinion and Order under 28 U.S.C. § 636(c).

As to the motion to enforce, it is unclear if the parties' original consent with respect to the motion for a preliminary injunction reflects a consent to adjudicate a motion to enforce.  Because of the uncertainty, the motion to enforce is the subject of a Report and Recommendation herein.

## II.  LEGAL STANDARDS

### A.  Motion to Clarify

"It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" Paramount Pictures Corp. v. Carol Pub. Grp., Inc., 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (citing Regal Knitwear Co. v. NLRB, 324 U.S. 9, 15 (1945)); accord IGT v. High 5 Games, LLC, 2018 WL 2939032, at *3 (S.D.N.Y. Apr. 17, 2018).  "Clarifications of previously issued orders 'add certainty to an implicated party's efforts to comply with the order and provide fair warning as to what future conduct may be found contemptuous,' and 'may be obtained on motion or made sua sponte by the court.'"  Jones v. United States Postal Serv., 2020 WL 6554904, at *5 (S.D.N.Y. Sept. 29, 2020) (quoting N.A. Sales Co. v. Chapman Indus. Corp., 736 F.2d 854, 858 (2d Cir. 1984)).  "Thus, courts 'that issue injunctions can and should give declaratory guidance defining the meaning and scope of injunctions issued.'"  Genworth Fin.

Wealth Mgmt., Inc. v. McMullan, 2012 WL 13024369, at *5 (D. Conn. May 10, 2012) (quoting

Bank of Crete, S.A. v. Koskotas, 733 F. Supp. 648, 650 (S.D.N.Y. 1990)).

    B.  Motion to Enforce

      "A court can take 'any reasonable action . . . to secure compliance' with its orders, and

the 'scope of a district court's equitable powers to remedy past wrongs is broad.'"  In re Tronox

Inc., 855 F.3d 84, 112 (2d Cir. 2017) (quoting Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir.

1985)).  "A motion to enforce is an appropriate procedural vehicle for parties to seek compliance

with a court order."  United States v. Visa U.S.A., Inc., 2007 WL 1741885, at *3 (S.D.N.Y. June

15, 2007).  A party filing a motion to enforce asks the court to exercise its "ability to impose a

penalty or sanction . . . for noncompliance with its prior Orders, with or without a finding of

contempt or bad faith."  Espinosa ex rel. Espinosa v. Shah, 2014 WL 6865664, at *11 (S.D.N.Y.

Dec. 5, 2014).  A motion to enforce may be granted where it is shown "by a preponderance of

the evidence" that a court order has been violated, Visa U.S.A., 2007 WL 1741885 at *4, and is

granted even where there is no finding that a party has acted contemptuously, see generally

United States v. Am. Express Co., 2015 WL 9049915, at *1-3 (E.D.N.Y. Dec. 15, 2015); Vassell

v. Reliance Sec. Grp., PLC, 328 F. Supp. 2d 454, 462 (S.D.N.Y. 2004); see also Pena v. New

York State Div. for Youth, 708 F.2d 877 (2d Cir. 1983) (affirming grant of motion to enforce).

A court's "choice of how to enforce [an] order is reviewed for abuse of discretion."  In re

Tronox, 855 F.3d at 112.

III.  DISCUSSION

    A.  Interpretation of the TRO

      As background, we note that Section 21(d) of the Securities and Exchange Act of 1934,

15 U.S.C. § 78u(d), empowers the SEC to seek a "temporary or permanent injunction" against

"any person [who] is engaged or is about to engage in acts or practices constituting a violation"

of the securities laws.  Accord SEC v. Materia, 745 F.2d 197, 200 (2d Cir. 1984).  If the SEC

provides the requisite showing that it is likely to succeed on the merits of its case, "the court has the power to order all equitable relief necessary, including an asset freeze." SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc., 296 F.R.D. 241, 254 (S.D.N.Y. 2013). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." SEC v. Byers, 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009); see also SEC v. Infinity Grp. Co., 212 F.3d 180, 197 (3d Cir. 2000) (purpose of an asset freeze is "to preserve the status quo by preventing dissipation and diversion of assets"). Here, as noted, the asset freeze in the TRO, to the extent it applies now, was the result of a stipulation of the parties to settle, on an interim basis, the SEC's motion for a preliminary injunction.

In his motion to clarify, Kontilai asks this Court to clarify that the TRO permits "the filing and litigation of lawsuits," including but not limited to the malpractice action and the wrongful death action. See Def. Mem. at 15-16. One of his arguments in support of this contention is that the existing and future settlement proceeds of the lawsuit, which were obtained after the TRO was issued, represent "after-acquired" assets — that is, assets acquired after entry of the TRO — and that "after-acquired" assets are not in fact subject to the TRO. E.g., id. at 4, 24.

We do not find it necessary to address the question of whether the TRO applies to "after-acquired" assets in general and instead will assume arguendo that it does not affect any assets acquired after the issuance of the TRO. See id. at 23-25. This assumption does not help Kontilai here, however, because the two lawsuits at issue in this motion arose from events that had already occurred at the time of the asset freeze. The malpractice action arose from legal representation of Kontilai and CCI in 2018, the year before the TRO was issued. See Malpractice Complaint ¶¶ 65, 129, 135. The wrongful death action arose from the circumstances of the death of Kontilai's mother, which occurred in 2006. See WD Comp. ¶ 6. While any

proceeds from these lawsuits became available or will become available only after the TRO was

entered, this fact does not alter the character of the lawsuits.  On the date it was issued, the TRO

froze all "assets" or "property" held by or under the direct or indirect control of CCI and

Kontilai.  TRO ¶ I.A.  The right to file a lawsuit, sometimes termed a "chose in action," "is a

constitutionally recognized property interest."  Phillips Petroleum Co. v. Shutts, 472 U.S. 797,

807 (1985).  The "property" interest represented by the lawsuits existed before the date the TRO

was entered.  Because the ability to file claims relating to these matters came into being before

the entry of the TRO, the TRO declared the rights inhering in these lawsuits to be "frozen."

TRO ¶ I.A.  The signing of a retainer agreement and the settlement of claims against a party sued

is simply inconsistent with a "freeze" of the right to file the lawsuit.  The unsupervised pursuit

and settlement of lawsuits has a significant potential to undermine the status quo that the TRO

sought to preserve.  See id. at 2 (finding that an asset freeze was "necessary to preserve the status

quo and to protect this Court's ability to award equitable relief in the form of disgorgement of

illegal profits from fraud and civil penalties").  Prosecuting or settling a lawsuit is akin to

converting one asset, a legal claim, into another asset, cash.  If we found that conduct to fall

outside the scope of the TRO, such a ruling could arguably permit Kontilai to sell a "frozen"

piece of real estate simply to maximize its value.  Unsupervised actions of this kind jeopardize

the availability of assets to satisfy a potential future judgment.

 Kontilai briefly argues that the lawsuits are "untainted funds" and that "to include after-

acquired assets and other untainted funds" within the scope of the TRO "would be contrary to

settled case law."  Def. Mem. at 24; accord Def. Opp. at 11 ("untainted assets like these

lawsuits[] are not properly subject to an asset freeze").  The simple response to this argument is

that the TRO was agreed to by Kontilai and he has provided no basis for modifying it at this late

date (nor has he moved to modify it).  Additionally, there was nothing improper about the TRO

as initially issued.  A court's equitable powers in a securities fraud case are not limited solely to

the unlawful gains acquired as a result of the underlying fraud.  This was made clear decades ago

in SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir. 1990), when the Second Circuit upheld an asset

freeze that extended to "funds in an amount sufficient to cover not just the profits that might

have to be disgorged but the civil penalty, equal to three times the profits, that the Commission

may recover under section 21A of the Exchange Act upon proof of a violation."  Id. at 1041.

Courts of this district have relied on Unifund to impose asset freezes that go beyond the alleged

amount of unlawful — and thus tainted – profits.  See SEC v. Ahmed, 123 F. Supp. 3d 301, 312

(D. Conn. 2015) (freezing untainted assets to permit future payment of civil penalties) (citing

Unifund, 910 F.2d at 1041), aff'd, 664 F. App'x 53 (2d Cir. 2016); SEC v. Maillard, 2014 WL

1660024, at *4 (S.D.N.Y. Apr. 23, 2014) (freezing amounts sufficient for disgorgement and the

imposition of civil penalties); accord SEC v. Callahan, 2014 WL 11343760, at *5 (E.D.N.Y.

May 17, 2014); SEC v. Schiffer, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998) ("A court has

the authority to freeze assets at an amount that will cover the maximum civil penalty available

under applicable law should securities law violations be proven at trial").  This power extends to

assets "untainted" by fraud at least in cases where, as is true here, there is no showing that frozen

tainted assets are sufficient to compensate allegedly defrauded investors.  See, e.g., SEC v. Roor,

1999 WL 553823, at *3 (S.D.N.Y. July 29, 1999) (freezing line of credit borrowed against equity

in defendant's home); SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("[i]t is

irrelevant whether the funds affected by the Assets Freeze are traceable to the illegal activity").[6]

---

[6] The cases Kontilai cites in support of the argument that a court may not freeze
untainted assets, see Def. Mem. at 24-25, relate to a Court's inherent equitable power, not the
grant of statutory authority contained in 15 U.S.C. § 78u(d).  See Grupo Mexicano de Desarrollo
S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 319-22 (1999) (discussing a court's general equitable
powers and noting that Congress could expand such powers through legislation); In re Fredeman
Litig., 843 F.2d 821, 824 (5th Cir. 1988) (relying on "[t]he general federal rule of equity").
Another case Kontilai cites relates only to a court's ability to freeze income earned after the
filing of a bankruptcy petition under 11 U.S.C. § 362(b)(4)).  See In re Dolen, 265 B.R. 471, 485
(Bankr. M.D. Fla. 2001).

2. Whether There Has Been a Violation of the TRO

Having determined that the right to file, pursue, and settle claims in a lawsuit was "frozen" by the TRO, we now turn to the question of what the TRO demanded from CCI and Kontilai with respect that right.  As CCI and Kontilai point out, see Def. Reply at 6; Def. Opp. at 10, if the lawsuits were meritorious and had CCI and Kontilai done nothing to pursue them, they could have been accused of failing to "prevent any . . . dissipation" of those assets under paragraph I.B of the TRO.  This is because statutes of limitations generally apply to the lawsuits.  Also, the value of a lawsuit diminishes with the passage of time as evidence typically becomes harder to come by.  Notably, the mandate to prevent dissipation applies to assets "in whatever form such assets may presently exist," so long as the assets are "under [CCI and Kontilai's] control or over which they exercise . . . authority."  TRO ¶ I.B.

On the other hand, the TRO clearly declared all of the defendants' property to be "frozen."  Id. ¶ I.A.  It also separately ordered the defendants to not "take any action to interfere with the asset freeze, including . . . the filing of lawsuits . . . to impact the property and assets subject to this order; provided however, that any party or non-party may seek leave from this order upon a proper showing."  Id. ¶ I.D.  This latter provision has some ambiguity when applied to a lawsuit that itself is part of the property frozen by the TRO.  The provision's bar to the filing of lawsuits is limited to lawsuits that "interfere with the asset freeze" and "impact the property and assets."  Id.  This provision likely reflects an intention to prevent the defendants from filing lawsuits that might affect ownership or title to existing assets.  It is not as clearly geared to addressing the right to file a lawsuit where that right to file the suit is itself part of the "property and assets" at issue.  As a result, it is not clear that the provision — requiring leave from the Court to file the lawsuit — applies here.

For his part, Kontilai asserts that this separate provision in fact expressly permits "the filing of lawsuits" so long as the lawsuits do not "interfere with the asset freeze."  See Def. Mem.

at 3, 15-16.  But we cannot accept this reading either inasmuch as this provision is entirely

prohibitory — that is, it forbids the filing of certain lawsuits.  The fact that it contains an

exception where leave is permitted does not illuminate the question of whether the filing of the

lawsuits was permitted in the first place.  In any event, the word "interfere" is ambiguous in this

context.

In the end, we believe that the key to solving this ambiguity centers on the word "frozen"

in the TRO's main provision.  TRO ¶ I.A.  The TRO is clear that the property interest manifested

in the lawsuits was "frozen" as of the date of the TRO.  We believe that entering into a

contingency agreement with an attorney, authorizing the filing of a lawsuit, and entering into

settlements that partially extinguish the right represented by the lawsuit, are simply inconsistent

with the "freezing" of the property right that is the source of the lawsuits.  Even if the defendants

took action to increase the value of this property right, the TRO plainly does not authorize the

custodian of a frozen asset to take unilateral action affecting that asset merely because the

custodian intends to increase or even preserve its value.  An interpretation of the TRO that

permitted Kontilai to unilaterally change the character of his frozen assets for the purpose of

enhancing or preserving their value would fail to safeguard the status quo --- the maintenance of

which was plainly intended by the TRO.

In other words, while the TRO was intended to preserve the value of the assets, it also

contemplates that the assets are "frozen," which suggests the maintenance of the status quo with

respect to those assets.  See TRO ¶ I.A.  As a result, we conclude that the TRO did not authorize

Kontilai to enter into a retainer agreement, litigate, or settle the malpractice or wrongful death

claims.  If Kontilai thought that failing to file the lawsuit would dissipate the asset's value, the

better course would have been for him to move the Court to modify the TRO to allow him to

litigate what was otherwise a frozen asset.

Finally, Kontilai argues that litigating the wrongful death action cannot violate the TRO, as the cause of action is held by the estate of Kontilai's mother.  See Def. Opp. at 9.  However, Kontilai has been appointed as a co-special administrator of the estate and has personally signed documents releasing claims.  See, e.g., Settlement Agreement with Defendant Blue Bird Body Company.  In practice, therefore, it is obvious that Kontilai possesses a significant degree of control over the estate and its litigation, and has utilized that control by pursuing settlements with the wrongful death defendants.  Also, the TRO extends to "the assets, funds, or other property held by or under the direct or indirect control of [CCI or Kontilai], whether held in any of their names or for their direct or indirect beneficial interests."  TRO ¶ I.A.  At a minimum, Kontilai wields "indirect" control over the wrongful death action or has an "indirect" beneficial interest in it.  Therefore, the fact that the claims are held by an estate does not place the wrongful death claims outside the TRO.

In sum, we grant the motion to clarify to make clear that the TRO does not permit the defendants to pursue lawsuits based on claims that arose before the issuance of the TRO without obtaining relief from the "freeze" imposed by the TRO.[7]

B.  The SEC's Motion to Enforce the Asset Freeze Order

For the reasons stated above, Kontilai and CCI violated the TRO by instituting, pursuing, and partially settling the lawsuits.  As reflected in our previous ruling on the motion for contempt, we do not consider it a serious violation given that the TRO was not explicit as to

---

[7]  We reject Kontilai's argument that the TRO thus interpreted is somehow "unconstitutional" because it impinges on Kontilai's right of access to the courts under the Petition Clause of the First Amendment to the United States Constitution.  See Def. Opp. at 13. Kontilai agreed to the provisions of the TRO and Kontilai cites no case suggesting that a party may not enter into an agreement to forgo the right to file suit in the future.  Notably, the court's docket is replete with court-ordered settlements in which parties agree to forgo their rights to sue each other for claims that arose before the date of the settlement.

what should be done with respect to any frozen claims and the fact there has been no showing that the value of the lawsuits has yet been diminished.  But it is a violation nonetheless.  In light of this conclusion, we next turn to the issue of what should be done to enforce the TRO in light of the violation.  As noted, a court has "broad" equitable powers to secure compliance with its orders.  In re Tronox Inc., 855 F.3d at 112.  In fashioning appropriate relief, we are mindful that our goal is to secure compliance both with the language of the TRO that "freezes" the assets and also the language that prevents the "dissipation" of assets.  Case law specifically upholds the authority of a court to issue orders to liquidate assets subject to an asset freeze where the value of those assets might be dissipated absent further action.  See Smith v. SEC, 653 F.3d 121, 129 (2d Cir. 2011) (noting the "sweeping mandate manifest in the securities laws . . . and the district court's broad equitable power to fashion ancillary relief when its jurisdiction under those law has been involved") (citations omitted).

The SEC makes differing requests depending on the lawsuit.  Accordingly, we address each lawsuit separately.  In considering the requests, we keep in mind that, in the Court's view, there are three major aspects of decision-making in litigation that are exercised by a client: the decision to bring suit, the decision as to which attorney to retain, and the decision to settle.  A potential fourth area occurs when clients are called upon to make strategic decisions about the progress of a case.  But such decisions are not required of clients in all cases, and counsel frequently have no need to obtain a client's permission to make such decisions.

### 1.  The Wrongful Death Action

As to the wrongful death litigation, the SEC does not question the propriety of the decision to institute the suit.  Nor does it seek to control any specific aspects of decision-making regarding litigation choices (other than settlement).  Rather, the SEC seeks an order:

(1) enjoining Kontilai and those acting in concert with him from litigating the wrongful death action without leave of the Court; and (2) permitting pursuit of the wrongful death action only if (a) Kontilai's current counsel in that case receives a copy of this Court's order; and (b) Kontilai notifies the Court "of any future change in counsel in that case to ensure that any new counsel are aware of this Court's orders regarding the Asset Freeze." SEC Mem. at 14. Also, (3) if the suit is permitted, the SEC seeks an order (a) directing Kontilai to provide a sworn accounting of all settlement funds obtained in the lawsuit that includes the amounts and dates of all distributions; (b) prohibiting Kontilai from entering into settlement agreements without approval from this Court; and (c) prohibiting the distribution of any settlement funds without approval from the Court and stating that the Court will deny the release of the funds obtained in the wrongful death action without prior Court approval "in any situation in which the Court has discretion to do so." SEC Mem. at 14-15.

For his part, Kontilai points to a number of practical problems with these proposals, including the fact the case is being litigated on behalf of an estate, not himself individually, and that Kontilai has only a 50% interest in the proceeds. See Def. Opp. at 20-23.

Turning now to each request, we are not certain what is meant by request # (1) given its broad language. But we find it unnecessary to issue any further order in this regard in light of our ruling on the motion to clarify that makes clear the lawsuits are frozen assets within the meaning of the TRO. To the extent that the SEC is proposing that no litigation decision be made by Kontilai's attorney without leave of the Court, such an order would be unworkable from a practical standpoint and the request should be denied.

As to request # (2), it is appropriate that counsel in the wrongful death case be made aware of the order resulting from the motion to enforce, which certainly should contain a direction to counsel to hold any settlement funds in escrow pending further order of this Court.

Moreover, once counsel is made aware of the TRO, counsel will be bound not to dispose of the proceeds of the suit even without a further order from this Court because the TRO places the obligation not to dispose of frozen assets not only on Kontilai but also on his "agents." See TRO ¶ I.B. To fully effectuate this provision, Kontilai must be obligated to immediately inform this Court if there is any change in counsel in the wrongful death action so that any new counsel may be made aware of the TRO and of the obligation to hold any settlement funds in escrow.

As to request # (3), given Kontilai's critical role in bringing the wrongful death suit and the fact that the proceeds are frozen by the TRO, it is entirely appropriate that Kontilai provide to the Court on request an accounting of any settlement funds obtained. Also, any such accounting must be updated any time additional settlement funds are received. Additionally, because the funds are subject to the asset freeze, any funds that might potentially go to Kontilai must be kept in escrow until further court order. However, we believe any such order should apply only to Kontilai's share of settlement funds — not the share belonging to Kontilai's co-beneficiary, the estate's attorney, or any other party entitled to compensation from settlement proceeds. Obviously, release of funds held in escrow pertaining to Kontilai for any purpose may be accomplished only by seeking and obtaining leave of this Court. See TRO ¶¶ I.B - I.D.

Finally, as to the request that we prohibit Kontilai from entering into settlement agreements without approval from this Court, we find this provision to be unworkable as a practical matter. First, even though Kontilai presumably has a significant say in the settlement decision, the case is being litigated on behalf of the estate of the deceased with another beneficiary, and that beneficiary is highly incentivized to agree only to a fair settlement.[8]

---

[8] As noted, Kontilai's nephew is entitled to a 50% share of the net proceeds of the wrongful death action. See Consent to Division, annexed as Ex. E to Def. Mot.; Motion to Substitute, annexed as Ex. F to Def. Mot.

Second, counsel for the defendant has represented, and the SEC has agreed, that the "Illinois Court . . . must enter an order approving each settlement," Def. Opp. at 22; SEC Reply at 9 ("Kontilai already seeks approval for settlement agreements from the Illinois State Court"), suggesting that there is already a level of court review for reasonableness. To involve this Court in a review process would be duplicative and extraordinarily time consuming, and could potentially harm the possibility of settlement in some instances, given that settlement discussions normally need to proceed swiftly.

We also reject as unnecessary the SEC's request to announce in an order that the Court will deny release of funds that were the subject of an improper settlement.

　　　　　　2. Malpractice Action

Unlike its position on the wrongful death action, the SEC's position on the malpractice action is that the litigation should not go forward unless Kontilai and CCI "make a showing that the Malpractice Action is a prudent use of resources that accounts for all the costs and risks associated with the planned litigation, including the fact that the defendants in the Malpractice Action will file a counterclaim for unpaid legal fees if the Malpractice Action proceeds." SEC Mem. at 12. The SEC also asks that the Court require that CCI and Kontilai be "represented by competent and conflict-free counsel under written engagement letters that clearly define responsibility for costs." SEC Mem. at 13. Defendants represent that "costs will be advanced by counsel and they will not be collectable or collected if the malpractice case is lost." Def. Opp. at 16.

As to the "competen[ce]" of counsel, the Court certainly has concerns about the attorney retained in the malpractice action, given that CCI and Kontilai are being represented by George Lambert, who is still attorney of record in this matter and is part of a group of attorneys whose conduct has been characterized by this Court as "dilatory," see Order of November 30, 2020

(Docket # 679), at 3, and has been the subject of repeated criticism, see Order of January 28, 2021 (Docket # 774), at 2 ("the defendants' conduct in delaying the mechanisms to obtain discovery is inexcusable"); see also SEC v. Collector's Coffee Inc., 338 F.R.D. 309, 317-18 (S.D.N.Y. 2021) (defendants "hav[e] taken numerous improper actions to delay this case, including engaging in highly dilatory tactics in the discovery process, filing numerous frivolous applications, and having required the court to address numerous frivolous arguments").  But we think the Court would be overstepping its role if it became the arbiter of which particular attorney should pursue an action frozen by the TRO.  As to the SEC's claim that there is a conflict of interest between CCI and Kontilai, see SEC Mem. at 13, there is no reason to believe that the conflict is not waivable.

As to the question of whether the malpractice action is a "prudent use of resources," we conclude that it should not be the Court's role to decide the merits of a suit subject to the asset freeze as long as no frozen "resources" are likely to be expended.  Indeed, the Court does not believe that it could undertake such a task without assuming the burdensome effort of essentially requiring a mini-litigation in front of it, in which it would evaluate the evidence and possible defenses.  If the malpractice action has value, it would be better for it to be pursued than not.  If it is worthless or frivolous, it could harm the frozen assets only if the lawsuit resulted in the imposition of costs or sanctions against the defendants that were ordered to be borne by defendants personally and not by their attorneys.  Given the lack of evidence presented to us on this question, we view this possibility as sufficiently remote that it should not form part of the Court's decisionmaking.

The SEC does raise the concern that, if the suit proceeds, Kontilai will become subject to a counterclaim for Debevoise's unpaid attorney fees and may be liable for costs.  See SEC Mem. at 12.  The Court does not believe the potential for a counterclaim is enough to change our view

that we should not be assessing the merits of the lawsuit, given that nothing would stop

Debevoise from suing Kontilai and CCI at any time for unpaid fees within the statute of

limitations (presumably the six-year period normally applied to suits for breach of contract)

regardless of whether the malpractice action were pursued or not.

The Court does have some concern about costs, however, because while Kontilai's

retainer agreement with Lambert states that all "costs" will "be on contingency, namely subject

to prevailing in litigation till a judgment and/or settlement," see Lambert Engagement Ltr. at 2,

Lambert later limited his liability for such costs to $200,000, see Lambert 3/1/21 E-mail, and the

phrase "prevailing in litigation till a judgment" is ambiguous.  On the former point, while the

$200,000 limit may at first blush seem unlikely to be reached, the possibility that it will be

reached cannot be discounted --- particularly in light of the dilatory manner in which counsel

have handled the instant case which might result in significant costs in the event of a loss.  In any

event, we have been provided with no reason that the litigation should not proceed with

representation by an attorney willing to absorb any costs without placing a monetary limitation.

If Lambert so agrees, or if another attorney is found who agrees to eliminate the $200,000

limitation, the Court will be prepared to recommend issuance of an order similar to that issued

for the wrongful death action: that is, an order that allows the litigation to proceed subject to the

same constraints involving notice to the attorney and keeping any proceeds in escrow pending

order of the Court.  The Court should also require that the agreement make clear that the costs

would be paid only out of a judgment, that the costs will otherwise be borne by the attorney, and

that CCI and Kontilai would not have to bear them as an out-of-pocket expense.

There is a separate problem as to CCI that needs to be addressed: there is no retainer

agreement in the record reflecting the arrangement between CCI and Lambert (or any other

attorney).  Accordingly, CCI should not be permitted to proceed in the malpractice action until

satisfactory proof is provided to the Court of the written retainer agreement, which must reflect the lawyer's agreement to bear responsibility for any costs without limitation.

IV.  <u>CONCLUSION</u>

Kontilai's motion to clarify the terms of the asset freeze (Docket # 958) is granted to the extent stated above.

As to the SEC's motion to enforce the asset freeze (Docket # 970), we recommend that the motion be granted in part and denied in part as set forth above.  Once a ruling is made by the district judge on the motion to enforce, the parties are directed to attempt to agree on the specific terms of an order to effectuate the ruling.  The parties shall submit an agreed-upon order (or, if they cannot agree, separate proposed versions) within 7 days of that ruling.

**<u>PROCEDURE FOR FILING OBJECTIONS TO THIS<br>REPORT AND RECOMMENDATION</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this document to serve and file any objections to the portion that is a Report and Recommendation.  <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court.  Any request for an extension of time to file objections must be directed to Judge Marrero.  If a party fails to file timely objections, that party will not be permitted to raise any objections to the Report and Recommendation on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010). [9]

---

[9] If neither side plans to object to the Report and Recommendation, the parties may wish to stipulate to the motion to enforce being decided on consent by the undersigned.

Dated: February 10, 2022

      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge