UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                                              :
UNITED STATES SECURITIES AND EXCHANGE                         :
COMMISSION,                                                   : **1:19-cv-04355-VM-GWG**
                                                              : **JURY TRIAL DEMANDED**
                                                              :
        Plaintiff,                                            :
                                                              :
        -vs.-                                                 :
                                                              :
                                                              :
                                                              :
COLLECTOR'S COFFEE, INC., and                                 :
MYKALAI KONTILAI,                                             :
                            Defendants, and                   :
VERONICA KONTILAI,                                            :
                            Relief Defendant.                 :
_____                :
SDJ INVESTMENTS, LLC; ABODE INVESTMENTS,                      :
LLC; DAREN SIVERTSEN, TRUSTEE OF THE                          :
SIVERTSEN FAMILY TRUST U/A/D 10/1/2002                        :
                                                              :
        Intervenor-Plaintiffs,                                :
                                                              :
        v.                                                    :
                                                              :
COLLECTOR'S COFFEE, INC., MYKALAI                             :
KONTILAI, an Individual, JACKIE ROBINSON                      :
FOUNDATION, INC., DOE INDIVIDUALS 1                           :
THROUGH 50, AND ROE CORPORATIONS 1                            :
THROUGH 50,                                                   :
                                                              :
        Intervenor-Defendants.                                :
------------------------------------------------------------------------x

**COLLECTOR'S COFFEE, INC.'S ANSWER TO THE JACKIE ROBINSON
FOUNDATION, INC.'S CROSSCLAIM AND COUNTERCLAIM**

1

Defendant Collector's Coffee, Inc. (Collector's), by and through its attorneys, hereby answers the Crossclaim [ECF No. 1002] filed on April 4, 2022, by Jackie Robinson Foundation, Inc. ("JRF") and Counterclaims against JRF as follows:

## ANSWER

Unless expressly admitted, all allegations in the Crossclaim of the Jackie Robinson Foundation, Inc. ("JRF") are denied. The numbered paragraphs below correspond to the numbered paragraphs in the Crossclaim.

1. To the extent the allegations contained in paragraph 1 of the Crossclaim are directed to parties other than Collector's, no response by Collector's is required. Collector's denies the allegations set forth in paragraph 1 of the Crossclaim.

2. Collector's denies the allegations contained in paragraph 2 of the Crossclaim.

3. Paragraph 3 of the Crossclaim purports to state legal conclusions as to which no response is required; to the extent (if any) that a further response is required, Collector's denies the allegations of paragraph 3. Declaratory relief under 28 USC 2201 and 2202 is not an independent basis for federal jurisdiction. Before declaratory relief can be granted, federal subject matter jurisdiction requirement must be satisfied. The Declaratory Judgment Act is procedural only and does not enlarge a federal court's jurisdiction. There is no federal question, and there is no diversity. There is no federal court subject matter jurisdiction over the Crossclaim.

4. Paragraph 4 of the Crossclaim purports to state legal conclusions as to which no response is required; to the extent (if any) that a further response is required, Collector's denies the allegations of paragraph 4.

5. Collector's admits that it is a Nevada corporation. Except as expressly admitted, the allegations in paragraph 5 are denied.

6. Collector's admits that it is an Intervenor-Defendant in this action. Except as expressly admitted, the allegations in paragraph 6 are denied.

7. Collector's lacks knowledge or information sufficient to form a belief as to whether the allegations in paragraph 7 of the Crossclaim are true and on that basis, denies such allegations.

8. Collector's admits that JRF is an Intervenor-Defendant in this action.

9. The allegations set forth in paragraph 9 of the Crossclaim contain legal conclusions to which no response is required. To the extent a response is required, Collector's denies that this Crossclaim arises out of the transaction or occurrence that is the subject matter of the original action. Collector's further denies that this Court has subject matter jurisdiction.

10. Collector's lacks knowledge or information sufficient to form a belief as to whether the allegations in paragraph 10 of the Crossclaim are true, but denies JRF has any legitimate claim to the Jackie Robinson Contracts it initially negotiated to purchase.

11. Collector's admits that it has appeared by counsel in this action and conducted business in the Southern District of New York.

12. The allegations set forth in paragraph 12 of the Crossclaim contain legal conclusions to which no response is required. To the extent (if any) that a further response is required, Collector's denies the allegations of paragraph 3. Declaratory relief under 28 USC 2201 and 2202 is not an independent basis for federal jurisdiction. Before declaratory relief can be granted, federal subject matter jurisdiction requirement must be satisfied. The Declaratory Judgment Act is procedural only and does not enlarge a federal court's jurisdiction. There is no federal question, and there is no diversity. There is no federal court subject matter jurisdiction over the Crossclaim.

13. Collector's admits the allegations set forth in paragraph 13 of the Crossclaim, except denies that Jackie Robinson only signed a single original of that contract.

14. Collector's denies the allegations in paragraph 14 of the Crossclaim, and further avers that the historic 1947 Contract referenced in such allegations likely was treated differently than the "customary" manner in which other major league baseball contracts were handled at that time. Collector's further avers that there were at least three original versions of the 1947 Contract.

15. Collector's denies the allegations in paragraph 15 of the Crossclaim, and further avers that the historic 1947 Contract referenced in such allegations likely was treated differently than the "standard practice" by which other major league baseball contracts were handled at that time. Collector's further avers that there were at least three original versions of the 1947 Contract.

16. Collector's admits the allegation set forth in paragraph 16 of the Crossclaim.

17. Collector's admits the allegation in paragraph 17 of the Crossclaim.

18. Collector's denies the allegations in paragraph 18 of the Crossclaim.

19. Collector's admits that Jackie Robinson signed a contract with the Montreal Royals in 1945. Except as expressly admitted, Collector's lacks sufficient information to admit or deny the allegations set forth in paragraph 19 of the Crossclaim, and on that basis denies such allegations.

20. Collector's lacks sufficient information to admit or deny the allegations set forth in paragraph 20 of the Crossclaim, and on that basis denies such allegations.

21. Collector's lacks sufficient information to admit or deny the allegations set forth in paragraph 21 of the Crossclaim, and on that basis denies such allegations.

22. Collector's denies the allegation in paragraph 22 of the Crossclaim.

23. Collector's admits that Peter Siegel of Gotta Have It first offered to sell and physically showed the Contracts to the Dodgers' ownership management in 2012, long before the same documents were sold to Collector's, but the Dodgers refused to pay the asking price. At that time, and for seven years thereafter, the Dodgers never claimed to own the contracts shown to them, and later sold to Collector's. Collector's further admits that long after all the offers and sales of its securities to investors had already been made that in January 2019 (for the first time), the Dodgers claimed ownership of the contracts. Except as expressly admitted, Collector's denies each and every allegation in the Crossclaim.

24. Collector's (i) admits that it has refused to provide the Contracts to the Dodgers and (ii) refers the Court to the May 14, 2019, Temporary Restraining Order for an accurate and complete statement of the contents thereof. CCI denies the Court has jurisdiction to decide a quiet title action. Except as expressly admitted, Collector's denies the allegations in paragraph 24.

25. Collector's lacks sufficient information to admit or deny the allegation set forth in paragraph 25 of the Crossclaim, and on that basis denies such allegations.

26. Collector's denies the allegation in paragraph 26.

27. Collector's denies the allegation in paragraph 27.

28. Collector's repeats and re-alleges its answers to paragraphs 1 through 27, as though fully set forth herein.

29. The allegations contained in paragraph 29 constitute legal conclusions as to which no response is required. Collector's asserts that the Court lacks subject matter jurisdiction. Except as expressly admitted, Collector's denies the allegations in paragraph 29 of the Crossclaim.

30. Collector's admits that it is the owner of the Contracts in question and denies JRF has any legal claim to such Contracts. Except as expressly admitted or denied, Collector's denies allegations in paragraph 30 of the Crossclaim.

31. Collector's denies the allegations in paragraph 31 of the Crossclaim.

32. Collector's denies the allegations in paragraph 32 of the Crossclaim.

33. The allegations contained in paragraph 33 constitute legal conclusions as to which no response is required. To the extent a response is deemed required, Collector's denies the allegations in paragraph 33.

## PRAYER FOR RELIEF

Collector's denies that JRF is entitled to the relief requested in subparagraphs (1) through (3) of their "Prayer for Relief" allegations in the Crossclaim.

## DEFENSES

Without admission that it carries the burden of proof as to any of the following, Collector's asserts the following affirmative defenses without waiver of other applicable affirmative defenses not included here, which Collector's reserves the right to assert as they become known to it.

### FIRST DEFENSE

34. The Crossclaim fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

35. The Court lacks subject matter jurisdiction as articulated in Collector's appeal pending before the Second Circuit Court of Appeals in 21-2070-cv. In short, the Crossclaim states a pure state law claim. Jurisdiction relies on the jurisdiction of the Intervenor Complaint, which does not exist. 28 U.S.C. section 1367(a) does not support the claim of subject matter jurisdiction because the Intervenor Action does not constitute anything close to the same case or

controversy as the Securities and Exchange Commission's action against Collector's, which is the sole source of jurisdiction over the Intervenor Action. Declaratory relief under 28 USC 2201 is not an independent basis for federal jurisdiction. Before declaratory relief can be granted, federal subject matter jurisdiction requirement must be satisfied. The Declaratory Judgment Act is procedural only and does not enlarge the jurisdiction of the federal court.

**THIRD DEFENSE**

36. JRF's claims and related requests for relief are barred, in whole or part, by the doctrines of estoppel, waiver, and laches. JRF asserts its equitable claims through the Dodgers, whose alleged assignment of the Dodgers' claims to JRF are the only basis upon which JRF makes a claim to the ownership of the Contracts. It appears there were at least three original versions of the Contracts at inception in 1945 and 1947, and perhaps more. The Dodgers' own expert (Chris Ivy, not designated by JRF as an expert in this case) expressly advised the Dodgers that there were three versions, not two. Specifically, Mr. Ivy stated, unequivocally, "Just to give you some background, there were three signed versions of every contract; one went to the team, one went to the player, and one went to the league office." The Dodgers' version, and all of their versions of player contracts from this era are not in the Dodgers' possession, and the Dodgers are unaware how they became dispossessed of such contracts. There was no record of the Dodgers' last date of possession of the Dodgers' team version of all of their contracts from this era, much less the Jackie Robinson Contracts at issue in this case. The Dodgers made no police report or claim against anyone ever that their version of these documents was lost or stolen. The last time the Dodgers' team version was ever displayed was in the 1950s. When the Dodgers' ownership and management were solicited to buy the Contracts at issue in this case and physically shown the documents in 2012 by Peter Siegel of Gotta Have It, long before Collector's purchased them from the same seller in July 2013, the Dodgers made no claim of ownership to the Contracts. Instead, the Dodgers' management simply stated that they were involved in another purchase of other collectibles and were not interested. Several times over the following years, the Dodgers were invited to bid at public auctions of these Contracts, and each time never made a claim to

7

own the Contracts and never bid on them. Had the Dodgers made a timely claim of ownership to the Contracts, Collector's never would have purchased them for $2 million, and never would have told their investors of their ownership of those documents. On top of that, the Jackie Robinson Foundation, Inc., itself, entered into written agreements to support the marketing and sale of the Contracts, in exchange for a 10% distribution of the sales proceeds. Collector's relied on JRF's support to support its ownership rights at all times thereafter when discussing the Contracts with its potential investors, auction houses, including Christie's, and existing investors. Collector's publicized its ownership of the Contracts nationally, including on ESPN national programming, on YouTube, and at Major League Baseball Stadiums while throwing out the opening pitch. Collector's would be highly prejudiced by the Dodgers' and JRF's delay in asserting ownership rights in the Contracts, and thus JRF and the Dodgers are barred by the doctrine of laches, waiver, and estoppel, to assert such claims at this late date.

**FOURTH DEFENSE**

37. JRF's claims are barred by applicable statutes of limitations. While JRF seeks relief to determine ownership of the Contracts through a declaratory relief action, the proper cause of action for such relief in equity is replevin- a common law remedy that permits the prevailing party to recover personal property from an allegedly unlawful possessor, referred to as "claim and delivery" in California state court. See *Ananda Church of Self-Realization v. Mass. Bay Ins. Co.*, 95 Cal. Rptr. 4th 1273, 1281-1282 (Cal. Ct. App. 2002); *Solomon R. Guggenheim Found. v. Lubell*, 569 N.E.2d 426 (N.Y. 1991). Actions for replevin are subject to a three-year statute of limitations. Cal. Civ. Proc. Code § 338(c) (West 2016); N.Y. C.P.L.R. § 214(3). *McCann v. Foster Wheeler LLC,* 225 P.3d 516, 525 (Cal. 2010); *see-also Ins. Co. of N. Am. V. ABB Power Generation*, 690 N.E. 2d 1249, 187 88 (N .Y. 1999) (explaining that where a foreign plaintiff brings suit based on the cause of action arising outside New York the claim must be timely under the laws of both states.); and CPLR §202. JRF claims that the Dodgers lost or had stolen from the Dodgers the Contracts at issue after moving to Los Angeles in 1958, therefore the claims asserted are by the assignee of a foreign entity arising from actions

8

purportedly occurring in California, thus requiring the application of California law. The Dodgers were well aware of the alleged theft by former first baseman Wes Parker of player contracts in the 1980s and were actually shown and offered the Contracts in October 2012 and thereafter, and yet did nothing until January 2019 to assert ownership over those Contracts. Under these facts, the Dodgers and JRF are barred by the applicable statute of limitations from asserting such claims in the Crossclaims filed in March of 2022, for the first time.

**FIFTH DEFENSE**

38.     The JRF claims are barred, in whole or part, because Collector's bought the Contracts from the lawful owner, which in turn purchased them from the probated estate of the lawful owner of the Contracts, Arthur Konop, a Brooklyn Historian who maintained them in his possession for more than 40 years.

**SIXTH DEFENSE**

39.     JRF'S claims are barred because JRF and/or the Dodgers had knowledge of Collector's claim of ownership to the Contracts at all relevant times, including without limitation when Collector's predecessor, AZ Collectors, offered to sell the Contracts to the Dodgers in 2012 and, years later, when JRF agreed to support the sale of the Contracts to the public in return for 10% of the proceeds.

**SEVENTH DEFENSE**

40.     The JRF and/or Dodger's claims are barred by the equitable doctrine of unclean hands.

**EIGHTH DEFENSE**

41.     JRF's claims are barred because Collector's was a bona fide purchaser in good faith for value of the Contracts from AZ Collectors, who offered the same Contracts to the Dodgers' management in 2012, months before the July 2013 purchase by Collector's.

**NINTH DEFENSE**

42.     Collector's asserts all appropriate defenses which may be asserted and further reserves the right to please additional defenses, as appropriate.

## COUNTERCLAIM

Intervenor Crossclaim Defendant, Collector's Coffee, Inc. ("Collector's"), brings this Counterclaim against Cross claimant The Jackie Robinson Foundation, Inc. ("JRF") pursuant to Federal Rule of Civil Procedure 13(g), and in support states as follows:

### FACTS

43. In 2013, Collector's purchased two Jackie Robinson signed player contract Contracts from 1945 and 1947 (the "JR Contracts") for *two million dollars* from a well-known reputable collectibles dealer, Peter Siegel, through his company, Gotta Have It.

44. In or around February 2012, Mr. Siegel brokered a transaction between Odette Konop, Arthur Konop's widow, and Martin Zweig, a reputable collector, through his company, AZ Collectors. In connection with that acquisition, Mr. Zweig, through Pete Siegel, secured a letter from Odette Konop, attesting to her late husband's ownership of them for 40 years. Arthur Konop, a historian with an unblemished reputation, held the original version of the JR Contracts since at least the early 1970s. His son, Scott Konop, testified that his father showed the Contracts publicly when Scott was a child (approximately 40 years ago), and that he believes Mrs. Rachel Robinson (Jackie Robinson's widow) attended the event celebrating either Jackie Robinson or Black History Month in Cooperstown, New York. Scott was born in 1967.

45. In marketing the Contracts for sale for Martin Zweig, on or around September 2012 (nearly a year before CCI purchased the Contracts and *more than six (6) years before* the Dodgers made any claim of ownership in the JR Contracts on January 24, 2019), Mr. Siegel met personally with a partner and President of the owner of the Dodgers, Guggenheim Investments, Todd Boehly.

46. At the time of that meeting, Guggenheim Investments had recently purchased the

10

Dodgers reportedly for more than $2 billion and was the most likely financially capable buyer of such JR Contracts. Mr. Siegel physically brought the JR Contracts to Mr. Boehly and the Dodgers' principal collectibles agent, Corey Shanus, and discussed the prospect of the Dodgers purchasing the JR Contracts. Unfortunately for all concerned, the Dodgers expressed no interest in the Contracts. Nor did the Dodgers assert any claim of ownership to the JR Contracts shown to the Dodgers' management. If the Dodgers had done either, this lawsuit would not have been necessary, and *CCI would not have purchased the Contracts*.

47. No one living today has been identified by the parties as a person with first-hand knowledge of how many originals of those contracts were made at inception.

48. Some experts, including one engaged by the Dodgers' ownership, Chris Ivy, opines that there were 3: one for the player; one for the team; and one for the league. Major League Baseball claims that its version of all Uniform Player Contracts of that era were destroyed or stolen in the early 1980s when Shae Stadium's basement, where those documents were archived, flooded. JRF asserts that there were only two versions: the player and team originals. The Dodgers have no other Uniform Player Contracts from 1947.

49. Although no explanation has been given for the missing era of documents, it appears the Dodgers may have discarded their version of inactive player contracts in the late 1950s, when the team moved from Brooklyn, New York to Los Angeles, California. Another possible explanation is that the contracts were stolen in the 1980s by the Dodgers' former first baseman, who adamantly denies doing so. In any event, what is clear is that the Dodgers have been dispossessed of the team version of the contracts for decades, and did nothing about trying to find them or asserting the Dodgers' claims against the contracts until January 2019, when the

team counsel wrote a demand letter, and took no Court action to enforce the team's rights until JRF did so in March 2022, when it filed the Crossclaim.

50. To the contrary, JRF agreed to support the marketing and sale of the Contracts in a letter agreement dated April 7, 2014, in exchange for a 10% donation to the foundation. For years thereafter, Defendant Mykalai Kontilai and Collector's marketed CCI's new business and the JR Contracts on television and through public displays at Major League Baseball games, throwing out the opening pitches as several games. A Times Square event in the heart of New York City, featuring celebrities, including Larry King, Al Sharpton, and others, was televised nationally on ESPN, at which the Contracts, which had not been displayed publicly in decades, were unveiled.

51. During all of those promotions, and despite its close relationship with JRF, the Dodgers never claimed ownership until January 2019.

52. Even when the JR Contracts were offered to the Dodgers, again, in 2016-2018, as a potential bidder at the auction of such Contracts, the Dodgers never once claimed that the Dodgers owned the Contracts.

53. The Dodgers did not even assert an ownership right in the JR Contracts until January 24, 2019, which is after the disclosures and investments at issue in the Complaint were made, ending in December 2018. And, the Dodgers never filed a lawsuit asserting such ownership rights. Instead, JRF first asserted such a claim against Collector's in March 2022 by filing the Crossclaim, as an assignee of such claim from the Dodgers.

54. Collector's is informed, believes, and based thereon alleges that starting in or before January 2019 and continuing through this day, JRF, working with the Los Angeles Dodgers' management team and ownership, engaged in the following wrongful conduct with the

intent and effect of interfering with Collector's prospective economic advantage in connection with its sale of the JR Contracts. Such actions interfered with and terminated Collector's ability to sell the JR Contracts either at auction or pursuant to a written agreement to Seth Kaller (representing a third-party purchaser the identity of whom is subject to a confidentiality agreement (the "Kaller Purchaser")). Such wrongful actions included, but are not limited to, the following:

a) JRF and the Dodgers coordinated their efforts to interfere with Collector's efforts to sell the JR Contracts at auction in or around January 2019. Collector's had a ready, willing, and able buyer, through Seth Kaller, to purchase the JR Contracts at auction, which the Dodgers intentionally interfered with by sending Collector's counsel a cease-and-desist letter, based on false allegations of the Dodgers' ownership of the JR Contracts.

b) JRF conspired with the Dodgers in or around May 2019, at a time when JRF's Chief Executive Officer stated to the Dodgers that she believed Collector's was "on the ropes", and based on false allegations of the Dodgers' ownership of the JR Contracts, intentionally, deliberately and maliciously interfere with the written sale agreement pursuant to which the Kaller Purchaser would have purchased the JR Contracts for $7,975,000 from Collector's. JRF knew about the contract and initially consented to it in a conversation with Ken Goldin, but later joined in the Dodgers' objection to it. Such actions were born out of greed. To motivate JRF to defy its contractual obligations to Collector's to support the sale of the JR Contracts, the Dodgers offered JRF an assignment of their false claims that the Dodgers owned the JR Contracts, and offered to fund the litigation against the

13

    financially desperate Collector's, in order to steal away with the entire value of the JR Contracts, rather than the 10% of proceeds JRF had contractually agreed to accept. The Dodgers' offer, which JRF greedily accepted, provided JRF the potential through that lawsuit against a financially weakened Collector's, to recover 100% of the proceeds of the sale of the JR Contracts, rather than the 10% it promised to accept in exchange for supporting Collector's sale of such contracts.

  c) JRF filed the Crossclaim against Collector's ensuring that Collector's could not sell the JR Contracts to anyone, including at auction, as a result of such claim.

55. Collector's maintains that there is no subject matter jurisdiction over the Intervenor action and thus that there is no derivative subject matter jurisdiction over any crossclaims asserted on the basis of the Intervenor Action, including the Crossclaim filed by JRF. However, in the event the Court determines that subject matter jurisdiction does exist over the Crossclaim, subject matter jurisdiction over this Counterclaim exists on the same basis. Collector's does not hereby intend to concede, admit or consent to subject matter jurisdiction over the Intervenor Action or the Crossclaim.

## FIRST COUNTERCLAIM
## BREACH OF CONTRACT

56. Collector's incorporates the allegations in paragraphs 43 through 55, inclusive, as if set forth in full at this place.

57. On or about April 7, 2014, Della Britton Baeza, as President and CEO of JRF, entered into a letter agreement to support Collector's in its sale of the JR Contracts in exchange for a 10% share of the proceeds. That letter states the "understanding" of the parties that, in exchange for the 10% share of the proceeds of the sale of the JR Contracts, "JRF is pleased and agrees to support the public or private sale/auction of the Contracts by Collectors Cafe, and will

14

use our best efforts to engage Rachel Robinson, the wife of Jackie Robinson, to attend, with travel and accommodation costs paid by Collectors Cafe, at least one (1) event promoting the public or private sale/auction of the Contracts organized by Collectors Cafe on a mutually agreed-upon and convenient date."

58. In the performance of that contract, as recently as January 2018, Ms. Baeza wrote a letter to certain benefactors of the JRF, including Lorrain Cortes Vazquez, EVP of Multicultural Markets & Engagement in Washington DC, soliciting the auction sale of the JR Contracts and explaining that 10% of the purchase price would be donated to the Jacki Robinson Foundation.

59. Collector's relied to its detriment on JRF's promises to support the sale of the contracts, including by entering into contracts for the auction of such contracts, and soliciting many millions of dollars of investment from third parties premised, in part, on its ownership of the JR Contracts and JRF's commitment to support such contracts.

60. Collector's, at all times, was ready, willing, and able to perform its obligations under the letter agreement with JRF dated April 7, 2014.

61. As alleged above, JRF failed and refused to perform its obligations under that contract, including that JRF refused to support the sale of the contracts at auction, and instead acted in a coordinated effort with the Dodgers, to prevent Collector's sale of such contracts. JRF's conduct constitutes a material breach of JRF's contract with Collector's.

62. JRF's breach of contract has damaged Collector's because it was unable to sell the contracts before the SEC lawsuit was commenced and thereafter, and, to this day, Collector's has been unable to do so, to its extreme detriment, and to the detriment of its creditors and shareholders.

63. Collector's is entitled to recover its damages from JRF in an amount to be determined at trial.

## SECOND COUNTERCLAIM
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

64. Collector's incorporates the allegations in paragraphs 43 through 63, inclusive, as if set forth in full at this place.

65. Collector's is informed, believes, and based thereon alleges that JRF, working with the Los Angeles Dodgers' management team and ownership, engaged in the foregoing wrongful conduct with the intent and effect of interfering with Collector's prospective economic advantage in connection with its sale of the JR Contracts. Such actions interfered with and terminated Collector's ability to sell the JR Contracts either at auction or pursuant to a written agreement with third parties.

66. But for JRF's interference, Collector's would have been able to sell the JR Contracts to a third party, whether through direct means to an unidentified purchaser through Seth Kaller or at public or private auction, but could not do so due to JRF's wrongful interference.

67. JRF's wrongful interference with Collector's sale of the JR Contracts directly and proximately caused Collector's damages in an amount to be determined at trial, which Collector's alleges will be at least $7,975,000.

68. JRF's wrongful interference with Collector's sale of the JR Contracts was malicious, greedy, outrageous, and unconscionable under the circumstances and, as such, supports an award of punitive and exemplary damages.

69. As a result of Collector's wrongful conduct in intentionally interfering with Collector's prospective economic advantage, Collector's is entitled to recover its consequential

and compensatory damages caused by such wrongful conduct, prejudgment interest thereon, and punitive damages according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Collector's prays for judgment against JRF and in favor of Collector's as follows:

On the First Counterclaim for Breach of Contract, general and consequential damages, according to proof at trial, in the amount of at least $7,975,000.

On the Second Counterclaim for Intentional Interference with Prospective Economic Advantage, for general, consequential, and punitive damages, according to proof at trial, which Collector's alleges should exceed $7,975,000.

On both Counterclaims, Collector's prays for costs of suit and such other and further relief as the Court deems just.

## JURY TRIAL DEMAND

Collector's demands a jury trial for all issues so triable.


Dated: April 25, 2022
　　　　Los Angeles, California　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　Intervenor-Defendant
　　　　　　　　　　　　　　　　　*COLLECTOR'S COFFEE, INC., A Nevada Corp.*

　　　　　　　　　　　　　　　　　By counsel,
　　　　　　　　　　　　　　　　　*/s/ Stanley C. Morris*

　　　　　　　　　　　　　　　　　Stanley C. Morris (NY Bar No. 2415446)
　　　　　　　　　　　　　　　　　　 CORRIGAN & MORRIS, LLP
　　　　　　　　　　　　　　　　　12300 Wilshire Boulevard, Suite 210
　　　　　　　　　　　　　　　　　Los Angeles, California 90025
　　　　　　　　　　　　　　　　　(310)394-2800
　　　　　　　　　　　　　　　　　scm@cormorllp.com