UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No.19-cv-04355-VM-GWG |
| – against – | |
| COLLECTOR'S COFFEE, INC., *et al*., | |
| Defendants. | |

**DEFENDANT MYKALAI KONTILAI'S POST-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

Introduction ...................................................................................................................... 1

Proposed Findings of Fact ................................................................................................ 8

I.    The Development of Collector's Coffee, Inc. ........................................................ 8

    A.    Early Development and Mr. Kontilai's Personal Investments ............................. 8

    B.    The Limited Role of CCI's Board of Directors ................................................. 11

    C.    Envisioning CCI's Website, Producing CCI's Television Show, and Patenting a Novel, Game-Changing Authenticity Insurance Program ............................... 13

    D.    Negotiating Deals with Master Dealers for Collectibles Inventory .................... 18

    E.    Purchasing the Jackie Robinson Contracts ......................................................... 21

    F.    Raising Additional Capital through the Sale of Securities ................................. 22

II.    An Uncontested Accounting of CCI's Use of Investor Funds for Legitimate Business Expenses ......................................................................................................... 25

    A.    Mr. Kontilai's Finances During the Time Period ............................................... 26

    B.    Gail Holt's Finances During the Time Period .................................................... 27

    C.    CCI's Finances During the Time Period ............................................................. 28

    D.    The SEC Has Failed to Demonstrate That Any Funds Invested By Kirk Jensen, John Cutsey, or Richard Coleman Were Misused By Either CCI or Mr. Kontilai ......................................................................................................... 29

        1.    Kirk Jensen's Investment ....................................................................... 30

        2.    John Cutsey's Investment ...................................................................... 34

        3.    Richard Coleman's Investment .............................................................. 35

        4.    The SEC Failed to Demonstrate that Any Statements Were False or Misleading ............................................................................................. 38

III.     The SEC's Key Witness, Gail Holt, Has Lied on Numerous Occasions and Admitted to Withdrawing Significant Amounts of Funds Belonging to CCI.................................41

Incorrect Statements and Evidentiary Holes in the SEC's Proposed Findings of Fact ....................49

I.      The SEC's Proposed Findings of Fact Fail to Demonstrate that Mr. Kontilai Misappropriated Any Funds or Fabricated Any Evidence ...............................................50

        A.      The SEC Cannot Meet Its Burden By Solely Relying on Summary Evidence That Makes No Attempt to Distinguish Investor Funds or Legitimate Business Expenses ....................................................................................................51

        B.      The SEC Failed to Demonstrate that Mr. Kontilai Withdrew Any Investor Money in Cash Transactions...................................................................................54

        C.      The SEC Has to Demonstrate that Mr. Kontilai Withdrew Any Investor Funds Through Checks or Electronic Transfers .............................................................56

        D.      The SEC Failed to Demonstrate that Mr. Kontilai Withdrew Any Investor Funds Through Transfers to Gail Holt.................................................................58

        E.      The SEC Failed to Demonstrate that Mr. Kontilai Used Any Investor Funds to Pay for Credit Card Charges Made for Personal Expenses .................................59

        F.      The SEC Failed to Demonstrate that Mr. Kontilai Used Fabricated Documents to Conceal Any Fraud ...........................................................................................60

II.     The SEC Failed to Demonstrate that Mr. Kontilai Made Any False or Misleading Statements to Mr. Cutsey, Mr. Coleman, or Mr. Jensen...................................................62

        A.      The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About the Use of Investor Money in Connection With the Purchase of a Security....................................................................................64

        B.      The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About Mr. Kontilai's Investment in CCI in Connection With the Purchase of a Security........................................................................65

        C.      The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About CCI's Anticipated Dealer Inventory in Connection With the Purchase of a Security ......................................................67

D. The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About the Ownership or Value of the Jackie Robinson Contracts in Connection With the Purchase of a Security ...................................69

III. Any Alleged Deceptive Conduct Has No Bearing As The SEC Has Failed to Meet Its Burden to Demonstrate that Any Fraud Occurred ...........................................................71

IV. The SEC Once Again Fails to Understand that It Carries the Burden of Proof, Not Mr. Kontilai ...............................................................................................................72

Proposed Conclusions of Law ...............................................................................................72

I. The SEC Has Failed to Demonstrate a Substantial Likelihood of Success on Each Count Alleged Against Mr. Kontilai...............................................................................74

A. The SEC Has Failed to Demonstrate a Violation of the Exchange Act or the Securities Act Based on Alleged Misstatements and Omissions.........................76

i. The Statements Regarding CCI's Use of Investor Funds Are Not Actionable ...................................................................................78

ii. The Statements Regarding Mr. Kontilai's Personal Investment in CCI Are Not Actionable ...................................................................83

iii. The Statements Regarding CCI's Inventory or Business Dealings Are Not Actionable ...............................................................................85

iv. The Statements Regarding the Jackie Robinson Contracts Are Not Actionable ...................................................................................87

B. The SEC Has Failed to Demonstrate a Violation of the Exchange Act or the Securities Act Based on an Alleged Scheme ......................................................91

C. Although this Court Has Found that Mr. Kontilai Violated Rule 21F-17, No Damages Can Be Awarded that Would Warrant a Preliminary Injunction .........91

III. This Court Should Decline to Take Any Adverse Inferences as a Result of Mr. Kontilai's Refusal to Testify at the Preliminary Injunction Hearing..............................94

IV. If this Court is Inclined to Take Any Adverse Inferences, this Court Should Instead Stay this Case Pending the Conclusion of the Outstanding Criminal Proceedings so that Mr. Kontilai Can Testify Without Fear of Criminal Reprisal................................102

A.     The First Factor Heavily Favors a Stay as the Criminal Indictments Significantly Overlap with the Claims in this Case ........................................... 105

B.     The Second Factor Favors a Stay as the Criminal Indictments Have Been Filed and Published and a Warrant Was Issued for Mr. Kontilai's Arrest ........ 106

C.     The Third Factor Weighs in Favor of a Stay, as a Stay Would Not Unduly Prejudice the SEC ........................................................................................... 108

D.     The Fourth Factor Weighs in Favor of a Stay, as Mr. Kontilai's Rights and Interests in Both Cases Have Been Prejudiced by the Impossible Choice to Testify or Face Adverse Inferences ................................................................. 110

E.     The Fifth Factor Weighs in Favor of a Stay, as the Resolution of the Criminal Proceedings May Encourage Settlement or Otherwise Resolve this Case ........ 110

F.     The Sixth Factor Weighs in Favor of a Stay as the Criminal Proceedings Would Advance the Public's Interest in Preserving the Integrity of the Markets ........................................................................................................... 111

G.     As All Six Factors Weigh in Favor of a Stay, this Court Should Stay this Case Pending Resolution of the Criminal Proceedings Instead of Imposing Any Adverse Inference ............................................................................................ 112

V.     Even if this Court Finds that a Preliminary Injunction is Appropriate, the Current Freeze is Overbroad and Significantly Overreaches ..................................................... 113

VI.     To Any Extent that this Court is Inclined to Enter a Preliminary Injunction, the Value of the Jackie Robinson Contracts Should Satisfy Any Injunction ................................. 117

VII.     Any Preliminary Injunction Entered by this Court Should Not Include Either After-Acquired Assets or Funds Required by Mr. Kontilai for His Criminal Defense or to Pay for Basic Necessities ............................................................................................... 118

A.     A Preliminary Injunction Cannot Include Untainted Assets ............................. 118

B.     A Preliminary Injunction Cannot Include After-Acquired Assets .................... 121

C.     At a Minimum, Any Preliminary Injunction Should Provide Mr. Kontilai With Funds to Pay for His Basic Necessities ............................................................. 124

D.     Any Preliminary Injunction Should Provide Mr. Kontilai With Sufficient Funds to Pay for His Criminal Defense ............................................................. 126

Conclusion ................................................................................................................128

Certificate of Service ...............................................................................................130

# TABLE OF AUTHORITIES

## Cases

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)................................................................77, 86

*AIG Life Ins. Co. v. Phillips*,
  2007 WL 2116383 (S.D.N.Y. July 20, 2007) ........................................104

*Alexander v. F.B.I.*,
  691 F. Supp. 2d 182 (D.D.C. 2010) ........................................................96

*Amusement Indus., Inc. v. Stern*,
  293 F.R.D. 420 (S.D.N.Y. 2013) .............................................................95

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)......................101

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  No. 20-3716-CV, 2022 WL 727149 (2d Cir. Mar. 11, 2022).......... 76-78, 89

*Basic Inc. v. Levinson*,
  485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)..........................77

*Baxter v. Palmigiano*,
  425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)..............................97

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).........................101

*Brink's Inc. v. City of New York*,
  717 F.2d 700 (2d Cir. 1983).....................................................................96

*Byrd v. Abate*,
  945 F. Supp. 581 (S.D.N.Y. 1996).........................................................125

*Corcoran Law Group v. Posner*,
  2009 WL 1739702 (S.D.N.Y. June 10, 2009) .......................................104

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014).....................................................................77

*Deckert v. Independence Shares Corp.*,
   311 U.S. 282 (1940)....................................................................................6, 119

*Estelle v. Gamble*,
   429 U.S. 97 (1976)..........................................................................................125

*Farmer v. Brennan*,
   511 U.S. 825 (1994)........................................................................................125

*Favourite v. 55 Halley St., Inc.*,
   381 F. Supp. 3d 266 (S.D.N.Y. 2019)...........................................................95-96

*FTC v. Bronson Partners, LLC*,
   654 F.3d 359 (2d Cir. 2011)...........................................................................113

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)................................................................................2-3, 119

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)....................................................................79, 81-83

*Hassoun v. Searls*,
   467 F. Supp. 3d 111 (W.D.N.Y. 2020).............................................................96

*Hutto v. Finney*,
   437 U.S. 678 (1978)........................................................................................125

*I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*,
   936 F.2d 759 (2d Cir.1991).............................................................................76

*In re Dolen*,
   265 B.R. 471 (Bankr. M.D. Fla. 2001) .....................................................3, 6, 118

*In re Fredeman Litig.*,
   843 F.2d 821 (5th Cir. 1988) ..................................................................2, 121-122

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ........................................................................75, 91

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021) .............................................................................77

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   386 F.Supp.2d 461 (S.D.N.Y. 2005)............................................................96

*Kaley v. United States*,
   571 U.S. 320 (2014)..................................................................................127

*Lefkowitz v. Turley*,
   414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).....................................94

*Liu v. Sec. & Exch. Comm'n*,
   140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) ..................................... passim

*Louis Vuitton Malletier S.A. v. LY USA. Inc.*,
   676 F.3d 83 (2d Cir. 2012)................................................................104, 110

*Luis v. United States*,
   578 U.S. 5, 136 S. Ct. 1083, 194 L. Ed. 2d 256 (2016)........................ 7, 119-120, 127

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)........................ 77-78

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   900 F.2d 576 (2d Cir.1990)........................................................................79-80

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)......................................................................76-78

*Morris v. Am. Fed'n of State, Cnty. & Mun. Emps.*,
   2001 WL 123886 (S.D.N.Y. Feb. 9, 2001)..............................................112

*Mullaney v. Wilbur*,
   421 U.S. 684 (1975)........................................................................................3

*Mullins v. City of New York*,
   634 F. Supp. 2d 373 (S.D.N.Y. 2009), aff'd, 626 F.3d 47 (2d Cir. 2010) ..................................74

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010)........................................................................74

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)........................................................................76

*Powell v. Alabama*,
 287 U.S. 45 (1932)................................................................................................127

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)...................................................................................76

*Root v. Railway Co.*,
 105 U.S. 189, 26 L.Ed. 975 (1882)...............................................................3, 119

*Rubber Co. v. Goodyear*,
 9 Wall. 788, 19 L.Ed. 566 (1870) ..............................................................................3

*S.E.C. v. Bremont*,
 954 F. Supp. 726 (S.D.N.Y. 1997)...............................................................3, 120

*S.E.C. v. Byers*,
 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ..............................................................73

*S.E.C v. Carroll*,
 2020 WL 1272287 (S.D.N.Y. Mar. 17, 2020) .....................................................104

*S.E.C v. Cavanagh*,
 155 F.3d 129 (2d Cir.1998)...................................................................................72

*S.E.C v. Cavanagh*,
 445 F.3d 105 (2d Cir. 2006)................................................................................113

*S.E.C. v. Coates*,
 No. 94 CIV. 5361 (KMW), 1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) .................7

*S.E.C. v. Credit Bancorp Ltd.*,
 No. 99 CIV. 11395, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) ......................... 72-73

*S.E.C. v. Duclaud Gonzalez de Castilla*,
 170 F. Supp. 2d 427 (S.D.N.Y. 2001)............................................................. 7, 73-74

*S.E.C. v. First Jersey Securities, Inc.*,
 101 F.3d 1450 (2d Cir.1996)............................................................................76, 87

*S.E.C. v. FTC Cap. Markets, Inc.*,
 No. 09 CIV. 4755 (PGG), 2010 WL 2652405 (S.D.N.Y. June 30, 2010)....................3, 122, 124

*S.E.C. v. Gordon*,
  2009 WL 2252119 (N.D. Okla. July 28, 2009) .......................................................................111

*S.E.C. v. Graystone Nash, Inc.*,
  25 F.3d 187 (3d Cir. 1994)................................................................................... 96-97, 99, 102

*S.E.C v. Heden*,
  51 F.Supp.2d 296 (S.D.N.Y.1999)..........................................................................................73

*S.E.C v. LaGuardia*,
  435 F. Supp. 3d 616 (S.D.N.Y. 2020)........................................................................... 104-108

*S.E.C. v. McGinn, Smith & Co.*,
  752 F. Supp. 2d 194 (N.D.N.Y.), order vacated in part on reconsideration sub nom. *S.E.C. v. Wojeski*, 752 F. Supp. 2d 220 (N.D.N.Y. 2010), and aff'd sub nom. *Smith v. S.E.C.*, 432 F. App'x 10 (2d Cir. 2011), and aff'd sub nom. *Smith v. S.E.C.*, 432 F. App'x 10 (2d Cir. 2011)..94-95

*S.E.C v. McGinnis*,
  161 F. Supp. 3d 318 (D. Vt. 2016)...................................................................................104, 111

*S.E.C. v. Monarch Funding Corp.*,
  192 F.3d 295 (2d Cir. 1999).............................................................................................76, 87

*S.E.C. v. Musella*,
  578 F. Supp. 425 (S.D.N.Y. 1984)..........................................................................................74

*S.E.C v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013)....................................................................................................113

*S.E.C v. Shkreli*,
  2016 WL 1122029 (E.D.N.Y. March 22, 2016) ...................................................... 105, 110-111

*S.E.C. v. Suman*,
  684 F. Supp. 2d 378 (S.D.N.Y. 2010), aff'd, 421 F. App'x 86 (2d Cir. 2011).................101, 104

*S.E.C v. Treadway*,
  2005 WL 713826 (S.D.N.Y. Mar. 30, 2005) .........................................................................112

*S.E.C. v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990).................................................................................................73

*Sec. & Exch. Comm'n v. Dresser Indus., Inc.*,
  628 F.2d 1368 (D.C. Cir. 1980) .............................................................................. 101, 103-104

*Sec. & Exch. Comm'n v. Fowler*,
440 F. Supp. 3d 284 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert.
denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) ........................................................ 92, 113-116

*Sec. & Exch. Comm'n v. Manor Nursing Centers, Inc.*,
458 F.2d 1082 (2d Cir. 1972) ........................................................................................ 74

*Sec. & Exch. Comm'n v. Santillo*,
No. 18-CV-5491 (JGK), 2018 WL 3392881 (S.D.N.Y. July 11, 2018) ...................... 7

*Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*,
305 F. Supp. 3d 486 (S.D.N.Y. 2018) .......................................................................... 75

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019) ............................................................................................ 77

*Smith v. S.E.C.*,
653 F.3d 121 (2d Cir. 2011) .......................................................................................... 72

*Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*,
175 F. Supp. 2d 573 (S.D.N.Y. 2001) .................................. 97, 101-103, 105, 108, 112

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir.2007) ........................................................................................... 74

*Tilghman v. Proctor*,
125 U.S. 136, 8 S.Ct. 894, 31 L.Ed. 664 (1888) ..................................................... 3, 119

*Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.*,
886 F. Supp. 1134 (S.D.N.Y.1995) ............................................................................. 104

*United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*,
55 F.3d 78 (2d Cir. 1995) ............................................................................................. 94

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006) ..................................................................................................... 127

*Univ. of Tex. v. Camenisch*,
451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ............................................... 74

*Volmar Distributors, Inc. v. New York Post Co., Inc.*,
152 F.R.D. 36 (S.D.N.Y. 1993) .................................................................................. 111

*Wheat v. United States*,
    486 U.S. 153 (1988)................................................................................................127

*Woods v. START Treatment & Recovery Centers, Inc.*,
    864 F.3d 158, 170 (2d Cir. 2017)..........................................................................96

## Statutes

17 C.F.R. § 240.10b-5................................................................................................75, 91

15 U.S.C. § 77q........................................................................................................75

15 U.S.C. § 77t..................................................................................................92, 115

15 U.S.C. § 78j........................................................................................................75

15 U.S.C. § 78u.........................................................................................92-94, 115, 119

COMES NOW Defendant Mykalai Kontilai, by and through undersigned counsel, and respectfully submits these Proposed Findings of Fact and Proposed Conclusions of Law in opposition to the SEC's motion for a preliminary injunction, stating as follows:

## INTRODUCTION

In the lead up to the recent preliminary injunction hearing, this Court warned the SEC about significant gaps in its analysis and potential evidence, stating:

> The SEC's letter, you know, was almost less than helpful citing all kinds of things that are not even evidence, putting even aside whether they're hearsay or not, you know, things like indictments and denials of summary judgment, and statements in court opinions, none of it evidence. ***So the SEC has to think seriously about what its actual evidence is in this case….I mean the SEC has to think about what the disputed issues of fact are and think about it in a serious way***, not acting as if I'm going to judge credibility based upon someone being indicted and make decisions on that basis.

Doc. No. 1048, May 26, 2022 Hearing at 15-16 (emphasis supplied).

The SEC failed to heed the Court's warning and fell woefully short of meeting its burden of proof at the recent preliminary injunction hearing.[1]

***First***, the SEC failed to meet its burden to prove that Mykalai Kontilai diverted *investor funds* for his own use or that any such funds were used by Collector's Coffee, Inc. ("CCI") for anything other than legitimate business expenses. As demonstrated in detail below, the SEC's own witnesses and evidence demonstrate that the enterprise at issue paid significant legitimate business expenses and that it was funded in large part by Mr. Kontilai himself.

---

[1] As this Court has made clear, the only evidence to be considered in ruling on the SEC's request for a preliminary injunction is that adduced during the hearing process. Doc. 1075, Sept. 21, 2022 hearing at 21-22 ("The point is what we're considering for the preliminary injunction hearing, and that's -- I'm not going to bother asking it again, because I've made it clear it's only what's being presented at the hearing, including any exhibits and any deposition testimony that's being listed as an exhibit.").

Yet, the SEC made no effort to account for investor monies spent for legitimate business expenses or the funds invested by Mr. Kontilai.  The SEC has no expert witness to address these issues and the SEC lawyer whose spreadsheets were admitted for limited purposes made no effort to account for legitimate business expenses or investment from Mr. Kontilai.  Nor does the SEC make any serious effort to trace the funds identified in its spreadsheets to investors.

Instead, the SEC offers only its own lawyer's calculation of the funds invested by outside investors and the funds allegedly spent by CCI and Mr. Kontilai.[2]  But without accounting for funds spent on legitimate purposes and those invested into the venture by Mr. Kontilai, the SEC is unable to demonstrate that there were *any* investor monies that were unlawfully taken by Mr. Kontilai or misspent by CCI.

In contrast, defense expert Stefano Vranca, a forensic accountant, prepared a report detailing that the amount of money spent on legitimate business expenses exceeded that received from outside investors.  *See* Doc. No. 1094-1 at 26.  While the SEC quibbles with the defense expert's methods, the fact remains that the SEC bears the burden of proof and *the SEC has no expert at all*; nor has the SEC made any effort to perform the calculations necessary to demonstrate that any investor funds were misused.  As a result, the SEC fails in its twin burdens to prove that there should be an asset freeze in the first place, or the appropriate amount of any such freeze.

"The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment." *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988); *Grupo*

---

[2] Where its own analysis is lacking, the SEC does occasionally rely on the calculations of defense expert Stefano Vranca. However, elsewhere the SEC encourages this Court to exclude those opinions. The SEC cannot have it both ways, and, in any event, it is the SEC's burden to prove not just entitlement to a freeze but the amount of that freeze.

2

*Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999); *see also In re Dolen*, 265 B.R. 471, 485 (Bankr. M.D. Fla. 2001); *S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)("the Commission is not entitled to freeze assets unrelated to its investigation.").

Any asset freeze must be "tethered to a wrongdoer's net unlawful profits," and does not extend beyond that strictly limited scope. *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020). This is because a "wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu*, 140 S. Ct. at 1943 (*quoting Tilghman v. Proctor*, 125 U.S. 136, 145–146, 8 S.Ct. 894, 31 L.Ed. 664 (1888)); *see also Root v. Railway Co.*, 105 U.S. 189, 207, 26 L.Ed. 975 (1882).

The Supreme Court has recently limited the SEC's disgorgement "remedy to an individual wrongdoer's net profits to be awarded for victims." *Liu*, 140 S. Ct. at 1942. This is "a remedy tethered to a wrongdoer's net unlawful profits." *Id*. at 1943.

In order to meet its burden of proof to obtain a preliminary injunction for the purpose of preserving the *status quo* for a potential future disgorgement, therefore, the SEC must demonstrate "the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'" *Id*. at 1945 (quoting *Rubber Co. v. Goodyear*, 9 Wall. 788, 804, 19 L.Ed. 566 (1870)). Yet, the SEC has failed entirely to do so. As a result, the SEC is unable to "demonstrate that the frozen funds are traceable to fraud." *S.E.C. v. FTC Cap. Markets, Inc.*, No. 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010)*; see also Mullaney v. Wilbur*, 421 U.S. 684 (1975)(the government violates due process when it shifts burdens of proof or persuasion onto the accused). Therefore, no injunction should issue.

**Second**, the SEC failed to meet its burden to prove that CCI or Mr. Kontilai's statements materially misled investors to the extent of the asset freeze sought.  The SEC only called *three* of approximately 200 investors to the stand.  In total, these investors only invested $2,650,005, and at least one of those investors has already recouped an undisclosed amount of his investment.[3] Thus, the SEC's evidence *might* only go to whether these few investors were misled.  This falls far short of the asset freeze sought in the amount of tens of millions.

However, the weight of the SEC's evidence was actually to the effect that investors were *not* misled.  The testimony to the effect that investors expected Mr. Kontilai to make money from his efforts and that they anticipated that others investing in certain CCI assets would receive priority payments is discussed below.

**Fourth**, the disclosures made by CCI undermine the SEC's claims that investors were misled.  These written disclosures, *including notice to investors that nothing else should be relied upon*, are discussed in detail below.

**Fifth**, the SEC asserts that Mr. Kontilai misled investors by allegedly stating that he would not take a "salary," but there is no evidence that the SEC has provided to the effect that Mr. Kontilai was ever a salaried employee.  There is no evidence of any bi-weekly or other regularly scheduled payments to him and no evidence that he was issued an IRS form W2 as a salaried employee.  Instead, the SEC argues that he received a number of irregular payments from CCI, none of which amount to a "salary."  There is no basis on which to conclude that Mr. Kontilai received a salary and, even if there were, any related freeze should be limited to the precise amount of "salary" proven – *if any*.

---

[3] Despite bearing the burden of proof, the SEC has made no effort despite a lengthy discovery period to determine or disclose how much of his investment the investor recouped and how much remains outstanding. It is self-evident that the SEC cannot claim an investor's funds were misappropriated where those funds were returned.

Moreover, the testimony of the SEC's own witnesses undermines the absurd claim that investors might have seriously believed that Mr. Kontilai was working for CCI for years without any form of support from the company at all.

*Sixth*, the SEC failed to distinguish between CCI and Mr. Kontilai. The direct evidence against Mr. Kontilai is scant at best and the SEC has made no effort to pierce the corporate veil protecting Mr. Kontilai.

*Seventh*, the SEC provided no evidence whatsoever of any allegedly tainted funds in Mr. Kontilai's possession or under his control at the present time. As a result, there is no basis for an asset freeze. Indeed, the SEC's own Amended Complaint asserts that Mr. Kontilai used funds received from CCI to "fund his lavish lifestyle," including to pay for "rent on an oceanfront condo in Miami, tuition at a private school in Las Vegas, expenses at gentleman's clubs, [and] stays at a luxury resort in Miami over New Year's Eve…." Doc. No. 134 at 25. Far from alleging that Mr. Kontilai was stockpiling assets, the SEC alleges that he spent the money long ago. Without evidence of tainted funds in Mr. Kontilai's possession to freeze, *despite almost two years of full discovery*, the SEC is not entitled to a freeze.

Finally, there are additional failures of proof highlighted below which underscore the fact that the SEC is not entitled to an asset freeze.

If the SEC could overcome the hurdles listed above on the present record, then the question would become what relief, if any, would be appropriate. The relief sought by the SEC is improper for the following reasons:

*First*, the SEC has not proven that the value of the Jackie Robinson contracts does not meet or exceed the amount of any proper asset freeze. Therefore, if a freeze is ordered, it should freeze only the contracts. Indeed, no other allegedly tainted assets were ever even identified by

the SEC in the preliminary injunction record.   Thus, if the Court were to freeze only the contracts, the Court would be freezing the only asset the SEC has alleged, in the present preliminary injunction record, is arguably subject to a freeze.

**Second**, any freeze should not cover assets acquired after investors ceased investing in CCI because there is no argument whatsoever that any funds acquired after this point are tainted in any way.   *See In re Dolen*, 265 B.R. 471, 484 (Bankr. M.D. Fla. 2001) ("To the extent that the [FTC] seeks to enforce the preliminary injunction to enjoin the debtor's use of her post-petition earnings, it goes beyond 'a reasonable measure to preserve the status quo pending final determination' of the merits of the district court action.") (*quoting Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940)).

**Third**, no untainted funds should be frozen. *See* discussion supra *& Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1942, 207 L.Ed. 2d 401 (2020).   In particular, the funds from Mr. Kontilai's mother's estate should be released to him.   This Court has already found all the facts necessary to demonstrate that the proceeds from the wrongful death action are untainted.   These findings include a detailed history of the Illinois lawsuit at issue, the fact that it arose out of "Sylvia Contile's death from mesothelioma due to exposure to asbestos," the source of settlement funds, the amounts of various settlements, the fact that the funds are held in trust by an Illinois attorney and the fact that "Illinois court records indicate that the wrongful death action is still being actively litigated…."   Doc. No. 988 at 4-10.   Indeed, the Court also observed that the SEC had been in contact with the estate's lawyers directly and that both the Court and the SEC had been provided with an accounting of the funds from the Illinois law firm handling the case.   *Id*. The SEC itself has admitted that these funds originate from "his mother's estate" and are connected to "tort claims on his own behalf and on behalf of his mother's estate" connected to

Mr. Kontilai's mother's death.  *See* Memorandum of Law in Support of Motion to Enforce the Asset Freeze Order, Doc. No. 971, filed Oct. 29, 2021.

*Fourth*, there is no evidence that Mr. Kontilai has anywhere near the amount of money the SEC seeks to freeze.  Indeed, there is no evidence that he has *any assets at all* given that he has been ordered not to work or otherwise accept money for a period of years.  Any asset freeze must make allowances for Mr. Kontilai's survival (including food, housing, healthcare, transportation, and the other necessities of life).  *Sec. & Exch. Comm'n v. Santillo*, No. 18-CV-5491 (JGK), 2018 WL 3392881, at *3 (S.D.N.Y. July 11, 2018)(unfreezing $5,000 per month for living expenses after noting that, "courts routinely carve out modest sums from asset freeze orders when necessary to meet the defendant's reasonable living expenses," and because "Santillo cannot be expected to live and support his family with no money at all."); *SEC v. Duclaud Gonzalez de Castilla*, 170 F.Supp.2d 427, 429 (S.D.N.Y. 2001) ("the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.").

Similarly, allowance must be made for Mr. Kontilai to retain criminal counsel in connection with the charges pending against him.  *Luis v. United States*, 578 U.S. 5 (2016)(Sixth Amendment to the United States Constitution prohibits the pre-trial restraint of untainted assets needed to retain a defendant's criminal counsel of choice); *see also S.E.C. v. Coates*, No. 94 CIV. 5361 (KMW), 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994) (ordering, in effect, that a freeze order be modified by requiring the SEC to make a "showing that the frozen assets are traceable to fraud.").

PROPOSED FINDINGS OF FACT

**I.**     **The Development of Collector's Coffee, Inc.**

   **A.**     **Early Development and Mr. Kontilai's Personal Investments.**

Mykalai Kontilai met Gary Farrell 2004, a few years prior to the founding of CCI. Doc. No. 1129 at 102. At the time, Mr. Kontilai was working "with Scholastic, the book publisher," to "sell a series of programs to public television." Doc. No. 1129 at 102. The year after he met Mr. Kontilai, Mr. Farrell and Mr. Kontilai started Public Media, a company that continued the same type of work Mr. Kontilai had previously been doing with Scholastic—specifically, as "a marketing program for a company" which marketed "using public television as well as visits to stations." Doc. No. 1129 at 102-103. Both Mr. Farrell and Mr. Kontilai seeded $33,000 of start-up capital into Public Media. Doc. No. 1129 at 103.

Public Media only had four clients: Xyience, an energy drink that was promoted at Ultimate Fighting Championship matches, Doc. No. 1129 at 137-138, CCI, which hired Public Media to produce a pilot episode of its television show, Doc. No. 1129 at 103, a "not so good rock band," which hired Public Media to produce a music video, Doc. No. 1129 at 146, and the Latino Confederation of Los Angeles, which hired Public Media to develop its website. Doc. No. 1129 at 146-147. Xyience paid Public Media a total of $500,000, of which Mr. Kontilai was entitled to at least $200,000. Doc. No. 1129 at 137. Mr. Kontilai paid Public Media $450,000 on behalf of CCI. Doc. No. 1129 at 144. The rock band paid Public Media less than $100,000. Doc. No. 1129 at 146. The Latino Confederation of Los Angeles paid Public Media somewhere between $20,000 and $30,000. Doc. No. 1129 at 147.

The funds Mr. Kontilai paid to Public Media on behalf of CCI was connected to the production of the pilot episode of Collectors Café's television show. Doc. No. 1129 at 103.

8

Public Media produced the pilot episode and was paid a total of $450,000 by CCI for its work. Doc. No. 1129 at 104. The payments made to Public Media on behalf of CCI were made by wire transfer, with the bank records reflecting that the wire originated from "Mykalai Kontilai." Doc. No. 1129 at 108-109, Exhibit 82 at 18. As Mr. Farrell admitted, the payments to Public Media were made before the first private placement memorandum was distributed to potential investors. Doc. No. 1129 at 142. None of the money used by Mr. Kontilai to pay for the pilot came from "any investors who responded to a PPM that's dated April 28, 2008." Doc. No. 1129 at 144. Nothing in the bank records indicated that any of those payments originated from CCI itself. Doc. No. 1129 at 142 ("Q. Okay. And there is no indication of it being from CCI, is there? A. No."). In fact, Mr. Farrell admitted to knowing that Mr. Kontilai paid $450,000 to Public Media, testifying that he "do[es] not remember him putting anymore than $450,000 in." Doc. No. 1129 at 149.

These wire transfers from Mr. Kontilai were "how Collector's Coffee paid for the pilot." Doc. No. 1129 at 109. Mr. Kontilai made numerous wires to Public Media on behalf of CCI in 2007, including a $71,000 wire on May 31, $75,000 on June 8, $49,000 on June 15, $9,802.47 on June 25, $39,000 on July 3, $35,000 on July 11, $50,000 on July 19, $51,000 on August 3. Exhibit 82 at 18-21. In those four months, Mr. Kontilai personally wired a total of $379,802.47 to Public Media on behalf of CCI, "payments that were made for the pilot" Public Media had produced. Exhibit 82 at 18-21; Doc. No. 1129 at 109. Mr. Kontilai paid in multiple installments as "he paid [Mr. Farrell and Public Media] as [they] needed the money to produce the show." Doc. No. 1129 at 140.

Thus, according to Mr. Farrell, Public Media was paid less than $1.1 million by its four clients, of which Mr. Kontilai directly paid or was owed a minimum of $650,000. But over the

course of its incorporation, Public Media received over $1.4 million in deposits. Exhibit 82 at 2. Mr. Farrell was unable to identify where any of the deposited money came from and who paid into Public Media. Doc. No. 1129 at 149. As Mr. Farrell admitted that he only ever deposited $33,000 into Public Media—in addition to paying some amount in credit card expenses that was less than $20,000—it is evident that, ***at a minimum***, the remainder of the unaccounted-for deposits came from Mr. Kontilai. Doc. No. 1129 at 145, 148. Thus, according to Mr. Farrell, the SEC's witness, Mr. Kontilai paid a minimum of approximately $983,000 into Public Media: $450,000 paid on behalf of CCI to produce the pilot episode of CCI's television show, Doc. No. 1129 at 144, $200,000 of the $500,000 paid by Xyience that Mr. Kontilai was owed, Doc. No. 1129 at 137, $33,000 in seed money, Doc. No. 1129 at 103, and approximately $300,000 in additional deposits not attributable to any client or Mr. Farrell, the only other individual involved with the company. This formed the base of the "$1.411 million loan to predecessor firm Public Media in December 2007." Doc. No. 1094-1 at 28.

Mr. Kontilai incorporated Collector's Coffee, Inc. ("CCI") in California a few years later, on August 13, 2007, Exhibit 1, and an identically named CCI in Nevada on November 1, 2007, Exhibit 3 at 4, and filed to merge the California corporation into the Nevada corporation on February 21, 2008. Exhibit 3 at 7. From the beginning, Mr. Kontilai was "the founder, president, and chief executive officer of Collectors Café and has owned 100 percent of the voting shares of Collectors Café." Doc. No. 241 at 4.[4] In addition to the funds Mr. Kontilai paid into Public Media, Mr. Kontilai continued to loan additional funds to CCI to pay for corporate expenses until the first "infusion of third-party investment capital" in September 2009. Doc. No. 1094-1 at

---

[4] Mr. Kontilai's Answer was not admitted as an exhibit in this proceeding and Mr. Kontilai cites it here solely because the SEC cited this specific excerpt in their Proposed Findings of Fact. Doc. No. 1185 at 11.

40. Altogether, Mr. Kontilai provided $**1,696,644.19** in primary source funding from the inception of the company in 2006 through to September 2009. Doc. No. 1094-1 at 40. The loan, adjusted to include a standard rate of interest, totaled **$3,273,347.23** as of April 28, 2021. Doc. No. 1094-1 at 29.

Mr. Kontilai also made other investments of his own funds in CCI beyond the amounts loaned. The sole expert witness in this case independently verified that Mr. Kontilai made **$2,363,301.47** in additional investments outside of the $1.411 million loan. Doc. No. 1094-1 at 29.

Thus, in the early years of CCI's development, before the first Confidential Private Placement Offering Memorandum was prepared on April 28, 2008, *see* Exhibit 7 at 2, and the first infusion of capital from that first PPM was received around September 2009, *see* Doc. No. 1094-1 at 40, the capital funding for CCI's operations came from Mr. Kontilai. From the beginning, CCI had corporate expenses such as expenses for the leasing of space, attorneys' fees, and other consultants. Doc. No. 1129 at 160. For example, CCI hired a consultant "to run a test kitchen," which involved the development of "products that might go into Collector's Café." Doc. No. 1129 at 160-161.

### B.     The Limited Role of CCI's Board of Directors.

Mr. Farrell was "a director of Collector's Coffee" and sporadically worked as Secretary and Treasurer, stating that he held those roles "at one point." Doc. No. 1129 at 111. He could not recall how long he held the position, claiming that he was a director "at least through middle 2008," which would be only a single year of CCI's existence. Doc. No. 1129 at 152. The director role at CCI was limited—there were never any meetings of the board and anything that was approved by the board was done "indirectly," through Mr. Farrell or Mr. Kontilai just "do[ing]

some things." Doc. No. 1129 at 153. For example, Mr. Farrell and Mr. Kontilai rented office space for CCI in La Jolla, which was "indirectly" approved because it had been done by a board member. Doc. No. 1129 at 153. Mr. Farrell admitted that he was unable to "say what was approved or wasn't approved" through that "indirect" method of board approval via board member action. Doc. No. 1129 at 153-154. In fact, requiring board approval is "not typical of this size company in the start up stages." Doc. No. 1129 at 154.

Mr. Kontilai, as majority shareholder, did not need "to call a corporate board meeting to make all decisions." Doc. No. 1129 at 154. Just as Mr. Farrell took actions on his own on behalf of Public Media to further its interests, it is evident that Mr. Kontilai would have taken actions on his own on behalf of CCI to further its interests without consulting Mr. Farrell. Doc. No. 1129 at 156-157. Mr. Farrell indicated that he would "[o]bjected" if the board of directors had been asked to authorize the payment of a salary to Mr. Kontilai. Doc. No. 1129 at 130. But his own testimony made clear that he would not have objected because the payment of a salary would have been inappropriate given the circumstances—but that he would have objected simply because *he* "wasn't getting paid anything." Doc. No. 1129 at 130. Mr. Farrell made his personal interest clear again when discussing whether he would have objected to Mr. Kontilai's use of a company credit card for personal expenses, stating that he would have objected "because I was – I wasn't getting anything from it. I wasn't charging personal expenses." Doc. No. 1129 at 132.

David Chapman was a board member of CCI for approximately a year. Doc. No. 1093-5 at 1. During that time, he never attended a single board meeting or signed a single board resolution. Doc. No. 1129 at 238.

C.  **Envisioning CCI's Website, Producing CCI's Television Show, and Patenting a Novel, Game-Changing Authenticity Insurance Program.**

The investors were aware that CCI was building out its operations at the time of their investment. As Mr. Jensen testified, "Mr. Mykalai was very clear on all the big things that were happening," which included the development of the web platform for its products and creating content such as the television show. Doc. No. 1129 at 191.

The concept for "Collector's Café" was similar to shows like "Antique Road Show, which was very popular on public television at the time." Doc. No. 1129 at 139. The pilot episode was a full hour long and involved multiple collectors selling various collectibles, including, but not limited to, "a guitar that was owned by a famous rocker, … a flag from the Eds Sullivan Show that was – that was signed by the Beatles … [and] a sword that Mr. Kontilai had." Doc. No. 1129 at 140.

In 2007, CCI marketed the pilot episode to American Public Television ("APT"). Exhibit Q. APT wrote to Mr. Farrell on October 3, 2007 expressing its interest "in offering the series to public television stations nationwide," noting that "[w]e feel the concept has broad, national appeal and will be well-received by public television station programmers and viewers alike." Exhibit Q at 1. APT's Christopher Funkhouser described the show's concept as:

> ***Collector's Café*** puts a contemporary, pop-culture spin on the appraisal of collectibles, and takes viewers behind the scenes to learn the fascinating stories behind each item. … At the ***Collector's Café***, you won't find a random antique that someone uncovers in his attic and is surprised that it's worth thousands. What you *will* find, are *true collectors* – people who have a genuine interest in the memorabilia they present, and often, a fascinating personal story to go along with it. Host Marianne Goen says it best: "Everything has a story behind it."

Exhibit Q at 1 (emphasis in original).

As the concept of the television developed, CCI hired Larry King to be the host of the show and the "face" of the company. Doc. No. 1129 at 178-179. The exclusive agreement was

for Larry King and his wife Shawn King to become "global ambassadors [and] daily TV hosts of the Collectors Café TV Series." Exhibit 70 at 36. Mr. Jensen, one of the investors, met Larry King and Mr. Kontilai at a studio in Los Angeles where CCI was working. Doc. No. 1129 at 179. When he toured the studio, Mr. Jensen could tell that CCI was producing both a sizzler reel and the television show in that space. Doc. No. 1129 at 179-180. Mr. Jensen was so impressed by what he had seen that "[a]fter this trip, [he] made [his] second investment of $300,000 in CCI." Doc. No. 1093-4 at 4.

As he toured the facility, Mr. Jensen "knew there would be a cost to" developing the studio space and producing the television show" and knew that CCI was spending money on those expenses. Doc. No. 1129 at 180. Mr. Jensen had a role in the television show himself: he was a "front man" for "collector technology." Doc. No. 1129 at 188. As the front man, or the "collectors coach," Mr. Jensen was involved in the filming of multiple episodes. Doc. No. 1129 at 188. As part of the show, Mr. Jensen had the opportunity to interview Bass Rutten, a champion ultimate fighter, a second fighter whose name he could not recall, and a historian of the Los Angeles Dodgers. Doc. No. 1129 at 188-189.

Mr. Kontilai was in discussions with HBO and another company from Las Vegas to market the television show. Doc. No. 1129 at 233.

There were many expenses involved with filming multiple episodes of the television show, including payments to Aura TV, which filmed the show and provided crew such as the producer and cameramen, payments to the "B or C list folks" that came to be interviewed, and back-end production expenses. Doc. No. 1129 at 189-190. CCI spent over **$6 million** in business-related production, media, and marketing expenses, which included substantial amounts paid to companies hired to produce and distribute the television series. Doc. No. 1094-1 at 37.

For example, Mr. Kontilai paid Larry King and his wife **$368,796.87** for Mr. King's work as a CCI brand ambassador. Doc. No. 1094-1 at 37.

Mr. Kontilai and CCI also developed a website for the business, which was demonstrated to numerous investors, including Mr. Jensen, during a video call in March 2015. No. 1129 at 182-183. Mr. Jensen, who is a "software person by trade," Doc. No. 1129 at 177, testified that the website "looked very good." Doc. No. 1129 at 183. It was designed "like a blogger network [that] was to bring people that were collectors together and they could be in kind of a chat group." Doc. No. 1129 at 183-184. The website had a graphical user interface with "a lot going on" and logos at the bottom of the screen that "really impressed" Mr. Jensen. Doc. No. 1129 at 184. The graphical user interface was "as good" as the GUIs used by eBay or Amazon. Doc. No. 1129 at 185. CCI incurred business expenses in connection with the development of the website; all investors were notified in the PPMs that CCI was developing "a unique and proprietary Blogger network" and had incurred expenses such as hiring "the former CEO Cori Dyer, of Broadcast Blogger Company," as a full-time employee to "oversee and manage this entire project." Exhibit 70 at 38. Mr. Kontilai and CCI also hired consultants to assist in the development of the website, including hiring Mr. Cutsey's company, FDM4, to provide website design services in December 2016. Doc. No. 1093-1 at 2. Mr. Coleman acknowledged that he was aware that the development costs of the website, including the salaries of consultants and contractors, would be paid with investor funds, and that it had been "declared when [he] signed up." Doc. No. 1129 at 72-73. CCI spent at least **$309,887.69** to pay for various software and web development expenses, in connection with the development of CCI's website. Doc. No. 1094-1 at 37.

The investors were informed, through the PPMs, that Mr. Kontilai and CCI were executing an invention that Mr. Kontilai had created—the "first ever Authenticity Insurance Policy in the collectibles industry" which would be "exclusive and fully underwritten by the assets and brands of some of the largest and most prestigious insurance companies in the world." Exhibit 70 at 35.

The authenticity insurance program was a novel program designed to address a key problem with the online sale and purchase of collectibles: that "the purchaser is often forced to rely on either the seller's word that the collectible is authentic or a dubious certificate of authenticity." Exhibit I at 2. While other people had attempted to solve this problem, each of the prior programs had "fail[ed] to offer systems and methods for providing a central hub that facilitates the authentication of all collectibles by independent experts in the relevant field, the administration of an insurance policy backing the authenticated collectibles, and the registration of collectibles and insurance policies associated with the collectibles, among other things." Exhibit I at 7.

The program developed by Mr. Kontilai aimed to fill this void and "provid[e] an authenticity guarantee for a collectible offered to potential buyers through a global online marketplace by providing buyers with authentication by a collectible expert dealer and insuring the authenticity of the collectible through an insurance policy underwritten by an established insurance provider." Exhibit I at 8. Mr. Kontilai fully conceptualized and constructed the novel new authenticity insurance program, developing systems and methods for facilitating the program and outlining his invention in a comprehensive patent application titled "Online Auctions with Collectible Authenticity Insurance Systems and Methods." Exhibit I.

Peter Siegel, an expert in the collectibles field, even described the concept as a "game-changer" in the business: "when I first met Mykalai he – the most important thing that got me totally hooked was the authenticity insurance. That, basically, is a game-changer and it's – it's not – never been done in my business. And I started – well, that's, you know, I – I said, if you can pull that off, I – I'm definitely with you. I mean, that's fantastic." Exhibit L at 23. In fact, Mr. Siegel testified that the authenticity program would provide additional value to the collectibles sold by CCI:

> A: This -- the business that I'm in has a lot of -- I wouldn't say a lot, but they have, you know, some bad people. Some things that aren't right. Certain things that will come with a certificate of authenticity that doesn't mean it's real. It just comes with a certificate of authenticity. The fact of having authenticity insurance through major insurance companies, which I was told, you know, is amazing, I mean, that to me would make items worth more money, you know, being that it's backed by insurance companies. People like to hear those big names, you know, 'cause anybody could write a certificate of authenticity and that's what most dealers do, but that doesn't mean it's real.

Exhibit L at 24. This novel program, and the business relationships Mr. Kontilai built while developing and implementing the program, were attractive to investors: Mr. Jensen said that Mr. Kontilai had built impressive business relationships with key players in the industry, including Lloyd's of London and AIG. Doc. No. 1129 at 186. Mr. Jensen found those "major relationships" to be even "more impressive to me than the GUI." Doc. No. 1129 at 186.

CCI incurred expenses developing this cutting-edge program, including expenses to the insurance companies that partnered with CCI; for example, CCI paid Chubb Insurance **$22,173.24** in connection with the program. Doc. No. 1094-1 at 36.

The investors were also aware that CCI incurred other standard business expenses such as expenses connected to renting office spaces. Mr. Jensen, for example, knew that CCI leased

office space in Edmonton, Canada. Doc. No. 1129 at 191. He also visited a space in Los Angeles were Mr. Kontilai was working with two programmers. Doc. No. 1129 at 191.

CCI also incurred expenses in connection with hosted events and employee salaries. In September 2015, Mr. Jensen attended an event hosted by CCI in New York where he met CCI employees. Doc. No. 1129 at 180. Mr. Jensen acknowledged that he "knew that CCI also had some employees and consultants that were working with it to build the company," including the employees that he personally met. Doc. No. 1129 at 180-181. Those employees and consultants "would have been offered compensation" by CCI for their services. Doc. No. 1129 at 181. Mr. Chapman, who worked as "a consultant for CCI" as part of CCI's "investor relations" admitted that he received "some" checks from the company as payment for his services. Doc. No. 1093-5 at 1, Doc. No. 1129 at 240. Mr. Coleman, an executive himself, understood that the company would have employees and consultants that it would need to pay and that the employees would be paid with investor funds. Doc. No. 1129 at 71-72.

CCI also hosted other events, including several events to show the Jackie Robinson contracts. Doc. No. 1129 at 181. In addition to the September 2015 event in New York, CCI hosted events to show the Jackie Robinson contracts in Montreal and in Times Square. Doc. No. 1129 at 181. The events were attended by other CCI investors in addition to Mr. Jensen. Doc. No. 1129 at 181-182.

    **D.**    **Negotiating Deals with Master Dealers for Collectibles Inventory.**

After hearing Mr. Kontilai's vision for CCI, Peter Siegel offered his services as an experienced collectibles dealer to Mr. Kontilai: "You know, he had some visions that were amazing. And I, basically, said to him, look, if you can actually come through with these visions I will definitely be interested in being with you." Exhibit L at 20-21. The concept was for CCI to

contract with expert "master dealers" to provide base inventory to sell on CCI's website, which

was a unique concept developed by Mr. Kontilai and Mr. Siegel specifically for CCI:

> A: Mykalai and I had come up with some ideas for the dealers, different levels for different -- what do would you call it? For different amounts of inventory for different commitments to the -- to the company. So, a master dealer is an expert in their field whether you sell coins or whether you sell Tiffany lamps, those are so-called master dealers. Those are the dealers that were the ones that -- that obtained that name through that -- he gave -- that's something that Mykalai came up with, the master dealer.

> Q: Okay. So that's a term sort of unique to Collectors Cafe, not something used more broadly in the industry?

> A: It's not, right.

Exhibit L at 21-22. Mr. Siegel then negotiated with numerous potential master dealers on behalf

of CCI as "the director of dealer relations," who worked "for Collectors Café to get the dealers"

to provide inventory for CCI's website. Exhibit L at 70. As of his deposition on August 30, 2018,

Mr. Siegel confirmed that he had verbal commitments from "hundreds" of master dealers who

signed short term agreements and were just awaiting the release of CCI's television show to

execute longer term master dealer agreements:

> A: Verbal commitments I have hundreds. Dealers that we signed up were, basically, for a four-month period. Those were -- those are my experts in my field and everybody signed those contracts except for one person who just had so much work on his plate and didn't get involved, but those were signed. And, you know, basically, everything that I explained to them as far as what's going on, what the future is, et cetera, et cetera, with the company, everybody was ecstatic. So, those are the -- the contracts that we had signed at first. And everybody's been waiting for this television show.

Exhibit L at 22. Mr. Siegel noted that the master dealers were so interested in working with CCI

that he had conversations with interested parties consistently through to the date of the

deposition. Exhibit L at 22 ("And, you know, it's -- even 'til today, I mean, I get – people say -- I

was at a convention last month and it was like, what's going on with Collectors Cafe? What's going on with Collectors Cafe, you know, so.").

Mr. Siegel and GottaHaveIt.com, Inc. agreed to operate as a master dealer sell their own inventory of collectibles through CCI, with every piece of GottaHaveIt's inventory mirrored for sale through both CCI and GottaHaveIt directly: "Basically, all my inventory is mirrored once the site's up, which is my pleasure. If it sells it's like, you know, that's incredible, you know. So, all my items that I get that I sell would go up on Collectors Cafe, the new items, and anything that I sell come down, et cetera." Exhibit L at 62. In other words, GottaHaveIt's "entire inventory on [its] website is on Collectors Café's website at the same time." Exhibit L at 64.

Mr. Siegel successfully negotiated with a first set of approximately 15 to 20 master dealers in 2011, who were all well established in the industry and would have provided millions of dollars of inventory upon CCI's website launch:

> A: All right. So, the dealers that I chose, this 15 to 20 dealers that were first signed up I guess in '11, are probably at least 20 to 30 years in the business, individually have their own businesses and have a tremendous amount of inventory. So, as soon as we launch with those dealers, if we did, we would have had, you know, millions of dollars of inventory just to start because it was their own personal inventory. They had it.

Exhibit L at 86. Mr. Siegel confirmed that CCI had the potential to enter into over 200 exclusive agreements with master dealers to provide about $1 billion of inventory for CCI's website. As the master dealers were just "waiting for [CCI's] television show" before executing the agreements, Mr. Siegel noted that the agreements would have been "easily" obtained following the launch of the show:

> I was aware that we could have easily 200 exclusive contracts when we launched, but roughly $1 billion, yes. We would have had it if we launched the TV show, again, with the website, et cetera, et cetera.

Exhibit L at 196.

Mr. Coleman acknowledged that there was, at a minimum, "a handful of dealers" who had "signed short term agreements" with CCI. Doc. No. 1093-3 at 5. He "believed it to be true" that there were "dealers that CCI had signed up to sell on its anticipated website." Doc. No. 1129 at 86.

E.   **Purchasing the Jackie Robinson Contracts.**

While CCI's business was expanding with hundreds of potential master dealers ready to provide up to a billion dollars of inventory once the television show and the website were launched, Mr. Kontilai and CCI also sought to purchase collectibles inventory owned by CCI itself. In 2013, Mr. Kontilai "facilitated CCI's purchase of the Jackie Robinson contract[s]" for this purpose, working with a collectibles dealer for the source and acquisition of the contracts. Doc. No. 1094-1 at 41. To acquire the contracts, CCI issued promissory notes to three investors with a total principal amount of $6,000,000. Doc. No. 1094-1 at 41-42. Two-thirds of the total principal, or $4,000,000, was "intended to provide short-term liquidity to CCI," and Mr. Vranca determined that the bank transactions appropriately reflected that the majority of those funds were deposited into CCI accounts between September 2013 and August 2014. Doc. No. 1094-1 at 42. The remaining $2,000,000 of the principal amount was used to purchase the Jackie Robinson contracts. Doc. No. 1094-1 at 42. In total, CCI spent **$3,168,367.81** to source, purchase, and store collectibles, which included, but was not limited to, the Jackie Robinson contracts. Doc. No. 1094-1 at 36.

In November 2013, CCI obtained an appraisal of the value of the Jackie Robinson contracts from Christie's which estimated the value to be $25,000,000. Doc. No. 1094-1 at 42. A little more than a year later, in January 2014, CCI obtained a second appraisal from Seth Kaller,

who estimated the value to be $36,000,000. Doc. No. 1094-1 at 42. Both of these valuations were

disclosed to potential investors in the Second Amendment to the PPM, which stated:

> The Company through a relationship with one of its Master Dealers, has acquired [two] of the most important historical documents in American History. What is considered by many to be the Founding Documents of the Modern Civil Rights Movement, Jackie Robinson made history in both 1945 & 1947 by being the first African American to sign contracts to play Professional Baseball in the Major Leagues. First with the minor league Montreal Royals, and second with the Brooklyn Dodgers. These contracts which the Company was advised were sold by Robinson shortly after Robinson signed his historic Brooklyn Dodger contract in 1947, were put away and never seen by the American Public for over 67 years. When they re-emerged in 2013, Collectors Café was contacted with the opportunity. The Company in partnership with a separate investment made by some of its senior investors, purchased the contracts. After contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents with the blessing of both the JR Foundation and Rachel Robinson. **This led to massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively**.

Exhibit 84 at 24 (emphasis added).

## F.     Raising Additional Capital through the Sale of Securities.

Although Mr. Kontilai originally provided most of the initial capital for CCI, CCI

ultimately began to raise capital from third-party investors as it developed its operations. In total,

CCI raised a total of **$30,794,514.24** in investor contributions. Doc. No. 1094-1 at 24. CCI also

received funds from other sources, such as third-party payments, cash deposits, and check or

wire deposits. Doc. No. 1094-1 at 25.

The SEC's allegations in this case focus solely on investor contributions raised from June

2014 through December 2018. Doc. No. 142 at 3. During that period, the SEC contends that CCI

raised investor contributions by selling preferred stock and issuing Series B Promissory Notes

"using (at least) two different versions of a Private Placement Memorandum" that the SEC has

named the "Coffee Shop PPM" and the "Social Media PPM." Doc. No. 142 at 3-4; Doc. No. 10 at 4-5. Both the Coffee Shop PPM and the Social Media PPM provided cautionary language to investors to ensure that any potential investor was aware of the risk of investing in a company that was in its initial stages of expansion. *See generally* Exhibit 6, 7. It was standard practice at CCI "to send a PPM and its amendments to individuals interested in investing" for review before investment. Doc. No. 1093-5 at 2. If the individual decided to invest, the individual "would sign and return the PPM and amendments." Doc. No. 1093-5 at 2.

At the outset, the PPMs established that the purpose of raising investor funds was to fund the company through the initial stages of expansion and for ***all general purposes*** associated with such expansion:

> THESE SECURITIES ARE BEING OFFERED BY COLLECTOR'S COFFEE, INC. (SOMETIMES REFERRED TO HEREAFTER AS THE "COMPANY") FOR THE GENERAL PURPOSE OF RETIRING EXISTING COMPANY DEBT AND FUNDING INITIAL INFRASTRUCTURE, OPERATING CAPITAL AND PHASE 1 EXPANSION OF THE COMPANY AND ITS WHOLLY OWNED SUBSIDIARY COMPANIES.

Exhibit 6 at 3; Exhibit 7 at 2.

The PPMs set explicit suitability standards for the sophistication and risk tolerance of any potential investors, making clear that the investment opportunities in CCI were high-risk and available only to sophisticated parties:

> THE SHARES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK TO THE INVESTORS AND SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT.
> …
> IT IS INTENDED THAT THE RECIPIENT HAVE SUFFICIENT SOPHISTICATION TO BE THOROUGHLY FAMILIAR WITH HIGH RISK INVESTMENTS.

Exhibit 6 at 4-5; Exhibit 7 at 3-4. In addition, the PPM specifically limited the authorization for anyone—*even Mr. Kontilai*—to provide any representations relating to CCI outside of the representations explicitly written within the PPM:

> NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THIS INVESTMENT OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS CONFIDENTIAL MEMORANDUM.

Exhibit 6 at 4; Exhibit 7 at 3. Crucially, the PPMs made explicitly clear to potential investors that it was *not warranting to the accuracy or completeness of any representation made by any person that was not a part of the PPM itself*:

> ALL OF THE INFORMATION PROVIDED HEREIN, INCLUDING THE STATEMENTS, ESTIMATES AND PROJECTIONS AS TO FUTURE OPERATIONS, REVENUE AND OPERATING INCOME, HAS BEEN FURNISHED BY THE COMPANY. THE ESTIMATES AND PROJECTIONS OF FUTURE FINANCIAL AND OPERATING PERFORMANCE FOR THE COMPANY HAVE NOT BEEN PREPARED WITH A VIEW TOWARD COMPLYING WITH THE PUBLISHED GUIDELINES OF THE SECURITES AND EXCHANGE COMMISSION (THE "SEC") REGARDING PROJECTED FINANCIAL INFORMATION. FURTHERMORE, BECAUSE THESE PROJECTED FINANCIAL ASSUMPTIONS ARE ABOUT CIRCUMSTANCES AND EVENTS THAT HAVE NOT YET TAKEN PLACE AND ARE SUBJECT TO MATERIAL VARIATION, THERE CAN BE NO ASSURANCE THAT THE PROJECTED RESULTS WILL BE ATTAINED OR THAT THE DIFFERENCES BETWEEN ACTUAL AND PROJECTED RESULTS WILL NOT BE SUBSTANTIAL AND MATERIAL. THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED TO ASSIST INTERESTED PARTIES IN MAKING THEIR OWN EVALUATION OF THE COMPANY, THE INVESTMENT, AND THE DATA SET FORTH IN THIS CONFIDENTIAL MEMORANDUM. COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF THIS CONFIDENTIAL MEMORANDUM AND SHALL HAVE NO LIABILITY FOR ANY REPRESENTATION, EXPRESSED OR IMPLIED, OTHER THAN AS CONTAINED HEREIN.

Exhibit 6 at 4; Exhibit 7 at 3.

## II.     An Uncontested Accounting of CCI's Use of
        <u>Investor Funds for Legitimate Business Expenses</u>.

Stefano Vranca, a Certified Fraud Examiner who holds a B.A.Sc. in Economics, performed a financial and accounting analysis of CCI's records in this case, and submitted an expert report presenting his findings. Doc. No. 1094-1 at 21. Mr. Vranca has considerable experience in forensic accounting reviews and fraud investigations and has conducted such investigations in other cases involving investor and shareholder disputes. Doc. No. 1094-1 at 21.

In coming to his conclusions, Mr. Vranca examined "all available bank and credit card transactions data" for CCI as well as "transactions to/from accounts held by CCI as well as individuals who were allegedly affiliated with CCI," including Mr. Kontilai, his wife, Veronica Kontilai, and Gail Holt. Doc. No. 1094-1 at 21.

Mr. Vranca's report is uncontested. Mr. Vranca is the *only* expert witness designated by any party in this case that has provided an expert accounting of any of the financial accounts at issue in this case. As no expert has been offered by any party that has disputed any portion of Mr. Vranca's findings, Mr. Vranca's report, and all the findings therein, should be considered undisputed.

Mr. Vranca ultimately concluded that, between April 11, 2006 and May 17, 2019 (the "Time Period"), CCI obtained a total of **$30,794,514.24** of investor contributions. Doc. No. 1094-1 at 24. Of those funds, the vast majority were deposited into accounts held by CCI: **$30,308,402.30** was deposited into CCI accounts, **$418,611.94** was deposited into accounts held by Mr. Kontilai, and **$67,500** was deposited into an account held by Gail Holt. Doc. No. 1094-1 at 24. There were other sources of funds that were deposited in CCI's accounts as well, including payments from third parties, cash deposits, check and wire deposits, and transfers between the accounts. Doc. No. 1094-1 at 25. Mr. Vranca determined that the total amount of investor

contributions made between 2014 and 2018, the time period at issue in this case, totaled **$23,183,438.30**. Doc. No. 1094-1 at 33. Amounts paid for expenses totaled **$27,005,248.06**. Doc. No. 1094-1 at 26. Of that amount, a total of **$25,463,555.47** was determined by Mr. Vranca to be business-related expenses. Doc. No. 1094-1 at 26. The business-related expenses were paid in part from accounts held by Mr. Kontilai (totaling approximately **$3 million**) and accounts held by CCI (totaling **$22,983,659.09**). Doc. No. 1094-1 at 26.

### A.   Mr. Kontilai's Finances During the Time Period.

During the Time Period, Mr. Kontilai was compensated for his work as founder, president, and chief executive officer in the amount of **$4,008,909.03**. Doc. No. 1094-1 at 28. The amounts deposited to Mr. Kontilai's accounts from CCI and/or withdrawn in cash by Mr. Kontilai during the Time Period were found to be as follows:

| | |
|---|---|
| Deposits from CCI Accounts into Kontilai Accounts: | **$10,899,557.73** |
| Cash Withdrawn from CCI Accounts by Kontilai: | **$1,746,000.00** |
| Total Funds from CCI to Kontilai: | **$12,645,557.73** |

Doc. No. 1094-1 at 29. Mr. Kontilai subsequently used a considerable portion of these funds on CCI's behalf, totaling the following amounts:

| | |
|---|---|
| Business-Related Expenses Paid by Kontilai: | **$3,000,000.00** |
| Transfers from Kontilai to CCI: | **$2,363,301.47** |
| Outstanding Balance of 2007 Loan: | **$3,273,347.23** |
| Total Funds used by Kontilai for CCI's Benefit: | **$8,636,648.70** |

Doc. No. 1094-1 at 29. The remaining difference—**$4,008,909.03**—accounts for Mr. Kontilai's compensation during this time. While Mr. Kontilai was not compensated during this time at a steady annual rate, the sporadic distributions paid to Mr. Kontilai (when dividing the total

amount paid over the 13 years represented in the Time Period) would total approximately $308,377.62 per year. As Mr. Vranca noted, Mr. Kontilai's compensation was not a regularly "salary" but instead operated as "sporadic distributions," which included "reimbursements for moneys loaned by Mr. Kontilai to CCI and expenses." Doc. No. 1094-1 at 42-43.

      **B.**    **Gail Holt's Finances During the Time Period.**

During the Time Period, Ms. Holt received transfers from CCI into her personal accounts, which accounted for more than two-thirds of all deposits into her accounts during this time. Ms. Holt then subsequently withdrew a considerable portion of the total funds in her personal accounts in cash, totaling approximately 80% of the total funds present:

    Deposits from CCI Accounts to Holt Accounts:       **$5,339,293**

Doc. No. 1094-1 at 447.

    Cash Withdrawals from Holt Accounts:       **$5,735,640**

Doc. No. 1094-1 at 448. Unlike Mr. Kontilai, Ms. Holt never transferred any funds from her accounts back to any CCI-held account. *See* Doc. No. 1094-1 at 448.

*No one* has been able to trace what Ms. Holt subsequently did with those funds—no shred of evidence exists to suggest that Ms. Holt ever subsequently gave those funds to any other person, much less Mr. Kontilai in particular. Ms. Holt herself was unable to recall any withdrawal with specificity, stating that she made "so many withdrawals" she couldn't "remember specifically any." Exhibit F at 277-278. Ms. Holt *claimed* that she gave the withdrawn cash to Mr. Kontilai, which she claims to remember years later because "for the most part he was always there." Exhibit F at 279.

This explanation is absurd, and Ms. Holt admitted numerous times that she never asked for or was provided any type of receipt, email, text message, or other written confirmation that

any of these alleged cash transfers ever actually occurred. For example, Ms. Holt acknowledged that there is no "receipt from that or any sort of document that would verify that's what [she] did with the cash." Exhibit F at 284. In relation to another set of transfers, Ms. Holt acknowledged again that she had no evidence of what happened to the cash that she withdrew. Exhibit F at 286-289.

Ms. Holt has been unable to provide any evidence that she ever gave Mr. Kontilai a single cent. Ms. Holt acknowledged that no receipts, emails, text messages, or any other documentation of any kind existed to support her allegations. Exhibit F at 60. Ms. Holt also did not ask Mr. Kontilai to provide anything to document the alleged transactions. Exhibit F at 74.

**C.**     **CCI's Finances During the Time Period.**

Mr. Vranca reviewed the entirety of the available financial data for CCI's finances during the Time Period and concluded that CCI expended a total of **$27,005,248.06** for expenses during the 13-year period. Doc. No. 1094-1 at 36. Of the total amount of expenses paid, Mr. Vranca confirmed that a *minimum* of **$25,463,555.47** were business-related expenses. Doc. No. 1094-1 at 36.[5] Mr. Vranca identified these business-related expenses in several different categories, as follows:

Business-Related Costs for Purchasing and Storing Collectibles:     **$3,168,367.81**

Business-Related Costs for Insurance Coverage:     **$2,816,388.67**

Business-Related Costs for Legal Expenses:     **$2,494,669.19**

Business-Related Costs for Production, Media, and Marketing:     **$6,083,872.84**

Business-Related Costs for Talent, Beauty, and Cleaning Costs:     **$799,663.66**

---

[5] Mr. Vranca was unable to identify the purposes of approximately $4 million expended through check and wire payments. As a result, Mr. Vranca noted that his estimation of the amount of business-related expenses "may be understated" and may actually *exceed* the amount in his report. Doc. No. 1094-1 at 36.

Business-Related Costs for Business Development Expenses: **$2,096,537.97**

Business-Related Costs for Finance, and Consulting Services: **$1,129,974.59**

Business-Related Costs for Operations Expenses: **$650,807.62**

Business-Related Costs for Software and Web Development: **$309,887.69**

Business-Related Costs for Labor and Healthcare Costs: **$97,132.64**

Business-Related Costs for Real Estate Costs: **$2,587,429.07**

Business-Related Costs for Stock Purchases: **$166,666.60**

Business-Related Costs for Miscellaneous Products and Services: **$62,361.35**

Business-Related Costs for Business-Related Credit Card Charges: **$2,999,795.77**

Doc. No. 1094-1 at 36-38. While Mr. Vranca noted that there were miscellaneous "other charges" totaling **$375,105.35** and credit card charges that appeared to be personal totaling **$1,166,587.24**, these amounts are vastly eclipsed by the "$3.0 million of CCI's business-related expenses" paid by Mr. Kontilai. Doc. No. 1094-1 at 39.

> **D.    The SEC Has Failed to Demonstrate That Any Funds Invested By Kirk Jensen, John Cutsey, or Richard Coleman Were Misused By Either CCI or Mr. Kontilai.**

The SEC produced the testimony of three investors during the preliminary injunction hearing: Kirk Jensen, who invested a total of $500,000 in 2015, John Cutsey, who invested a total of $900,000 in 2016, and Richard Coleman, who invested a total of $1,250,005 in 2016 and 2017. Doc. No. 1093-4 at 1; Doc. No. 1093-1 at 1; Doc. No. 1093-3 at 1. The SEC has presented no other evidence to demonstrate that any other person (1) invested in CCI during the relevant time period, (2) subsequent to a signed PPM, (3) that were given any material misrepresentation or omission, (4) in connection with the purchase or sale of securities.

Other witnesses produced by the SEC either never invested in the company or had no financial interest during any relevant period. Gary Farrell was not an investor and no longer held any financial interest in CCI. Doc. No. 1129 at 102. He was a shareholder, but he did not pay anything for his shares and admitted that his "value to the company" was not as an investor, but because of his "ability to get it on public television." Doc. No. 1129 at 151. Mr. Kontilai bought out any equity interest that Mr. Farrell had in CCI in 2013 or 2014, and Mr. Farrell was satisfied with the payment he received at the time. Doc. No. 1129 at 151-152. David Chapman was not an investor and never invested or had a financial interest in CCI. Doc. No. 1129 at 232.

Accordingly, the SEC's claims are now limited to the **$2,650,005** invested by the only three investors that have claimed Mr. Kontilai or CCI made any misrepresentation or omission during their purchase of CCI securities. But the SEC has failed to demonstrate that a single cent of those funds were misused.

### 1.  Kirk Jensen's Investment.

Kirk Jensen made two investments in CCI through his golf course management software company, Jencess Software & Technologies, Inc. Doc. No. 1093-4 at 1. On March 15, 2015, Mr. Jensen invested $200,000. Doc. No. 1093-4 at 1. On May 15, 2015, he invested $300,000. Doc. No. 1093-4 at 1. He admitted that he has "been able to recoup some of my initial investment based on settlements with CCI and Mr. Kontilai," but has made no indication of how much he received and how much, if any, of his initial investment remains outstanding. Doc. No. 1093-4 at 1; Doc. No. 1129 at 198. Mr. Jensen received the Private Placement Offering Memoranda, the First and Second Amendments, and the Subscription Agreement on March 12, 2015, three days prior to deciding to make the first investment. Doc. No. 1093-4 at 3. Mr. Jensen read the PPM at the time that he signed it. Doc. No. 1129 at 196.

Mr. Jensen was a sophisticated investor; he was an entrepreneur and business owner who owned multiple businesses and made investments on many public exchanges such as NASDAQ, the New York Stock Exchange, and the Toronto Exchange, as well as private investments. Doc. No. 1129 at 177-178. He described himself as "aware" and "intelligent" in matters of business and investments. Doc. No. 1129 at 178.

The PPM Mr. Jensen received, read, and signed prior to investing contained the following language:

> ALL OF THE INFORMATION PROVIDED HEREIN, INCLUDING THE STATEMENTS, ESTIMATES AND PROJECTIONS AS TO FUTURE OPERATIONS, REVENUE AND OPERATING INCOME, HAS BEEN FURNISHED BY THE COMPANY IN A PRO-FORMA FASHION. THE ESTIMATES AND PROJECTIONS OF FUTURE FINANCIAL AND OPERATING PERFORMANCE FOR THE COMPANY HAVE NOT BEEN PREPARED WITH A VIEW TOWARD COMPLYING WITH THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") REGARDING PROJECTED FINANCIAL INFORMATION. FURTHERMORE, BECAUSE THESE PROJECTED FINANCIAL ASSUMPTIONS ARE ABOUT CIRCUMSTANCES AND EVENTS THAT HAVE NOT YET TAKEN PLACE AND ARE SUBJECT TO MATERIAL VARIATION, THERE CAN BE NO ASSURANCE THAT THE PROJECTED RESULTS WILL BE ATTAINED OR THAT THE DIFFERENCES BETWEEN ACTUAL AND PROJECTED RESULTS WILL NOT BE SUBSTANTIAL AND MATERIAL. THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED TO ASSIST INTERESTED PARTIES IN MAKING THEIR OWN EVALUATION OF THE COMPANY, THE INVESTMENT, AND THE DATA SET FORTH IN THIS CONFIDENTIAL MEMORANDUM. COMPANY MAKES NO REPRESENTATION OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF THIS CONFIDENTIAL MEMORANDUM AND SHALL HAVE NO LIABILITY FOR ANY REPRESENTATION, EXPRESSED OR IMPLIED, OTHER THAN AS CONTAINED HEREIN.
>
> NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THIS INVESTMENT OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS CONFIDENTIAL MEMORANDUM. THE INFORMATION CONTAINED IN THIS CONFIDENTIAL MEMORANDUM IS SUBJECT TO AMENDMENT OR SUPPLEMENTATION.

Exhibit 84 at 4. With respect to the use of investor funds, the PPM that Mr. Jensen received, read, and signed prior to investing warned him that investment funds would be used as the company deemed appropriate, which could include the satisfaction of outstanding debts:

> THE COMPANY RESERVES THE RIGHT TO USE REASONABLE DISCRETION IN ALLOCATING THE USE OF PRIVATE OFFERING PROCEEDS IN A MANNER THAT IT DEEMS APPROPRIATE. THERE MAY BE SOME REASONABLE VARIATION IN THE PROJECTED USE OF PRIVATE OFFERING, AND ACTUAL ALLOCATION, BASED SOLELY UPON THE BEST JUDGMENT OF MANAGEMENT.
>
> SATISFACTION OF OUTSTANDING COMPANY DEBT IN THE FORM OF PROMISSORY NOTES HELD BY INDIVIDUALS, INCLUDING OFFICERS AND DIRECTORS, AS IT DEEMS APPROPRIATE.

Exhibit 84 at 14. With respect to the purchase of the Jackie Robinson contracts, the PPM that Mr. Jensen received, read, and signed prior to investing notified him that:

> The Company through a relationship with one of its Master Dealers, has acquired [two] of the most important historical documents in American History. What is considered by many to be the Founding Documents of the Modern Civil Rights Movement, Jackie Robinson made history in both 1945 & 1947 by being the first African American to sign contracts to play Professional Baseball in the Major Leagues. First with the minor league Montreal Royals, and second with the Brooklyn Dodgers. These contracts which the Company was advised were sold by Robinson shortly after Robinson signed his historic Brooklyn Dodger contract in 1947, were put away and never seen by the American Public for over 67 years. When they re-emerged in 2013, Collectors Café was contacted with the opportunity. The Company in partnership with a separate investment made by some of its senior investors, purchased the contracts. After contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents with the blessing of both the JR Foundation and Rachel Robinson. This led to massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively.

Exhibit 84 at 24.

In his testimony at the hearing, Mr. Jensen walked back several statements that he made in his affidavit. In his affidavit, he claimed that Mr. Kontilai told him on a conference call that he

was the owner of the Jackie Robinson contracts. Doc. No. 1093-4 at 2. When he testified live, however, he first claimed that he could not "be a hundred percent sure" that Mr. Kontilai ever told him that he was the personal owner of the Jackie Robinson contracts. Doc. No. 1129 at 203. In fact, despite whatever he was or was not told, Mr. Jensen knew that it was CCI, not Mr. Kontilai, that had an ownership interest in the contracts. Doc. No. 1129 at 204. Later, Mr. Jensen completely walked back his sworn affidavit testimony, stating unequivocally that "I understood that the contracts were owned by CCI. That was always the representation; in conference calls, in meetings, in gatherings." Doc. No. 1129 at 205.

Mr. Jensen also claimed multiple times in his affidavit that "[p]rior to investing, I was never informed that there was a lower valuation of the Jackie Robinson contracts" below the $36 million Seth Kaller appraisal. Doc. No. 1093-4 at 4. But he agreed that the PPM disclosed that the contracts had been appraised between $25 million and $36 million, which he knew before he invested as he received and read the PPM three days prior to investing. Doc. No. 1129 at 213; Doc. No. 1093-4 at 3. The PPM received by Mr. Jensen stated that the endorsements by the Jackie Robinson Foundation and Rachel Robinson personally "led to [a] massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively." Exhibit 84 at 24. Mr. Jensen acknowledged that the statement in his affidavit "is not true." Doc. No. 1129 at 217. Mr. Jensen also acknowledged that he did not rely on the $36 million valuation, instead believing that it "would be great" to get $20 million. Doc. No. 1129 at 220.

Mr. Jensen also claimed that "[p]rior to investing, I was never informed … that CCI's ownership of the Jackie Robinson contracts was in question." Doc. No. 1093-4 at 4. But Mr.

Jensen was aware that other parties had an interest in the contracts: he agreed that "[w]hatever the PPM said about any other ownership interest or any other interest in the contracts, [he] knew at the time [he] invested." Doc. No. 1129 at 204. The PPM explicitly stated that "[t]he Company in partnership with a separate investment made by some of its senior investors, purchased the contracts." Exhibit 84 at 24; Doc. No. 1129 at 207-208. In addition, "[a]fter contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents." Exhibit 84 at 24. Mr. Jensen never bothered to ask what the arrangement was between CCI and the senior investors. Doc. No. 1129 at 210. Mr. Jensen was notified, through the Second Amended PPM, that CCI had "negotiated an agreement with the Jackie Robinson Foundation and the widow personally to endorse the sale of the documents." Doc. No. 1129 at 208. Despite being aware of that, Mr. Jensen never bothered to ask whether any money might be due to the foundation or the widow because of the endorsement. Doc. No. 1129 at 211.

### 2.   <u>John Cutsey's Investment</u>.

John Cutsey is the founder and CEO of FDM4 International Inc. and FDM4 America Inc., companies which provide e-commerce, ERP, inventory, and warehousing services. Doc. No. 1093-1 at 1. Mr. Cutsey invested twice in CCI: he invested $700,000 on January 11, 2016 and $200,000 on October 4, 2016. Doc. No. 1093-1 at 1. Mr. Cutsey was provided with a copy of the PPM and all amendments which he "reviewed and executed prior to investing." Doc. No. 1093-1 at 4. The PPM Mr. Cutsey received, reviewed, and executed prior to investing stated the following regarding the purchase of the Jackie Robinson contracts:

> The Company through a relationship with one of its Master Dealers, has acquired [two] of the most important historical documents in American History. What is considered by many to be the Founding Documents of the Modern Civil Rights Movement, Jackie Robinson made history in both 1945 & 1947 by being the first

African American to sign contracts to play Professional Baseball in the Major Leagues. First with the minor league Montreal Royals, and second with the Brooklyn Dodgers. These contracts which the Company was advised were sold by Robinson shortly after Robinson signed his historic Brooklyn Dodger contract in 1947, were put away and never seen by the American Public for over 67 years. When they re-emerged in 2013, Collectors Café was contacted with the opportunity. The Company in partnership with a separate investment made by some of its senior investors, purchased the contracts. After contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents with the blessing of both the JR Foundation and Rachel Robinson. This led to massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively.

Exhibit 70 at 38.

In his affidavit, Mr. Cutsey claimed that he knew that statements regarding dealers and inventory "were critical to prospective investors because the sale of that inventory on the website was the primary source of CCI's expected revenue." Doc. No. 1093-1 at 3-4. But Mr. Cutsey had no personal knowledge regarding other investors, instead basing his opinion solely on his own assessment of CCI's business plan and what he believed to be CCI's "format for doing business." Doc. No. 1129 at 258.

### 3.  Richard Coleman's Investment.

Richard Coleman is a mining company executive and the trustee and beneficiary of The Rick and Shelley Coleman Family Trust. Doc. No. 1093-3 at 1. On August 2, 2016, Mr. Coleman, through the trust, invested $1,000,005 in CCI. Doc. No. 1093-3 at 1. On April 10, 2017, Mr. Coleman, through the trust, invested an additional $250,000. Doc. No. 1093-3 at 1.

The PPM Mr. Coleman received, read, and signed prior to investing contained the following language:

ALL OF THE INFORMATION PROVIDED HEREIN, INCLUDING THE STATEMENTS, ESTIMATES AND PROJECTIONS AS TO FUTURE

OPERATIONS, REVENUE AND OPERATING INCOME, HAS BEEN FURNISHED BY THE COMPANY IN A PRO-FORMA FASHION. THE ESTIMATES AND PROJECTIONS OF FUTURE FINANCIAL AND OPERATING PERFORMANCE FOR THE COMPANY HAVE NOT BEEN PREPARED WITH A VIEW TOWARD COMPLYING WITH THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") REGARDING PROJECTED FINANCIAL INFORMATION. FURTHERMORE, BECAUSE THESE PROJECTED FINANCIAL ASSUMPTIONS ARE ABOUT CIRCUMSTANCES AND EVENTS THAT HAVE NOT YET TAKEN PLACE AND ARE SUBJECT TO MATERIAL VARIATION, THERE CAN BE NO ASSURANCE THAT THE PROJECTED RESULTS WILL BE ATTAINED OR THAT THE DIFFERENCES BETWEEN ACTUAL AND PROJECTED RESULTS WILL NOT BE SUBSTANTIAL AND MATERIAL. THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED TO ASSIST INTERESTED PARTIES IN MAKING THEIR OWN EVALUATION OF THE COMPANY, THE INVESTMENT, AND THE DATA SET FORTH IN THIS CONFIDENTIAL MEMORANDUM. COMPANY MAKES NO REPRESENTATION OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF THIS CONFIDENTIAL MEMORANDUM AND SHALL HAVE NO LIABILITY FOR ANY REPRESENTATION, EXPRESSED OR IMPLIED, OTHER THAN AS CONTAINED HEREIN.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THIS INVESTMENT OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS CONFIDENTIAL MEMORANDUM. THE INFORMATION CONTAINED IN THIS CONFIDENTIAL MEMORANDUM IS SUBJECT TO AMENDMENT OR SUPPLEMENTATION.

Exhibit 65 at 3. With respect to the use of investor funds, the PPM that Mr. Jensen received, read, and signed prior to investing warned him that investment funds would be used as the company deemed appropriate, which could include the satisfaction of outstanding debts:

THE COMPANY RESERVES THE RIGHT TO USE REASONABLE DISCRETION IN ALLOCATING THE USE OF PRIVATE OFFERING PROCEEDS IN A MANNER THAT IT DEEMS APPROPRIATE. THERE MAY BE SOME REASONABLE VARIATION IN THE PROJECTED USE OF PRIVATE OFFERING, AND ACTUAL ALLOCATION, BASED SOLELY UPON THE BEST JUDGMENT OF MANAGEMENT.

SATISFACTION OF OUTSTANDING COMPANY DEBT IN THE FORM OF PROMISSORY NOTES HELD BY INDIVIDUALS, INCLUDING OFFICERS AND DIRECTORS, AS IT DEEMS APPROPRIATE.

Exhibit 65 at 12. With respect to the purchase of the Jackie Robinson contracts, the PPM that Mr.

Jensen received, read, and signed prior to investing notified him that:

> The Company through a relationship with one of its Master Dealers, has acquired [two] of the most important historical documents in American History. What is considered by many to be the Founding Documents of the Modern Civil Rights Movement, Jackie Robinson made history in both 1945 & 1947 by being the first African American to sign contracts to play Professional Baseball in the Major Leagues. First with the minor league Montreal Royals, and second with the Brooklyn Dodgers. These contracts which the Company was advised were sold by Robinson shortly after Robinson signed his historic Brooklyn Dodger contract in 1947, were put away and never seen by the American Public for over 67 years. When they re-emerged in 2013, Collectors Café was contacted with the opportunity. The Company in partnership with a separate investment made by some of its senior investors, purchased the contracts. After contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents with the blessing of both the JR Foundation and Rachel Robinson. This led to massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively.

Exhibit 66 at 9-10.

Mr. Coleman claimed that Mr. Kontilai "emphasized that he did not take a salary and that he expected to earn profits from his investment," and that the PPM does not "state[] an intent to use investor funds to pay a salary to company executives or for personal expenditures of company executives." Doc. No. 1093-3 at 2-3. But Mr. Coleman acknowledged that he understood Mr. Kontilai sought to earn money from his work at CCI and that he understood there were multiple forms of payment that an executive like Mr. Kontilai could receive that would neither be a salary nor the return-on-investment Mr. Coleman claimed to believe Mr. Kontilai would receive. Doc. No. 1129 at 69-70.

Mr. Coleman also claimed that "[i]t was never disclosed to me that Mr. Kontilai directed Seth Kaller to provide an estimate of the contracts at $36 million." Doc. No. 1093-3 at 6. But Mr.

Coleman had never met Seth Kaller, did not know who he was, had never been party to any conversations between Seth Kaller and Mr. Kontilai, and had no basis to claim that Mr. Kontilai provided any instructions to Seth Kaller. Doc. No. 1129 at 81-82. That statement was "just in here" when the SEC asked Mr. Coleman to sign the affidavit. Doc. No. 1129 at 83.

### 4.  The SEC Failed to Demonstrate that Any Statements Were False or Misleading.

The SEC alleges that Mr. Kontilai and CCI made misrepresentations that fell into four different categories: (1) misleading statements about using investor money to pay Mr. Kontilai a salary, Doc. No. 1185 at 22, (2) misleading statements about Mr. Kontilai loaning the company funds rather than investing funds, Doc. No. 1185 at 32, (3) misleading statements about dealer inventory, Doc. No. 1185 at 35, and (4) misleading statements about the ownership and value of the Jackie Robinson contracts. Doc. No. 1185 at 39.

*First*, the SEC has failed to demonstrate that any of the investor funds paid by Mr. Cutsey, Mr. Jensen, or Mr. Coleman—the only three investors alleging that they were mislead in any way by CCI or Mr. Kontilai—were paid to Mr. Kontilai, either as salary or as a payment on any outstanding loan. None of the SEC witnesses witnessed Mr. Kontilai pay himself using investor funds. Mr. Jensen testified that he has "no firsthand knowledge" that Mr. Kontilai ever paid himself with investor money. Doc. No. 1129 at 194, 215. Mr. Chapman claimed that "[a]s a board member, [he] was not aware of any compensation paid or owed by the company to Mr. Kontilai and I was not aware of any money he had loaned to CCI." Doc. No. 1093-5 at 1. But he admitted that he did not expect to be aware of any compensation that Mr. Kontilai might have been paid, as Mr. Kontilai "was then and always very secretive and closed." Doc. No. 1129 at 239. He further admitted that he had no personal knowledge of Mr. Kontilai ever taking a salary. Doc. No. 1129 at 241. He was "not aware" of anything related to the company's finances. Doc.

No. 1129 at 243. Mr. Coleman also had no personal knowledge that Mr. Kontilai ever paid himself from investor money. Doc. No. 1129 at 71. Mr. Coleman also had no personal knowledge that any large amount of cash was being transferred from CCI to Mr. Kontilai. Doc. No. 1129 at 88-89.

None of the SEC witnesses ever witnessed Mr. Kontilai pay his friends using investor funds either. Mr. Jensen testified that he had no idea whether Mr. Kontilai used investor funds to pay any of his friends. Doc. No. 1129 at 195. Mr. Coleman admitted that he had no personal knowledge that Mr. Kontilai ever paid any of his friends using investor funds. Doc. No. 1129 at 71.

None of the SEC witnesses ever witnessed Mr. Kontilai use investor funds to purchase collectibles other than the Jackie Robinson contracts. Mr. Jensen testified that he once saw a Derek Jeter shirt in Mr. Kontilai's room, but he did not claim that the shirt was purchased using investor funds and stated that he had no knowledge that Mr. Kontilai ever used investor funds or had anyone else use investor funds to purchase a collectible other than the Jackie Robinson contracts. Doc. No. 1129 at 196-197.

*Second*, none of the SEC witnesses provided any evidence of how Mr. Kontilai *loaning* the company funds versus *investing* those funds made any difference at all to their investments—clearly, as none of the SEC witnesses ever witnessed Mr. Kontilai receive investor funds, the SEC failed to prove that Mr. Kontilai received any investor funds as payment for *either* a loan *or* as payment on an investment. In addition, the investors were aware that Mr. Kontilai was involved in CCI to make money. Mr. Jensen stated that would be "anyone's assumption in business." Doc. No. 1129 at 198. Mr. Coleman admitted that Mr. Kontilai had told him that he intended to make money from CCI and that he was fully aware that was Mr. Kontilai's intention.

Doc. No. 1129 at 69. No reasonable investor could have ever concluded that an entrepreneur was *not* seeking to make money on a business venture.

*Third*, Mr. Coleman, one of the three investors alleging that he was misled by Mr. Kontilai or CCI, acknowledged that CCI had entered into agreements with dealers and that there were "a handful of dealers" who had "signed short term agreements" with CCI. Doc. No. 1093-3 at 5. He "believed it to be true" that there were "dealers that CCI had signed up to sell on its anticipated website." Doc. No. 1129 at 86. It was true that Peter Siegel had secured hundreds of verbal commitments from dealers that had executed short-term agreements to execute long-term agreements as soon as the company launched the television show; "everybody was ecstatic" to be involved. Exhibit L at 22. In 2011, several years before any of the three investors invested in CCI, Mr. Siegel had successfully negotiated with a first set of approximately 15 to 20 master dealers in 2011, who were all well established in the industry and would provide millions of dollars of inventory upon CCI's website launch. Exhibit L at 86. Mr. Siegel confirmed that CCI had the potential to enter into more than 200 exclusive agreements to provide over $1 billion of inventory for the website as soon as the television show launched. Exhibit L at 196. Those agreements did not come to fruition because *the SEC* halted CCI's development in its tracks with this lawsuit—*not* because the dealers were not ready and waiting for CCI to launch its business.

*Fourth*, the investors were aware that other investors contributed to the purchase of the Jackie Robinson contracts. Mr. Coleman was told that there was an investor involved in the purchase other than CCI. Doc. No. 1129 at 75. From that knowledge, Mr. Coleman extrapolated "the common sense conclusion that that other investor had an interest in the Jackie Robinson contracts." Doc. No. 1129 at 75. Further, Mr. Coleman acknowledged that he had all the information he needed to determine that the other investor would have some type of priority

position over later investors at the time of his investment. Doc. No. 1129 at 76. There was no effort by either Mr. Kontilai or CCI to hide that there was another investor involved in the purchase from later investors. Doc. No. 1129 at 77. But despite his later claims that the size of the other investor's investment was "the key," Mr. Coleman made no effort to ask for further details. Doc. No. 1129 at 80-81. Further, it was "common sense" that "the family and the Jackie Robinson Foundation" would be owed some percentage of the sales in exchange for the endorsement. Doc. No. 1129 at 100.

Further, the investors were aware that CCI had obtained two appraisals for the Jackie Robinson contracts, one which valued the contracts at $36 million and the other at $25 million. Doc. No. 1129 at 212. Mr. Jensen agreed that the PPM disclosed the appraisal to be between $25 million and $36 million, contradicting his affidavit testimony that claimed he had only ever been told that the value was $36 million. Doc. No. 1129 at 213. Each of the three investors' PPM amendments clearly referenced both appraisals. Exhibit 66 at 9-10; Exhibit 70 at 38; Exhibit 84 at 24.

### III. The SEC's Key Witness, Gail Holt, Has Lied on Numerous Occasions and Admitted to Withdrawing Significant Amounts of Funds Belonging to CCI.

The SEC's case relies heavily on Ms. Holt, an unreliable witness that has admitted to receiving transfers of millions of dollars from CCI into her personal accounts. Ms. Holt claimed that starting before her employment at CCI, Mr. Kontilai would deposit money from CCI into her personal bank account, which Ms. Holt would then withdraw in cash. According to Ms. Holt, the sole reason she agreed to permit Mr. Kontilai to deposit funds in her personal account was because Mr. Kontilai "was a friend of mine." Exhibit F at 50. Ms. Holt also could not remember how much Mr. Kontilai allegedly deposited in her personal accounts, vaguely claiming that she "think[s] it was 4 or 5 million," but acknowledging that she was "not 100 percent sure." Exhibit

F at 52. Ms. Holt claimed that she was willing to "participate in the fraud on the investors" because she "was just doing a friend a favor." Exhibit F at 53.

But Ms. Holt's own testimony perfectly demonstrates how unreliable and uncredible she is as a witness. Ms. Holt freely admitted to *continuously* lying. For example, to withdraw cash from her Bank of America account, Ms. Holt testified that Bank of America required her to fill out forms stating what she "was taking the money out for." Exhibit F at 56-57. Ms. Holt admitted that she lied on the Bank of America forms and that she lied when she spoke with the branch manager. Exhibit F at 57-58. Ms. Holt acknowledged under oath that she made "a false statement on that bank form," that she "knew … was false when [she] made it." Exhibit F at 59.

Ms. Holt did not lie to Bank of America *once* or *twice*—she lied to the bank *numerous* times on *numerous* separate occasions, so many times that Ms. Holt could not recall how many times she lied. Exhibit F at 72-73. Ms. Holt also admitted under oath to obstructing the SEC's investigation and lying to the SEC—who have now inexplicably become her champion in this matter. Ms. Holt directed her attorney to make false statements to the SEC during the SEC's investigation. Exhibit F at 30-31. She directed Mr. Leone to falsely tell the SEC that Ms. Holt did not know Mr. Kontilai would provide documents that Ms. Holt had created, including the employment agreement, to the SEC. Exhibit F at 31. As Ms. Holt admitted, she was aware that Mr. Leone followed her direction and did, in fact, provide false statements to the SEC on her behalf. Exhibit F at 31.

She also lied to her attorney, Andrew Ceresney, Esquire, telling him that she had created Mr. Kontilai's employment agreement with full knowledge that the SEC would be informed of her statement. Exhibit F at 33. Ms. Holt claimed under oath that her only motivation for lying to the SEC and obstructing the SEC's investigation was that she was *friends* with Mr. Kontilai.

Exhibit F at 44. Ms. Holt ultimately terminated Mr. Leone's services because Mr. Leone did not believe Ms. Holt's incredulous stories. Exhibit F at 65.

These were not the only lies Gail Holt told related to this case.  She admitted to lying to a lawyer named John Aldrich about having lent the defendant corporation money. *See* Exhibit F at 79. She admitted to lying to other lawyers by telling them she had invested $4 million in CCI. *See* Exhibit F at 203. She admitted to lying about preparing the PPMs.  Exhibit F at 155. Ms. Holt constantly lied and changed her story about almost every material fact in this case at one point or another. Exhibit F at 183-84; 304.

In addition, Ms. Holt had a strong motivation to keep the money that was transferred from CCI's accounts to her personal account. Ms. Holt has had a long history of poor finances, to the extent that she has had to file for bankruptcy twice—the first around 1990 and the second around 2010. Exhibit F at 208. The second bankruptcy occurred shortly before the time that the SEC alleges—and Ms. Holt confirms—that she received millions of dollars in transferred funds from CCI. At that time, Ms. Holt described her own financial condition as "terrible," noting that her family had to move because they could no longer afford where they were living and that the family was "barely … scraping anything together":

> Q: What was your financial condition like in the 2013 to 2018 time frame?
>
> A: Terrible. I didn't have a job. My husband was on social security. He was getting $600 a month. I had one son who is a musician, who was trying to sell some music, and then another son that was getting some sales jobs on the phone, but barely -- barely earning anything. It was just horrendous. So we had moved to Apple Valley because it was too expensive to live in Los Angeles. Apple Valley is up in the high desert, and it's a much cheaper place. But my rent was $600 a month. So we were barely even scraping anything together at that point.

Exhibit F at 209.

Yet, despite her own "terrible" and "horrendous" financial condition, Ms. Holt and the SEC would ask a jury to believe that Ms. Holt turned over millions of dollars in cash to Mr. Kontilai for the sole reason that she was "just doing a friend a favor." Exhibit F at 53. There is no compelling reason to believe this frankly incredulous tale, and ample reason to question Ms. Holt's credibility based on her own testimony and her consistent tendency to lie to all and sundry.

Ms. Holt also had a strong motivation to lie in favor of the SEC given the legal jeopardy that Ms. Holt faces based on her own admissions. At first, Ms. Holt admitted to her own wrongdoings, such as telling Andrew Ceresney that she had created Mr. Kontilai's employment agreement. Exhibit F at 33. Ms. Holt subsequently changed her story, claiming that she lied to Andrew Ceresney and instead pointing the finger at Mr. Kontilai. The answer to the question *why* is clear: Ms. Holt understood the legal jeopardy that she faced and was motivated to change her story to protect herself. To that end, Ms. Holt has now entered into two different proffer agreements regarding her testimony in this case. The proffer agreement that Ms. Holt entered into with the SEC guaranteed, in part, that the "commission staff will not use any statements provided by you during the meeting, except for the following purposes: To obtain evidence which may be used against you and others in any action or proceeding brought or instituted by the commission against you, to rebut your testimony, evidence offered, or arguments."  Exhibit F at 28-29. Ms. Holt signed another proffer agreement with the Department of Justice. Exhibit F at 39-40.

Thus Ms. Holt's motivations were clear: Ms. Holt has consistently provided statements including blatant lies and falsehoods, several of which contradict each other. Within these statements, Ms. Holt has plainly admitted to a myriad of federal crimes, including, but not

limited to, the misuse of the funds that were deposited from CCI's accounts into her own personal accounts. In fact, as far as Ms. Holt knew, she was "going to a Grand Jury" after telling her story in December 2018. Exhibit F at 307. But only a few months later, Ms. Holt entered into proffer agreements with both the SEC and the Department of Justice and provided other statements that completely changed her story to instead point the finger at Mr. Kontilai. Exhibit F at 39-40, 307. Ms. Holt now speaks purely out of self-preservation, saying whatever she needs to in an effort to protect herself from her own admissions to various federal crimes—nothing that Ms. Holt has testified to has any credibility.

In sum, as outlined above, Ms. Holt admitted under oath to committing several federal crimes. It is inconceivable that Ms. Holt remains uncharged by both the SEC and the Department of Justice today, despite these admissions and despite the fact that the crimes admitted to demonstrably harmed CCI's investors. These admitted crimes include ***obstructing the SEC's investigation***:

> Q: Okay. In connection with the Proffer Agreement did you admit to the SEC that you caused your -- your attorney, Bill Leone, to make false statements to the SEC?
>
> A: Yes.
>
> Q: What false statements did you cause Mr. Leone to make to the SEC?
>
> A: I -- I asked him to go and meet with them with -- with Andrew Ceresney, and to tell them that I never knew that Mykalai was going to give documents that I made to the SEC. And it was -- it was Andrew's fault because he never looked at them beforehand. And to go and explain this to them, that it wasn't my fault. That -- that they had got this. Or that it had gone to the SEC.
> …
> Q: Okay. Did Mr. Leone, in fact, make false statements to the SEC?
>
> A: Yes.
> …
> Q: Just so the record's clear, so you lied to Mr. Ceresney and told him that you had created the employment agreement when, in fact, you had not?

A: Yes.

Exhibit F at 30-31, 44.

***Making false statements*** to her bank to cover up her misappropriation of CCI's funds:

Q: Okay. Which bank asked you to fill in the form?

A: Bank of America.

Q: Okay. Do you recall what branch you filled the form out at?

A: I probably filled it out at more than one Bank of America depending where we were getting the money from, but mostly at the Spring -- Spring Mountain branch in Las Vegas.

Q: Did you ever speak with a branch manager there whose name is Charles?

A: Yes.

Q: Okay. What did you talk to Charles about?

A: That I was working as a consultant for Collector's Cafe, and we needed the money in cash, because we were buying collectibles and that there were shows around Las Vegas, and it was cheaper. We got better prices if we paid cash rather than -- than checks or anything.

…

Q: Okay. But you put on the form that it was -- you were using it to buy collectibles; isn't that what you put on the form?

A: Yes. Yes.

Q: Okay. So that was a false statement on that bank form; correct?

A: Yes.

Q: Okay. And you knew it was false when you made it?

A: Yes.

Exhibit F at 57-59.

***Misappropriating CCI's funds*** by withdrawing CCI funds deposited into her account in cash:

Q: Let's look at the next bank statement, GHH 115 is the Bates number. And the account number, again, is -- this is for -- for a period December 8, 2012 through January 9th, 2013. Same Bank Of America account, 1255. Ms. Holt, there is a deposit in the amount of $425,000 on 12/27/2012; do you agree with me on that?

A: Yes.

Q: Okay. And then we see there are a series of withdrawals. On 12/28, the very next day, there is a withdrawal of $10,000. On 12/28, there is a $200,000 withdrawal. On 12/31 there is a $15,000 withdrawal. On 12/31 there is a $200,000 withdrawal. Do you see that?

A: Yes.

Q: Okay. Do you recall, were those withdrawals all in cash?

A: Yes.

Q: Okay. Did you get a cashier's check or you got physical --

A: Physical cash.

Q: Actual U.S. currency?

A: Yes.

Exhibit F at 283-284; *see also* Exhibit F at 279-286. Despite Ms. Holt's claims that she gave the cash withdrawn to Mr. Kontilai, Ms. Holt was unable to provide *any evidence at all* to indicate she gave even a single penny to Mr. Kontilai:

Q: Okay. Did you get a receipt from Mr. Kontilai when you gave him the cash?

A: No.

Q: Do you have any documentation that shows you provided Mr. Kontilai with the cash that you withdrew from Bank of America, for example?

A: No.

Q: Do you have any e-mails with Mr. Kontilai regarding these cash withdrawals that you made and -- and then purportedly handed the cash to Mr. Kontilai?

A: No.

Q: Do you have any text messages regarding these cash transactions where you withdrew cash from Bank of America and then handed it to Mr. Kontilai?

A: No.

…

Q: But you don't have any -- I -- I don't want to re-ask the same question, but is there any other -- any other written information that would corroborate, confirm, that the money you withdrew from cash was provided to Mr. Kontilai?

A: No.

MR. BOURELLY: That you're aware of.

THE WITNESS: Not that I'm aware of.

BY MR. MORRIS:

Q: Make my work easy. I'm just going through my outline here. Did you ever ask Mr. Kontilai to provide you something in writing that would document these financial transactions where you withdrew cash and handed it to him, purportedly?

A: No.

Exhibit F at 60, 74.

At no point up to and including a meeting "in December 2018 in New York City with the various lawyers" involved in this case, Ms. Holt admitted to committing these federal crimes herself. Exhibit F at 246. Right "[a]fter that meeting," Ms. Holt "learn[ed] that a Grand Jury subpoena had been issued for" her. Exhibit F at 246. Ms. Holt had received "a phone call from [her] husband saying that the FBI had been to [her] house and they had a Grand Jury subpoena for [her]." Exhibit F at 249. Suddenly, Ms. Holt changed her story: she claimed that she had "lied to Mr. Ceresney, Mr. Leone, [her] lawyer, Ms. Youn, Mr. Kontilai's lawyers, Mr. Little, and others that were in that – in that meeting in December of 2018." Exhibit F at 249. Ms. Holt "met with [her] sister … in January of 2019," told her sister about receiving the subpoena, and "decided to change the story that [she] told back in December of 2018." Exhibit F at 307. This

48

new story—told for the first time *after* Ms. Holt received the subpoena—now tries to shift the blame for *Ms. Holt's* illegal activities to Mr. Kontilai.

Ms. Holt's role in this case is not minor. The SEC makes *29 separate references* to Holt in the Complaint – far more than any other non-party. She is the only material witness to most of the more serious wrongdoing alleged. This Court has already noted Ms. Holt's extensive pattern of falsehoods and lies, describing how Ms. Holt testified that she created Mr. Kontilai's employment agreement before testifying that was a lie, how Ms. Holt testified that she lied about a loan agreement and bank statement, how Ms. Holt testified that she "caused Leone to make false statements to the SEC," and how Ms. Holt asked Leone not to produce certain documents to the SEC. Doc. No. 884 at 2-4. This Court then held that the crime-fraud exception applied to deposition testimony sought from Ms. Holt's prior counsel, noting that there is "probable cause to believe that she, in fact, made false statements to her counsel that she intended to be communicated to the SEC" in violation of 18 U.S.C. § 1001, and that Ms. Holt did, in fact, "attempt[] to use communications with counsel in furtherance of a plan to give false statements to the SEC." Doc. No. 884 at 14-16. If Ms. Holt was willing to lie to the SEC, it is highly likely that Ms. Holt will lie to this Court and lie to a jury, and any statement made by Ms. Holt without any corroborating evidence is simply not credible. The SEC's allegations, which are heavily dependent upon Ms. Holt's unreliable and uncredible testimony, are simply a total sham unsupported by any credible evidence.

## INCORRECT STATEMENTS AND EVIDENTIARY HOLES IN THE SEC'S PROPOSED FINDINGS OF FACT

The SEC's Proposed Findings of Fact contain numerous incorrect statements and evidentiary holes that belie the weakness of its case against Mr. Kontilai. These inaccuracies are addressed below.

I.     **The SEC's Proposed Findings of Fact Fail to Demonstrate that Mr.**
       **Kontilai Misappropriated Any Funds or Fabricated Any Evidence.**

At the start, the SEC claims that Mr. Kontilai "had no source of income other than Collectors Café" between the incorporation of the company in 2007 and May 14, 2019, but the SEC's own witnesses testified otherwise. Doc. No. 1185 at 4. Mr. Kontilai was owed money from Public Media, including at least $200,000 of the $500,000 earned from Xyience, Doc. No. 1129 at 137, which bank records indicate was paid into Public Media's account but was not distributed to Mr. Kontilai. *See* Exhibit 82 at 1 (reflecting the $500,000 deposit on May 2, 2006). In addition, Mr. Kontilai was engaged in other business ventures during that time, including the purchase of Nightly Business Report in 2010. Doc. No. 1129 at 161-162. Mr. Farrell contributed no funds towards the purchase of Nightly Business Report and made $80,000 after Mr. Kontilai sold the business; it is evident that Mr. Kontilai, who paid $500,000 to purchase the company, saw a similar rate of return on his investment. Doc. No. 1129 at 163.

Next, the SEC claims that "[f]rom April 1, 2014 to December 31, 2018, Kontilai and Collectors Café gave at least **$7.27 million** of investor money to Kontilai in at least four categories of transactions," but misstates the evidence on which it relies. Notably, the SEC cites to Exhibits 18, 19, 20, and B.[6] None of these exhibits purport to summarize the transfer of *investor money*—each of these exhibits reflect all transfers of a certain type to and from certain accounts *without regard to the ultimate source of those funds*. For example, Exhibit 18 is labeled as a "Summary of Cash Transactions from Collectors Café Bank Accounts between April 1,

---

[6] It was the SEC that proposed to this Court during the telephonic hearing on February 21, 2023 that the parties use Doc. No. 1094-1, pages 20-466, instead of Mr. Kontilai's previously marked Exhibits B, D, E, and K, as the copy of the report attached to Doc. No. 1094-1 includes all attachments to Mr. Vranca's amended report. See Feb. 21, 2023 Tr. at 59-60. As the SEC has not done so in their brief, Mr. Kontilai will refer to these exhibits as Exhibits B, D, E, and K when referencing the SEC's argument but will cite to Doc. No. 1094-1 otherwise.

2014 and December 21, 2018" and reflect primarily entries with no more detail then "ATM CASH DEPOSIT" or "DEPOSIT." Exhibit 18. As Ms. Moessner described, this chart was populated by using "an automated system that first pulls information from the [bank] statements" which is later filled in by a contract analyst. Doc. No. 1129 at 270. There is no differentiation at all between transactions depending on the origin of the funds, and none of these transactions have been traced back to investor funds generally, much less funds invested by Mr. Cutsey, Mr. Coleman, and Mr. Jensen specifically. Exhibit 19 is the same: this exhibit is allegedly a "Summary of Transactions to Kontilai from Collectors Café Bank Accounts between April 1, 2014 and December 21, 2018" without any indication at all of where the funds transferred originated from. Exhibit 19. The same is true of Exhibit 20, which allegedly reflects "Transfers from Collectors Café to Holt and Selected Cash Transaction in Holt Accounts between 12/27/2012-7/11/2018," which fails to link any of the transactions to investor funds—and especially is unable to do so for the several years of transactions made prior to Mr. Cutsey, Mr. Coleman, and Mr. Jensen investing in CCI. Exhibit 20. Mr. Vranca also did not link the "portion of credit card charges that appear to be of a personal nature ($1,166,587.24)" to investor funds. Doc. No. 1094-1 at 39.

### A. The SEC Cannot Meet Its Burden By Solely Relying on Summary Evidence That Makes No Attempt to Distinguish Investor Funds or Legitimate Business Expenses.

As noted above, the SEC relies entirely on its own summary charts, Exhibits 18, 19, and 20, to establish the amounts it alleges Mr. Kontilai misappropriated from CCI. But the SEC's summary charts are fundamentally flawed and cannot meet the SEC's burden of proof.

Each chart was prepared by compiling all transactions in a certain broad category—for example, all transactions of a certain type from a certain bank account. As Ms. Moessner

explained, the process is primarily automated and the system captures all information from bank statements without discretion: "there is an automated process that we use to pull information from the statements into an electronic form." Doc. No. 1129 at 277. The SEC analyst then "confirm[s] that everything that was pulled in electronically was pulled in correctly." Doc. No. 1129 at 277.

These summary charts do not account for the origin or purpose of any of the funds listed. The SEC has made no attempt to isolate investor funds from non-investor funds and no attempt to differentiate between legitimate business expenses and non-legitimate expenses. As Ms. Moessner noted:

> Q. Does the exhibit (Exhibit 18) identify the source of the funds that resulted in a net negative, I guess, of 2.1 million in cash?
>
> …
>
> THE WITNESS: I think the answer is no, it does not make any effort to do that. This is just cash transactions that appear in the bank records.

Doc. No. 1129 at 278-279. At the end of the day, the SEC's summary chart, Exhibit 19, is simply "just cash in and cash out. Other than it being cash, no indication of the source; is that correct? A. That's correct. If there was an indication of the source, like if it was a check deposit, that wouldn't be on this schedule." Doc. No. 1129 at 279.

Exhibit 19 and 20 are the same. The SEC claims that Exhibit 19 demonstrates transactions made from CCI accounts to accounts held by Mr. Kontilai:

> Q. And 19 – we talked about the other exhibit purported to look at cash in and cash out – what does 19 purport to summarize?
>
> A. 19 is transactions from Collectors Café accounts to accounts in the name of Mr. Kontilai or to Mr. Kontilai directly.

Doc. No. 1129 at 281. But once again, there is no attempt by the SEC to isolate investor funds from non-investor funds or determine which expenses are legitimate business-related expenses:

Q. And similar to 18, was there any effort made to – I'm sorry – does the document on its face reflect whether or not any of these are investor funds, the document on its face?

A. No.

Q. And was there any effort made for 18 or 19 to exclude any funds that did not come from investors?

A. No.

Doc. No. 1129 at 282.

Exhibit 20 allegedly reflects transactions that were made to and from Ms. Holt's accounts:

Q. Ms. Moessner, I'm going to follow a similar pattern as to 20. But first, tell us, what is it meant to summarize? The bottom line there, what is it meant to be?

A. These are transactions to Ms. Holt and out of Ms. Holt's accounts.

Doc. No. 1129 at 283. Just as with Exhibit 18 and Exhibit 19, the SEC made no attempt to determine whether any of these funds actually originated from investor contributions:

Q. Right. And this Plaintiff's Exhibit 20 also makes no effort to determine the original source of these funds. They are between CCI accounts and Ms. Holt, and then out to cash. I understand that, but it makes no effort to determine whether they are investors' accounts or not?

A. Correct.

Doc. No. 1129 at 285.

The only funds at issue here are *investor funds*. The SEC has no business litigating any case that simply involves a company's mismanagement of its own funds. If, for example, CCI mismanaged funds received from Mr. Kontilai as start-up capital, there is no securities violation. Similarly, there is no securities violation where funds were used for legitimate business expenses. The SEC's failure to address either of these requirements—that the funds be (1)

investor funds that (2) were not used for legitimate business expenses—is fatal to the SEC's case.

Unsurprisingly, the SEC complains at length about Mr. Vranca's categorization of certain expenses as legitimate business expenses. *See* Doc. No. 1185 at 49-54. The SEC has had Mr. Vranca's report for years—had the SEC wished to, it could have retained its own expert to opine as to which expenses are legitimate business expenses. Instead, the SEC seems to urge this Court to exclude Mr. Vranca's opinion and find that *no* expenses are legitimate, a patently unreasonable stance to take.[7] If there is even *one* legitimate business expense made with investor funds, that expense *must* be deducted from the total that the SEC alleges is misappropriated.

### B.   The SEC Failed to Demonstrate that Mr. Kontilai <u>Withdrew Any Investor Money in Cash Transactions</u>.

The SEC continues the same failure of proof in the following section. First, they claim that "Kontilai and CCI withdrew a net amount of at least **$2.1 million** in cash from CCI bank accounts between April 1, 2014 and December 21, 2018," now removing the allegation that these funds were investor funds. Doc. No. 1185 at 5. If these funds did not originate from investor contributions, then these funds are irrelevant to this case—and the SEC continues to fail to

---

[7] While the SEC quibbles with Mr. Vranca's characterization of an irrelevantly small number of expenses as legitimate business expenses, the vast majority of the expenses calculated by Mr. Vranca are self-evidently business related. For example, insurance expenses such as premiums for commercial insurance policies, legal expenses, expenses for the development of the television show including production, media, and marketing costs, operational expenses, development costs associated with the website including software, electronics, and web development, labor and employee healthcare costs, and rental expenses for office space. Doc. No. 1094-1 at 36-38.

In addition, it is notable that the documentation related to these expenses is not disputed—Mr. Vranca relied upon the same bank statements and other financial documentation that the SEC relies upon as the source documents for the summary charts introduced by Ms. Moessner. Accordingly, there can be no dispute that a majority of the expenses were legitimate business expenses and what little the SEC cross examined Mr. Vranca on does not reduce the legitimate nature of those other expenses.

provide any link at all between the cash withdrawn and any funds contributed (1) by any investor at all during the relevant period, and (2) by Mr. Cutsey, Mr. Coleman, or Mr. Jensen in particular.

Second, the SEC has no evidence to demonstrate that any cash withdrawal was used to purchase collectibles on behalf of the company. The SEC cites to Mr. Kontilai's deposition testimony and Mr. Jensen, Mr. Coleman, and Mr. Cutsey's declarations, but none of these provide any evidence for the SEC's supposition. Mr. Kontilai explicitly denies using the cash funds for the purchase of any collectibles, instead stating that the funds "might have been a repayment of my note back to me that I ended up using to buy a collectible for my personal collection," and that he could not recall ever purchasing a collectible on behalf of the company "other than the Jackie Robinson contracts." Doc. No. 1163-2 at 362. None of the three investors testified to having any personal knowledge of Mr. Kontilai purchasing any collectibles for the company other than the Jackie Robinson contracts. Mr. Jensen testified to the contrary, noting that he once saw a Derek Jeter shirt in Mr. Kontilai's room, but he explicitly did not claim that the shirt was purchased using investor funds and stated that he had *no knowledge* that Mr. Kontilai ever used investor funds or had anyone else use investor funds to purchase a collectible other than the Jackie Robinson contracts. Doc. No. 1129 at 196-197.

Third, the PPMs explicitly notified investors that CCI reserved the right to use investor funds in "a manner that it deems appropriate," including the "satisfaction of outstanding company debt in the form of promissory notes held by individuals, including officers and directors." Exhibit 65 at 12; Exhibit 84 at 14.

Fourth, the most egregious statement the SEC makes is to claim that "Defendants do not dispute that Kontilai took millions of investors' dollars and they presented no witnesses from the

company at the Hearing to explain what right Kontilai had to these funds." Doc. No. 1185 at 6. Perhaps the SEC has forgotten, but it is the ***SEC's burden*** to prove its case—***not Mr. Kontilai's***. Mr. Kontilai has no obligation to prove any right to any funds at all—unless and until the SEC links such funds to *investor contributions*, which it has failed to do here. Mr. Kontilai *absolutely* disputes this statement, as there is no evidence in the record to indicate that any cent transferred to Mr. Kontilai in any way, shape, or form originated from investor contributions generally, or, more importantly, from Mr. Cutsey, Mr. Coleman, or Mr. Jensen's investments in particular.

### C. The SEC Has to Demonstrate that Mr. Kontilai Withdrew Any Investor Funds Through Checks or Electronic Transfers.

Once again, the SEC claims that "Kontilai and CCI transferred a net amount of at least $1.9 million from CCI bank accounts to Kontilai bank accounts between April 1, 2014 and December 21, 2018" without making a single effort to connect even a penny of those funds to investor contributions. Doc. No. 1185 at 6. It is irrelevant for "Kontilai and CCI [to] never disclose[] to investors that their money would be used for the purposes served by [these] transactions" if none of those transactions were made with the funds contributed by the investors that claim they were never informed of that—specifically, it is irrelevant to this case unless the SEC has demonstrated that those funds came from Mr. Coleman, Mr. Cutsey, or Mr. Jensen's investments. They have not.

Beyond their failure to demonstrate that any of the funds at issue are relevant to this case, the SEC pins its entire analysis on one allegation—that Mr. Kontilai was not "entitled to millions in compensation." Doc. No. 1185 at 6. Even the SEC's own investor witnesses acknowledged, however, that it was expected that Mr. Kontilai would seek to make money on this business venture and that he would ultimately be compensated in same manner. The investors were aware that Mr. Kontilai was involved in CCI to make money. Mr. Jensen stated that would be

"anyone's assumption in business." Doc. No. 1129 at 198. Mr. Coleman admitted that Mr. Kontilai had told him that he intended to make money from CCI and that he was fully aware that was Mr. Kontilai's intention. Doc. No. 1129 at 69. No reasonable investor could have ever concluded that an entrepreneur was *not* seeking to make money on a business venture and it is truly unreasonable to contend that Mr. Kontilai was entitled to *nothing at all* after working to develop CCI over *more than a decade*.

In addition, the SEC's sole piece of evidence that any of these funds were paid to Mr. Kontilai as "salary" or "compensation" are a few "[c]ontemporaneous notations." Doc. No. 1185 at 6. There is no actual evidence that any investor funds were paid to Mr. Kontilai as salary or compensation of any type. None of the SEC witnesses witnessed Mr. Kontilai pay himself using investor funds. Mr. Jensen testified that he has "no firsthand knowledge" that Mr. Kontilai ever paid himself with investor money. Doc. No. 1129 at 194, 215. Mr. Chapman claimed that "[a]s a board member, [he] was not aware of any compensation paid or owed by the company to Mr. Kontilai and I was not aware of any money he had loaned to CCI." Doc. No. 1093-5 at 1. But he admitted that he did not expect to be aware of any compensation that Mr. Kontilai might have been paid, as Mr. Kontilai "was then and always very secretive and closed." Doc. No. 1129 at 239. He further admitted that he had no personal knowledge of Mr. Kontilai ever taking a salary. Doc. No. 1129 at 241. He was "not aware" of anything related to the company's finances. Doc. No. 1129 at 243. Mr. Coleman also had no personal knowledge that Mr. Kontilai ever paid himself from investor money. Doc. No. 1129 at 71. Mr. Coleman also had no personal knowledge that any large amount of cash was being transferred from CCI to Mr. Kontilai. Doc. No. 1129 at 88-89.

### D.     The SEC Failed to Demonstrate that Mr. Kontilai Withdrew Any Investor Funds Through Transfers to Gail Holt.

For a third time, the SEC claims that "Defendants transferred at least **$2.1 million** to Kontilai through Holt's accounts in two episodes between April 1, 2014 and December 21, 2018" without making any attempt to link those funds to investor funds. Doc. No. 1185 at 7. The SEC seems to believe that every penny transferred from and to a CCI account qualifies as investor funds—it does not.

Further, the SEC's sole evidence to demonstrate that any of the funds transferred to Ms. Holt's account ever returned to Mr. Kontilai's hands is Ms. Holt's word alone. There is no corroborating evidence, no receipts, no documents. Further, the SEC cites several times to Exhibit 21, an exhibit that was not offered into evidence for this hearing. Exhibit 21 contains excerpts from Ms. Holt's July 11, 2019 deposition testimony; but when the parties jointly prepared and filed their affirmative deposition designations, the SEC did not designate any excerpts from this transcript for inclusion. *See* Doc. No. 1163. Every citation to Exhibit 21 should be ignored.

At its core, this entire allegation relies on the credibility of Gail Holt—a witness who this Court has already determined to be not credible. Ms. Holt has admitted to misappropriating CCI's funds, Exhibit F at 283-284, making false statements to her bank to cover up the misappropriation, Exhibit F at 57-59, and obstructing the SEC's investigation. Exhibit F at 30-31, 44. This Court has already noted Ms. Holt's extensive pattern of falsehoods and lies, describing how Ms. Holt testified that she created Mr. Kontilai's employment agreement before testifying that was a lie, how Ms. Holt testified that she lied about a loan agreement and bank statement, how Ms. Holt testified that she "caused Leone to make false statements to the SEC," and how Ms. Holt asked Leone not to produce certain documents to the SEC. Doc. No. 884 at 2-

4. Ms. Holt has been unable to provide any evidence at all to corroborate her claim that she gave even a single cent to Mr. Kontilai. Exhibit F at 60, 74. This Court should decline to give any credence to any allegation supported by Ms. Holt's word alone.

> **E.     The SEC Failed to Demonstrate that Mr. Kontilai Used Any Investor Funds to Pay for Credit Card Charges Made for Personal Expenses.**

Continuing the pattern, the SEC alleges that "Kontilai used company credit cards for at least **$1,166,587.24** for personal expenses," relying on Mr. Vranca's report without acknowledging (1) that Mr. Vranca never stated those expenses were solely made by Mr. Kontilai for his own benefit, (2) that Mr. Vranca never linked any of those charges—and the funds used to pay that balance—to any investor contributions, and (3) that Mr. Vranca never stated which portion, if any, of that amount might have been charged or paid during the time relevant to the SEC's claims, as the total amount was calculated for Mr. Vranca's Period of Available Data spanning from April 11, 2006 through May 17, 2019. Doc. No. 1094-1 at 22, 38-39.

Crucially, the SEC produces not a single shred of evidence to support its contention that Mr. Kontilai used a CCI credit card to charge personal expenses that were then paid back using investor funds. The SEC cites to one mention in Mr. Kontilai's deposition where Mr. Kontilai stated that he did not keep track of which payments were business and which were personal, and then does not cite to another piece of evidence for the entirety of this section. Instead, the SEC again attempts to shift the burden of proof to ***Mr. Kontilai***, baselessly claiming that "Defendants admit at least some of the charges were made for Kontilai's personal use" and then blaming Mr. Kontilai for not "present[ing a] company witness at the Hearing to explain what authority Defendants had to make them." Doc. No. 1185 at 10. Once again, it is the ***SEC's burden*** to prove its own case—Mr. Kontilai has no obligation whatsoever to produce any evidence where

the SEC fails to meet that burden. The SEC has provided no credit card statements, no analyst testimony, no receipts or other documents, nothing at all to prove what it alleges.

**F.      The SEC Failed to Demonstrate that Mr. Kontilai<br>Used Fabricated Documents to Conceal Any Fraud.**

As an initial matter, where the SEC has failed to meet its burden to prove any fraud, misleading statements, or omissions, it is simply irrelevant whether Mr. Kontilai produced any fabricated documents. The SEC has not raised any claims that arise out of the fabrication of documents—instead, the SEC appears to use these allegations to demonstrate scienter for its other claims. As the SEC has failed to meet its burden to demonstrate that Mr. Kontilai misappropriated any investor funds as outlined above, this Court need not even consider the scienter element.

Regardless, the SEC's claim here fails just as the SEC's claim regarding funds received from Ms. Holt must fail, as the SEC's sole evidence that either the employment agreement or the promissory note were fabricated is the word of Ms. Holt. Essentially, the SEC's argument hinges on its contention that Ms. Holt was not Chairman of the Board at the time. See Doc. No. 1165 at 12 ("Defendants still maintained that Defendants had in fact entered into a written employment agreement in 2007 signed by Holt as chairman of the board"), at 13 ("Given … Ferrell's unchallenged testimony that Holt was never a chairman of Collectors Café" … "One of the lynchpins of Defendants explanation for their authority to make large transfers of investors' funds to Kontilai is their contention that Holt served as the chairman of the Collectors Café board in 2007."). But looking to Mr. Farrell's testimony does the SEC no favors, as Mr. Farrell freely admitted that he never did anything as a member of the Board. There were no meetings and no board actions taken, as Mr. Farrell and Mr. Kontilai simply worked separately and anything either of them did was "indirectly" board approved. Doc. No. 1129 at 153. Mr. Farrell was

unable to say what Mr. Kontilai may or may not have done during his time—especially given that Mr. Kontilai was the majority shareholder and had no need to call a board meeting to make decisions on behalf of the company. Doc. No. 1129 at 154. In sum, there was no reason that Mr. Farrell would have known whether Mr. Kontilai appointed anyone else as a Board member during that time—as there were no board meetings that would make that evident—and Mr. Farrell had no reason to know what actions Mr. Kontilai was taking on behalf of the company, as Mr. Kontilai did not require Mr. Farrell's approval or consent.

Ms. Holt's word that she was never chairman is again not credible and unavailing. As this Court has noted, Ms. Holt has simultaneously testified under oath that she did create Mr. Kontiali's employment agreement and promissory note and that she did not. Doc. No. 884 at 2-4.

The SEC attempts to disparage Mr. Kontilai by accusing him of relying on a fabricated document at the preliminary injunction hearing—namely, the promissory note for a $1.411 million loan. Doc. No. 1185 at 16. But Mr. Vranca did not rely upon the loan agreement alone to verify the veracity of the loan—instead, Mr. Vranca went through the painstaking task of comparing each deposit and wire received by Public Media, verified against Public Media's bank statements, and totaling the amount received to $1,411,062. Exhibit 82 at 1-2.[8] Notably, although the SEC now seems to question the veracity of Mr. Vranca's findings in Exhibit 82, the SEC relied on Mr. Vranca's exhibit when it questioned Mr. Farrell on direct examination. See Doc. No. 1129 at 107. In doing so, Mr. Farrell acknowledged the authenticity of Public Media's bank statements.

---

[8] The SEC focuses intently on Mr. Vranca's testimony that he was not told the loan agreement was in dispute but seems to ignore the verification of receipt of those funds through Public Media's bank statements and Mr. Farrell's testimony. It is not necessary for this Court to even consider whether the loan agreement is legitimate: it is sufficient to look at Public Media's bank records, Mr. Vranca's summary of those records, and Mr. Farrell's testimony.

What is undeniably true is this: the SEC's own witness recognized the bank statements the SEC used to question him on direct examination. There is no reason for this Court, or anyone else, to believe that Public Media's bank statements do not accurately reflect the funds received by Public Media. The SEC has not identified any issues with Mr. Vranca's compilation and summary of the bank statements. Exhibit 82 at 1-2. The SEC's own witness identified payments that were made by Mr. Kontilai and/or that were owed to Mr. Kontilai and many payments that the SEC's witness could not identify, that could not have come from anyone *but* Mr. Kontilai. *See* Section I.A. in Proposed Findings of Fact above. It is indisputable that Mr. Kontilai paid, *at a minimum*, nearly $1 million of the total $1,411,062 received by Public Media. The SEC simply ignores Mr. Kontilai's claim to the majority of these funds despite its own witness testifying to it: for example, claiming that the $500,000 deposit was a payment from a client that "Public Media never agreed to repay … to anyone" without acknowledging Mr. Farrell's testimony that $200,000 of that fee was owed to Mr. Kontilai. Doc. No. 1129 at 137.

Once again, the SEC reverts back to Gail Holt and only Gail Holt to support its contentions that these documents were part of "ongoing efforts to cover up the theft of company money for his personal use" or that Mr. Kontilai "forged" Ms. Holt's signature on those documents. Doc. No. 1185 at 20-21. As demonstrated at length herein, Ms. Holt is an incredibly unreliable witness and this Court should give any statement supported by her word alone no credence at all.

## II.     The SEC Failed to Demonstrate that Mr. Kontilai Made Any False or Misleading Statements to Mr. Cutsey, Mr. Coleman, or Mr. Jensen.

Having failed to meet its burden to prove that Mr. Kontilai ever misappropriated any investor funds from CCI, the SEC next turns to attempting to demonstrate that Mr. Kontilai

"made four types of false and misleading statements in connection with the offer and sale of securities." Doc. No. 1185 at 21.

As an initial matter, it should go without saying that the SEC has failed to demonstrate anything with respect to any investor other than Mr. Cutsey, Mr. Coleman, or Mr. Jensen. The SEC has failed to identify any other investor with specificity or identify which investors were told which allegedly misleading statement, whether that statement was made before or after any purchase of securities—as any statement made to a prospective investor would obviously not apply and any statement made to an investor after the investment is made is no longer in connection with the purchase of a security—whether the investor relied on such statement, or even whether the investor felt mislead by such statement. The SEC simply cannot meet its burden with vague, broad allegations meant to encompass a large swath of individuals that the SEC has not bothered to produce for this case.[9]

With respect to Mr. Cutsey, Mr. Coleman, and Mr. Jensen, the SEC has sought to demonstrate that they were mislead about Mr. Kontilai and CCI's usage of investor money, Mr. Kontilai's personal investment in CCI, CCI's anticipated dealer inventory once CCI's television show and website were launched, and CCI's ownership interest in and the valuation of the Jackie Robinson contracts. The SEC has failed to meet its burden with respect to each.

---

[9] It should also go without saying that perhaps the reason for the SEC selecting only three of a much larger group of investors is the SEC's failure to secure the cooperation of any other investors, who may feel that they were never mislead in the purchase of their security.

### A. The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About the Use of Investor Money in Connection With the Purchase of a Security.

The SEC alleges that Mr. Kontilai and CCI made misleading statements that Mr. Kontilai would not be paid a salary and/or made omissions in failing to disclose that Mr. Kontilai would be paid a salary. Doc. No. 1185 at 22.

First, the SEC has failed to meet its burden to demonstrate that Mr. Kontilai was paid a salary using investor funds. *See* Section I.C. above. Mr. Kontilai was not paid a traditional salary—he was paid in "sporadic distributions." Doc. No. 1094-1 at 42-43. The SEC's only evidence that these payments are salary, rather than another form of compensation, are the few "[c]ontemporaneous notations" made on the bank statements. Doc. No. 1185 at 6.

There is no actual evidence that any investor funds were paid to Mr. Kontilai as salary or compensation of any type. None of the SEC witnesses witnessed Mr. Kontilai pay himself using investor funds. Mr. Jensen testified that he has "no firsthand knowledge" that Mr. Kontilai ever paid himself with investor money. Doc. No. 1129 at 194, 215. Mr. Chapman claimed that "[a]s a board member, [he] was not aware of any compensation paid or owed by the company to Mr. Kontilai and I was not aware of any money he had loaned to CCI." Doc. No. 1093-5 at 1. But he admitted that he did not expect to be aware of any compensation that Mr. Kontilai might have been paid, as Mr. Kontilai "was then and always very secretive and closed." Doc. No. 1129 at 239. He further admitted that he had no personal knowledge of Mr. Kontilai ever taking a salary. Doc. No. 1129 at 241. He was "not aware" of anything related to the company's finances. Doc. No. 1129 at 243. Mr. Coleman also had no personal knowledge that Mr. Kontilai ever paid himself from investor money. Doc. No. 1129 at 71. Mr. Coleman also had no personal

knowledge that any large amount of cash was being transferred from CCI to Mr. Kontilai. Doc. No. 1129 at 88-89.

Mr. Coleman acknowledged that Mr. Kontilai was entitled to some form of compensation—he merely disagreed about the form that compensation should take. He understood that Mr. Kontilai sought to earn money from his work at CCI and that he understood there were multiple forms of payment that an executive like Mr. Kontilai could receive that would not be a "salary." Doc. No. 1129 at 69-70.

Thus, the SEC has failed to demonstrate that the statement "investor money would not be used to pay Kontilai for a salary or debt" is false. Doc. No. 1185 at 27. There is no evidence in the record that the specific funds transferred to Mr. Kontilai originated from Mr. Coleman, Mr. Cutsey, or Mr. Jensen's investments. There is no evidence in the record, beyond a mere notation of "salary" on a bank statement, that the funds received by Mr. Kontilai constituted a salary rather than any other form of compensation that an executive may be entitled to receive. Further, even if the statement was misleading, it is clear from the three investors' testimony that they each understood that Mr. Kontilai founded CCI for the purpose of making money and expected to receive compensation for his time and effort from the company.

**B.    The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About Mr. Kontilai's Investment in CCI in Connection With the Purchase of a Security.**

The SEC alleges that Mr. Kontilai somehow mislead Mr. Jensen, Mr. Cutsey, and Mr. Coleman by implying that he had invested his money into CCI rather than loaned money to the business. Doc. No. 1185 at 33.

As the SEC indicates, Mr. Coleman, Mr. Cutsey, and Mr. Jensen's primary concern is whether "investor money would be used to grow the company [or] repay debts." Doc. No. 1185

at 32. But the SEC has failed to demonstrate that any funds transferred to Mr. Kontilai from CCI originated from Mr. Coleman, Mr. Cutsey, or Mr. Jensen's investments. *See* Section I above. Without demonstrating that any such payments came from Mr. Coleman, Mr. Cutsey, or Mr. Jensen's investments, the three investors' concerns, which arise out of concern regarding the use of *investor money* specifically, are no longer applicable.

Over time, Mr. Kontilai invested several millions of dollars into CCI through paying business-related expenses on CCI's behalf, directly transferring funds into CCI's account, and through the initial funds paid into Public Media:

| | |
|---|---|
| Business-Related Expenses Paid by Kontilai: | **$3,000,000.00** |
| Transfers from Kontilai to CCI: | **$2,363,301.47** |
| Outstanding Balance of 2007 Loan: | **$3,273,347.23** |
| Total Funds used by Kontilai for CCI's Benefit: | **$8,636,648.70** |

Doc. No. 1094-1 at 29. Whether those funds were transferred as an investment or a loan, all three investors knew that their investment funds could be used to pay outstanding company debts, either currently held or assumed in the future:

> SATISFACTION OF OUTSTANDING COMPANY DEBT IN THE FORM OF PROMISSORY NOTES HELD BY INDIVIDUALS, INCLUDING OFFICERS AND DIRECTORS, AS IT DEEMS APPROPRIATE.

Exhibit 65 at 12; Exhibit 84 at 14. All three investors also knew that Mr. Kontilai did not start CCI out of the kindness of his heart—but rather to make money, which would require the company to pay him at some point. Mr. Jensen stated that would be "anyone's assumption in business." Doc. No. 1129 at 198. Mr. Coleman admitted that Mr. Kontilai had told him that he intended to make money from CCI and that he was fully aware that was Mr. Kontilai's intention. Doc. No. 1129 at 69.

**C.     The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About CCI's Anticipated <u>Dealer Inventory in Connection With the Purchase of a Security</u>.**

Despite framing this allegation as a misleading statement regarding CCI's "projected revenue," the SEC alleges that Mr. Kontilai and CCI made misleading statements regarding "the number of dealers committed to CCI." Doc. No. 1185 at 35.

As an initial matter, the SEC makes a desperate attempt to extrapolate Mr. Cutsey's opinion on what facts were material to him in deciding to invest with what may have been material for other investors for whom the SEC presented no affidavit and failed to call as a witness. No matter how "emphatic" Mr. Cutsey's testimony may have been, he is not qualified to testify to the mental state of other people who he likely has never even met. Mr. Coleman, Mr. Cutsey, and Mr. Jensen were not testifying as experts and provided no foundation for personal knowledge to know the mindset of any other investor and this Court should decline to stretch the SEC's thin evidence to cover individuals not even named by any witness at the preliminary injunction hearing simply because the SEC failed to meet its burden.[10]

The SEC has also failed to meet its burden with respect to Mr. Cutsey, Mr. Coleman, and Mr. Jensen, because it is evident that CCI had verbal agreements with a substantial number of master dealers for over a billion dollars of inventory that were set to sign long term agreements as soon as the company's television show and website launched. That the television show and website did not launch—as a result of the *SEC's* case hitting the brakes on CCI's business development, not through any issue with CCI's supply of inventory and dealers—does not

---

[10] In another portion of its brief the SEC calls Ms. Moessner's summary document, Exhibit 33, a summary of "voluminous documents evidencing dates of investments, amounts of investments, and identity of other investors in CCI." Doc. No. 1185 at 33. This summary document is not sufficient on its own to establish claims for fraud on behalf of investors as this document does not establish which investors were told what when, how each investor interpreted those statements, and whether those statements were material to the investor's decision to invest.

detract from the fact that CCI was primed and ready to upload that inventory when the time came, as promised to its investors.

Peter Siegel, an experienced collectibles dealer hired for this precise purpose, confirmed that he had verbal commitments from "hundreds" of master dealers who signed short term agreements and were just awaiting the release of CCI's television show to execute longer term master dealer agreements. Exhibit L at 22. Even after this case halted CCI's development, Mr. Siegel noted that dealers were so interested in working with CCI that dealers continued to consistently ask him when the business would launch. Exhibit L at 22. Mr. Siegel confirmed that CCI had the potential to enter into over 200 exclusive agreements with master dealers to provide about $1 billion of inventory for CCI's website, who were just "waiting for [CCI's] television show" before executing the agreements. Exhibit L at 196. The specifics of whether these dealers signed short term agreements or long term agreements is minutiae compared to Mr. Siegel's certainty that all of these dealers would be ready and eager to add their inventory at the time of launch.

To support its contention that CCI did not have a single dealer prepared to load his or her inventory on CCI's website, the SEC turns to Mr. Cutsey, whose company was hired by CCI to provide website design services in December 2016. Doc. No. 1093-1 at 2. According to the SEC, CCI could not have had a single dealer because Mr. Cutsey—a contractor, not an employee— "would have been aware" so that those dealers could have been added to the website. Doc. No. 1185 at 37. But as Peter Siegel testified, the dealers were ready to commit *once the website and television show were launched*. As that threshold had not been met by the time this case began, the dealers had not yet been added to the website and there would be no reason for Mr. Cutsey to

have any superior knowledge of available inventory to Peter Siegel, the man hired specifically to engage with dealers for this purpose.

### D. The SEC Failed to Demonstrate that Mr. Kontilai or CCI Made Any False or Misleading Statement About the Ownership or Value of the Jackie Robinson Contracts in Connection With the Purchase of a Security.

The SEC claims that Mr. Coleman, Mr. Cutsey, and Mr. Jensen were told that CCI owned the Jackie Robinson contracts and that the contracts had been appraised for $36 million without disclosing that other persons had interests in the contracts and that there was a lower appraisal by Christie's Action House. Doc. No. 1185 at 39-41.

But each of the investors walked back their allegations during cross examination. Mr. Coleman claimed that "[i]t was never disclosed to me that Mr. Kontilai directed Seth Kaller to provide an estimate of the contracts at $36 million." Doc. No. 1093-3 at 6. But Mr. Coleman had never met Seth Kaller, did not know who he was, had never been party to any conversations between Seth Kaller and Mr. Kontilai, and had no basis to claim that Mr. Kontilai provided any instructions to Seth Kaller. Doc. No. 1129 at 81-82. That statement was "just in here" when the SEC asked Mr. Coleman to sign the affidavit. Doc. No. 1129 at 83.

Mr. Jensen claimed that "[p]rior to investing, I was never informed … that CCI's ownership of the Jackie Robinson contracts was in question." Doc. No. 1093-4 at 4. But Mr. Jensen was aware that other parties had an interest in the contracts: he agreed that "[w]hatever the PPM said about any other ownership interest or any other interest in the contracts, [he] knew at the time [he] invested." Doc. No. 1129 at 204. The PPM explicitly stated that "[t]he Company in partnership with a separate investment made by some of its senior investors, purchased the contracts." Exhibit 84 at 24; Doc. No. 1129 at 207-208. In addition, "[a]fter contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the

Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents." Exhibit 84 at 24. Mr. Jensen never bothered to ask what the arrangement was between CCI and the senior investors. Doc. No. 1129 at 210. Mr. Jensen was notified, through the Second Amended PPM, that CCI had "negotiated an agreement with the Jackie Robinson Foundation and the widow personally to endorse the sale of the documents." Doc. No. 1129 at 208. Despite being aware of that, Mr. Jensen never bothered to ask whether any money might be due to the foundation or the widow because of the endorsement. Doc. No. 1129 at 211.

Mr. Jensen also claimed that "[p]rior to investing, I was never informed that there was a lower valuation of the Jackie Robinson contracts" below the $36 million Seth Kaller appraisal. Doc. No. 1093-4 at 4. But he agreed that the PPM disclosed that the contracts had been appraised between $25 million and $36 million, which he knew before he invested as he received and read the PPM three days prior to investing. Doc. No. 1129 at 213; Doc. No. 1093-4 at 3. The PPM received by Mr. Jensen stated that the endorsements by the Jackie Robinson Foundation and Rachel Robinson personally "led to [a] massive increase in the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively." Exhibit 84 at 24. Mr. Jensen acknowledged that the statement in his affidavit "is not true." Doc. No. 1129 at 217. Mr. Jensen also acknowledged that he did not rely on the $36 million valuation, instead believing that it "would be great" to get $20 million. Doc. No. 1129 at 220.

Mr. Coleman was told that there was an investor involved in the purchase other than CCI. Doc. No. 1129 at 75. From that knowledge, Mr. Coleman extrapolated "the common sense conclusion that that other investor had an interest in the Jackie Robinson contracts." Doc. No. 1129 at 75. Further, Mr. Coleman acknowledged that he had all the information he needed to

determine that the other investor would have some type of priority position over later investors at the time of his investment. Doc. No. 1129 at 76. It was "common sense" that "the family and the Jackie Robinson Foundation" would be owed some percentage of the sales in exchange for the endorsement. Doc. No. 1129 at 100.

There was no effort by either Mr. Kontilai or CCI to hide that there was another investor involved in the purchase from later investors. Doc. No. 1129 at 77. To the contrary: it was evident from the Second Amendment to the PPM that other investors, Jackie Robinson's widow, and the Jackie Robinson Foundation all had an interest in the sale of the contracts, as each of the investors admitted. *See* Exhibit 66 at 9-10; Exhibit 70 at 38; Exhibit 84 at 24. The disclosure of the lower appraisal amount could not be clearer, as the Second Amendment to the PPM states plainly that "the contracts value according to both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents who issued written appraisals of 25 million and 36 million dollars respectively." Exhibit 66 at 9-10; Exhibit 70 at 38; Exhibit 84 at 24. The SEC has produced no evidence that either of these statements were misleading to Mr. Cutsey, Mr. Coleman, or Mr. Jensen.

III.    **Any Alleged Deceptive Conduct Has No Bearing As The SEC Has Failed to Meet Its Burden to Demonstrate that Any Fraud Occurred.**

As the SEC has not raised any claims that arise from any alleged deceptive conduct, the only relevance any of that alleged conduct has in this case is as a potential demonstration of scienter. But scienter alone is not sufficient to meet the SEC's burden, and this conduct is no longer relevant where the SEC fails to meet its threshold burden to demonstrate that any

fraudulent conduct occurred. Accordingly, this Court need not even consider any of the "additional deceptive conduct" that the SEC alleges.[11]

## IV.    The SEC Once Again Fails to Understand that It Carries the Burden of Proof, Not Mr. Kontilai.

Finally, the SEC spends multiple pages contending that Mr. Kontilai did not "meaningfully challenge much of the SEC's allegations or the SEC's witnesses' version of events." Doc. No. 1185 at 46. As explained herein, the burden of proof is the SEC's burden to bear, not Mr. Kontilai. Whether or not Mr. Kontilai presents evidence has no bearing on whether the SEC, in its affirmative case, presented sufficient evidence to entitle it to the preliminary injunction that it seeks.

## PROPOSED CONCLUSIONS OF LAW

To obtain a preliminary injunction, the SEC must make "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *Smith v. S.E.C.*, 653 F.3d 121, 127-128 (2d Cir. 2011) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.1998)). The standard for a preliminary injunction is higher than the standard for an ex parte preliminary asset freeze because a preliminary injunction is not obtained simply preserves a status quo, and it subjects defendants to potential liability for contempt: "The Commission's burden when seeking an asset freeze is lower than its burden when seeking a preliminary injunction against statutory violations because such injunctive relief raises the specter of future

---

[11] Mr. Kontilai contests the validity of the SEC's claims and note that the SEC has attempted to utilize evidence for an improper purpose. For example, the SEC cites to Exhibit 28 as evidence that investors previously confronted Mr. Kontilai and CCI about allegations of fraud and Exhibit 30 as evidence that confidentiality provisions were important to Mr. Kontilai and that Mr. Kontilai filed a lawsuit to enforce a confidentiality agreement. Both exhibits were admitted by this Court as "consciousness of guilt" **only** and are not admissible to prove the veracity of any of the allegations contained therein. Doc. No. 1161 at 122-124. However, as these allegations are generally irrelevant to the SEC's claims, Mr. Kontilai has not debunked each claim in an effort to limit the pages of briefing presented to this Court.

liability for contempt while an asset freeze only preserves the status quo." *S.E.C. v. Credit Bancorp Ltd.*, No. 99 CIV. 11395, 2010 WL 768944, at *2 (S.D.N.Y. Mar. 8, 2010). This higher standard applies both where the SEC seeks "a preliminary injunction enjoining a violation of the securities laws," *SEC v. Heden*, 51 F.Supp.2d 296, 298 (S.D.N.Y.1999), and also where the sought preliminary injunction would accomplish "more than the preservation of the status quo." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir. 1990). This higher standard is applicable here, because the SEC seeks an injunction which both "raises the specter of future liability for contempt," *see Credit Bancorp*, 2010 WL 768944, at *2, and contains provisions "enjoining a violation of the securities laws." *See Heden*, 51 F.Supp.2d at 298.

The SEC urges this Court to apply different legal standards for the different remedies it requests. But this Court should not review the SEC's motion piecemeal, but rather as one cohesive whole where the SEC seeks not to simply preserve the status quo but to subject Mr. Kontilai to a burdensome injunction which raises the specter of liability for contempt. Indeed, it is clear that the specter of contempt looms large, as the SEC has *already* sought to hold Mr. Kontilai in contempt. *See* Doc. No. 716.

The purpose of freezing a defendant's assets is not punitive—it is "a provisional remedy," which is solely intended "to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *S.E.C. v. Byers*, 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To that end, this Court should not end the analysis on the question of whether the SEC has met its burden. This Court should consider "the disadvantages and possible deleterious effect of a freeze" and weigh those deleterious effects "against the considerations indicating the need for such relief." *S.E.C. v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d

427, 429 (S.D.N.Y. 2001) (quoting *Sec. & Exch. Comm'n v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972)).

In determining whether a preliminary injunction is appropriate, this Court should consider that "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009), aff'd, 626 F.3d 47 (2d Cir. 2010) (quoting *Sussman v. Crawford*, 488 F.3d 136, 139–40 (2d Cir.2007)) (emphasis in original). While a preliminary injunction hearing "is often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)), this Court should only rely on evidence that is either admissible under the rules of evidence or otherwise bears some indicia of reliability. This Court has previously considered hearsay evidence where the basic facts of the case were not directly at issue, as "this is not an instance where defendants have proffered conflicting evidence to contest the "raw facts," but rather one in which they strenuously dispute the inferences to be drawn from those facts," and where the proffered hearsay evidence was "inherently trustworthy" with distinct "indicia of the evidence's trustworthiness." *S.E.C. v. Musella*, 578 F. Supp. 425, 427-428 (S.D.N.Y. 1984).

I.    **The SEC Has Failed to Demonstrate a Substantial Likelihood of Success on Each Count Alleged Against Mr. Kontilai.**

In the Amended Complaint in this case, the SEC identifies six claims for relief. *See* Doc. No. 134 at 37-40. The sixth claim of relief, equitable disgorgement, was pled solely against Mr. Kontilai's wife, Veronica Kontilai. The first and third claims arise under the Exchange Act, which generally prohibits the use of "any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). The SEC has supplemented this prohibition by identifying three actions as the "manipulative or deceptive device[s] or contrivance[s]" prohibited under the Exchange Act. 17 C.F.R. § 240.10b-5. Although there are three clauses in 17 C.F.R. § 240.10b-5, this Court has grouped clauses together to generally create two categories: clauses (a) and (c), which "require use of a fraudulent or deceptive device, scheme, artifice, act, or practice," and clause (b), which "focuses not on schemes, devices, or practices, but on statements made." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021).

The second and fourth claims arise under the Securities Act. 15 U.S.C. § 77q(a). As the Second Circuit has stated, claims arising under "the Securities Act have essentially the same elements as those under Exchange Act Section 10(b) and Rule 10b-5," except that "the *mens rea* elements of Section 17(a)'s three subsections differ." *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC,* 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018). To appropriately bring a claim under Section 17(a)(1) of the Securities Act, a plaintiff must provide "proof of scienter," but to appropriately state claims under (a)(2) and (a)(3), a plaintiff is required to produce "proof of negligence." *Id.*

The SEC has failed to produce any evidence to establish any violation under either the Securities Act or the Exchange Act alleged in Counts I-IV. Although Mr. Kontilai has admitted to some of the facts that underpin the alleged violation of Rule 21F-17 in Count V, which this Court has already partially addressed on summary judgment, a violation of Rule 21F-17 cannot

support the extensive injunction that the SEC has sought in this case. As Counts I and II, and Counts III and IV, contain similar elements, those counts are addressed together below.

### A.      The SEC Has Failed to Demonstrate a Violation of the Exchange Act or the Securities Act Based on Alleged Misstatements and Omissions.

Under Counts I and II, the SEC has alleged that Mr. Kontilai violated the Exchange Act's and Securities Act's prohibition against the use of manipulative or deceptive devices connected with the purchase or sale of securities by making material misrepresentations or omissions. To establish a *prima facie* case, the SEC must demonstrate that Mr. Kontilai:

> (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.

*S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996)).

There are two types of actions upon which the SEC can base a Rule 10b-5(b) claim—the making of a materially misleading statement or the omission of material facts. If the claim is based on the making of a materially misleading statement, the "test for whether a statement is materially misleading … is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991)). "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, No. 20-3716-CV, 2022 WL 727149, at *7 (2d Cir. Mar. 11, 2022) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). If a plaintiff alleges that a defendant made a misleading statement, the plaintiff must:

(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Statements that are "indefinite statements of corporate optimism" are "not actionable," as the Second Circuit has made clear that no "reasonable investor[ would] place substantial reliance on generalizations regarding a company's health or the strength of a company's product." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020).

If the claim is based on an omission, the test is whether "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S. Ct. 978, 983, 99 L. Ed. 2d 194 (1988)). The allegedly misleading statements, or omitted material facts, must be "evaluated not only by literal truth, but by context and manner of presentation." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)). A business is not required to disclose *every possible fact*, or even *all material facts*: "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S. Ct. 1309, 1321, 179 L. Ed. 2d 398 (2011). While an investor may *want* to know a particular fact, that desire "does not create any obligation to speak up." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, No. 20-3716-CV, 2022 WL 727149, at *6 (2d Cir. Mar. 11, 2022) (citing *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014)). Disclosure is *solely* required "only when necessary 'to

make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Siracusano*, 563 U.S. at 44 (quoting 17 CFR § 240.10b–5(b)).

The SEC addresses both its Rule 10b-5(b) claim and its Rule 10b-5(a) and (c) claim simultaneously, making little distinction between the two claims. *See* Doc. No. 1185 at 59-62. Mr. Kontilai understands the SEC's claim as relying on its allegations related to fabricated documents for its Rule 10b-5(a) and (c) claim and relying on its allegations that Mr. Kontilai made statements about (1) his compensation, (2) his investments in the company, (3) the number of dealers and inventory, and (4) the ownership and valuation of the Jackie Robinson contracts for its Rule 10b-5(b) claim.

Addressing the SEC's Rule 10b-5(b) claim first, it is clear that the SEC has not met its burden to explain how the statements are fraudulent, *Mills*, 12 F.3d at 1175, or demonstrate a substantial likelihood that the disclosure would have significantly altered the total mix of information available to Mr. Coleman, Mr. Cutsey, and Mr. Jensen. *Matrixx Initiatives*, 563 U.S. at 38. The test is not whether the statements are literally true: it is whether the statement would have misled a reasonable buyer. *Arkansas Pub. Emps. Ret. Sys.*, 2022 WL 727149, at *7.

### i.    The Statements Regarding CCI's Use of Investor Funds Are Not Actionable.

The SEC has failed to produce any evidence to prove any of the most basic elements of its case regarding CCI's or Mr. Kontilai's alleged use of investor funds, which should be fatal to the SEC's request for a preliminary injunction. Notably, the SEC has failed to provide any evidence at all that any of the funds received by Mr. Kontilai were investor funds, much less investor funds contributed by Mr. Coleman, Mr. Cutsey, or Mr. Jensen, the only three investors

at issue in this case.[12] Further, the SEC has failed to produce any evidence that Mr. Kontilai ever received a *salary* rather than another form of compensation an executive in Mr. Kontilai's position would have been entitled to—as Mr. Vranca, the only expert witness in this case, stated, Mr. Kontilai's compensation was not paid out as a regular salary but was rather paid out as a sporadic distribution. In addition, even if the SEC had met its burden, each of the investors testified that they understood Mr. Kontilai would be receiving some form of compensation for his work at CCI; that the specific *form* of compensation did not match their expectations is a minor issue that certainly does not rise to the level of significantly altering the total mix of information available to Mr. Coleman, Mr. Cutsey, and Mr. Jensen.

Further, none of the alleged statements regarding salary are actionable. With regard to any statement written in the PPMs or any disseminated business plan, those statements are not actionable because of the precautionary language contained in the PPMs. "Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). The Second Circuit has identified this doctrine as the "bespeaks caution" doctrine, and noted that "when cautionary language is present," the court must view all of "the allegedly fraudulent materials in their entirety," questioning "not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id*. (citing *McMahan & Co. v.*

---

[12] The SEC's claim is limited to the investors *actually misled* by the statements it identifies and cannot simply *presume* that all investors were given the same allegedly misleading information or interpreted the same information in the same way.

*Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir.1990)). The Second Circuit generally described a two-step analytical process for applying the bespeaks caution doctrine: first, "identify the allegedly undisclosed risk" to investors, and, second, "read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Id*. at 359.

The PPMs clearly indicate that the investor funds would be used for "the general purpose of funding initial infrastructure, operating capital and Phase 1 expansion of the company." Exhibit 84 at 3. Any reasonable investor, when looking at those statements, would understand "general purpose" corporate funds to include funds used to pay employees—which would include the CEO, who expended 13 years of work to develop CCI. The PPMs state that the executive team, which includes Mr. Kontilai as the CEO, was assembled "[t]o allow for execution of all operational aspects of the Collector's Coffee, Inc. business plan." Exhibit 80 at 11. In other words, the executive team, including Mr. Kontilai, were essential for the operation of the company and thereby any compensation paid to the executive team would easily be justified as "operating capital" under the PPM. In addition, the PPM explicitly reserves reasonable discretion for the company in choosing how to utilize investor funds, and any reasonable investor would understand that the payment of key employees, especially a CEO, would certainly be covered by such reasonable discretion:

> THE COMPANY RESERVES THE RIGHT TO USE REASONABLE DISCRETION IN ALLOCATING THE USE OF PRIVATE OFFERING PROCEEDS IN A MANNER THAT IT DEEMS APPROPRIATE. THERE MAY BE SOME REASONABLE VARIATION IN THE PROJECTED USE OF PRIVATE OFFERING, AND ACTUAL ALLOCATION, BASED SOLELY UPON THE BEST JUDGMENT OF MANAGEMENT.

80

Exhibit 84 at 14. No reasonable, sophisticated investor would ever interpret such statements regarding "general" funds used for growth and operating capital as being limited *solely to specific business expenses*—for example, these statements also do not identify expenditures on rent for office space, but no reasonable investor would believe that their investment could not be used to pay for such a basic operating expense.

The focus of the inquiry is not on whether that particular statement is *true or not*, but whether a reasonable investor would have been misled regarding the nature of their investment. With the precautionary language in the PPMs and the description of the funds as being used for "general use," no reasonable investor could possibly be misled into believing that their investment was anything other than what it was—an infusion of capital to be used for general business expenses related to the growth of the business. *See Halperin*, 295 F.3d at 357. Whether those "general business expenses" were ultimately expended on rent, television production costs, web development, legal expenses, or employee salaries is immaterial. Further, neither of the PPMs included any financial statements, financial projections, or any other document describing CCI's general budget and expenses. Therefore, it would be difficult for any reasonable investor to contend that the details of assets, liabilities, and expenses—which were never outlined in the PPMs—was material to their decision to invest in a start-up enterprise like CCI.

Accordingly, any "omission" regarding the usage of funds for Mr. Kontilai's compensation is immaterial and would not alter the mix of information available to investors, and any representation regarding the use of investor funds for general business capital would be understood to include employee compensation as well as any other legitimate business expense. Any "omission" regarding investor funds used for personal expenditures simply has not been

proven by the SEC, who has failed to provide any reliable or admissible evidence at all that any investor funds were expended on any personal expense.

Even if the SEC was able to prove that Mr. Kontilai was ever paid a salary using investor funds—which the SEC has failed to do here—Mr. Kontilai could permissibly receive compensation for his work as CEO from investor funds under the terms of the PPM. Mr. Coleman, Mr. Cutsey, and Mr. Jensen's claim now, years after they invested *not once, but twice*, in CCI, is nothing more than investors angrily using hindsight to nitpick at minor issues that were not material or misleading at the time the statements were made. All three reasonable, sophisticated investors understood that Mr. Kontilai was not working so hard for free; that he did expect to receive compensation for his work from the company. Doc. No. 1129 at 69, 198. None of the investors even had firsthand knowledge of Mr. Kontilai being paid a salary from investor funds. Doc. No. 1129 at 71, 88-89, 194, 215.

Finally, to any extent the SEC relies on oral statements made by Mr. Kontilai to any investor, any reasonable investor would understand that those statements should not be relied upon when assessing the investment risk. The PPMs specifically made clear that no individual—*including Mr. Kontilai*—was authorized to make any statement that concerning the sale of the security outside of the written statements made in the PPMs:

> NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THIS INVESTMENT OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS CONFIDENTIAL MEMORANDUM.

Exhibit 84 at 4. As there is sufficient cautionary language here to invoke the bespeaks caution doctrine, this Court should consider (1) what the allegedly undisclosed risk was to the investors, and then (2) read the allegedly fraudulent materials to determine whether "a reasonable investor

could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Halperin*, 295 F.3d at 359.

These statements easily fail the bespeaks caution test. The test requires that the risk the investors fear *actually materialize* and result in the investors' loss. Here, the investors were only able to vaguely speculate that they might have suffered loss from their investment capital being utilized to pay Mr. Kontilai's compensation. First, the SEC has failed to prove that ever occurred. Second, even if it did, there is nothing in the record to indicate that Mr. Coleman, Mr. Cutsey, or Mr. Jensen would have been harmed or suffered any loss—there is certainly no difference between their investment funds being utilized to pay for one employee's salary or another's, so it is impossible for the investors to claim they suffered any actual, identifiable loss as a result.

ii.     **The   Statements   Regarding   Mr.   Kontilai's** <u>**Personal Investment in CCI Are Not Actionable.**</u>

Every statement the SEC cites was allegedly made outside the bounds of the PPMs—in the corporate update, orally related by Mr. Kontilai, or orally communicated through Mr. Cutsey. *See* Doc. No. 1185 at 33. As discussed in Section a above, the PPMs received, reviewed, and executed by Mr. Coleman, Mr. Cutsey, and Mr. Jensen contained explicit cautionary language stating that no individual was authorized to provide any information outside the four corners of the PPMs and noting that there was no warrant of accuracy or correctness for any statement made by any individual outside of the statements made in the PPMs. Accordingly, no reasonable investor would have relied on any such extraneous statement.

With that cautionary language in mind, this Court should question what the "allegedly undisclosed risk" would have been and determine "if a reasonable investor could have been misled into thinking that the risk … did not actually exist." *Halperin*, 295 F.3d at 358. Other than

some vague statements regarding "skin in the game" if Mr. Kontilai personally invested money in the business, the SEC identifies no risk at all that would have been posed to the investors whether this statement was true or not. Doc. No. 1185 at 34. The SEC has certainly failed to prove that any investor funds were utilized to pay Mr. Kontilai that would not have been paid out if the funds were investments rather than loans—not only has the SEC not been able to link any payment to investor funds, but there is no evidence in the record to demonstrate that Mr. Kontilai would have received any less compensation from CCI had he "invested" rather than "loaned" the money. The SEC's overwhelming focus on the pedantic difference between an investment and a loan does not create a risk of loss where none exists.

Regardless, no reasonable, sophisticated investor would have relied upon a statement about Mr. Kontilai's own investments to determine the likelihood of the future success of the business—especially where the PPM explicitly cautions investors to conduct their own due diligence of the merits of the business prior to investing. A sense of "optimism" does not make a statement misleading. Mr. Kontilai can be "optimistic" about the success of his business regardless of whether he loans money to the company or invests money in it and as CEO he certainly has significant "skin in the game" either way.

In addition, Mr. Vranca independently verified that Mr. Kontilai *did* invest approximately $5 million into CCI, albeit not as a single lump-sum loan. Mr. Vranca confirmed that Mr. Kontilai made various transfers from his personal accounts to CCI, and made loans to CCI in 2007 with the following outstanding balance:

| | |
|---|---|
| Transfers from Kontilai to CCI: | **$2,363,301.47** |
| Outstanding Balance of 2007 Loan: | **$3,273,347.23** |

Doc. No. 1094-1 at 29.. Thus, if Mr. Kontilai *had* represented to any investor that he had personally contributed funds to CCI, that statement would be correct: the outstanding balance of the loan made in 2007 added to the various transfers Mr. Kontilai made from his personal accounts to CCI total **$5,636,648.70**.

No reasonable investor would rely on an extraneous statement made outside the language of a PPM where the PPM explicitly noted that no individual was authorized to make such statements on behalf of the company and that such statements were not warranted for accuracy or completeness. No reasonable investor would rely on a CEO's personal investment in a company as the sole indicator of the likelihood of future success. Even if an investor *did* rely on a CEO's personal investment as some sort of indicator, it is far from clear that the risk—Mr. Kontilai not working as hard for the company as he would have if he had personally invested—ever actually materialized—Mr. Kontilai worked tirelessly for the company for 13 years regardless of any personal financial investment. Accordingly, the SEC has failed to demonstrate a substantial likelihood of success on the merits of this claim.

### iii. The Statements Regarding CCI's Inventory or Business Dealings Are Not Actionable.

The SEC generally contends that Mr. Kontilai made misleading statements about "the company's expected revenue," arising out of statements regarding the number of dealers and amount of inventory that would be available on CCI's website after launch. Doc. No. 1185 at 61.

As an initial matter, the SEC has failed to prove that these statements are false, given Peter Siegel's testimony regarding the numerous dealers who were ready to execute long term agreements with the company as soon as the television show aired and the website launched, amounting to over $1 billion in inventory. But even if these statements were false, the statements are not actionable. These were statements made outside the PPMs, and the PPMs contained

explicit cautionary language stating that no individual was authorized to provide any information outside the four corners of the PPMs and noting that there was no warrant of accuracy or correctness for any statement made outside the PPMs. Accordingly, no reasonable investor would have relied on any of these statements in assessing the investment opportunity.

In addition, these statements are "indefinite statements of corporate optimism" that are "not actionable" under the Securities Act or the Exchange Act—the statements provide general statements of optimism about "hundreds of dealers" and "billions of dollars of inventory available"[13] and do not provide a definitive accounting of assets currently held by CCI. *Abramson*, 965 F.3d at 173. Companies are permitted to be optimistic about their business plans, especially where those statements are "fluff" statements that speak to general optimism without providing specifics. In these statements, Mr. Kontilai was not saying that the current inventory owned by CCI was precisely X amount; he was providing a general statement of optimism regarding the expansion and development of CCI's inventory and other business dealings. No reasonable investor would "place substantial reliance on [such] generalizations"—especially where those statements of optimism were said in a "sizzle reel," which is made for the sole purpose of marketing and providing a positive outlook for future prospects. *Id.*

In addition, statements that were made ***after*** an investor had already invested cannot, by definition, be considered material, as the investor has already made the decision to invest and the securities being sold were not marketable once purchased, as there was never an active market for non-voting shares in CCI. This situation is easily distinguishable from an investor who purchased a publicly traded security. There, the investor may rely on statements made after the

---

[13] This statement refers to the inventory available for purchase on the website, which is separate and distinct from the collectibles actually owned by CCI, given that CCI was intended to operate primarily as a marketplace to connect sellers and buyers and not as a store to sell solely items currently owned and possessed by CCI.

initial purchase to determine whether to sell those shares, retain the shares, or purchase more shares—and, therefore, they may rely on any representations made at any given time "in connection with the purchase or sale of securities." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citing *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996)). But in this case, as the investors had already purchased shares and had no market to subsequently sell those shares, any representation made by Mr. Kontilai or CCI after the original purchase could not have been made in connection with the purchase or sale of any security. Thus, as no investor could have relied on any of these statements in connection with the purchase of securities if the statement was made *after* the purchase, the SEC must demonstrate on a case-by-case basis *when* each investor purchased shares, *when* the specific statements at issue were allegedly made, and whether the alleged statements were *pre*-purchase or *post*-purchase. The SEC has failed to meet this burden.

No reasonable investor would have relied upon these statements or understood these statements to be specific accountings of currently held inventory rather than generalized statements of optimism regarding the growth of the company. Further, no statement made after the purchase was made "in connection with the purchase or sale of any security," and the SEC has failed to demonstrate that any of these alleged statements were made prior to any investor's purchase of securities. Accordingly, the SEC has failed to demonstrate a substantial likelihood of success on the merits of this claim.

### iv.   The Statements Regarding the Jackie Robinson Contracts Are Not Actionable.

Generally, the SEC claims that Mr. Kontilai and CCI disclosed the amount of one appraisal of the value of the Jackie Robinson contracts and did not disclose any other appraisals

that may have valued the contracts lower and did not disclose that other investors also contributed to the purchase of the contracts.

As an initial matter, the SEC has failed to prove that these facts were *not* disclosed. Mr. Jensen claimed that "[p]rior to investing, I was never informed … that CCI's ownership of the Jackie Robinson contracts was in question." Doc. No. 1093-4 at 4. But Mr. Jensen was aware that other parties had an interest in the contracts: he agreed that "[w]hatever the PPM said about any other ownership interest or any other interest in the contracts, [he] knew at the time [he] invested." Doc. No. 1129 at 204. The PPM explicitly stated that "[t]he Company in partnership with a separate investment made by some of its senior investors, purchased the contracts." Exhibit 84 at 24; Doc. No. 1129 at 207-208. In addition, "[a]fter contacting the widow of Jackie Robinson, Rachel Robinson, the Company negotiated an agreement with the Jackie Robinson Foundation and Rachel Robinson personally, to endorse the sale of the documents." Exhibit 84 at 24. Mr. Jensen never bothered to ask what the arrangement was between CCI and the senior investors. Doc. No. 1129 at 210. Mr. Jensen was notified, through the Second Amended PPM, that CCI had "negotiated an agreement with the Jackie Robinson Foundation and the widow personally to endorse the sale of the documents." Doc. No. 1129 at 208. Despite being aware of that, Mr. Jensen never bothered to ask whether any money might be due to the foundation or the widow because of the endorsement. Doc. No. 1129 at 211. Mr. Jensen also acknowledged that the PPM disclosed that the contracts had been appraised between $25 million and $36 million, which he knew before he invested as he received and read the PPM three days prior to investing. Doc. No. 1129 at 213; Doc. No. 1093-4 at 3.

Mr. Coleman had been explicitly informed that there was an investor involved in the Jackie Robinson contract purchase other than CCI. Doc. No. 1129 at 75. From that knowledge,

Mr. Coleman extrapolated "the common sense conclusion that that other investor had an interest in the Jackie Robinson contracts." Doc. No. 1129 at 75. Further, Mr. Coleman acknowledged that he had all the information he needed to determine that the other investor would have some type of priority position over later investors at the time of his investment. Doc. No. 1129 at 76. Further, he agreed that it was "common sense" that "the family and the Jackie Robinson Foundation" would be owed some percentage of the sales in exchange for the endorsement. Doc. No. 1129 at 100.

But even if CCI had not specifically disclosed the interests of the other parties, the "other parties" at issue were *other investors* in CCI—to fund the initial acquisition of the contracts, CCI sourced funds from three investors, and issued promissory notes to those investors in the amount of their investments. Doc. No. 1094-1 at 41-42. No reasonable investor could conclude that their investment was the *only* investment in a business or even the *primary* investment—a sophisticated investor would be well aware that companies source investor funding from a number of investors, especially in cases such as this one, where the purchase of the Jackie Robinson contracts occurred years before Mr. Coleman, Mr. Cutsey, and Mr. Jensen even began to consider investing in CCI.

As noted above, a company is not required to disclose *every possible fact*, or even *all material facts*. Even if an investor would have wanted to know the amount of prior investor funds obtained by CCI that funded the initial acquisition of the Jackie Robinson contracts, such a desire would not have obligated CCI or Mr. Kontilai to disclose those facts. *Arkansas Pub. Emps. Ret. Sys.*, 2022 WL 727149, at *6. Disclosure is only required where such disclosure is necessary to make sure that statements made are not misleading. *Siracusano*, 563 U.S. at 44. Here, the disclosure of prior investor funding—and the issuance of promissory notes as a

result—was not necessary, as the disclosure of the source of the funds used by CCI to purchase the Jackie Robinson contracts do not change or otherwise make misleading the facts that CCI purchased and now own those contracts.

There was similarly no affirmative duty on Mr. Kontilai or CCI to disclose the first appraisal of the value of the Jackie Robinson contracts. After purchasing the contracts, CCI obtained an appraisal from Christie's in November 2013 that valued the contracts at $25,000,000. Doc. No. 1094-1 at 42. A little over a year later, CCI obtained a second appraisal from Seth Kaller, who estimated the value to be $36,000,000. Doc. No. 1094-1 at 42. CCI relied on the second appraisal in determining the value of the asset for the purpose of obtaining insurance, taking out a policy from Chubb Insurance on or about October 2016 in the amount of $36 million. Doc. No. 1094-1 at 42.

CCI was not obligated to share both appraisals—CCI obtained two appraisals and credited the second appraisal as closer to the actual value of the asset as demonstrated by its subsequent acquisition of insurance. If CCI had obtained ten appraisals, it similarly would not have been required to disclose every single one. Instead, CCI disclosed the one appraisal that it determined to be the closest to the value of the asset. Further, this valuation is simply an estimate of how much the asset may be worth if sold in the future—a future-looking statement that would be dependent on a wide variety of factors when trying to *actually* sell the asset. A company may place certain value on a piece of real estate, for example, that may end up differing from the actual sale value of the real estate when sold years later; but such subsequent sale price has no bearing on the validity of the initial appraisal, and CCI and Mr. Kontilai were reasonably permitted to rely on the appraisal that they received in January 2015.

Accordingly, the SEC has failed to demonstrate any alleged misrepresentation or omission that could constitute a violation under the Exchange Act or the Securities Act and has failed to demonstrate a substantial likelihood of success on the merits of their claim.

**B.     The SEC Has Failed to Demonstrate a Violation of the Exchange Act or the Securities Act Based on an Alleged Scheme.**

Pursuant to the third count, the SEC has alleged that Mr. Kontilai and CCI violated the Exchange Act's prohibition against the use of manipulative or deceptive devices connected with the purchase or sale of securities by either "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a) and (c). The two provisions "thus require use of a fraudulent or deceptive device, scheme, artifice, act, or practice." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021).

As noted in Section A above, the SEC bases its Rule 10b-5(a) and (c) claim on its allegation that Mr. Kontilai misappropriated funds and then fabricated documents to demonstrate that he was entitled to payments. But the SEC has failed to prove that Mr. Kontilai either misappropriated funds, *see* Incorrect Statements Section I.A-E, or fabricate any documents. *See* Incorrect Statements Section I.F.[14]

**C.     Although this Court Has Found that Mr. Kontilai Violated Rule 21F-17, No Damages Can Be Awarded that Would Warrant a Preliminary Injunction.**

This Court has already ruled that "Defendants' conduct actually violates Rule 21F-17." Doc. No. 976 at 9. Thus, the SEC has already succeeded on the merits on Count V. However,

---

[14] In this section, the SEC again repeats its misconception that Mr. Kontilai relied on the $1.411 million promissory note in this proceeding. Mr. Vranca reviewed the document as he did with thousands of others connected to this case, but his findings are based on a review of Public Media's bank statements which independently corroborate the amount in the note. The document was attached to an exhibit that the *SEC* put into evidence—not any exhibit that Mr. Kontilai sought to admit.

despite holding that "Defendants are liable on the SEC's fifth claim," this Court has not yet ruled on the question of whether any damages are available for such violation. *Id*. The SEC itself has failed to indicate whether any damages were available for a violation of Rule 21F-17 and to provide any authority for any claimed damages, as the SEC solely argued that it had "establish[ed] a *prima facie* case that Defendants violated Rule 21F-17" without discussing the associated damages. Document No. 142 at 26.

In fact, there are no damages that are warranted for the Rule 21F-17 violation. As the individuals that signed the settlement agreements at issue reported promptly to the SEC, it is difficult to imagine how any damages could have been sustained. Even if the individuals that signed the agreements had delayed for a considerable period before reporting, it is difficult to ascertain how any delay at all could possibly warrant an award of damages, and it would be nearly impossible to assess a measurable amount of damages to such a nebulous and minimal "injury." Further, even if damages *were* awarded by this Court, those damages could not include any amount in disgorgement, given that there are no "profits" to be disgorged. *See Sec. & Exch. Comm'n v. Fowler*, 440 F. Supp. 3d 284, 295-296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021). As disgorgement is not appropriate, there is no need to maintain the "status quo," and a preliminary injunction would not be warranted.

Regarding possible penalties, the Amended Complaint only seeks civil fines and penalties that may be available under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), or Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). As Rule 21F-17 arises under the Exchange Act, the only appropriate possible civil penalties would arise under the provisions of the Exchange Act. The SEC publishes a chart of civil monetary penalties, adjusted for inflation, on

its website. *See* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2023), at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm (last accessed Apr. 17, 2023). The chart indicates that the available penalty under 15 U.S.C. § 78u(d)(3) is as follows: (1) an amount not exceeding $11,162 per violation for Mr. Kontilai or the gross amount of any gain, or (2) if the misconduct involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," then an amount not exceeding $111,614 per violation or the gross amount of any gain, or (3) if the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," then an amount not exceeding at $223,229 or the gross amount of pecuniary gain.

As the Rule 21F-17 violation did not result in any pecuniary gain, the civil penalties available against Mr. Kontilai are capped at the monetary amounts indicated above. As the SEC did not ask this Court to make any of the predicate fraud, intent, or recklessness findings related to Count V that are necessary for a Tier 2 or Tier 3 penalty, and this Court did not make any, any civil penalty assessed should be capped at the Tier 1 amount of $11,162 per violation.

While the SEC may subsequently request the recklessness finding necessary for a Tier 2 penalty, the question of motivation and mental state is best reserved for the jury and the SEC has not raised that issue to date relating to Count V. Further, if the SEC *does* later request a finding on this issue, Mr. Kontilai would have a number of defenses to raise that have not yet been briefed given that this is a new interpretation of Rule 21F-17—including, but not limited to, an advice of counsel defense. It is difficult to imagine that any reasonable person could find that Mr. Kontilai "intentionally" or "recklessly" violated a rule that has never before been interpreted to

prohibit the conduct at issue, especially where Mr. Kontilai reasonably relied on advice provided by counsel.

Finally, there is no reasonable argument that the alleged Rule 21F-17 violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii).

Accordingly, any possible civil penalty assessed related to the alleged Rule 21F-17 violation should be capped at $11,162 per violation.

## III.   This Court Should Decline to Take Any Adverse Inferences as a Result of Mr. Kontilai's Refusal to Testify at the Preliminary Injunction Hearing.

There is "no question that an individual is entitled to invoke the privilege against self-incrimination during a civil proceeding." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973)). While a litigant's invocation of his right against self-incrimination in a civil proceeding is not "costless," such cost is limited to the opponent party being permitted to "comment upon the claim of privilege in the hope of persuading the trier of fact to draw a negative inference," where that party is "disadvantaged" by the privilege "keep[ing] them from obtaining information they could otherwise get." *Id.* at 82-83. But the imposition of an adverse inference is not a punitive measure to punish a litigant for invoking their constitutional right against self-incrimination—it is an equitable measure solely intended to "vitiate the prejudice to the party denied evidence by invocation of the privilege." *S.E.C. v. McGinn, Smith & Co.*, 752 F. Supp. 2d 194, 209 (N.D.N.Y.), order vacated in part on reconsideration sub nom. *S.E.C. v. Wojeski*, 752 F. Supp. 2d 220 (N.D.N.Y. 2010), and aff'd sub nom. *Smith v. S.E.C.*, 432 F. App'x 10 (2d Cir. 2011), and aff'd sub nom. *Smith v. S.E.C.*, 432 F. App'x 10 (2d Cir. 2011).

As an adverse inference is an equitable measure rather than punitive, adverse inferences are not appropriate in all circumstances where a litigant or witness invokes his constitutional right against self-incrimination. As an equitable remedy, it necessarily follows that adverse inferences are not appropriate where the other party does not suffer any prejudice as a result of the litigant's invocation of privilege. It is axiomatic that adverse inferences are also not appropriate where testimony sought at a hearing is not probative or relevant.

For example, adverse inferences may be appropriately used to remedy prejudice resulting from invocations of the privilege that obstruct discovery. This Court has noted that "in a civil case, a court may draw an adverse inference against a person whose invocation of the Fifth Amendment results in obstruction of discovery." *Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013). For example, the Northern District of New York has refused to permit adverse inferences where the testimony sought had already been provided during another proceeding:

> First, as to Lynn Smith, David Smith's testimony at the FINRA proceeding included answers to certain questions relevant here. For example, David Smith testified that he and his wife had maintained separate finances for twenty years although they always filed joint tax returns. Pl. Ex. 20 at 278–79. David Smith declined to answer other questions about his wife's finances. *Id*. at 279–92. Serious questions exist about the credibility of David Smith's limited testimony as they do for Lynn Smith's testimony. *See* note 12 *supra*. However, as to those questions which are relevant here and which David Smith answered in the FINRA proceeding, the SEC has obtained sworn answers rendering unwarranted adverse inferences as to those matters.

*McGinn*, 752 F. Supp. 2d at 211. Thus, prejudice only arises out of an invocation of privilege where the testimony sought is not available through other means *and* obstructs discovery.

If the invocation of privilege denies the other party testimony that is both not available through other means and obstructs discovery, then the adverse inference may be appropriate if the testimony sought is probative and relevant: "[w]hile an adverse inference may be

impermissible in a criminal setting, … in a civil setting the court may draw a negative inference against a party if the party asserts the Fifth Amendment privilege against self-incrimination in response to **probative** evidence." *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 281 (S.D.N.Y. 2019) (citing *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F.Supp.2d 461, 464 (S.D.N.Y. 2005)) (emphasis added). "[A]dverse inferences are appropriately admitted, however, only if they are **relevant**, **re-liable**, and **not unduly prejudicial**." *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) (citing *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983)) (emphasis added). An adverse inference is highly prejudicial by its very nature:

> the danger of unfair prejudice is high when a jury is told that a witness declined to answer a question by invoking the Fifth Amendment; the implication is, at best, that the witness refused to answer because she had something to hide.

*Id*. at 171. Thus, adverse inferences should be used cautiously and only where the information sought is probative, relevant, reliable, and not unduly prejudicial.

Where an adverse inference is taken, that inference must be strictly limited, as adverse inferences alone cannot support an adverse decision without other supporting evidence. "[A] defendant's silence in itself was insufficient to support an adverse decision." *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994); *see also Hassoun v. Searls*, 467 F. Supp. 3d 111, 123–24 (W.D.N.Y. 2020) (quoting *Alexander v. F.B.I.*, 691 F. Supp. 2d 182, 196 (D.D.C. 2010)) ("[w]hile it is permissible to draw an adverse inference in a civil case from a witness's refusal to testify, in order to do so there must be independent evidence to support the negative inferences.").

As this Court has recognized, a litigant facing both civil and criminal litigation in parallel proceedings faces a dangerous dilemma: whether to testify in the civil proceeding and risk his

liberty if such testimony is used against him in the criminal proceeding or to invoke his constitutional right against self-incrimination, risking that the court may permit adverse inferences as a result of his refusal to testify that prejudice him in the civil proceeding. "There is no question that any defendant facing parallel criminal and civil litigation is hard put to decide whether to waive the privilege and give potentially damaging testimony or to assert it at the risk of having a Court or jury draw adverse inferences against him in the civil case." *Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 578 (S.D.N.Y. 2001) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). This dilemma is especially difficult where the opposing party is the government, which controls both the civil and criminal proceedings. As the Third Circuit has stated, "Courts must bear in mind that when the government is a party in a civil case and also controls the decision as to whether criminal proceedings will be initiated, special consideration must be given to the plight of the party asserting the Fifth Amendment." *Graystone Nash*, 25 F.3d at 193–94.

Therefore, there are several hurdles that must be cleared before an adverse inference can be taken. *First*, the other party must have suffered prejudice because of the invocation of privilege, such as where the testimony sought is not available through other means and the invocation of privilege obstructs discovery. *Second*, the testimony sought must be probative, relevant, and reliable. *Third*, the adverse inference must not be unduly prejudicial, such as where the adverse inference arises out of an invocation of privilege by a defendant facing parallel criminal and civil proceedings where the plaintiff government is both pursuing the civil case and controlling the criminal proceedings. All three of these factors counsel against any adverse inferences being taken against Mr. Kontilai in this case.

*First*, the SEC has not suffered any prejudice because of Mr. Kontilai's invocation of privilege, because the testimony the SEC sought is already available to the SEC through Mr. Kontilai's prior testimony. Indeed, the SEC utilized deposition testimony from *two* prior depositions in this proceeding. *See* Exhibit 41, 42. This Court has also already recognized that deposition testimony would be sufficient for the preliminary injunction hearing and there is no reason why in-person testimony would be so superior to deposition testimony as to warrant a finding of prejudice. At a previous telephonic hearing, this Court clearly contemplated that deposition transcripts would appropriately be introduced as evidence at the preliminary injunction hearing: "We've had depositions and those, I don't, depending upon the circumstances probably wouldn't even be hearsay depending upon how they're treated under the rule and where the witness is and whatever party and so forth, but all of it's admissible anyway in a preliminary injunction hearing." Doc. 1048 at 15. With this Court's recognition that deposition transcripts are sufficient for the purposes of the preliminary injunction hearing, it is difficult to imagine how the need for live testimony would be so dire as to warrant adverse inferences.

Further, the SEC provides nothing more than vague allegations that if Mr. Kontilai had testified in person he would have "provide[d] damaging evidence of false exculpatory statements." Doc. No. 1185 at 70. But the SEC has previously deposed Mr. Kontilai on all of these issues before: they have deposed him about the PPMs and the amendments to the PPMs, including the preparation of the documents, the dissemination of the documents, the statements therein, and what was communicated to third parties in relation to the PPMs.[15] The SEC asked Mr. Kontilai about the 2017 Corporate Update, which was marked as an exhibit at the

---

[15] This testimony was available to the SEC in Mr. Kontilai's 2020 Deposition at pages 34, 69-73, 77-92, 188-201. As not all of the deposition testimony referenced in this section is in evidence for this hearing, Mr. Kontilai notes the pages here solely to indicate that the testimony was available to the SEC had the SEC chosen to use it and not as evidence.

deposition.[16] The SEC questioned Mr. Kontilai about the master dealers and the long-term master dealer contracts, the expected financial terms for sales conducted through CCI's website, and collectibles inventory.[17] The SEC asked Mr. Kontilai about Gail Holt and the funds transferred into Ms. Holt's accounts.[18] The SEC questioned Mr. Kontilai about his compensation.[19] Mr. Kontilai was questioned about the loan note, which was entered as an exhibit at the deposition, and his personal investments in CCI.[20] The SEC asked about the employment agreement, which was also entered as an exhibit at the deposition.[21] Mr. Kontilai was questioned about the Jackie Robinson contracts.[22] The SEC questioned Mr. Kontilai on CCI's emails and website domain hosted by GoDaddy.[23]

With hundreds of pages of deposition testimony already available to the SEC, it is difficult to imagine what questions are left for the SEC to ask that have not already been answered numerous times already or which the SEC simply chose not to ask despite having multiple opportunities to do so.

This case is "a far cry from a case where invocation of the privilege prevented the opposing party from obtaining the evidence it needed to prevail in the litigation." *Graystone Nash*, 25 F.3d at 193. The SEC has access to Mr. Kontilai's previous testimony and other sources that relate to each topic the SEC seeks testimony on. As Mr. Kontilai's invocation of his constitutional right against self-incrimination has not prevented the SEC from obtaining any evidence it claims to need, has not obstructed discovery, and has not prevented the SEC from

---

[16] Kontilai 2020 Deposition at 177-179.
[17] Kontilai 2018 Testimony at 83-93.
[18] Kontilai 2020 Deposition at 116-124.
[19] Kontilai 2020 Deposition at 39-40, 46-48, 54-66, 175-176, 195.
[20] Kontilai 2020 Deposition at 41-44, 50-53, 169-171, 179-186.
[21] Kontilai 2020 Deposition at 49, 89-90, 168-177.
[22] Kontilai 2020 Deposition at 254-270.
[23] Kontilai 2020 Deposition at 202-214.

seeking to establish the basic facts of its case through other evidence, adverse inferences are not appropriate here and this Court should decline to take any adverse inferences at the preliminary injunction hearing.

*Second*, the testimony sought by the SEC is not probative, relevant, and reliable, and therefore is not appropriate for an adverse inference. This Court has already noted that the evidence sought by the SEC is unlikely to be relevant or probative to the SEC's affirmative case. At the telephonic hearing held on May 26, 2022, this Court directed the SEC to "think seriously about what its actual evidence is in this case." Doc. 1048 at 15. The SEC then indicated their intention to "subpoena Mr. Kontilai as either our first or second witness at the hearing." *Id*. at 19. This Court then noted that the SEC seeking to use a defendant "as a witness for the plaintiffs [is] unusual in an SEC case," cautioning that this Court could not see why Mr. Kontilai's testimony could be evidence for the SEC when the SEC has continuously "call[ed] him a liar." Doc. 1048 at 29. When the SEC claimed that "it's the credibility of Mr. Kontilai's explanation that it wasn't his fault [that] is a key part of our case," and that it was "important for the Court to see Mr. Kontilai testify and explain away some of the things," this Court stated that the following:

> you have a tough row to hoe because I'm trying to wrap my mind around it and it's not very easy. The notion that you need to call someone you believe is lying to the stand so that I will look at him and judge him to be a liar and that that is evidence necessary for you to make your affirmative case, unusual, I'm not saying it's impossible but think carefully about what it is you're asking for and whether it's necessary.

Doc. 1048 at 32-34. Further, it is highly questionable whether a credibility determination, such as the one the SEC seeks, can be made via adverse inference. The SEC sees the issue as a matter of black and white. If Mr. Kontilai testifies to black, and the SEC is able to persuade this Court that Mr. Kontilai is a liar, then it must necessarily follow that the SEC has proven white. If Mr. Kontilai was testifying that the traffic light was red and a jury concluded that he was not

credible, there are only a few other possible options that could be true—that the light was yellow or that the light was green. But the same is not true when discussing complex issues of fact, intentions, and motivations. As the Supreme Court has said, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)).

In this instance, what the SEC seems to seek is for Mr. Kontilai to testify to some "exculpatory statement," as the SEC calls it, which the SEC will then claim is "false" because he is a liar. This is simply not a permissible adverse inference to take.

*Third*, any adverse inference taken against Mr. Kontilai because of his invocation of privilege would be unduly prejudicial. Mr. Kontilai faced the difficult decision of "whether to waive the privilege and give potentially damaging testimony or to assert it at the risk of having a Court or jury draw adverse inferences against him in the civil case." *Sterling Nat. Bank*, 175 F. Supp. 2d at 578. This difficult decision is made even more crucial here, where the government controls both this case and the criminal proceedings. While the SEC and the Department of Justice are separate arms of the government, their functions are intertwined for cases involving securities laws. The SEC is specifically empowered by statute to "investigate possible infractions of the securities laws with a view to both civil and criminal enforcement, and to transmit the fruits of its investigations to Justice in the event of potential criminal proceedings." *Dresser Indus.*, 628 F.2d at 1376; *see also S.E.C. v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010), aff'd, 421 F. App'x 86 (2d Cir. 2011) (acknowledging that adverse inferences are not appropriate where criminal charges have been filed, as "the absence of criminal charges means the predicates

for a "cost-free" assertion of the privilege are not present."). Thus, any information obtained by the SEC in this case—including testimony obtained from Mr. Kontilai were he to waive his constitutional right against self-incrimination—will be transmitted from the SEC to the Department of Justice for use against Mr. Kontilai in the criminal proceedings. In these circumstances, "special consideration must be given to the plight of the party asserting the Fifth Amendment." *Graystone Nash*, 25 F.3d at 193–94.

**IV.    If this Court is Inclined to Take Any Adverse Inferences, this Court Should Instead Stay this Case Pending the Conclusion of the Outstanding Criminal Proceedings so that Mr. Kontilai Can Testify Without Fear of Criminal Reprisal.**

If this Court is inclined to adopt any adverse inferences against Mr. Kontilai because of his invocation of his constitutional right against self-incrimination at the preliminary injunction hearing, Mr. Kontilai respectfully requests that this Court stay this case pending the conclusion of the outstanding criminal indictments against him prior to adopting any such adverse inferences. A stay pending the resolution of the criminal charges would permit Mr. Kontilai to resolve the criminal matters first and then testify in this case without fear of criminal reprisal.

While the "party seeking a stay bears a heavier burden when he has not yet been indicted," that burden shifts heavily in favor of the defendant after indictment. *Sterling Nat. Bank*, 175 F. Supp. 2d at 577. This Court has recognized that after indictment a defendant's "situation is particularly dangerous, and takes a certain priority, for the risk to his liberty, the importance of safeguarding his constitutional rights, and even the strain on his resources and attention that makes defending satellite civil litigation particularly difficult, all weigh in favor of his interest" in a stay. *Id*. Further, any prejudice to the plaintiff is reduced post-indictment, "since the criminal litigation has reached a crisis that will lead to a reasonably speedy resolution," and the indictment itself provides useful guidance to the court "for determining the extent of the

threat to the defendant's Fifth Amendment rights" as well as "the likely extent and timing of the criminal litigation." *Id*. The dangers posed to Mr. Kontilai in testifying are no longer "remote" and it becomes clear "just how much the … defendant really has to fear." *Id*. In fact, the "the strongest case for deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter." *Sec. & Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980).

This Court found that a stay was not required where "there is nothing to suggest that indictments are imminent" and "the Court has no way of knowing whether the grand jury's inquiry has expanded or will expand beyond these allegations." *Sterling Nat. Bank*, 175 F. Supp. 2d at 578. But crucially, the Court noted that "this is not a case in which the government itself has an opportunity to escalate the pressure on defendants by manipulating simultaneous civil and criminal proceedings, both of which it controls." *Id*. at 578-579. The opposite is true in circumstances where civil and criminal proceedings often arise simultaneously, such as in cases involving asset forfeiture:

> The tension between self-incrimination concerns and the desire to testify may be especially acute for a claimant in a civil forfeiture proceeding. In forfeiture, a claimant typically must prove that the defendant property was not used unlawfully or not derived from or traceable to criminal transactions, or else he must establish a statutory "innocent owner" defense. See 18 U.S.C. § 981(a); 21 U.S.C. § 881(a). Yet the claimant is often subject to criminal prosecution based on the same alleged illegal behavior that supports the confiscation. The claimant thus "faces a dilemma: remain silent and allow the forfeiture or testify against the forfeitability of his property and expose himself to incriminating admissions." *United States v. $250,000*, 808 F.2d 895, 900–01 (1st Cir.1987).

*Certain Real Prop*, 55 F.3d at 83. In these circumstances, "trial courts should not disregard the fact that the plaintiff in forfeiture actions is the Government, which controls parallel criminal proceedings in federal court and also possesses the power to grant some forms of immunity." *Id*.

The same is true in this instance, where securities laws "explicitly empower the SEC to investigate possible infractions of the securities laws with a view to both civil and criminal enforcement, and to transmit the fruits of its investigations to Justice in the event of potential criminal proceedings." *Dresser Indus.*, 628 F.2d at 1376; *see also Suman*, 684 F. Supp. 2d at 387 (acknowledging that adverse inferences are not appropriate where criminal charges have been filed, as "the absence of criminal charges means the predicates for a "cost-free" assertion of the privilege are not present.").

This Court has commonly stayed civil actions pending criminal charges asserted on similar allegations. *S.E.C v. LaGuardia*, 435 F. Supp. 3d 616 (S.D.N.Y. 2020) (staying SEC enforcement action following criminal indictment); *S.E.C v. Carroll*, 2020 WL 1272287 (S.D.N.Y. Mar. 17, 2020) (staying the SEC's enforcement action); *Corcoran Law Group v. Posner*, 2009 WL 1739702 (S.D.N.Y. June 10, 2009) (granting defendant's request for stay); *see also S.E.C v. McGinnis*, 161 F. Supp. 3d 318 (D. Vt. 2016) (granting, in part, defendants' request for stay). When considering whether to grant a stay, this Court should consider six factors:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest.

*Louis Vuitton Malletier S.A. v. LY USA. Inc.*, 676 F.3d 83, 99 (2d Cir. 2012) (quoting *Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y.1995)); *see also LaGuardia*, 435 F. Supp. 3d at 621, *AIG Life Ins. Co. v. Phillips*, 2007 WL 2116383, at *2 (S.D.N.Y. July 20, 2007).

After the indictments against Mr. Kontilai were initially unsealed in October 2020, Mr. Kontilai filed a motion before this Court to stay this case pending the conclusion of the criminal

proceedings. *See* Doc. No. 635. On December 11, 2020, this Court issued an Order denying Mr. Kontilai's motion, concluding that "only one factor clearly favors a stay: (1) the extent to which the issues in the criminal case overlap with those presented in the civil case." Doc. No. 713 at 1. But circumstances have changed since this Court's prior order, as the SEC has now actively sought Mr. Kontilai's testimony, in-person, during the preliminary injunction hearing, which placed Mr. Kontilai squarely within the dangerous dilemma of deciding "whether to waive the privilege and give potentially damaging testimony or to assert it at the risk of having a Court or jury draw adverse inferences against him in the civil case," and are now seeking adverse inferences as a result of his choice not to testify. *Sterling Nat. Bank*, 175 F. Supp. 2d at 578.

### A.    The First Factor Heavily Favors a Stay as the Criminal Indictments Significantly Overlap with the Claims in this Case.

This Court previously concluded that the first factor, the extent to which the issues in the criminal case overlap with those presented in the civil case, "clearly favors a stay." Doc. No. 713 at 1. This is still true today. As "[t]he overlap of the issues in the criminal and civil cases" is "a particularly significant factor" in determining whether to stay the civil case, this overlap strongly favors a stay. *LaGuardia*, 435 F. Supp. 3d at 621 (quoting *S.E.C v. Shkreli*, 2016 WL 1122029, at *4 (E.D.N.Y. March 22, 2016)).

The Amended Complaint filed in this case and the indictment unsealed in Nevada contain essentially the same allegations. *Compare* Doc. No. 134 with Doc. No. 637-2 at ¶¶ 15-18. Both the Amended Complaint and the indictment allege securities fraud in violation of Section 10(b) and SEC Rule 10b-5. Both assert that Mr. Kontilai defrauded CCI's investors and misappropriated corporate funds. Both allege that Mr. Kontilai misled investors about his compensation and loans to the company. Both allege that he used corporate funds to pay personal expenses. Both claim that he directed a CCI employee to deposit and withdraw funds from

various bank accounts for his benefit and tried to conceal his supposed wrongdoing from the SEC.

The Amended Complaint also significantly overlaps with the indictment unsealed in Colorado. *Compare* Doc. No. 134 with Doc. No. 637-1 at ¶¶ 7-12. Both the Amended Complaint and the indictment claim that Mr. Kontilai obstructed justice by allegedly altering or falsifying documents. Both allege that he misled SEC investigators by making false statements and/or causing a former employee to make false statements. In fact, the entire Colorado indictment is based upon conduct that took place during the SEC's investigation, so it is reasonable to assume that any trial in either case will address that conduct in significant part.

This Court should once again find that the first factor is satisfied and weighs in favor in granting a stay of this case. As this first factor is "a particularly significant factor," this Court should weigh the significant overlap between the Amended Complaint in this case and the indictments unsealed in Nevada and Colorado heavily in favor of granting a stay. *LaGuardia*, 435 F. Supp. 3d at 621.

### B. The Second Factor Favors a Stay as the Criminal Indictments Have Been Filed and Published and a Warrant Was Issued for Mr. Kontilai's Arrest.

Previously, this Court concluded that the second factor "does not favor a stay" because Mr. Kontilai has not yet answered the criminal charges against him or been arrested pursuant to the outstanding warrant:

> The return of the indictment against Kontilai, however, has not had the same result. This is because while a warrant had been issued for Kontilai's arrest as of October 15, 2020, Kontilai has taken no steps since then to appear in court to defend against the charges against him. Because Kontilai has refused to answer the charges, there is no reason to believe that the criminal process will ever proceed beyond the indictment stage.

Doc. No. 713 at 1-2. Crucially, although this Court recognized that Mr. Kontilai had not yet answered the indictments because he "has asserted that he needs to consult with a criminal defense attorney to do so and he cannot afford an attorney because of the asset freeze," this Court nonetheless found that this second factor did not weigh in favor of a stay because Mr. Kontilai could have simply been arrested and then been "entitled to a criminal defense attorney free of charge." Doc. No. 713 at 1.

This should not be the standard that this Court applies here. If this Court requires Mr. Kontilai to *be arrested subject to an arrest warrant* and then *sit in pre-trial detention for an unknown period* while he awaits the services of a public defender, Mr. Kontilai will be incredibly prejudiced in both this case and the criminal proceedings. First, requiring Mr. Kontilai to be arrested and then seek the services of a free public defender denies Mr. Kontilai his constitutional right to select his own criminal defense attorney. Second, Mr. Kontilai would be incredibly hard pressed to effectively litigate this case from pre-trial detention, especially given the significant upcoming deadlines in this case—most crucially the trial date, as the SEC has now actively sought to have this case scheduled for trial within the calendar year. This possible outcome is also no longer theoretical, as the SEC has attempted to force Mr. Kontilai to appear at the preliminary injunction hearing in person—where, inevitably, Mr. Kontilai would likely be arrested pursuant to that outstanding warrant—and has sought adverse inferences following Mr. Kontilai's choice not to testify.

This factor weighs heavily in favor of a stay at the time the indictments are unsealed. The unsealing of the indictments marks the point where the criminal proceedings are underway. There is no requirement that a defendant be arrested or incarcerated in pre-trial detention or have reached any other point of the criminal process for a stay to be appropriate. *See LaGuardia*, 435

F. Supp. 3d at 621 ("A stay of a civil case is most appropriate where a party to the civil case already has been indicted for the same conduct."). While the criminal proceedings have not proceeded past the unsealing of the indictments and the issuance of the arrest warrant, this Court should not ignore or undervalue the fact that the criminal proceedings have stalled *because of this case*, and if this case was no longer an impediment to the criminal proceedings, then those proceedings could proceed. Mr. Kontilai has consistently and repeatedly sought access to untainted funds to hire criminal defense counsel—including once again in this post-hearing brief—and has been trying to secure criminal defense counsel of his choosing since the unsealing of the indictments nearly two years ago. The only impediment to Mr. Kontilai selecting criminal defense counsel and proceeding to resolve the criminal cases is this case and his inability to access untainted funds for that purpose.

Thus, this Court should weigh the second factor in favor of a stay. The unsealing of the indictments alone are sufficient to meet this factor, as such unsealing marks the formal initiation of criminal proceedings. While Mr. Kontilai has been unable to answer those charges to date, his inability is a direct result of this case and his inability to access untainted funds to select criminal defense counsel of his choice.

### C.   The Third Factor Weighs in Favor of a Stay, as a Stay Would Not Unduly Prejudice the SEC.

Any prejudice suffered by a plaintiff because of a stay is significantly reduced post-indictment, "since the criminal litigation has reached a crisis that will lead to a reasonably speedy resolution," and the indictment itself provides useful guidance to the court "for determining the extent of the threat to the defendant's Fifth Amendment rights" as well as "the likely extent and timing of the criminal litigation." *Sterling Nat. Bank*, 175 F. Supp. 2d at 577. This Court previously concluded that this factor did not weigh in favor of a stay, concluding that "the SEC

and the intervenor plaintiffs have a strong interest in proceeding expeditiously to vindicate the rights of any defrauded investors and they would be significantly prejudiced by a lengthy delay." Docket No. 713 at 2.

As noted in Section B above, the delay in the criminal proceedings to date have resulted from this case and Mr. Kontilai's current inability to use untainted funds to select a criminal defense attorney of his own choosing. If this case was stayed and Mr. Kontilai had the ability to select counsel, he would be able to proceed with resolving those cases.

Further, the SEC themselves have argued that Mr. Kontilai's testimony is central to their case, telling this Court:

> Here, there is no individual more important or "key" in this case than Kontilai. He is at the center of the SEC's allegations, and his truthful admissions or irrational justifications are relevant. The SEC should be able to confront him with inconsistent prior statements to demonstrate the type of affirmative evidence of fraud that the jury will hear in this case.

Docket No. 1051 at 8. While Mr. Kontilai disputed the basis of the SEC's motion requesting this Court issue a subpoena forcing Mr. Kontilai to testify in person at the preliminary injunction hearing, *see* Docket No. 1054, the SEC's entire motion demonstrates that the SEC would *benefit* from a stay. If this case was stayed pending resolution of the criminal proceedings, then Mr. Kontilai might be able to testify afterwards without fear of criminal reprisal. The SEC could obtain what it so desperately sought for the preliminary injunction hearing—Mr. Kontilai's testimony. Thus, this Court should weigh the third factor in favor of a stay.

**D.     The Fourth Factor Weighs in Favor of a Stay, as Mr. Kontilai's Rights and Interests in Both Cases Have Been Prejudiced by the <u>Impossible Choice to Testify or Face Adverse Inferences</u>.**

This Court previously concluded that the fourth factor did not weigh in favor of a stay solely because Mr. Kontilai had testified twice before and—at the time—there was no indication that Mr. Kontilai would be called on to testify again:

> As to factor (4), there is no burden on Kontilai in proceeding with this case while the criminal charges are pending as he has not shown that the pendency of the criminal charges will affect his ability to defend the civil case or vice versa. Certainly, one of the guiding principles in staying civil cases pending resolution of related criminal proceedings is to spare a party from being "forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." <u>Louis Vuitton Malletier</u>, 676 F.3d at 98. But that consideration has little weight here because Kontilai waived his Fifth Amendment right in this case and was deposed for two days (and testified at a contempt hearing) about the allegations in this matter. There is no reason to believe he would be deposed again.

Doc. No. 713 at 2. But the situation has changed. The SEC has actively sought Mr. Kontilai's testimony, in person, at the preliminary injunction hearing. Upon Mr. Kontilai's invocation of his constitutional right against self-incrimination, the SEC has sought to have this Court impose adverse inferences as a result of his decision. This is *precisely* the dilemma of being "forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege" that weighs heavily in favor of a stay.

As this consideration no longer has "little weight here" because Mr. Kontilai has been placed in this exact position, this Court should weigh this factor in favor of a stay.

**E.     The Fifth Factor Weighs in Favor of a Stay, as the Resolution of the Criminal <u>Proceedings May Encourage Settlement or Otherwise Resolve this Case</u>.**

While this Court previously noted that "the Court has an interest in not having the case linger on its docket unnecessarily," it is in the interest of the court to stay these proceedings. Doc. No. 713 at 2. A stay of the civil action while the criminal case moves forward "would avoid

a duplication of efforts and a waste of judicial time and resources." *Shkreli*, 2016 WL 1122029, at *6 (quoting *S.E.C. v. Gordon*, 2009 WL 2252119, at *5 (N.D. Okla. July 28, 2009)). A stay while criminal proceedings are pending would "avoid duplication of effort and unnecessary litigation costs" and "may encourage settlement." *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36, 42 (S.D.N.Y. 1993). Even if the resolution of the criminal proceedings does not result in settlement, the criminal proceedings may narrow the scope of this case, resulting in this Court needing to use fewer judicial resources to resolve the case and remove the case from the Court's docket. For example, depending on the outcome of the criminal proceedings, there may be collateral estoppel or issue preclusion which narrows the issues needing to be resolved before this Court. A stay would also avoid potentially conflicting outcomes, such as a defense verdict in this case followed by a subsequent conviction in the criminal matter.

### F.   The Sixth Factor Weighs in Favor of a Stay as the Criminal Proceedings Would Advance the Public's Interest in Preserving the Integrity of the Markets.

The public interest favors a stay. As the Court noted in *Shkreli*: "Ultimately, the court concludes that the public's interest in the effective enforcement of the criminal law is the paramount public concern." *Shkreli*, 2016 WL 1122029, at *6. "Although the public 'certainly has an interest in the preservation of the integrity of competitive markets,' the 'pending criminal prosecution serves to advance those same interests.'" *Id.* (quoting *Volmar*, 152 F.R.D. at 40). The "public's interest in the integrity of the [parallel] criminal case is entitled to precedence over the civil litigant." *McGinnis*, 161 F. Supp. 3d at 324 (internal quotation marks and citation omitted). Further, as noted above, it is in the public's interest to protect criminal defendants from the government's efforts to use civil proceedings to circumvent limitations on discovery in

criminal proceedings. *S.E.C v. Treadway*, 2005 WL 713826, at *4 (S.D.N.Y. Mar. 30, 2005) ("It is in the public interest ... to prevent circumvention of the limitations on discovery in the criminal proceedings."); *Morris v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 2001 WL 123886, at *2 (S.D.N.Y. Feb. 9, 2001) ("The public has an interest in ensuring the criminal discovery process is not subverted.").

> ### G.   As All Six Factors Weigh in Favor of a Stay, this Court Should Stay this Case Pending Resolution of the Criminal Proceedings Instead of Imposing Any Adverse Inference.

Mr. Kontilai was in the difficult position where he must "decide whether to waive the privilege and give potentially damaging testimony or to assert it at the risk of having a Court or jury draw adverse inferences against him in the civil case." *Sterling Nat. Bank*, 175 F. Supp. 2d at 578. If this Court is not inclined to find any adverse inferences against Mr. Kontilai and impose heavy costs on him for his invocation of his constitutional right against self-incrimination, this case can proceed simultaneously with the criminal proceedings. But if this Court is inclined to find adverse inferences and impose upon Mr. Kontilai significant costs for his invocation of privilege, this Court should instead stay this case pending the resolution of the criminal proceedings. Granting a stay would permit Mr. Kontilai to resolve the criminal matters first and then testify in this case without fear of criminal reprisal, which would benefit both Mr. Kontilai and the SEC, as the SEC will undoubtably seek Mr. Kontilai's testimony for trial. A stay would also benefit this Court, as resolving the criminal proceedings may result in the settlement of this case or the narrowing of the issues in this case, resulting in fewer judicial resources needed to bring this case to resolution.

Accordingly, if this Court is inclined to impose adverse inferences on Mr. Kontilai as a result of Mr. Kontilai's invocation of his Fifth Amendment privilege at the preliminary

injunction hearing, this Court should instead stay this case pending the conclusion of the outstanding criminal proceedings.

**V.      Even if this Court Finds that a Preliminary Injunction is Appropriate,
the Current Freeze is Overbroad and Significantly Overreaches.**

This Court generally has "broad equitable power to fashion appropriate remedies" if the SEC succeeds in proving any federal securities law violations at trial, which includes "ordering that culpable defendants disgorge their profits." *Sec. & Exch. Comm'n v. Fowler*, 440 F. Supp. 3d 284, 295-296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)). For a disgorgement order, there must be "factfinding by a district court to determine the amount of money acquired through wrongdoing." *Fowler*, 440 F. Supp. 3d at 296 (quoting *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006)). The purpose of disgorgement is strictly limited to "forcing a defendant to give up the amount he was unjustly enriched," and is not intended to compensate victims or to punish defendants. *Id*. For the SEC to seek disgorgement, it must first meet its burden to "show that its calculations reasonably approximate[ ] the amount of the defendants' unjust gains." *Id*. (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011)). If the SEC meets its burden, the burden then shifts to the defendant to demonstrate that the SEC's figures are inaccurate. *Id*.

Thus, the SEC's request for a preliminary injunction against Mr. Kontilai in the amount of $46,121,649.68 is inappropriate and overbroad for two reasons: first, the SEC's request treats Mr. Kontilai and CCI as the same person and ignores the distinction between investor funds received by *CCI* and investor funds received by *Mr. Kontilai*, and second, the SEC's request ignores the question of how much *Mr. Kontilai personally* might have been unjustly enriched. Any disgorgement order entered against Mr. Kontilai—if the SEC does, in fact, manage to prove

its case—would be strictly limited to the amount that *Mr. Kontilai* was unjustly enriched. Mr. Kontilai and CCI are, in fact, not the same person and do not have the same assets.

Even taking the SEC's allegations at face value, the allegations fall far short of the requested amount. The SEC alleges that there was only "$7.27 million of investor money" that Mr. Kontilai misappropriated for his personal use. Doc. No. 1185 at 59. Assuming *arguendo* that this statement is true, and the SEC was able to prove this at trial, a subsequent disgorgement order against Mr. Kontilai would be strictly limited at $7.27 million: the amount that the SEC alleges Mr. Kontilai was *personally* enriched. But as the SEC has failed to demonstrate that Mr. Kontilai misappropriated even a single cent of investor funds, no amount is appropriate.

In addition, as disgorgement is only appropriate where it is tied to the *specific wrongdoing* alleged, *see Fowler*, 440 F. Supp. 3d at 296, the SEC can only request disgorgement for any amount that the SEC can *demonstratively prove* was enjoyed by Mr. Kontilai because of a particular violation. As the SEC has failed to demonstrate that any funds transferred were *investor* funds, there is no evidence in the record of a nexus or causal link that could possibly tie Mr. Kontilai's receipt of funds from CCI to any investor's loss. If Mr. Kontilai's actions resulted in no losses, disgorgement is not available.

As the SEC has failed to demonstrate that Mr. Kontilai's alleged conduct resulted in *any losses to any investor*, disgorgement is not appropriate here and this Court should decline to order a preliminary injunction. However, presuming *arguendo* that this Court finds a causal connection, then the only appropriate disgorgement amounts are as follows: a maximum of $7.27 million, if this Court credits the entirety of the SEC's case at face value, with amounts subtracted for every allegation the SEC failed to prove.

The next issue is whether any additional penalty amounts should be added in addition to any disgorgement amount. The SEC has asked this Court to apply a penalty equivalent to the disgorgement amount, which is incredibly excessive given the facts of this case.

Civil penalties may be available if the SEC succeeds in proving a violation of the Securities Act or the Exchange Act. The two Acts have virtually identical civil penalty provisions, which assess three tiers of violations depending on the circumstances of the alleged violation. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). For a natural person, the civil monetary penalty under each tier is capped at the greater of the tier amount or the gross amount of pecuniary gain to the defendant—for Tier 1, the cap for natural persons is $5,000, for Tier 2, the cap for natural persons is $50,000, and for Tier 3, the cap for natural persons is $100,000. 15 U.S.C. § 77t(d)(2)(A)-(C); 15 U.S.C. § 78u(d)(3)(B)(i)-(iii). These penalties are not intended to compensate victims and are paid directly to the United States Treasury. 15 U.S.C. § 77t(d)(3); 15 U.S.C. § 78u(d)(3)(C).

Which tier is applied depends on the circumstances of the case. A Tier 1 penalty may be applied for any violation under the Securities Act. A Tier 2 penalty is only appropriate where the alleged violation "involve[s] fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). A Tier 3 penalty is only appropriate where the alleged violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). In determining the appropriate amount for a civil monetary penalty, this Court should weigh the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was

isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Fowler*, 440 F. Supp. 3d at 299 (quoting *SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014)). This Court has used a variety of methods to count the number of violations for the purposes of civil monetary penalties, *see Fowler*, 440 F. Supp. 3d at 299 (compiling cases), but this Court has generally considered violations involving a single scheme to be a single violation, such as where the "scheme" alleged is "a scheme derived from a single offering." *Id*. at 300.

Notably, the SEC has had years in discovery to build its case. It has had considerable time to locate any allegedly misappropriated investor funds, to appoint its own expert to conduct a forensic accounting of the financial statements, and to find real, admissible evidence of the allegations in this case. The SEC has done none of that. There is no indication of any substantial losses, no indication that Mr. Kontilai benefitted from any alleged fraudulent activity, no indication that Mr. Kontilai ever received a cent of investor money, and certainly no indication at all that Mr. Kontilai is in any current or future financial condition to pay a high penalty.

Despite conducting full discovery, the SEC has not found any misappropriated funds and has found limited assets. The original asset identified only a handful of bank accounts and storage facilities, none of which contain any meaningful amount of assets. Doc. No. 8-1 at 3-4. In the two and a half years since the filing of the original request for an asset freeze, the SEC has failed to identify any other assets of any value, other than the Jackie Robinson contracts and untainted assets from other sources, such as assets from unrelated litigation.

With Mr. Vranca providing expert testimony to demonstrate that CCI expended the vast majority of the investor funds it received in verifiable legitimate business expenses and with the SEC's failure to identify any meaningful assets that Mr. Kontilai might possess to pay a hefty fine, imposing the heaviest possible fine is inappropriate for this case. As Mr. Kontilai has

significantly limited assets, this Court should decline to impose any penalty higher than the maximum amount in each tier: $5,000 for Tier 1, $50,000 for Tier 2, or $100,000 for Tier 3. As Mr. Kontilai's conduct was not deliberate and he did not act with reckless regard, as required for Tier 2, and the conduct did not result in substantial losses, as required for Tier 3,[24] this Court should, for the purposes of preliminary injunction, add no more than the maximum penalty for individuals under Tier 1.

Thus, if this Court finds that the SEC has demonstrated a significant likelihood of success on the merits for the entirety of this case, this Court should order a preliminary injunction of no more than $7,275,000.[25] If this Court discounts Ms. Holt's unbelievable story and the SEC's failure to produce sufficient evidence of its claims, this Court should deny the SEC's request for an asset freeze.

## VI.    To Any Extent that this Court is Inclined to Enter a Preliminary Injunction, the Value of the Jackie Robinson Contracts Should Satisfy Any Injunction.

Even if this Court finds that a preliminary injunction is warranted, this Court should find that the entirety of the asset freeze levied against Mr. Kontilai can be secured by the Jackie Robinson contracts alone.

There were two professional expert appraisals of the Jackie Robinson contracts: an appraisal by Christie's in November 2013, which appraised the value of the Jackie Robinson contracts at $25 million, and an appraisal by Seth Kaller in January 2015, which appraised the value of the Jackie Robinson contracts at $36 million. Doc. No. 1094-1 at 42. As the SEC has

---

[24] The SEC intervened in this case and essentially shut down operations before CCI could open. Had the SEC permitted CCI to open for full operations, the investors may have seen returns on their investments.

[25] Even if this Court accepts all the SEC's contentions at face value and accepts the SEC's request to add a penalty amount equal to the disgorgement amount, the maximum injunction that can be awarded against Mr. Kontilai is $14,540,000.

failed to produce a contrary appraisal or expert to dispute the validity of these appraisals, both appraisals are currently uncontested.

Either appraisal of the value of the Jackie Robinson contracts far exceeds the amount of disgorgement plus possible civil penalty that could justify an asset freeze in this case. Accordingly, if this Court enters a preliminary injunction against Mr. Kontilai, this Court should limit the asset freeze to Mr. Kontilai's interest in CCI, which owns the Jackie Robinson contracts. This interest would fully satisfy any justifiable freeze.

Alternatively, and at the very least, should the Court enter an asset freeze, the value of Mr. Kontilai's interest in CCI (and, in turn, the contracts) should be taken into account in satisfying the freeze, commensurately lowering the amount of other assets frozen.

## VII.   Any Preliminary Injunction Entered by this Court Should Not Include After-Acquired Assets or Funds Required by Mr. Kontilai for His Criminal Defense or to Pay for Basic Necessities.

To any extent that this Court is inclined to enter a preliminary injunction, this Court should limit that injunction to currently held tainted assets, as preliminary injunctions cannot freeze untainted assets or after-acquired assets. In addition, any preliminary injunction entered by this Court should provide Mr. Kontilai with funds for his criminal defense as well as funds that he can use for his basic daily needs such as food, shelter, and medical care.

### A.   A Preliminary Injunction Cannot Include Untainted Assets.

An injunction cannot freeze assets that are not derived from illegal acts in violation of the conduct prohibited by the injunction. *See In re Dolen*, 265 B.R. 471, 484 (Bankr. M.D. Fla. 2001) ("To the extent that the [FTC] seeks to enforce the preliminary injunction to enjoin the debtor's use of her post-petition earnings, it goes beyond 'a reasonable measure to preserve the status quo pending final determination' of the merits of the district court action.") (quoting

*Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940)). The SEC is authorized to seek only "equitable relief that may be appropriate or necessary for the benefit of investors," which does not include assets untainted by or obtained after the alleged wrongdoing. 15 U.S.C. § 78u(d)(5).

The Supreme Court recently noted that while the principles of equity seek to ensure that a wrongdoer does not "make a profit out of his own wrong," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020) (quoting *Root v. Railway Co.*, 105 U.S. 189, 207, 26 L.Ed. 975 (1882)), equity principles simultaneously establish that a "wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Liu*, 140 S. Ct. at 1943 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–146, 8 S.Ct. 894, 31 L.Ed. 664 (1888)). The remedy, therefore, is "tethered to a wrongdoer's net unlawful profits," and does not extend beyond that strictly limited scope. *Id.* As Courts cannot use their equitable powers to ensure that a potential remedy at law is collectible, *see Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), and the SEC cannot seek an equitable remedy such as disgorgement beyond the alleged unlawful profits at issue, the injunction cannot freeze assets that are untainted by the claims alleged by the SEC in this case.

The reason that untainted assets cannot be frozen is simple: a defendant's property interest in tainted assets is imperfect, as the ownership of the tainted assets is disputed. But a defendant's property interest in untainted assets is clear—those assets belong to the defendant, free and clear:

> The relevant difference consists of the fact that the property here is untainted; i.e., it belongs to the defendant, pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime. The Government may well be able to freeze, perhaps to seize, assets of the latter, "tainted" kind before

trial. As a matter of property law the defendant's ownership interest is imperfect. The robber's loot belongs to the victim, not to the defendant.

…

The property at issue here, however, is not loot, contraband, or otherwise "tainted." It belongs to the defendant.

*Luis v. United States*, 578 U.S. 5, 12–13, 136 S. Ct. 1083, 1090, 194 L. Ed. 2d 256 (2016).

The SEC has had considerable time in discovery and has failed to locate any tainted assets with the exception of a few hundred dollars in bank accounts and a storage full of collectibles. What this means is that the assets the SEC alleges are tainted are *identifiable*—and, in fact, have already *been* identified. Thus, the principles of equity require that any injunction be limited *specifically* to these tainted assets *only*, excluding any other sources of funds or untainted assets. As this Court has noted, "the Commission is not entitled to freeze assets unrelated to its investigation." *S.E.C. v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997).

Mr. Kontilai does have untainted assets that should be excluded from any freeze. Primarily, these assets exist in the form of ongoing litigation in other matters. Mr. Kontilai is currently pursuing two other lawsuits: a wrongful death suit arising out of the wrongful death of Mr. Kontilai's mother, and a malpractice suit arising out of legal malpractice. The wrongful death suit has already resulted in several settlements by defendants in the case. The portion of the settlements to which Mr. Kontilai is entitled is currently held by Mr. Kontilai's attorneys and has not been touched by Mr. Kontilai to date.

Any funds originating from settlements in the wrongful death suit are clearly untainted. Mr. Kontilai has not touched any of those funds, and none of those funds have been commingled into any of Mr. Kontilai's accounts. The right to receive those funds arise from Mr. Kontilai's status as next of kin for his mother and is completely unrelated to any allegation pled by the SEC in this case. As a disgorgement order is directly "tethered to a wrongdoer's net unlawful profits"

and cannot encompass assets untainted by the alleged wrongdoing, *Liu*, 140 S. Ct. at 1943, these funds would not be available to satisfy any future disgorgement order. Since the purpose of a freeze is to maintain the status quo, there is no purpose to freezing assets that are not available to satisfy a potential future judgment.

Further, the SEC has failed to demonstrate that that the few hundred dollars in bank accounts and/or the storage facilities containing collectibles are, in fact, tainted assets. The storage facilities in particular contain items that are untainted, including, but not limited to, Mr. Kontilai's personal collectibles that are not owned by CCI and were not purchased with any of the investor funds at issue in this case. Notably, the SEC does not even *try* to demonstrate that any of the items in any of these facilities is connected in any way to this case, merely listing the storage facilities by name in their request for a temporary restraining order. Without any indication of *what items* are contained in those facilities, *who owns* those items, *when* those items were purchased, and whether any of those items were obtained using any of the investor funds at issue in this case, it is impossible for the SEC to demonstrate that any of these items are tainted assets.

Thus, to any extent that this Court enters an injunction in this case, this Court should exclude any untainted assets held by Mr. Kontilai that are untainted and unconnected to any allegedly "unlawful profits," including, but not limited to, any settlement funds or other monies obtained from the wrongful death suit that arose out of the death of Mr. Kontilai's mother and any items contained in the storage facilities listed by the SEC that are untainted.

### B.     A Preliminary Injunction Cannot Include After-Acquired Assets.

Any preliminary injunction entered in this case must also exclude after-acquired assets. An injunction cannot freeze assets that came into existence after the entry of the freeze. *See In re*

*Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988) ("The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment."). This is because the freeze must be strictly limited to the "wrongdoer's net unlawful profits." *Liu*, 140 S. Ct. at 1943. As after-acquired assets are, by definition, obtained after the alleged wrongdoing occurred, those assets are clearly separate and distinct from any alleged profits that could have resulted from the wrongdoing and it would be impossible for the SEC to "demonstrate that the frozen funds are traceable to fraud." *S.E.C. v. FTC Cap. Markets, Inc*., No. 09 CIV. 4755 (PGG), 2010 WL 2652405, at *7 (S.D.N.Y. June 30, 2010).

In addition, after-acquired assets may be kept entirely separate from the allegedly tainted funds. While the SEC may attempt to argue that the fungible nature of funds means that untainted assets should be frozen to ensure that the tainted funds are undisturbed,[26] the concern about fungibility does not apply to after-acquired assets as these assets can easily be segregated into separate accounts. For example, the settlement funds from the wrongful death suit are after-acquired, and currently completely separate and distinct from any funds that the SEC have alleged are "tainted." The earliest settlement in the wrongful death suit was executed on July 15, 2020, long after the original asset freeze was sought and obtained in May 2019. These funds are currently held by Mr. Kontilai's counsel in that case—these funds have never touched Mr. Kontilai's hands and are completely distinct funds that cannot be construed to be fungible with any other funds Mr. Kontilai may hold in the accounts identified by the SEC in their application.

---

[26] An argument that this Court should not credit, as it is the SEC's burden to identify tainted assets and their failure to do so does not give the SEC license to just freeze everything on the off chance that some small portion may be tainted.

Any other after-acquired assets would also be easily distinguishable from the funds and accounts the SEC has identified. Mr. Kontilai desires to find a job, receive gifts and/or loans from family and friends, and otherwise obtain assets so that he has a way to earn a living and pay for his basic necessities. If Mr. Kontilai were to start a job tomorrow, any money that he received as part of his salary could be easily kept separate and distinct from any frozen funds, and as such funds are not available to satisfy any disgorgement order, it would be inappropriate to include those funds within the scope of any preliminary injunction order.

In the SEC's brief, they state that they are "willing to stipulate to an order permitting Kontilai to use up to $3,000 per month from money he earns from future employment." Doc. No. 1185 at 80. First, as after-acquired assets are not traceable to the alleged fraud and are easily distinguishable and not commingled with any funds that could conceivably be tainted, there should be no limits to how much money Mr. Kontilai can earn and spend from future employment. If he can earn more than $3,000 a month from future employment, he is entitled to receive and utilize those funds. Further, the strict spending limit the SEC asks this Court to adopt would preclude necessary and ordinary expenses above that amount, including, but not limited to, emergency medical care, placing a deposit on a rental unit, buying an automobile and any number of other expenses that might arise. The SEC's strict spending limit—justified by their assertion that Mr. Kontilai has no need to pay rent because of a home in Las Vegas despite knowing that Mr. Kontilai is not in Las Vegas and cannot live in that home given his current status as an indictee—is simply insufficient for any person to meet the basic necessities of daily living.

Second, the SEC has asked this Court to require Mr. Kontilai to "open a new bank account to deposit his employment earnings" and to "produce bank statements from that account

to the SEC upon request." Doc. No. 1185 at 88. As explained in Mr. Kontilai's letter dated March 30, 2023, Mr. Kontilai explained that opening a new bank account is not a viable option for him given his lack of documentation and status as an indictee. *See* Doc. No. 1194. Further, providing the SEC with access to any bank account he could open would create Fifth Amendment concerns, because his whereabouts could be deduced from the bank statements, and creates serious privacy concerns related to expenditures he makes that would be evident in bank records, such as expenditures for medical care. The SEC has no legitimate need for such highly personal information and the SEC makes no attempt to justify any access to such information.

It is the SEC's burden to demonstrate that funds it seeks to freeze are "traceable to fraud." *FTC Cap. Markets, Inc*., 2010 WL 2652405, at *7. As assets acquired after the alleged wrongdoing are clearly not traceable to that wrongdoing, such funds cannot be frozen by an injunction. In addition, if this Court releases these funds and permits Mr. Kontilai access to these assets, this Court may not need to make additional provisions to account for Mr. Kontilai's Sixth Amendment right to criminal counsel and right to basic necessities, as these funds could be used for those purposes. However, if this Court finds that the funds from the wrongful death suit settlements should be included in the freeze, then this Court should make additional provisions to ensure Mr. Kontilai has access to sufficient funds to provide for his criminal defense and a reasonable monthly allowance to pay for the basic necessities of daily living.

### C. At a Minimum, Any Preliminary Injunction Should Provide Mr. Kontilai With Funds to Pay for His Basic Necessities.

Any preliminary injunction entered must also account for Mr. Kontilai's right to basic necessities such as food, shelter, and healthcare and provide Mr. Kontilai with an avenue for paying for these necessities. To ensure that the preliminary injunction order meets the basic standards of due process, Mr. Kontilai must be able to buy food, housing, clothing, healthcare,

and any other necessities. Denying Mr. Kontilai, the ability to purchase the basic necessities of life would deny Mr. Kontilai even the most basic rights that are afforded to convicted criminals. At a minimum, convicted criminals are guaranteed food. *See Hutto v. Finney*, 437 U.S. 678, 683-85 (1978) (finding prison conditions including a severely limited diet of "fewer than 1,000 calories a day" to be unconstitutionally cruel and unusual punishment and stating that the Eighth Amendment requires prisoners to be treated according to "today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Convicted criminals are guaranteed shelter, healthcare, and safety. *Byrd v. Abate*, 945 F. Supp. 581, 585 (S.D.N.Y. 1996) ("The Eighth Amendment imposes duties on prison officials to ensure that inmates receive "adequate food, clothing, shelter, and medical care, and [in addition, prison officials] must 'take reasonable measures to guarantee the safety of the inmates.' ") (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Without funds, Mr. Kontilai is unable to purchase any food at all—far less than the 1,000 calories-a-day diet that was found to be unconstitutionally cruel and unusual punishment in *Hutto*. Without funds, Mr. Kontilai cannot obtain a safe place to sleep at night—even though this Court in *Byrd* found that convicted criminals were entitled to shelter and reasonable security measures. Without funds, Mr. Kontilai cannot obtain medical care for anything, whether he breaks his leg, catches the coronavirus, or develops a life-threatening condition. This cannot be a constitutional standard for a man convicted of *nothing* to be denied the basic necessities ensured by the constitution for convicted criminals.

By failing to exclude funds for daily necessities from their request for a preliminary injunction, the SEC seeks to shift the burden of proof to Mr. Kontilai to *prove* that he should be permitted to pay for food and shelter. But it is the SEC's burden to establish that they are entitled

to a preliminary injunction and establish the appropriate scope of that injunction—not Mr. Kontilai's. It is the SEC's obligation to request a preliminary injunction that respects Mr. Kontilai's constitutional rights and ensures that Mr. Kontilai has access to funds to pay for the basic necessities for daily living. The SEC is not permitted to purposefully request and obtain an inappropriately overbroad injunction and require Mr. Kontilai to ask for exceptions to regain enough funds to pay for food and shelter. This Court should require the SEC to ask for a constitutional, permissible order at the start—one that accounts for Mr. Kontilai's constitutional rights and basic daily needs.

Accordingly, this Court should exclude funds necessary for any expenses associated with basic necessities, including, but not limited to, food, shelter, and healthcare, from any preliminary injunction order. As discussed at length in Section B above, Mr. Kontilai has prepared and attached a comprehensive monthly budget demonstrating that his estimated monthly expenses total between $8,165 and $11,775 per month, with an average monthly total of $9,963. Exhibit R (Estimated Expenses). As Mr. Kontilai has demonstrated that his estimated monthly expenses would total between $8,165 and $11,775 per month, this Court should exclude that reasonable monthly living allowance from any preliminary injunction order so that Mr. Kontilai can afford to house himself, feed himself, and obtain essential medical care.

### D.   Any Preliminary Injunction Should Provide Mr. Kontilai With Sufficient Funds to Pay for His Criminal Defense.

Any preliminary injunction entered must also account for funds required for Mr. Kontilai's criminal defense that are over and above the matters covered by his insurance policies. The general rule of equity requires that an individual be permitted funds for criminal counsel as strictly freezing every single dime available violates the individual's Sixth Amendment right to counsel. By significantly limiting Mr. Kontilai's resources, the SEC limits Mr. Kontilai's choice

of counsel and the type of counsel that can be prepared in Mr. Kontilai's defense. Mr. Kontilai may be forced to hire less experienced counsel if that is the only counsel he is able to afford, and he may not be able to hire counsel with relevant experience. Mr. Kontilai may not be able to hire an attorney capable of handling the massive amount of documentation and discovery involved in cases such as these or an attorney who is able to prepare an effective defense. Lawyers who are retained on limited budgets also tend to have fewer resources than lawyers with full access to their clients' untainted, after-acquired funds.

Traditional Sixth Amendment jurisprudence champions the right of the individual to retain a lawyer of his or her choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (Sixth Amendment commands "that the accused be defended by the counsel he believes to be best"); *Wheat v. United States*, 486 U.S. 153, 159 (1988) (Sixth Amendment protections include "the right to select and be represented by one's preferred attorney"); *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("[A] defendant should be afforded a fair opportunity to secure counsel of his own choice."). As Chief Justice Roberts has observed, "[a]n individual facing serious criminal charges brought by the United States has little but the Constitution and his attorney standing between him and prison. He might readily give all he owns to defend himself." *Kaley v. United States*, 571 U.S. 320, 341 (2014) (Roberts, C.J., dissenting). The Supreme Court has plainly held that "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis*, 578 U.S. at 10. Permitting the SEC to substantially overreach and freeze Mr. Kontilai's after-acquired, untainted assets will result in the deprivation of Mr. Kontilai's ability to select a criminal defense attorney of his own choosing and severely limit Mr. Kontilai's ability to prepare his criminal defense, thereby depriving Mr. Kontilai of his Sixth Amendment rights.

Mr. Kontilai does have access to limited funds for his criminal defense as part of the insurance coverage that he holds. However, the insurance funds do not cover all elements of his criminal defense, and the Sixth Amendment right to counsel ensures Mr. Kontilai access to funds to pursue the best defense that he is able to obtain. Accordingly, Mr. Kontilai requests access to funds needed to pay for any expenses related to his criminal defense that are over and above the matters paid for by his insurance policy.

As noted above, the SEC has sought to shift the burden of proof to Mr. Kontilai to prove that he should be permitted to funds to pay for his criminal defense by failing to exclude funds for Mr. Kontilai's criminal defense from their overbroad request for a preliminary injunction. But as stated previously, it is the *SEC's* obligation to request a constitutional injunction that does not infringe on Mr. Kontilai's Sixth Amendment rights—it is not Mr. Kontilai's burden to chip away at an unconstitutional injunction to ensure that he has enough funds for his criminal defense.

Accordingly, this Court should exclude funds necessary for any expenses associated with Mr. Kontilai's criminal defense that are above and beyond the criminal defense expenses paid for by Mr. Kontilai's insurance policy from any preliminary injunction order.

## CONCLUSION

Wherefore, for the foregoing reasons, Defendant Mykalai Kontilai respectfully requests that this Honorable Court deny the SEC's motion.

Respectfully submitted,

HANSEL LAW, PC

April 18, 2023

_____/s/_____
Cary J. Hansel (*pro hac vice*)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:      301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com
*Counsel for Mykalai Kontilai*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2023, I caused the foregoing to be electronically filed by using the CM/ECF system. I further certify that a copy of the foregoing was served upon the following counsel of record via the Court's CM/ECF system:

Seth Eliot Spitzer, Esquire
Cristina Isabel Calvar, Esquire
Winston & Strawn LLP
200 Park Ave
New York, NY 10166
sspitzer@winston.com
ccalvar@winston.com
Counsel for the Intervenor-Defendant
Jackie Robinson Foundation

Mark L. Williams, Esquire
Terry Ryan Miller, Esquire
Stephen C. McKenna, Esquire
U.S. Securities and Exchange Commission
1961 Stout St., Suite 1700
Denver, CO 80294
williamsm@sec.gov; millerte@sec.gov
Counsel for the Plaintiff, SEC

Stanley C. Morris, Esquire
12300 Wilshire Blvd., Suite 210
Los Angeles, CA 90025
Phone: 310-394-2900
Email: scm@cormorllp.com
Counsel for Defendant CCI

George Lambert, Esquire
The Lambert Law Firm
1025 Connecticut Ave., 1000 NW,
Washington, D.C., 20036
lawdc10@gmail.com
Counsel for Veronica Kontilai

Robert G. Heim, Esquire
Tarter Krinsky & Drogin LLP
1350 Broadway | New York | NY | 10018
rheim@tarterkrinsky.com
Counsel for Mykalai Kontilai

Richard A. Schonfeld, Esquire
Chesnoff & Schonfeld
520 South Florida Street
Las Vegas, Nevada 89101
rschonfeld@cslawoffice.net
Counsel for Intervenor-Plaintiffs


_____/s/_____
Cary J. Hansel (*pro hac vice*)
*Counsel for Mykalai Kontilai*