UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES SECURITIES AND    :
EXCHANGE COMMISSION,

                       :

           Plaintiff,              <u>OPINION AND ORDER</u>

                       :

   -against-              19 Civ. 4355 (VM) (GWG)

                       :

COLLECTOR'S COFFEE, INC., et al.,

                       :

          Defendants.
--------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      The United States Securities and Exchange Commission ("SEC") brought this case against defendants Collector's Coffee, Inc. ("CCI") and Mykalai Kontilai ("Kontilai"), alleging violations of federal securities laws.  <u>See</u> Amended Complaint, filed Nov. 4, 2019 (Docket # 134) ("Am. Compl.").  Kontilai's wife, Veronica Kontilai, was named as a "relief defendant" due to her alleged receipt of illicit funds.  <u>See id.</u> ¶ 8.  Before the Court is the SEC's motion for a preliminary injunction and asset freeze.[1]  Also before the Court is Kontilai's motion for a modification of the asset freeze currently in place.[2]  For the reasons that follow, the SEC's motion is granted and Kontilai's motion is denied.

---

      [1] Proposed Findings of Fact and Conclusions of Law, filed Mar. 21, 2023 (Docket # 1185) ("SEC Proposed Findings"); Memorandum of Relief Defendant Veronica Kontilai, filed Apr. 18, 2023 (Docket # 1199) ("Veronica Kontilai Mem."); Proposed Findings of Fact and Conclusions of Law, filed Apr. 18, 2023 (Docket # 1200) ("Kontilai Proposed Findings"); Amended One-Page Brief Joining in Docket 1200, filed Apr. 19, 2023 (Docket # 1202) ("CCI Mem."); Reply, filed May 9, 2023 (Docket # 1217) ("SEC Reply").

      [2] <u>See</u> Notice of Motion, filed May 9, 2023 (Docket # 1218); Memorandum of Law, filed May 9, 2023 (Docket # 1219) ("Kontilai Freeze Mem."); Opposition, filed May 23, 2023 (Docket # 1230) ("SEC Freeze Opp."); Reply, filed May 30, 2023 (Docket # 1232) ("Kontilai Freeze Reply").

I.      BACKGROUND

As previously summarized by this Court, the SEC has alleged a broad range of wrongdoing by Kontilai and CCI related to the use of investor funds.  See United States S.E.C. v. Collector's Coffee, Inc., 2021 WL 1956369, at *1-3 (S.D.N.Y. May 17, 2021).  In short, the SEC alleges that Kontilai and CCI misappropriated investor funds, misrepresented CCI and its assets to prospective investors, attempted to impede the SEC's investigation of those violations, and fabricated evidence in support of their position.  See Am. Compl.  The SEC alleges six statutory violations: (1) that CCI and Kontilai violated section 10(b) of the Exchange Act, and Rule 10b-5(b), by making fraudulent misstatements and omissions in connection with the sale or purchase of securities, id. ¶¶ 171-73; (2) that CCI and Kontilai violated section 17(a)(2) of the Securities Act through the same fraudulent misstatements and omissions, id. ¶¶ 174-76; (3) that CCI and Kontilai's actions amount to a prohibited fraudulent scheme under section 10(b) and Rule 10b-5(a) and (c), id. ¶¶ 177-79; (4) that these same actions violated section 17(a)(1) and (3), id. ¶¶ 180-82; (5) that CCI and Kontilai's actions violated Rule 21F-17 of the Exchange Act, id. ¶¶ 183-85; and (6) that Veronica Kontilai received funds traceable to CCI and Kontilai's violations, and those funds must be equitably disgorged, id. ¶¶ 186-89.[3]

The complete history of the SEC's request for a temporary restraining order and preliminary injunction was previously recounted by this Court in United States S.E.C. v. Collector's Coffee Inc., 2021 WL 266284, at *1-2, 7 (S.D.N.Y. Jan. 27, 2021).  In brief, on May 16, 2019, the court issued a temporary restraining order freezing assets held by Kontilai and CCI

_____

[3] The conduct alleged is also the subject of pending criminal charges against Kontilai. See Colorado Indictment, filed Nov. 12, 2020 (Docket # 637-1); Nevada Indictment, filed Nov. 12, 2020 (Docket # 637-2).  Kontilai has been detained in Germany as a result of those charges. See Letter from C. Hansel, filed Apr. 24, 2023 (Docket # 1210) ("Notification of Arrest").

up to the amount of $46,121,649.68.  Temporary Restraining Order, filed May 16, 2019 (Docket # 12) ("TRO").  On November 13, 2019, the parties consented to the undersigned presiding over the preliminary injunction hearing.  See Notice, Consent, and Reference, dated Nov. 13, 2019 (Docket # 143).  On December 9, 2019, shortly before the preliminary injunction hearing was to take place, the parties stipulated to an injunction and asset freeze under the terms of the TRO pending a hearing on the SEC's request for a preliminary injunction.  See Order, filed Dec. 9, 2019 (Docket # 175).  That order added a freeze as to the assets of Veronica Kontilai as a relief defendant.  Id. at 4.

Neither side sought to have an adjudication of the SEC's motion for a preliminary injunction until May 2022 when Kontilai filed opposition papers to the SEC's preliminary injunction motion, which had been filed two and a half years earlier, see Memorandum of Law in Opposition, filed May 9, 2022 (Docket # 1014), and then requested an evidentiary hearing on that motion, see Letter from C. Hansel, filed May 21, 2022 (Docket # 1028).

Ultimately, the Court held the hearing on November 7, 2022, January 24, 2023, and February 21, 2023.  See Transcript, dated Nov. 7, 2022 (Docket # 1129) ("Nov. 7 Tr.");  Transcript, dated Jan. 24, 2023 (Docket # 1161) ("Jan. 24 Tr."); Transcript, dated Feb. 21, 2023 (Docket # 1168) ("Feb. 21 Tr.").

II.    FACTS

A.    Hearing Testimony

The Court heard testimony from eight witnesses.  The SEC called Edward Little, Richard Coleman, Gary Ferrell, Kirk Jensen, David Chapman, Michael Cutsey, and Jacqueline Moessner.  See Nov. 7 Tr.  CCI called Stefano Vranca.  Jan. 24 Tr.  Neither Kontilai nor Veronica Kontilai called any witness.

3

We first summarize the relevant parts of each witness's testimony and later make credibility determinations.

### 1.   Edward Little

Little was an attorney retained by Kontilai to represent him in this case, although Little eventually withdrew from the representation.  Nov. 7 Tr. at 7:20-8:9.   Little's firm was not responsible for maintaining the Collectors Café website and email domain, and the firm had no control over "anything related to paying or maintaining [the] platforms."  Id. at 19:5-20:5.  Little had "many conversations directly with [] Kontilai" regarding the documents contained on CCI email accounts, but the firm never gained access to potential discovery materials.  Id. at 21:5-23:21.

### 2.   Gary Ferrell

Ferrell was the CEO of a company called Public Media, which was owned by Ferrell and Kontilai.  Nov. 7 Tr. at 102:16-103:2.  Ferrell had full control of Public Media's finances, and the only connection between Public Media and CCI was that CCI paid Public Media $450,000 to produce a pilot episode for CCI's "Collector's Café" television program.  Id. at 103:15-104:11.  The payments for this pilot were made by Kontilai, rather than by an account in CCI's name.  Id. at 142:14-143:22.  Neither CCI nor Kontilai ever made a loan to Public Media, id. at 104:12-25, and Public Media was not "a predecessor to Collector's Coffee in any way," id. at 107:1-3.

Ferrell also served in corporate roles for CCI, including as secretary and treasurer, and as a company director.  Id. at 110:22-111:3.  Ferrell was a director "from the very beginning," and served continuously on the board during the year 2007, id. at 111:4-5, 20-25, although the board never actually met, id. at 153:5-6.  Kontilai was likely the majority shareholder of CCI at the time and would not have needed board approval for "all decisions."  Id. at 154:14-24.

4

To Ferrell's knowledge, Gail Holt was never named chairman of CCI's board, and was not "associated with CCI in any way" in 2007.  Id. at 112:12-21.  Ferrell reviewed a series of documents purporting to remove Ferrell from the CCI board and appoint Gail Holt, see Board & Shareholder Resolutions, annexed as Ex. 54 to PHPFF (Docket # 1052-58),[4] but stated that he had never been removed as secretary to his knowledge, and had no knowledge of Gail Holt's supposed appointment as chairman, id. at 126:7-127:17.  The board had not entered into an employment agreement with Kontilai, id. at 129:14-20, and had never authorized payment of a salary to Kontilai, id. at 130:8-131:5.  The board had not approved any agreement allowing Kontilai or Veronica Kontilai to pay down any supposed loans or credits to CCI by using company credit cards for personal expenses.  Id. at 131:9-24.  Ferrell was not aware of a 2007 convertible note agreement for $4 million between CCI and Gail Holt, nor of a $1.411 million note between CCI and Kontilai.  Id. at 132:13-134:23.

### 3. David Chapman

Chapman served on the board of directors for CCI for a period beginning in 2009, and later served as an "investor relations" consultant between 2013 and 2018.  Declaration of David Chapman, dated Oct. 21, 2022 (Docket # 1093-5) ("Chapman Decl."), ¶¶ 2-3.  Although he was a member of CCI's board of directors, Chapman did not attend any board meetings.  Nov. 7 Tr. at 238:21-239:3.  Chapman was not aware of "any compensation paid or owed by [CCI] to [] Kontilai" and was not aware of any loans from Kontilai to CCI.  Chapman Decl. ¶ 2.

Chapman was aware of emails and oral statements in which Kontilai told prospective

---

[4] "PHPFF" refers to the SEC's pre-hearing proposed findings of fact and conclusions of law.  See Proposed Findings of Fact, filed June 24, 2022 (Docket # 1052).  Any exhibits to this document cited in this Opinion and Order were later admitted at the preliminary injunction hearing.

investors that Kontilai had not taken salary from CCI.  Id. ¶ 4.  On one occasion, he heard

Kontilai tell investor Richard Coleman that CCI had "10-year contracts with hundre[d]s of

dealers and $3.5 billion in inventory" and that "the contracts signed by Jackie Robinson[5] were

worth $36 million."  Id. ¶ 14.  Kontilai often sent private placement memoranda ("PPMs") and

investment information directly to investors, and although Chapman communicated with

investors from time to time, "Kontilai paid close attention to what prospective and existing

investors were told and . . . controlled what [Chapman] was permitted to say."  Id. ¶¶ 8-10.

       4.     Richard Coleman

Coleman invested roughly $1.25 million into CCI on behalf of a trust.  Declaration of

Richard Coleman, dated Oct. 20, 2022 (Docket # 1093-3) ("Coleman Decl."), ¶ 2.  Coleman

received numerous written representations from CCI and Kontilai regarding his investment.  Id.

¶ 3.  These included two subscription agreements and an April 28, 2008 PPM.  Id.; see Email

from L. Feliciano to R. Coleman, dated July 28, 2016 (Exhibit 64) (attaching July 2016

subscription agreement); Email from L. Feliciano to R. Coleman, dated Jul 28, 2016 (Exhibit 65)

(attaching 2008 PPM); Email from L. Feliciano to R. Coleman, dated Jul 28, 2016 (Exhibit 66)

(attaching amendment to 2008 PPM); Email from L. Feliciano to R. Coleman, dated Apr. 3, 2017

(Exhibit 68) (attaching March 2017 subscription agreement).[6]  Kontilai made oral

representations to Coleman regarding CCI's use of investor funds, including that Kontilai

himself did not take a salary, id. ¶¶ 4, 10, and that CCI had "no debt," id. ¶ 7.  Coleman would

---

[5] "The sole asset of any value held by CCI are [] two contracts signed by Jackie
Robinson, which CCI bought in 2013 for $2 million."  United States S.E.C. v. Collector's
Coffee, 2023 WL 3575428, at *1 (S.D.N.Y. May 22, 2023), adopted, 2023 WL 3862662
(S.D.N.Y. June 7, 2023).

[6] Exhibits numbered 61 and higher were admitted at the preliminary injunction hearing
but were not filed on the docket.

have "seriously questioned" his investment had he known it would be used to provide cash to Kontilai "for any purpose," and would have "requested an audit" if he had known CCI owed any debts.  Id. ¶¶ 14-15.  However, Coleman did not have personal knowledge of whether Kontilai took a salary from CCI and while he was aware that Kontilai intended to "make money from CCI," he believed that would be accomplished through "return on [Kontilai's] investment." Nov. 7 Tr. at 69:1-70:14.  Coleman was never told that Kontilai considered Kontilai's own investment in CCI to be a loan.  Coleman Decl. ¶ 16.  Kontilai's representation that CCI "had signed 10-year agreements with 580 dealers" was "important" to Coleman in choosing to invest. Id. ¶ 18.

CCI "never disclosed" to Coleman that it had granted the rights to portions of the contracts signed by Jackie Robinson ("Jackie Robinson Contracts") to other parties or that it had commissioned the $36 million valuation of those Contracts.  Id. ¶¶ 21-25.  However, he was aware that "another investor" in CCI "was involved with the [C]ontracts," and that investor would likely be entitled to "some priority interest" in the event of a sale.  Nov. 7 Tr. at 76:14-77:17.  Coleman never asked Kontilai or CCI about this "priority" positioning, but "what was told to the investors was [that] there was a significant amount of money, up to $36 million . . . . And [Coleman's] belief was that a majority of that would go to the investors, even if somebody else had the routes to some of that funding first."  Id. 80:5-81:3.

    5. Kirk Jensen

Jensen invested a total of $500,000 in CCI.  Declaration of Kirk Jensen, dated Oct. 23, 2023 (Docket # 1093-4) ("Jensen Decl."), ¶ 2.  Kontilai represented to Jensen on a conference call that either Kontilai or CCI owned the Jackie Robinson Contracts, Nov. 7 Tr. at 202:21-203:4, which were valued between $25 million and $36 million, id. at 214:2-6.  Jensen

understood it was "possible" that other parties had an interest in the Contracts, but believed "they were associated with CCI as [a] whole."  Id. at 205:11-18.  Jensen did not ask whether there were "senior investors" entitled to a portion of the Contracts' sale.  Id. at 210:20-211:12.

Kontilai represented to Jensen that CCI had no debt, no inventory costs, and more than $3 billion of merchandise available.  Jensen Decl. ¶ 3.  Kontilai and CCI later represented that CCI had contracts with around 400 "master dealers," which Jensen considered "very impressive."  Id. ¶¶ 4-5.  CCI sent Jensen the PPM and amendments, which made similar representations regarding the Contracts and their valuation, CCI's debt and costs, and the "master dealer" contracts.  Id. ¶ 6; see Email from L. Feliciano to M. Kontilai, dated Oct. 12, 2017 (Exhibit 84) (forwarding email from Jensen with attachment of signed 2008 PPM, 2009 amendment, and March 2015 subscription agreement).  Jensen was never told that Kontilai took a salary, that CCI had "granted significant rights to [the] proceeds of the sale of the [Contracts] to third-parties," or that Kontilai had received undocumented payments from CCI.  Id. ¶ 8.  Jensen stated that this information "would have been important" to his decision to invest.  Id.

In 2017, Jensen entered into a settlement with CCI, one term of which prohibited him from "contact[ing] the Securities and Exchange Commission or other state, federal, or local government agencies" to complain of conduct by Kontilai or CCI.  Jensen Decl. ¶ 18.

6.   Michael Cutsey

Cutsey invested $900,000 in CCI, and led efforts by his own company to design the CCI website.  Declaration of Michael John Cutsey, dated Oct. 21, 2022 (Docket # 1093-1) ("Cutsey Decl."), ¶¶ 2-3.  Kontilai represented to Cutsey that "CCI owned the Jackie Robinson [C]ontracts," which were "valued at $36 million," and "never disclosed a lower valuation . . . or the possibility that entities other than [] CCI had ownership interests in the [C]ontracts."  Id. ¶¶

8

16-18.  Kontilai also told Cutsey "that he was not taking a salary from CCI," "that he had invested $5 million of his own funds in the company," and that "CCI had no debt."  Id. ¶¶ 20-21, 23-24.  Finally, Kontilai represented to him that CCI had "hundreds of dealers" committed to supplying CCI's website, but in the course of preparing CCI's website, Cutsey was aware of only "one dealer."  Id. ¶ 11.  Cutsey would have known if additional dealers had been contracted due to his role in creating the web platform for CCI's sales.  Id. ¶ 12.

Cutsey spoke to Kontilai "countless times" about his investment and worked with Kontilai to communicate information to other prospective investors.  Id. ¶¶ 5, 7-8.  On behalf of Kontilai, Cutsey told investors that Kontilai "was not taking a salary," and referenced CCI's supposed "dealer assets."  Id. ¶ 7.  Cutsey also reviewed a "Corporate Update" for Kontilai which repeated the same representations.  Id. ¶¶ 8-9; see Email from Kontilai to Cutsey, dated Mar. 8, 2017 (Exhibit 72) ("Corporate Update") (attaching Corporate Update slideshow).  Kontilai was the "sole source" of Cutsey's information for both presentations.  Id. ¶¶ 7-8.

7.    Jacqueline Moessner

Jacqueline Moessner, an SEC attorney, testified as to various documents offered into evidence that are summaries of other evidence in the record.  See Nov. 7 Tr. at 261; Declaration of Jacqueline Moessner, filed Oct. 24, 2022 (Docket # 1093-6) ("Moessner Decl.").  Moessner supervised and directed the SEC's efforts to compile a "schedule of transactions" based on "voluminous records" relating to this case, "including statements, deposits, credits, wire transfer[s], and account authority information for bank accounts of [CCI], Mykalai Kontilai, and Gail Holt."  Moessner Decl. ¶¶ 2-3.  She explained how these "schedules" were compiled, and summarized the process used to obtain the evidence submitted by the SEC.  Id. ¶¶ 3-21.

9

8.    Stefano Vranca

The only witness called by the defendants was Stefano Vranca.

Vranca was retained by CCI to "perform a forensic reconstruction of the records that were made available to [him] and build a database that . . . identified business expenses as well as capital contribution [to CCI]."  Jan. 24 Tr. at 7:20-8:10.  The documents he reviewed included bank and credit card statements, deposit and withdrawal slips, wire receipts, cancelled checks, and financial statements.  See Amended Expert Witness Report of Stefano Vranca, dated Apr. 28, 2021, annexed at *20 to Declaration of Stefano Vranca (Docket # 1094-1) ("Vranca Report"), ¶¶ 7-10.  Vranca testified that "if there was an allegation that a document was not authentic" he "didn't rely on it."  Jan. 24 Tr. at 14:8-11.  However, he stated in his report that he did rely on a "convertible note agreement" that supposedly showed that Kontilai had invested $1.411 million into Public Media, see Vranca Report ¶ 10(d) & n.3, the validity of which the SEC disputes, see SEC Proposed Findings at 2, 19.

Vranca concluded that investor contributions to CCI totaled $30,794,514.24.  Vranca Report ¶ 15(a).  He identified $4,008,909.03 in "net compensation" received by Kontilai from CCI, which he defined as "deposits made into accounts held by Mr. or Mrs. Kontilai ($10.9 million) plus cash withdrawals from accounts held by CCI for the benefit of Mr. Kontilai ($1.746 million), less money potentially owed to Mr. Kontilai from CCI in relation to: business-related expenses incurred by Mr. or Mrs. Kontilai on behalf of CCI ($3.0 million); additional investments made by Mr. or Mrs. Kontilai into CCI ($2.4 million); and the outstanding balance of the December 2007 loan by Mr. Kontilai to Public Media ($3.3 million)."  Id. ¶ 21.  He also identified transfers of "roughly $5.3 million" from CCI to Gail Holt, a CCI employee.  Id. ¶ 23.

Vranca determined that Kontilai and Veronica Kontilai had incurred "$3.0 million" in

"business-related expenses." Id. ¶ 21.  At the hearing, Vranca testified that the following

accurately described his method for determining that such expenses were "business-related" and

thus should be offset against the total amount of money extracted from CCI by Kontilai and

Veronica: "these expenses, in the grossest sense, are expenses that businesses incur, and . . .

based on the size of the business, this could be a reasonable expense." See Jan. 24 Tr. at 34:3-

25.  But Vranca "ha[d] absolutely no idea whether [any given expense] was a proper or

legitimate expense." Id.  Vranca explained that "if [an item in his report] [is] marked as an

expense," his analysis for that item had consisted of determining whether "it [was] possible that

at least a portion of [the item] could be a business expense," and "then [he] threw that on the

business-related expenses line for [] Kontilai and CCI." Id. at 42:10-16.  Thus, Vranca attributed

to business-related expenses all payments to credit card companies from Kontilai's personal

accounts, id. at 43:7-21; all payments to restaurants, id. at 44:10-15; and any "entertainment" or

"beauty" expenses, id. at 55:4-12.  In making his assessment, Vranca "didn't seek to obtain any

information from [] Kontilai, Veronica Kontilai, Gail Holt, or anybody at CCI regarding whether

[the expenses] were business related." Id.

　　　　As to the purported $1.411 million "convertible note," Vranca examined a loan

agreement dated December 2007, in which CCI "agree[d] to repay . . . debts . . . incurred by

Kontilai" in the form of a "loan to Public Media." Vranca Report ¶ 52.  Vranca did not know "if

the document [was] legitimate or anything of that nature," Jan. 24 Tr. at 66:22-67:4, and did not

know "whether or not that document actually reflect[ed] what actually occurred," id. at 68:24-

69:3.  Vranca compiled a list of $1.411 million in "deposits into CCI accounts" that "appear to

relate to [] Kontilai's loan to Public Media," and calculated that the amount owed on that loan

was roughly $3.3 million as of the date of his report.  Id. ¶ 53.  The exhibit prepared by Vranca

indicates that all of these deposits were made into accounts held by Public Media, rather than

CCI.  See Deposits into CCI Accounts Relating to $1.411 Million Loan, annexed as Ex. 10 to

Vranca Report (Docket # 1094-1) ("Public Media Deposits").  Vranca considered Public Media

to be a "predecessor firm[]" to CCI, Vranca Report ¶ 3, but gave no explanation as to why.

Vranca did not attempt to verify that the payments at issue were loans — or even that the

payments were made by Kontilai — because he "was advised by [CCI] counsel that the

document of the loan was not an issue," Jan. 24 Tr. at 78:12-79:2, but if he had been told that

"Kontilai never loaned money to Public Media, that Gail Holt was never chairman of the board,

that the deposits referenced in that loan agreement were not from Mykalai Kontilai, and that that

loan agreement appeared fabricated," he "would not have counted initial capital contribution as

capital infusion" into CCI, id. at 79:12-20.

    B.    Findings of Fact Relevant to Disputed Issues and Credibility Determinations

        1.    Hearing Witnesses

The Court finds Coleman, Jensen, and Cutsey (the "Investors") to be entirely credible.

The Investors' testimony is supported to some degree by documentary evidence, including the

PPMs and Business Plans, and the Investors testified consistently with one another regarding the

representations made by Kontilai and CCI.

Likewise, the Court credits Gary Ferrell's testimony regarding CCI and Public Media,

David Chapman's testimony regarding CCI and his role there, and Edward Little's testimony

regarding his representation of Kontilai.  Notably, the defendants have advanced no reason that

these witnesses' testimony should not be given credence.

As to Moessner, we note that she was not offered as an expert witness in this case, and

despite Veronica Kontilai's claim that she "acted as an ad hoc expert," see Veronica Kontilai

Mem. at 7, in fact Moessner merely testified as to the preparation of certain exhibits as permitted by Fed. R. Evid. 1006. In that capacity, we find that her testimony was credible.

With regard to Vranca, we find his report to be essentially worthless. Vranca testified that his method of determining that CCI expenses were for the benefit of CCI consisted of simply questioning whether such an expense could conceivably be made for the benefit of a company CCI's size, without any sort of investigation or analysis as to whether the expenses were legitimate or actually made for CCI's benefit. See Jan. 24 Tr. at 34:3-25 (Vranca "ha[d] absolutely no idea" whether expenses were "proper or legitimate" and merely determined that "these expenses, in the grossest sense, are expenses that businesses incur."). Thus, his opinions as to the "business-related" expenses incurred by CCI are rejected. Likewise, we do not credit Vranca's opinion that Kontilai contributed $1.411 million to CCI through Public Media, nor that the purported loan is now worth $3.3 million. See Vranca Report ¶ 53. Vranca conceded that he relied on CCI's representation that the loan document was genuine and that if he had been told of the SEC's concerns regarding the document, he would not have considered it to be a "capital infusion" into CCI. Jan. 24 Tr. at 78:12-79:20. Vranca also undertook no investigation as to whether the payments into Public Media that made up the purported "loan" were, in fact, made by Kontilai, rather than any other individual or business. Id. at 78:18-21.

2.     Adverse Inference for Kontilai

To avoid being subpoenaed to appear at the preliminary injunction hearing, Kontilai stipulated that he would have invoked his Fifth Amendment right against self-incrimination if questioned regarding numerous topics relating to the operation of CCI. See Letter from T. Miller & C. Hansel, filed Aug. 31, 2022 (Docket # 1065) ("Fifth Am. Let."). The SEC now asks that the Court draw an adverse inference from Kontilai's invocation of that right. See, e.g., SEC

Proposed Findings at 70.  Kontilai and CCI argue that the Court need not and should not draw

such an inference.  See Kontilai Proposed Findings at 94; CCI Mem.[7]

     "A court may draw an adverse inference against a party who asserts his Fifth Amendment

privilege in a civil matter, because the invocation of the privilege results in a disadvantage to

opposing parties by keeping them from obtaining information they could otherwise get."  S.E.C.

v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (citing Baxter v. Palmigiano, 425 U.S. 308,

318 (1976); Collazos v. United States, 368 F.3d 190, 203-04 (2d Cir. 2004)) (additional citations

omitted).  "It is firmly established that 'an adverse inference is equally to be drawn where the

government is a party to a civil proceeding.'"  Id. (quoting S.E.C. v. Tome, 638 F. Supp. 629,

632 (S.D.N.Y. 1986)).  Likewise, "[c]ourts routinely draw adverse inferences in connection with

preliminary injunction proceedings."  CF 135 Flat LLC v. Triadou SPV N.A., 2016 WL

5945912, at *4 n.7 (S.D.N.Y. June 24, 2016); see John Paul Mitchell Sys. v. Quality King Distr.,

Inc., 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (allowing Fifth Amendment adverse inference

on preliminary injunction).  Even where an "overlapping criminal investigation or proceeding" is

pending, a civil defendant runs the risk of an adverse inference if he invokes the Fifth

Amendment.  See Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 97-98 (2d Cir.

2012) ("A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an

overlapping criminal investigation or proceeding risks the adverse inference arising from his or

her assertion of the privilege.") (punctuation and citation omitted).

     "The determination whether to draw an adverse inference from a Fifth Amendment claim

and the scope of the inference are within the discretion of the court."  Donoghue v. Retrophin,

---

[7] CCI's memorandum of law contains no argument but merely joins in Kontilai's
proposed findings.  See CCI Mem.

Inc., 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015) (citing Brink's Inc. v. City of New York, 717 F.2d 700, 710 (2d Cir. 1983)).  "The decision . . . will turn at least in major part on whether invocation of the privilege has prevented the other side from obtaining relevant information."  Id. (citing United States v. Certain Real Prop. & Premises Known as 4003-4005 Fifth Ave., 55 F.3d 78, 84 (2d Cir. 1995)).  An adverse inference is designed to "balance[] the equities" when a party is deprived of evidence, see Suman, 684 F. Supp. 2d at 387, and must "be only one of a number of factors the factfinder will consider and [] be given no more weight than the facts of the case warrant," Louis Vuitton, 676 F.3d at 97-98; accord S.E.C. v. Calabrigo, 2022 WL 2704103, at *5 (S.D.N.Y. July 11, 2022).  However, if supported by the facts of the case, "an adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader."  LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (citing United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923)).

Here, we have no reason to doubt that the adverse inference will serve to balance the equities in this case.  Kontilai is represented by counsel, and the decision to invoke the privilege represents an informed assertion of Kontilai's interest in not having inculpatory testimony used against him.  This decision was surely made with knowledge of the risk involved and cannot insulate him from an adverse inference in this proceeding.  Although Kontilai protests that the SEC's prior questioning of him at depositions should suffice to prevent any disadvantage to the SEC, the SEC has not had the opportunity to question Kontilai on the defendants' theory of the case as it now stands, nor on the opinions advanced by CCI's expert witness.  Accordingly, we find that an adverse inference may be drawn from Kontilai's refusal to appear and answer

questions relating to the issues in this case.[8]

III.   LEGAL STANDARD

"It is 'well established' that Section 22(a) of the Securities Act of 1933 and Section 27 of

the Securities Exchange Act of 1934 'confer general equity powers upon the district courts' that

are 'invoked by a showing of a securities law violation.'"  Smith v. S.E.C., 653 F.3d 121, 127

(2d Cir. 2011) (quoting S.E.C. v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1103 (2d Cir.

1972)).  "The equitable standards that apply in private injunction actions are not the same as

those that apply in SEC actions because the injunctions the SEC seeks are 'creatures of statute.'

We do not require a showing of irreparable harm . . . instead it is 'enough if the statutory

conditions for injunctive relief were made to appear.'"  City of New York v. Golden Feather

Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010) (quoting S.E.C. v. Mgmt. Dynamics, Inc.,

515 F.2d 801, 808 (2d Cir. 1975)).  Thus, "[t]o obtain a preliminary injunction enjoining future

violations of securities laws, the SEC must make a 'clear showing' of both (1) the likelihood of

success by establishing a prima facie case of a past violation of the securities laws, and (2) a

'reasonable likelihood' of future violations absent the injunction."  S.E.C. v. Gonzalez de

Castilla, 145 F. Supp. 2d 402, 414 (S.D.N.Y. 2001) (quoting S.E.C. v. Unifund SAL, 910 F.2d

1028, 1037 (2d Cir. 1990)); accord S.E.C. v. Telegram Grp., Inc., 448 F. Supp. 3d 352, 364

(S.D.N.Y. 2020).

By contrast, the SEC's request for an asset freeze is subject to a lower standard.  See

---

[8]  Kontilai requests that, if the Court is "inclined to adopt any adverse inferences," it should instead stay the determination of this motion until after the conclusion of Kontilai's criminal trial.  Kontilai Proposed Findings at 102.  The district court, however, has already ruled that the trial of this matter need not be stayed in light of Kontilai's current circumstances, see Order, dated May 26, 2023 (Docket # 1231).  In any event, the request is nonsensical since a stay would simply result in the existing injunction and asset freeze remaining in place for an indefinite period— precisely the outcome opposed by Kontilai in this motion.

Calabrigo, 2022 WL 2704103, at *4 ("The SEC need not make as substantial a showing to obtain an asset freeze as it must to obtain a preliminary injunction."). "Where an asset freeze is involved, the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." Smith, 653 F.3d at 128 (citation omitted).

The power to issue an asset freeze is not "limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action." Id. "Rather, 'federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'" Id. (quoting S.E.C. v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998)). "In such cases, the burden rests with the [SEC] to show that the funds in the possession of the relief defendant are ill-gotten." Id. (citation omitted).

## IV.    DISCUSSION

### A.    Preliminary Injunction

#### 1.    Likelihood of Success on the Merits

To obtain the preliminary injunction it seeks, the SEC must demonstrate that it is likely to succeed on the merits of its claims. See Gonzalez, 145 F. Supp. 2d at 414. A ruling in this case on an SEC motion for partial summary judgment has already determined that Kontilai and CCI violated Rule 21F-17 of the Exchange Act, 17 C.F.R. § 240, which prohibits actions taken "to impede an individual from communicating directly with the [SEC] . . . about a possible securities law violation." See United States S.E.C. v. Collector's Coffee Inc., 2021 WL 5360440, at *4 (S.D.N.Y. Nov. 17, 2021) ("21F-17 Decision"). The SEC's remaining allegations concern violations of the Exchange Act, 15 U.S.C. § 78j, Section 10(b); 17 C.F.R. § 240, Rules 10b-5(a)-

(c) and Rule 21F-17; and Section 17(a) of the Securities Act, 15 U.S.C. §§ 77(a)(1)-(3).  <u>See</u>

Am. Compl. ¶¶ 171-85.  We first examine the law under which the SEC seeks its injunction then

discuss its application to the facts of this case.

a.      <u>Governing Securities Law</u>

Section 10(b) of the Securities Act makes it unlawful "for any person, directly or

indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or

of any facility of any national securities exchange . . . [t]o use or employ, in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. §

78j(b).  A regulation promulgated under this statute, Rule 10b-5, states that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any national
> securities exchange,
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a
>> material fact necessary in order to make the statements made, in the light
>> of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or
>> would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Finally, Section 17(a) of the Securities Act states that:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the
> use of any means or instruments of transportation or communication in interstate
> commerce or by use of the mails, directly or indirectly—
>> (1) to employ any device, scheme, or artifice to defraud, or
>> (2) to obtain money or property by means of any untrue statement of a
>> material fact or any omission to state a material fact necessary in order to
>> make the statements made, in light of the circumstances under which they
>> were made, not misleading; or
>> (3) to engage in any transaction, practice, or course of business which
>> operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

To prove that CCI and Kontilai violated Section 10(b) and Rule 10(b)-5, the SEC must show that the defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." S.E.C. v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013) (quoting S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)).  A misrepresentation or omission is material where "a reasonable investor would have considered [it] significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); accord S.E.C. v. Riel, 282 F. Supp. 3d 499, 520 (S.D.N.Y. 2017)).  "In a securities fraud case, the plaintiff may establish scienter by either '(1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging strong circumstantial evidence of conscious misbehavior or recklessness.'" Riel, 282 F. Supp. 3d at 520 (quoting Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013)).  "The requirements for a violation of Section 17(a) apply only to a sale of securities but in other respects are the same as Section 10(b) and Rule 10b-5, except that 'no showing of scienter is required for the SEC to obtain an injunction under [Section 17] (a)(2) or (a)(3).'" Pentagon, 725 F.3d at 285 (quoting Monarch, 192 F.3d at 308).

As to deceptive or manipulative acts, "[c]ourts analyze claims brought under subsections (a) and (c) of Rule 10b-5 together, and often describe claims brought under these sections as alleging 'scheme liability.'" S.E.C. v. Rio Tinto plc, 2019 WL 124493, at *15 (S.D.N.Y. Mar. 18, 2019) ("Rio Tinto I") (citing S.E.C. v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)).  In order to prove "scheme liability," the SEC must show that defendants "participated in an illegitimate, sham or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance." S.E.C. v. Sason, 433 F. Supp. 3d 496, 508 (S.D.N.Y.

2020) (citing <u>S.E.C. v. CKB168 Holdings, Ltd.</u>, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016)).

Thus, a scheme liability claim requires the SEC to prove "that defendants: (1) committed a

deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with

scienter." <u>Id.</u>  "With respect to the first element, the SEC needs to show that what occurred was

an 'inherently deceptive act' and not just a misleading statement." <u>S.E.C. v. Penn</u>, 225 F. Supp.

3d 225, 235 (S.D.N.Y. 2016).  Thus, the "act" must include something other than the misleading

or deceptive statements required for 10b-5(b).  <u>See generally</u> <u>S.E.C. v. Rio Tinto plc</u>, 41 F.4th 47

(2d Cir. 2022) ("<u>Rio Tinto II</u>").  "Conduct that is deceptive only because of a subsequent

material misstatement may be actionable under [Rule] 10b-5(b) but cannot be shoehorned into a

claim for scheme liability under [Rule] 10b-5(a) and (c)."  <u>Penn</u>, 225 F. Supp. 3d at 235 (citing

<u>S.E.C. v. Garber</u>, 959 F. Supp. 2d 374, 381 & n.47 (S.D.N.Y. 2013)).

"As with Rule 10b-5, subsections (1) and (3) of Section 17(a) apply to scheme

liability . . . .  [N]umerous courts have held that the elements of a claim under Section 17(a) are

'essentially the same' as those for claims under Rule 10b-5."  <u>Kelly</u>, 817 F. Supp. 2d at 345

(S.D.N.Y. 2011) (quoting <u>Monarch</u>, 192 F.3d at 308)).  As noted above, "no showing of scienter

is required for the SEC to obtain an injunction under . . . [Section 17](a)(3)."  <u>Pentagon</u>, 725 F.3d

at 285.

b.    <u>Securities Violations by CCI and Kontilai</u>

The SEC's assertion that Kontilai and CCI made misrepresentations and omissions

centers on the following conduct with regard to investors and prospective investors: (1) that

Kontilai repeatedly claimed he was not taking a salary, but in fact received money from the

company on numerous occasions; (2) that Kontilai and CCI claimed they had secured a large

number of "master dealers" who were contractually bound to sell products on CCI's website,

though such contracts did not exist; (3) that Kontilai and CCI represented that the company had "no debt" and was initially funded by Kontilai's investments, but made substantial payments to Kontilai that they now attribute to purported loans; and (4) that Kontilai and CCI falsely represented that the sale of the Jackie Robinson Contracts was likely to generate between $25 and $36 million for CCI and its investors.  See SEC Proposed Findings at 21-41.  SEC's allegation of "deceptive acts" revolves largely around Kontilai and CCI's alleged misappropriation of investor funds, which the SEC contends was initially concealed via Kontilai's fabrication of documents.  See id. at 3-21, 42-45.

We next address the evidence adduced by the SEC, Kontilai, and CCI at the preliminary injunction hearing.

i.    Misappropriation of Funds

Kontilai and CCI withdrew a net amount of at least $2.1 million in cash from CCI bank accounts between April 1, 2014 and December 21, 2018.  See Summary of Cash Transactions from CCI Accounts, annexed as Ex. 18 to PHPFF (Docket # 1052-18) ("CCI Cash Summary") ($2,170,545.14 in net cash withdrawals).  Contemporaneous notations on the bank statements provide various explanations for these withdrawals, including references such as "Collectibles Purchase" for over $1 million of withdrawals.  See id. at Lines 69, 71, 73-75, 77-80, 84.

Additional funds were sent by CCI to Gail Holt, who worked with Kontilai at CCI, and who testified she withdrew the funds and delivered them to Kontilai.  Between June 19, 2014 and June 25, 2014, for instance, CCI transferred $1.1 million to Holt, and Holt withdrew the same total amount in cash, less $500.  See Transfers from Collectors Café to Holt and Selected Cash Transactions in Holt Accounts, annexed as Ex. 20 to PHPFF (Docket # 1052-20) ("Holt Transfer Summary"), at Lines 47-57.  Holt testified at her deposition that she delivered the withdrawn

cash to Kontilai, as she did on each occasion that CCI transferred money to her account.  See

Deposition of Gail Holt, dated Oct. 7, 2020, annexed as Ex. 43 to PHPFF (Docket # 1052-47)

("Holt Dep."), at 52:10-13 ("Q: The money that was deposited in your account, where did it go?

A: Back to Mykalai [Kontilai].  I took out cash and gave it to Mykalai.").[9]  Defendants do not

contest that CCI transferred more than $5 million to Holt in total, see Kontilai Proposed Findings

at 27, though Kontilai claimed that these transfers were intended for Holt to "hold[] onto . . .

almost like a piggybank until [CCI] found a next major asset that [CCI] wanted to buy."

Deposition of Mykalai Kontilai, dated Sept. 24, 2020, annexed as Ex. 42 to PHPFF (Docket #

1052-46) ("Second Kontilai Dep. Excerpt"), at 117:13-118:18.

    Contrary to Kontilai and CCI's justifications for these two sets of withdrawals, Kontilai

himself testified that the Jackie Robinson Contracts were the only collectibles CCI ever

purchased, see Deposition of Mykalai Kontilai, dated Apr. 16, 2018, annexed as Ex. 41 to

PHPFF (Docket # 1052-45) ("First Kontilai Dep. Excerpt"), at 362:13-16 ("Q: Collectors Café

didn't make any collectibles purchases?  A: No, not that I recall, other than the Jackie Robinson

contracts."), and investors were never informed that investor money would be used by anyone to

purchase collectibles for any reason, see Jensen Decl. ¶ 16; Coleman Decl. ¶¶ 12-13.  In fact,

CCI represented to investors that one key aspect of its proposed business was that CCI would not

buy or own collectibles.  Jensen Decl. ¶ 3(d); Coleman Decl. ¶ 5; Cutsey Decl. ¶ 14; see

Collectors Café Business Plan, annexed as Ex. 12 to PHPFF (Docket # 1052-12) ("2014

---

[9]  Holt's deposition testimony was made part of the record of the preliminary injunction
hearing even though she did not testify.  See Letter from C. Hansel, dated Feb. 17, 2023 (Docket
# 1163).  We credit her testimony given that Kontilai has refused on Fifth Amendment grounds
to answer any questions regarding the conduct that Holt testifies to, her testimony is consistent
with other evidence in the record, and her testimony is more plausible than the explanations
offered by the defendants.

Business Plan"), at *9 ("Collectors Café will collect commissions . . . each time a collectible

sells through our portal.  Most importantly, this happens with NO COST OF GOODS.").

When asked about the cash withdrawals and the notations describing them, Kontilai

testified that the withdrawals he made were repayments of debt owed by CCI to Kontilai, but

could not identify the amount of money CCI owed him or the amount of money CCI had repaid

on those debts.  See First Kontilai Dep. Excerpt at 361:19-365:10; see also Second Kontilai Dep.

Excerpt at 62:14-63:14.  Thus, the notion that these were repayments of debts was obviously

false.  In any event, Kontilai and/or CCI previously represented to investors that the company

had no debt during the relevant period between 2014 and 2018, and never informed investors that

investor money might be used to pay Kontilai.  Jensen Decl. ¶¶ 3(c), 16; Coleman Decl. ¶¶ 7, 12-

13; Cutsey Decl. ¶¶ 23, 26; see 2014 Business Plan at *11 ("The company is debt free . . . .").

Indeed, the sole evidence that any debt was owed by CCI to Kontilai comes in the form of

purported "convertible note agreements" for $5 million and $1.411 million that were likely

fabricated.  See Convertible Note Agreement, dated June 11, 2007, annexed as Ex. 16 to PHPFF

(Docket # 1052-16) ("$5 Million Note"); Convertible Note Agreement, dated Dec. 31, 2007,

annexed to Board and Shareholder Resolutions at *53 (Docket # 1052-58) ("$1.411 Million

Note").  We discuss these documents in greater detail below.  See Section IV(A)(1)(b)(ii).

An additional $1 million was transferred from CCI to Holt in three transactions between

July 10 and 11, 2018.  See Holt Transfer Summary at Lines 58, 60-61.  Kontilai testified that the

July 2018 transfers to Holt were in partial settlement of a threatened lawsuit in which Holt

planned to demand the repayment of an investment made by her or her family.  See Second

Kontilai Dep. Excerpt at 93:16-97:5.  However, Kontilai testified in May 2018 — two months

before these transfers — that although Holt had "at least seven figures in equity investment," the

supposed loan Holt made to CCI had "been paid." See First Kontilai Dep. Excerpt at 330:21-332:24. The defendants have not identified any documentation suggesting that Holt made either a loan to or an investment in CCI.

Kontilai and CCI also transferred a net amount of at least $1.9 million from CCI bank accounts to Kontilai's bank accounts between April 1, 2014 and December 21, 2018. See Summary of Transactions to Kontilai from Collectors Café Bank Accounts, annexed as Ex. 19 to PHPFF (Docket # 1052-19) ("CCI Transfer Summary") ($1,909,284.00 in net transfers). Contemporaneous notations for these transfers include references to: (i) "salary" and "compensation" for $1.1 million of transfers, see id. at Lines 4, 6-7; (ii) "partial repayment" of notes, id. at Lines 41, 43; and (iii) "Corporate Housing," id. at Line 3. The notations for "salary" and "compensation" appear on transfers made days after Kontilai received a letter sent by counsel for Kirk Jensen and certain other investors, which alleged Kontilai and Collectors Café engaged in fraud. Compare id. (transfers on March 20, March 21, and April 20, 2017); with Letter from T. Dennin to Kontilai, dated Mar. 17, 2017, annexed as Ex. 28 to PHPFF (Docket # 1052-28) (March 17, 2017 letter alleging that "the offer and sale of [CCI] shares violated numerous provisions under the federal securities and common law"). As already discussed, Kontilai and CCI had previously represented to investors that Kontilai did not — and would not — take a salary. See Coleman Decl. ¶¶ 4, 10; Cutsey Decl. ¶ 7, 20.

Finally, Kontilai and CCI indiscriminately used company cards for personal expenditures. Even the defendants' expert witness estimated that personal expenses constituted over $1.1 million of the charges on Kontilai's company credit cards. Vranca Report ¶¶ 44-45. As the SEC observed, this number is unlikely to represent the full scope of Kontilai's personal expenditures, because Vranca's methodology did not account for any expenses that could even hypothetically

have served a business purpose.  See, e.g., Jan. 24 Tr. 42:10-16 ("Q: So is it accurate to say that

given it is possible that at least a portion of this could be a business expense[,] [y]ou . . . assumed

it was a business expense, and then you threw it on the business-related expenses line . . . ?  A:

As far as I recall, if it's marked as an expense, yes, the answer is yes.").

Kontilai did not testify at the preliminary injunction hearing and instead stipulated that he

would have invoked his Fifth Amendment right against self-incrimination if questioned

regarding these withdrawals.  See Fifth Am. Let.  Thus, we draw an inference that any truthful

testimony he would have given would have been adverse to his interests in this case.

### ii.  Purported Loans & Employment Contract

The SEC issued subpoenas to Kontilai and CCI seeking copies of employment

agreements and any contracts related to the distributions from CCI to Kontilai.  See Moessner

Decl. ¶¶ 8, 13.  The last of these subpoenas was sent on February 16, 2018.  Id. ¶ 8.  Gail Holt

testified that in April 2018, Kontilai told her that he planned to create a document related to his

employment at CCI.  See Holt Dep. at 143:18-145:9.  Kontilai then asked Holt to send him a

copy of her signature so that Kontilai could recreate her signature on an employment agreement.

Id. at 142:4-144:22.  She sent Kontilai a digital copy of her signature to serve as a "model."  Id.

at 142:4-143:11.

On May 14, 2018, Kontilai and CCI produced a document purporting to be an

employment agreement between Kontilai and CCI.  See Employment Contract, dated May 14,

2007, annexed as Ex. 15 to PHPFF (Docket # 1052-15) ("Kontilai Contract"); see Letter from

Andrew Ceresney, dated May 14, 2018, annexed as Ex. 51 to PHPFF (Docket # 1052-55)

("Ceresney Let.") ("In response to the Subpoena, we are sending you a disc containing . . . . [a]

copy of Mykalai Kontilai's employment agreement").  The document purports to be dated May

14, 2007, and bears a signature attributed to "Ultimate Collector Inc. (Gail Holt, Chairman)."

See Kontilai Contract at 13. Tellingly, despite the 2007 date, the document contains a watermark

reading: "©2002-2018 Law Depot.com®." Id.

Indeed, in October 2018, counsel for Holt represented that this was not an original

document, but instead had been "recreated" based on a lost document, Moessner Decl. ¶ 17, and

Holt later testified that the signature on the document was "not [her] writing," but that she had

given Kontilai permission to affix a version of her signature "[b]ecause [Kontilai] asked [and]

said that he . . . had lost . . . the original employment agreement." Holt Dep. at 141:16-143:23.

Further, Holt testified that to her knowledge she was never Chairman of "Ultimate Collector," id.

at 115:11-20, which was CCI's corporate name in 2007, see Am. Compl. ¶ 19; Kontilai Ans. ¶

19. Gary Ferrell testified that he served continuously on the board during that year, Nov. 7 Tr. at

111:20-25, and to his knowledge Gail Holt was never named chairman of CCI's board and was

not "associated with CCI in any way" in 2007, id. at 112:12-21. Ferrell also testified that to his

knowledge the board had not entered into an employment agreement with Kontilai. Id. at

129:14-20. Robert Sparks was counsel for CCI in 2007, see Deposition of Robert Sparks, dated

Oct. 16, 2020, annexed as Ex. 52 to PHPFF (Docket # 1052-56) ("Sparks Dep."), at 27:11-15,

and testified that "[t]o the best of [his] knowledge, [he] never heard the name 'Gail Holt' until

2010, [or] [20]11," and Kontilai had never told him that Holt was a board member in 2007, id. at

26:24-27:5.

Also on May 14, 2018, Kontilai and CCI produced a document purporting to be a

"convertible note evidencing Mykalai Kontilai's loan to [CCI]." Ceresney Let.; see $5 Million

Note. Like the Employment Agreement, the $5 Million Note lists Holt as the Chairman of

Ultimate Collector and purports to contain her signature. $5 Million Note at *1, 4. The $5

Million Note is accompanied by a document purporting to be a Bank of America statement, which lists a $5 million deposit made by Kontilai into CCI's bank account on June 11, 2007.  Id. at *5-6.  The document contains mathematical errors, including the deduction of a $65 withdrawal from the $5 million balance, which results in a listed "Ending Balance" of $4,999,065 (rather than the accurate total of $4,999,935).  Id.  The bank statement the SEC obtained from Bank of America for the same account shows a deposit of only $1,000 on June 11, 2007.  See Bank of America Statement, dated June 29, 2007, annexed as Ex. 17 to PHPFF (Docket # 1052-17).  We thus find that the purported $5 Million Note is fabricated.

On May 16, 2018, Kontilai testified that he lent the company $5 million in the "first note."  First Kontilai Dep. Excerpt at 153:5-7.  About two weeks later, on June 1, 2018, Kontilai wrote a check to himself from CCI's bank account in the amount of $250,000.  BankUnited Check No. 238, dated June 1, 2018, annexed as Ex. 50 to PHPFF (Docket # 1052-54).  The memo line on the check reads: "Partial Repayment of 5MM Note."  Id.

An additional document purporting to be a "convertible note agreement" between CCI and Kontilai, dated December 31, 2007, reflects a purported loan by Kontilai in the amount of $1,411,142.02.  See $1.411 Million Note.  The document again lists Gail Holt as "Chairman," this time of "Collector's Coffee, Inc.," and bears a signature attributed to "Gail Holt Chairman of the Board."  Id. at *1, 4.  Defendants' expert Vranca attributes the amount reflected in this note to payments made by Kontilai to Public Media, which Vranca describes as CCI's predecessor. See Vranca Report ¶¶ 3, 52-53; Public Media Deposits.  Public Media CEO Gary Ferrell testified that he had no knowledge of this note, Nov. 7 Tr. at 134:8-135:4, and identified the deposits into Public Media's account as including less than $400,000 contributed by Kontilai, which he testified were payment for his creation of a pilot T.V. program for Collectors Café, not a loan to

Public Media, id. at 108:13-109:19.  Ferrell testified that neither Kontilai nor CCI ever loaned

any amount of money to Public Media, and that Public Media was not a predecessor to CCI.  Id.

at 104:12-21, 106:21-107:3.  We thus conclude that this purported "convertible note agreement"

was fabricated.  Again, this conclusion is bolstered by Kontilai's invocation of his Fifth

Amendment privilege with respect to these matters.

### iii.   False and Misleading Statements to Investors

Between April 1, 2014, and at least January 30, 2018, Kontilai and CCI disseminated

PPMs and Business Plans to potential investors that described the company's plans for the use of

investor funds.  None of the statements disclosed that CCI intended to provide Kontilai

personally with funds through transfers, cash withdrawals, or credit card usage.  Nor did they

disclose that payments would be made for the purposes that Kontilai now claims: that is, for the

purchase of collectibles by Kontilai or Holt, the payment of salary to Kontilai, or the repayment

of the purported loans at issue here.  Kontilai and Collectors Café also made affirmative

statements to potential investors that Collectors Café did not and would not pay or owe a salary

to Kontilai.

CCI used two versions of their PPM between 2014 and 2018.  See Answer and

Affirmative Defenses to the Amended Complaint, filed Mar. 6, 2020 (Docket # 241) ("Kontilai

Ans."), ¶ 25.  The first, created in 2008 and amended three times, represents that "upon funding

of this MEMORANDUM" Kontilai would receive a onetime payment of $300,000 and a stock

bonus plan "as compensation for past services," and makes no other statement about salary for

future services.  See Confidential Private Placement Offering Memorandum, dated Apr. 28,

2008, annexed at *3 to Ex. 6 to PHPFF (Docket # 1052-6) ("First PPM"); First Amendment,

dated Mar. 9, 2009, annexed at *56 to Ex. 6 to PHPFF (Docket # 1052-6); Second Amendment,

dated Nov. 8, 2009, annexed at *60 to Ex. 6 to PHPFF (Docket # 1052-6); Third Amendment,

dated Jan. 31, 2010, annexed at *63 to Ex. 6 to PHPFF (Docket # 1052-6).  The First PPM makes

no mention of an ongoing salary for Kontilai or other personal use of CCI funds by Kontilai.  See

generally id.  The document states that Kontilai "has approximately $600,000 in Promissory

Notes still outstanding," First PPM at *51, a number that appears to include the $400,000

payment made to Public Media for the Collector's Café T.V. pilot program, see id.  The second

PPM, also dated April 2008 but heavily amended in 2015, see Kontilai Ans. ¶¶ 27-28, states that

CCI intends to use investor money for "developing the Company infrastructure, related legal

costs, and to develop and growth [sic] the integrated social network and auction portal,"

Confidential Private Placement Offering Memorandum, dated Apr. 28, 2008, annexed at *2 to

Ex. 7 to PHPFF (Docket # 1052-7) ("Second PPM"); see Email from L. Feliciano to D.

Chapman, dated July 13, 2017, annexed as Ex. 8 to PHPFF (Docket # 1052-8) (annexing

amendments to the Second PPM) ("Second PPM Amendments").  The Second PPM contains no

notices regarding outstanding "promissory notes."  See generally id.  It goes on to note that

"[f]unds may also be used for broad purposes of general growth opportunities at the election of

the CEO," id. at *9, but does not refer to a salary for Kontilai, debt owed to Kontilai, or other

personal use of funds by Kontilai.

        Both PPMs contain a disclaimer to the effect that CCI "may use some of the private

offering proceeds for . . . satisfaction of outstanding company debt in the form of promissory

notes held by individuals, including officers and directors, as it deems appropriate."  First PPM

at *42; see Second PPM at *12.  Both PPMs also contain a disclaimer that "no person has been

authorized to give any information or make any representations concerning this investment other

than the information and representations contained in this confidential memorandum."  First

PPM at *4; Second PPM at *3.

CCI's "Business Plans," issued in 2014 and 2016, both included statements representing that investor funds would be used "for the General Purpose of increasing Operating Capital of the Company, in preparation for initial growth and launch of our website, national television shows and completion of the retail center and television studio at Caesar's Palace."  2014 Business Plan at 2; Business Plan, annexed as Ex. 13 to PHPFF (Docket # 1052-13) ("2016 Business Plan"), at *3.  Neither plan states that CCI intends to use investor money to provide Kontilai with a salary or other funds.  See 2014 Business Plan, 2016 Business Plan.  As noted, CCI and Kontilai represented on multiple occasions that Kontilai had not and would not take a salary.  E.g., Coleman Decl. ¶ 4; Cutsey Decl. ¶¶ 7, 10, 20; see also Corporate Update at *11 ("Collector's Café's founder & CEO, Mykalai Kontilai . . . has not taken a salary to-date"); Email from Kontilai to Cutsey, dated Dec. 5, 2016, annexed as Ex. 35 to PHPFF (Docket # 1052-35) (instructing Cutsey to tell investors Kontilai was "[d]oing all of this work for no salary . . . so our investment can try to stay non-diluted.").

Kontilai also repeatedly told potential investors that he had made substantial investments in Collectors Café.  For example, Kontilai stated to Coleman during a July 2016 call that CCI had no debt, and that Kontilai owned 62% of the company and had invested $8 million. Coleman Decl. ¶¶ 7, 16.  Coleman understood from Kontilai's statement that Kontilai would "earn returns from his investment just like an investor would."  Id. ¶ 16.  Kontilai did not state or suggest that his investment was a loan and did not provide any document showing that he made a loan.  Id. ¶ 16.  Similarly, during a conference call in 2015, Kontilai told Jensen and others that Collectors Café had no debt and that Kontilai funded operations with his own investments. Jensen Decl. ¶ 3(c).

30

Defendants stated to investors in their 2017 Corporate Update that Kontilai "invested several million dollars personally." Corporate Update at *11. Similarly, during a December 5, 2016, conference call in which Kontilai and Collectors Café sought more funding from investors, at Kontilai's instruction Cutsey told potential investors that Kontilai invested his own money. Cutsey Decl. ¶ 7. Kontilai himself repeated to Cutsey and other investors on multiple occasions that he had invested $5 million of his own funds in the company. Id. ¶ 21. Kontilai concedes that he indicated to investors that he had invested "some of his own money." Kontilai Ans. ¶ 44. As discussed in the previous section, the initial PPM indicates only that Kontilai loaned CCI $600,000, and the only written evidence of any investment or loan by Kontilai beyond that number — the convertible notes — was fabricated.

Defendants claim that CCI owed Kontilai a debt of several million dollars. See, e.g., Kontilai Proposed Findings at 84-85 ("[T]he outstanding balance of the loan made in 2007 added to the various transfers Mr. Kontilai made from his personal accounts to CCI total $5,636,648.70"). The primary documents offered by defendants as evidence of Kontilai's purported loan are the "convertible notes" and the annexed Bank of America statement, along with Vranca's opinion that deposits into Public Media accounts were in fact loans to CCI from Kontilai. See Section IV.A.1.b.ii. above. Kontilai could only "speculate" in his deposition as to the amounts owed to him for the purported debt, suggesting that no records of these "loans" were kept by CCI. See Second Kontilai Dep. Excerpt at 62:19-63:14. The initial PPM reflects only a $600,000 loan by Kontilai, see First PPM at *51, which is less than half of the "loan" amount reflected in the smaller "convertible note," see $1.411 Million Note. By 2014, the beginning of the period at issue here, CCI claimed to be debt free. See 2014 Business Plan at 10. Defendants repeatedly represented to investors after that point that the company had no debt. See, e.g.,

Jensen Decl. ¶ 3; Coleman Decl. ¶ 8; Cutsey Decl. ¶ 24; 2016 Business Plan at *11.  We thus find that Kontilai was not owed any money by CCI during the period at issue.

CCI's investors testified that these representations were material to their decision to invest.  Coleman testified that the representations regarding Kontilai's purported investment were "important" because "it meant that [] Kontilai not only had skin in the game, but was also motivated to make the company work."  Coleman Decl. ¶ 17.  Coleman testified that if he had known of CCI's purported debt to Kontilai he would have "requested an audit" before investing. Id. ¶ 15.  Likewise, Cutsey testified that Kontilai's purported investment "signified that [] Kontilai was very confident in the CCI business plan" and was thus "significant" to Cutsey. Cutsey Decl. ¶ 22.  Cutsey testified that if he had known of CCI's purported debts, he "would have asked for additional information," and would not have invested "without a reasonable explanation for the debt or other financial information showing that repayment was feasible."  Id. ¶ 25.

CCI also represented to investors that its revenue was inextricably tied to auction sales on CCI's website.  See Kontilai Ans. ¶ 53 (admitting that "at least two versions of a Collectors Café business plan stated that '[t]hrough its online auction business, Collectors Café will collect commissions, (approximately 20% from buyers and 20% from dealers/sellers) each time a collectible sells through our portal'"); 2014 Business Plan at 8; 2016 Business Plan at *11-12. To emphasize the likely profitability of that website, CCI and Kontilai made written and oral statements to investors about the number of dealers who had committed to sell products in partnership with CCI.  In amendments to the PPMs sent to investors, Kontilai and CCI represented that CCI continued to execute "additional inventory contracts" with "Dealers" and

"Master Dealers."[10]  Second PPM Amendments at *4, 14, 17, 20; see also Coleman Decl. ¶ 19.

Jensen testified that sometime after February 2015, CCI represented it had entered into "master

dealer contracts locking approximately 400 master dealers into exclusive, perpetual contracts."

Jensen Decl. ¶¶ 3-4.  "[J]ust before" Jensen's first investment, CCI sent Jensen a PPM stating

that it "had inventory contracts with Master Dealers."  Id. ¶ 6.  Coleman testified that before his

first investment, Kontilai stated in a July 2016 phone call that CCI had signed 10-year

agreements with 580 dealers.  Coleman Decl. ¶¶ 2, 18.  Cutsey stated that Kontilai had

represented there were "hundreds of dealers who had committed to supply inventory for the CCI

website," Cutsey Decl. ¶ 11, and had Cutsey prepare a document for investors that represented

CCI had a "massive dealer inventory," id. ¶ 10(a); see Corporate Update at *5.  Defendants

represented to investors that the total inventory on CCI's site was valued over $3 billion.  See

Jensen Decl. ¶ 3(f); Coleman Decl. ¶ 18.

In fact, these statements were false.  Kontilai testified that the company had not signed

"anybody" to a Master Dealer contract as of May 2018, First Kontilai Dep. Excerpt at 191:11-

192:2, and had not even offered a Master Dealer contract to anyone, id. at 193:2-5.  Kontilai also

testified that of ordinary (non-"Master") dealers, CCI had "approximately 13 or 14 . . . on written

contracts," id. at 174:3-8, and that the inventory on CCI's website was limited to offerings from

"[s]omewhere under five" dealers in total, id. at 187:25-188:7.  Kontilai testified that a

collectibles dealer named Peter Siegel was responsible for "getting dealers, [and] getting verbal

commitments."  Id. at 174:10-12.  Siegel testified, however, that as of August 2016, he did not

believe CCI had either "580 dealers" or "3.5 billion in inventory."  Deposition of Peter Siegel,

---

[10]  A "Master Dealer" agreement is a long-term agreement under which a dealer would agree to make their collectibles available for sale exclusively through CCI.  See First Kontilai Dep. Excerpt at 191:11-192:3.

dated Oct. 28, 2020, annexed as Ex. 46 to PHPFF (Docket # 1052-50) ("Siegel Dep."), at 374:22-375:16.  Siegel testified that he was not aware of any executed 10-year exclusivity contracts between CCI and dealers, nor of any contract longer than six months with any dealer. Id. at 413:23-414:21.  Cutsey, who was responsible for the creation of CCI's website, testified that he was aware of only one dealer in the time that he worked on the site.  Cutsey Decl. ¶ 11.

Investors credibly testified that the representations regarding inventory and master dealers were material to their decision to invest.  Cutsey stated that the "promise of exclusive access to dealers and their inventory was one of the most compelling features of CCI," id. ¶ 13, particularly because "CCI's revenue stream depended upon it getting 40% margins from the sale of the inventory, without ever having to buy the inventory," id. ¶ 14.  Coleman stated that the supposed Master Dealer contracts were "important" to him because "it meant that this inventory was available to generate a return on investment sooner rather than later," Coleman Decl. ¶ 19, and averred that if he had known that CCI's dealer contracts were limited to "short term agreements," he "would have likely reconsidered investing in whole or in part," id. ¶ 20.  Jensen explained that he "liked the idea that the master dealers were locked in to . . . 'perpetual' and 'exclusive' agreements with CCI," which was one element of a "very impressive" pitch by CCI. Jensen Decl. ¶ 5.

Finally, Kontilai and Collectors Café acquired the Jackie Robinson Contracts for $2 million in 2013.  See Kontilai Ans. ¶ 64; Am. Compl. ¶ 64.  CCI and Kontilai represented to investors and potential investors that (i) Collectors Café owned contracts signed by Jackie Robinson; and (ii) the contracts had been appraised at between $25 and $36 million.  See, e.g., Coleman Decl. ¶¶ 21-22; Cutsey Decl. ¶¶ 16-17; Jensen Decl. ¶¶ 3(b), 6(b), 12; Nov. 7 Tr. at 214:2-6; see also Kontilai Ans. ¶ 63 (admitting the Amended Complaint's allegation that

"Collectors Café and Kontilai represented to investors and potential investors that (i) Collectors Café owned contracts signed by Jackie Robinson; and (ii) the contracts had been appraised at $36 million").  In a February 2015 amendment to the Second PPM, for instance, CCI stated that it had "acquired a collectibles asset which has been appraised at $36,000,000" which was "likely to generate millions of dollars of additional cash flow upon its liquidation."  Second PPM Amendments at *6; see Spreadsheet, annexed as Ex. 33 to PHPFF (Docket # 1052-33) ("Investor Contributions") (listing dates on which investors received the Second PPM and amendments).  The same document stated that CCI had received valuations for the Contracts from "both Christies Auction House and Seth Kaller Inc., a leading appraiser of legacy historical documents[,] who issued written appraisals of 25 million and 36 million dollars respectively." Id. at *10.

There were no bona fide "appraisals," however.  Seth Kaller testified that he was retained to create a "marketing document that was ultimately written as an appraisal . . . that came up with a value [or] a sales price for [the Contracts]."  Deposition of Seth Kaller, dated Oct. 20, 2020, annexed as Ex. 47 to PHPFF (Docket # 1052-51) ("Kaller Dep."), at 72:3-12.  Kaller testified that "it was pre-agreed that the appraisal . . . would support" a $36 million valuation.  Id. at 82:3-11.  Kaller testified that he did his "appraisal" in return for an agreement that he would receive 5% of the price "actually paid to [CCI] from the sale or auction of the [Contracts]."  Id. at 76:13-24.  CCI instructed Kaller not to disclose the percentage he was owed.  Id. at 77:23-78:4.  The record does not reflect that Christie's Auction House ever prepared an appraisal of the Contracts' auction value; instead, Christie's proposed the $25 million figure as a suggested "private-sale asking price" for a "limited number of potential buyers."  See Letter from F. Wahlgren to Kontilai, dated Nov. 11, 2013, annexed as Ex. 48 to PHPFF (Docket # 1052-52)

("Christie's Let."). Kaller described a "private-sale asking price" as an amount "below which [Christie's] would not offer to sell it" to private parties. See Kaller Dep. at 242:2-7.

Jensen testified that the purported value of the Contracts was "very significant" to him as an investor "because [he] believed that [his] investment in the company was covered as long as CCI owned such a valuable asset." Jensen Decl. ¶ 12. He testified that he was never informed that Kaller's estimate was based on a number given by CCI, or that Christie's had not given a formal appraisal, and "would have considered this information very important when assessing the actual value of the company's assets." Id. ¶¶ 14-15. Cutsey testified that "[t]he high valuation . . . of the [Contracts]" was an "important representation[] because [it] made [Cutsey] feel confident that [his] investments were protected and would be recouped when the [C]ontracts were auctioned." Cutsey Decl. ¶ 19. Likewise, Coleman testified that the "statements about the Jackie Robinson [C]ontracts were important to [him] when considering [whether] to invest because it meant that [the] company had sufficient assets to repay [Coleman's] investment if the company failed." Coleman Decl. ¶ 26.

### iv.    Analysis

SEC has shown a likelihood of success on the merits of its securities claims.

First, the SEC has shown that Kontilai and CCI "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." See Pentagon, 725 F.3d at 285. Kontilai and CCI's statements about the use of investor funds, Kontilai's purported investment and the company's lack of debt, the company's collectibles inventory and "Master Dealer" contracts, and the appraisal of the Jackie Robinson Contracts all represent misrepresentations or omissions that satisfy the first element.

Although Kontilai and CCI represented in the PPM that the company's use of funds would be used for the company's "growth," Second PPM at *9, it did not mention payments to Kontilai personally.  More to the point, Kontilai repeatedly avowed to investors that he had not and would not receive a salary.  These representations proved to be false and misleading when Kontilai actually received funds from CCI, including payments for what he designated, either at the time or retrospectively, as salary.[11]  See CCI Transfer Summary.  Likewise, defendants' representations that Kontilai had invested millions are belied by the sheer absence of any evidence of such an investment, and are irreconcilable with Kontilai's current claim that payments from CCI were in partial repayment of loans.

Defendants' representations as to inventory and the "Master Dealer" contracts were false, as Kontilai himself acknowledged when he conceded that no ten-year "Master Dealer"

---

[11]  Kontilai argues that the SEC has failed to demonstrate that the funds received by Kontilai were "investor funds" much less "funds contributed by [] Coleman, [] Cutsey, or [] Jensen, the only three investors at issue in this case."  See Kontilai Proposed Findings at 78-79.  As to the latter point, the SEC's testimony from a limited number of investors was sufficiently representative for this preliminary injunction hearing, particularly when combined with the evidence that PPMs, Business Plans, and other communications bearing the alleged false statements were sent to a much broader group of investors and potential investors.  As to whether the funds were "investor funds," there is no legal requirement that the SEC perform asset tracing for this purpose.  See S.E.C. v. Wyly, 71 F. Supp. 3d 399, 405 (S.D.N.Y. 2014) ("[T]he Second Circuit has held that district courts are not required to 'trace specific funds' to specific violations when ordering disgorgement.") (quoting S.E.C. v. Rosenthal, 426 F. App'x 1, 3 (2d Cir. 2011) ("Imposing such a tracing requirement would allow a[ ] . . . defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits.")); accord S.E.C. v. Ahmed, 72 F.4th 379, 407 (2d Cir. 2023) ("[T]he district court is not required to 'trace' ill-gotten gains to specific assets in [defendant's] possession — any of his own assets may be liquidated to satisfy his disgorgement obligation.").  In any event, the SEC correctly points out that "[i]nvestor funds and company funds were the same during the period of April 2014 through 2018" because "[t]here was no other source of funds."  SEC Reply at 17.  Indeed, CCI's expert identifies no revenue earned by the company during that period, see generally Vranca Report, and the net numbers used by the SEC in calculating Kontilai's takings already account for any funds transferred into the company by Kontilai during that period, see SEC Reply at 17 (citing CCI Cash Summary; Holt Transfer Summary; CCI Transfer Summary).

agreements had been signed.

Finally, there is no evidence that CCI ever obtained an actual "appraisal" from either Christie's or Kaller, and the higher valuation that CCI advertised to investors was in fact based on a minimum price set by CCI prior to the valuation, and made by an "appraiser" who had a clear interest in the sale price, none of which was disclosed to investors.

Each of these statements was material, as evidenced by investor testimony that they in fact considered the representations "important" or "significant" to their investment decision. Jensen Decl. ¶¶ 5, 12, 14-15; Coleman Decl. ¶¶ 17, 19-20, 26; Cutsey Decl. ¶¶ 13-14, 19, 22; see generally Riel, 282 F. Supp. 3d at 520.  Although Kontilai argues that the SEC has failed to demonstrate that this was material to all investors, Kontilai Proposed Findings at 67, any reasonable investor would view these representations, both collectively and individually, as significantly altering the "total mix" of information available to investors, see Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (citation omitted).

Kontilai argues the statements to investors are not actionable under the "bespeaks caution" doctrine.  Kontilai Proposed Findings at 79.  This doctrine is a "corollary of the well-established principle that a statement or omission must be considered in context."  Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 141 (2d Cir. 2010) (citation omitted). Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  Id. (citing P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 (2d

Cir. 2004).  The Second Circuit has warned, however, that the "bespeaks-caution doctrine

applies <u>only</u> to statements that are forward-looking."  <u>Id.</u> at 142 (emphasis added) (citing <u>Daum</u>,

355 F.3d at 96-97 n.3); <u>accord</u> <u>Cheng v. Canada Goose Holdings, Inc.</u>, 2021 WL 3077469, at *7

(S.D.N.Y. July 19, 2021).  The false and misleading statements at issue here were not projections

regarding CCI's success, which an ordinary investor should take with a grain of salt.  <u>See</u>

<u>Abramson v. Newlink Genetics Corp.</u>, 965 F.3d 165, 173 (2d Cir. 2020)) (no reasonable investor

would rely on "indefinite statements of corporate optimism").  Instead, they were largely

statements of CCI's current status or past actions to which the doctrine does not apply.  Any

statements as to future actions — such as the claim that Kontilai would not take a salary — were

unaccompanied by any cautionary language and were the sort of statements that could properly

be taken at face value.[12]

Kontilai also argues that "to any extent the SEC relies on oral statements made by Mr.

Kontilai to any investor, any reasonable investor would understand that those statements should

not be relied upon when assessing the investment risk," because of certain disclaimers in the

PPMs, <u>see</u> Kontilai Proposed Findings at 82, including one stating that "no person has been

authorized to give any information or make any representations concerning this investment other

than the information and representations contained in this confidential memorandum," First PPM

at *4; Second PPM at *3.  This argument carries no weight, however, because the SEC need not

prove here that investors relied upon CCI or Kontilai's statements.  <u>See</u> <u>Pentagon</u>, 725 F.3d at

285 (elements of section 10(b) and Rule 10b-5(b) claim do not include reliance); <u>United States v.</u>

---

[12]  The doctrine would not protect these statements anyway given that CCI and Kontilai plainly knew they were false.  <u>See</u> <u>In re Prudential Sec. Inc. P'ships Litig.</u>, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").

Vilar, 729 F.3d 62, 89 (2d Cir. 2013) ("[T]he long established law of our Circuit, and nearly every other circuit, is that, when the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b-5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance.").[13]

As to scienter, Kontilai and CCI obviously knew their conduct was deceptive or acted recklessly with regard to the statements, given Kontilai's personal knowledge of the matters on which he was speaking.  See Riel, 282 F. Supp. 3d at 520.  Defendants' use of investor funds provides ample motive for these misrepresentations, as defendants appropriated millions of dollars from company coffers.  Defendants' explanation for these transfers relies upon documents that we find have been fabricated.  As discussed, the supposed "convertible notes"

---

[13]  Even where reliance must be proven, "the issue of reasonable reliance requires that we consider the entire context of the transaction . . . .  Standing alone, therefore, a general disclaimer . . . is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor."  FIH, LLC v. Found. Cap. Partners LLC, 920 F.3d 134, 141 (2d Cir. 2019) (punctuation and citation omitted).  Where an extremely broad disclaimer is accompanied by misrepresentations that alter the overall context of a transaction, courts have thus found that the disclaimer does not as a matter of law preclude a finding of reasonable reliance.  See, e.g., Hallett v. Stuart Dean Co., 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020) ("While 'there may be circumstances where a general disclaimer or merger clause, together with an extensive roster of specifically negotiated factual warranties and representations, can lead to a conclusion that, in the particular circumstances of a case, no reasonable jury could find reasonable reliance' on an oral representation, for the most part 'general disclaimers are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law.'") (quoting FIH, 920 F.3d at 141, 145); Xia, 2022 WL 17539124, at *22 (E.D.N.Y. Dec. 8, 2022) (where defendants cited "individual disclaimers in the offering memoranda that stated that their enterprise might not be profitable," the court considered these unpersuasive because the offering memoranda contained misstatements that "as a whole" would have given an unrealistic impression of likely profits, noting that "[d]efendants cannot rely on boilerplate disclaimers as a contractual escape hatch or to avoid liability under the securities laws") (citing S.E.C. v. Telegram Grp., Inc., 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive.")).

owed to Kontilai by CCI are unsupported by any contemporaneous evidence, and no individual

other than Kontilai has testified that they ever existed.  Likewise, no contemporaneous evidence

of Kontilai's supposed employment agreement exists that would corroborate his claims of

entitlement to a salary.  Each of the documents supposedly endorsed by Gail Holt as "Chairman

of the Board" is fabricated, given that neither CCI's then-counsel nor its sole other listed board

member had heard of Holt at the time, much less knew of her supposed appointment as the

board's chair.  Holt testified as to Kontilai's efforts to create these documents after the SEC had

commenced its investigation, and Kontilai has refused to testify regarding the matter, suggesting

that his answers would have been adverse to him.  The existence of scienter is equally obvious as

to the many other misrepresentations CCI and Kontilai made.

     The use of fabricated documents by itself shows that defendants acted with scienter.  See

S.E.C. v. Musella, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989) ("This false exculpatory statement

evidences consciousness of guilt and has independent probative value of scienter."); accord

United States v. Spectrum Painting Corp., 2020 WL 5026815, at *9 (S.D.N.Y. Aug. 25, 2020);

United States v. Taylor, 767 F. Supp. 2d 428, 434 (S.D.N.Y. 2010) ("It is well-settled in the

Second Circuit that evidence of a false exculpatory statement is admissible as circumstantial

evidence of consciousness of guilt.").  Also, as noted, it has been established on summary

judgment that defendants attempted to prevent certain investors from communicating with the

SEC regarding securities violations.  See 21F-17 Decision.  This is further evidence that the

defendants wished to conceal them from authorities and other investors and thus were aware of

the illicit nature of their actions.

     Furthermore, defendants could not have labored under the impression that the misleading

statements were true when they were made.  Kontilai and CCI commissioned the supposed $36

million dollar valuation for the Jackie Robinson Contracts; therefore, they knew at the time they touted it that it was neither impartial nor a true appraisal.  Likewise, defendants could not have mistakenly believed that they had between 400 and 580 "Master Dealers" under contract when they had not in fact offered the Master Dealer contract to even a single dealer.  Nor could they reasonably have believed that this information would be unimportant to investors and prospective investors, and their knowledge of its importance is evidenced by the repeated inclusion of misleading or false statements in the PPMs, which were designed to entice potential investors.  Such knowing falsehoods are sufficient support for the SEC's allegation that Kontilai and CCI acted with scienter.  See S.E.C. v. Universal Exp., Inc., 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) ("Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter."), aff'd sub nom. S.E.C. v. Altomare, 300 F. App'x 70 (2d Cir. 2008); see also CKB168 Holdings, Ltd., 210 F. Supp. 3d at 446 (scienter existed where defendant "helped to create [a company] and directed its promotional efforts[,]" "other defendants and victims describe[d] him as the source of the key misrepresentations in this case[,]" and "[m]ore than anyone, he knew those misrepresentations were false").

Finally, these misrepresentations and omissions were conducted as part of Kontilai and CCI's recruitment of investors for the company.  Because the statements related to shares in the company, they were made "in connection with the purchase or sale of securities."  See Landreth Timber Co. v. Landreth, 471 U.S. 681, 687 (1985) ("[T]he sale of stock in a corporation . . . is typical of the kind of context to which the [Securities] Acts normally apply.").

In sum, we find that the SEC has shown that defendants made material

misrepresentations or omissions, with scienter, in connection with the purchase or sale of securities, and has thus demonstrated a likelihood of success on the merits of its claims under 17 C.F.R. § 240.10b-5(b) and 15 U.S.C. § 77q(a)(2).

Likewise, the SEC has shown "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." See Sason, 433 F. Supp. 3d at 508. Kontilai's misuse of funds from CCI's coffers constitutes a "deceptive or manipulative act" in light of his and CCI's representations to investors and the apparent lack of any authority to use company funds in such a way. See S.E.C. v. Sugarman, 2020 WL 5819848, at *10 (S.D.N.Y. Sept. 30, 2020) ("[W]hile there is nothing 'inherently deceptive' about stealing money, the misappropriation of funds — when accomplished by deceptive acts — may be indicative of scheme liability.") (emphasis in original); see also S.E.C. v. Zandford, 535 U.S. 813, 819-20 (2002) (deferring to the SEC's position that "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5"). Defendants here obscured the misuse of investor money through cash transactions, false notations on check and wire transfer memos, and by routing funds through Gail Holt. Further, they relied on fabricated documents and made false exculpatory statements in failed efforts to show that the transfers to Kontilai were authorized. This reliance on fabricated documents, too, constitutes deceptive conduct. See, e.g., S.E.C. v. Cole, 2015 WL 5737275, at *8 (S.D.N.Y. Sept. 19, 2015) (listing "backdating and fabricating work papers to deceive the PCAOB" among defendant's "several deceptive acts"); see also S.E.C. v. Mizrahi, 2019 WL 3241185, at *3 (C.D. Cal. Apr. 10, 2019) ("The record before the Court shows that Defendants attempted to keep their scheme undetected by encouraging clients to lie to SEC investigators and that Defendants used fabricated documents

to perpetuate the fraudulent scheme, which courts have found violates Rules 10b-5(a) and (c).")
(citation omitted).  It is self-evident that these acts were in furtherance of defendants' scheme to
defraud investors because the misappropriation of funds (and later, the attempts to avoid
discovery or liability) directly led to the transfer of those funds to Kontilai for his personal use.

Finally, Kontilai acted with scienter with regard to this set of claims as well.  As
explained above, Kontilai and CCI's actions themselves speak to scienter.  The fact that Kontilai
— despite his present argument that the transactions were lawful — appears to have never
disclosed any of the transactions at issue to investors or even members of the board, strongly
suggests that he was aware of their wrongfulness, as does the fact that he obtained a substantial
personal benefit.  See S.E.C. v. Xia, 2022 WL 17539124, at *24 (E.D.N.Y. Dec. 8, 2022)
(scienter existed where, inter alia, "[t]he evidence show[ed] that [d]efendant . . . directly
benefited from the alleged fraud by singlehandedly controlling millions of dollars of investor
funds, which [defendant] transferred, without oversight or documentation, between the . . . bank
accounts he and [another individual] controlled[,]" "th[e] record show[ed] a stunning lack of
accounting as to how investor funds were spent or used[,]" and defendant "failed to disclose to
investors that he was misusing and misdirecting their funds on a daily, ad hoc basis.").  Because
Kontilai controlled CCI, the same scienter can be imputed to the company.  See Manor Nursing
Ctrs., 458 F.2d at 1089 n.3; accord S.E.C. v. Treadway, 430 F. Supp. 2d 293, 337 (S.D.N.Y.
2006) ("It is settled that the scienter of executives can be imputed to corporate entities.").  In
sum, we find that the SEC has shown that defendants undertook deceptive acts in furtherance of
their scheme, with scienter, and has thus demonstrated a likelihood of success on the merits of its
claims under 17 C.F.R. §§ 240.10b-5(a) & (c) and 15 U.S.C. §§ 77q(a)(1) & (3).

2.      Reasonable Likelihood of Future Violations

Because we have found that the SEC is likely to prevail on its Rule 10b-5 and Rule 10b claims at trial, we next consider whether there is a "reasonable likelihood of future violations in the absence of an injunction." Gonzalez, 145 F. Supp. 2d at 414. "In deciding this question, it is appropriate to weigh the degree of a defendant's scienter, the sincerity of any assurances that the violation will not be repeated, whether the violation was an isolated one, any acknowledgement by a defendant of the wrongful nature of his conduct, and the defendant's opportunity because of his profession to repeat the violation." S.E.C. v. Cavanagh, 1 F. Supp. 2d 337, 373 (S.D.N.Y. 1998) (citing S.E.C. v. Universal Major Indus., 546 F.2d 1044, 1048 (2d Cir. 1976)); accord S.E.C. v. Morgan, 2019 WL 2385395, at *10 (W.D.N.Y. June 5, 2019).

Defendants have acted with a high degree of scienter evidenced by, among other things, the fabrication of documents to justify theft of company funds and the circuitous transactions apparently designed to conceal Kontilai's use of investor funds for his personal use. There are no assurances that violations will not be repeated. The violations are not isolated given that the fraudulent statements and scheme continued over a period of at least four years, including through transactions made after Kontilai was aware that the SEC was investigating his conduct. Defendants have made no acknowledgment of the wrongful nature of their conduct and have made no representations that assure the Court they intend to cease their activity. Kontilai has forcefully denied any wrongdoing. See generally Kontilai Proposed Findings. We find that the weight of the remaining factors is sufficient to justify an injunction against future violations.

B.    Asset Freeze

Our determination that the SEC has demonstrated a likelihood of success on the merits of its claims satisfies the standard for the SEC's requested asset freeze as well. See Smith, 653 F.3d at 128 ("Where an asset freeze is involved, the SEC must show either a likelihood of success on

the merits, or that an inference can be drawn that the party has violated the federal securities

laws.").  Thus, the questions remaining are the scope of that asset freeze, whether Kontilai

should be allowed to access certain assets due to professed need, and whether the freeze should

apply to assets claimed by relief defendant Veronica Kontilai.  See Kontilai Proposed Findings at

113-128; Veronica Kontilai Mem.; Kontilai Freeze Mem.  We address each issue next.

       1.    Scope of the Asset Freeze

Kontilai argues that the existing asset freeze, which restrains Kontilai's assets up to the

amount of $46,121,649.68, "ignores the distinction between investor funds received by CCI and

investor funds received by [] Kontilai, . . . [and] ignores the question of how much Mr. Kontilai

personally might have been unjustly enriched."  Kontilai Proposed Findings at 113.  Thus,

Kontilai proposes that the asset freeze be limited to a "maximum of $7.27 million," or twice that,

if the Court "accepts the SEC's request to add a penalty amount equal to the disgorgement

amount."  Id. at 114, 117 n.25.  Kontilai further argues that "the entirety of the asset freeze levied

against Mr. Kontilai can be secured by the Jackie Robinson contracts alone," and thus no further

asset freeze is justified.  Id. at 117.  Finally, Kontilai argues that the asset freeze should not

include "untainted" or "after-acquired" assets, including the proceeds of two outstanding

lawsuits arising from the death of Kontilai's mother, id. at 118-122; see also Kontilai Freeze

Mem., and should not be extended to Kontilai's future earnings, id. at 123-124.

We begin with the amount of the asset freeze.  The original amount of the asset freeze —

$46,121,649.68 — was calculated by taking the total amount CCI raised from investors and

adding an additional equal amount on the ground that the additional amount could be assessed

against defendants as a civil penalty should the SEC prevail.  See TRO; Memorandum of Law,

filed May 15, 2019 (Docket # 9), at 26 (asset freeze amount was intended "to cover

disgorgement . . . and a civil penalty in the amount equal to disgorgement").  Neither Kontilai

nor CCI disputes that CCI raised at least $23,060,824.84 from investors.[14]  As the SEC contends,

Kontilai's personal misappropriations are not the sole assets that he can be ordered to disgorge.

The Supreme Court has indicated that partners in wrongdoing — as Kontilai and the company he

solely controlled have been shown to be here — may be held jointly and severally liable for

disgorgement, if equitable.  See Liu v. S.E.C., 140 S. Ct. 1936, 1949 (2020); see also Fed. Tr.

Comm'n v. Shkreli, 581 F. Supp. 3d 579, 642 (S.D.N.Y. 2022) ("Joint and several liability for

disgorgement is properly imposed when multiple defendants have collaborated in an illegal

scheme."); S.E.C. v. Penn, 2021 WL 1226978, at *13 (S.D.N.Y. Mar. 31, 2021) (noting that "Liu

permits joint and several liability" where defendants "were partners engaged in concerted

wrongdoing").  Joint and several liability is appropriate here given that "an individual defendant

[may be] required to disgorge net profits accruing to his company where he was 'primarily

liable' for the fraud that created these profits, was 'intimately involved' in the perpetration of the

fraud, and was a 'controlling person' of the company."  Shkreli, 581 F. Supp. 3d at 642 (citing

S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996)); see also S.E.C. v.

Bronson, 602 F. Supp. 3d 599, 618-19 (S.D.N.Y. 2022) (joint and several liability for

disgorgement was appropriate where defendant "was integral to the scheme, which he ran

through the companies that he controlled").  Thus, the asset freeze is warranted for, at minimum,

the amount that the SEC may prove at trial is subject to disgorgement, namely the

---

[14]  Vranca's report contends that CCI in fact raised $23,183,438.30 from investors
between 2014 and 2018.  See Vranca Report ¶ 33.  However, the SEC does not seek to increase
the amount of the asset freeze.

$23,060,824.84 raised from investors.[15]

As to the penalty portion, the SEC is entitled to an asset freeze "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." SEC v. Maillard, 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014) (citing Unifund, 910 F.2d at 1041-42). Kontilai contends that the SEC alleges only $7.27 million in misappropriations by Kontilai, and would thus be limited to a civil penalty of the same amount. See Kontilai Proposed Findings at 114-15. Unlike the disgorgement amount, the Second Circuit has held that the civil penalty the SEC seeks here — derived from section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), see SEC Proposed Findings at 74-75 — may not be imposed jointly and severally. See Pentagon, 725 F.3d at 287-88 ("The statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain to such defendant.' This language does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally." (emphasis in original) (citing 15 U.S.C. § 77t(d)(2))). However, "where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations," which may result in "some overlap among defendants' gains, and the gains attributed to each defendant may add up to over 100% of total gains." S.E.C. v. Amerindo Inv. Advs. Inc., 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014), aff'd, 639 F. App'x 752 (2d Cir. 2016). As the Second Circuit has explained, this means that because "multiple defendants can 'each benefit from the

---

[15] Although Kontilai argues that the asset freeze must account for deductions that will be assessed against the disgorgement amount for legitimate costs incurred by CCI and Kontilai, see Kontilai Proposed Findings at 54; see also Liu, 140 S. Ct. at 1950 ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)."), Kontilai has not offered any competent testimony as to what expenses are actually legitimate.

same dollar of gain,' . . . each can be penalized for that gain." S.E.C. v. Cole, 661 F. App'x 52, 55 (2d Cir. 2016) (quoting Amerindo, 2014 WL 2112032, at *11 n.11).  Here, given Kontilai's total control of the operations of CCI, the SEC has shown that Kontilai benefitted from investor funds to the same extent as CCI, and thus that the civil penalty may be as much as the total intake from investors.  Because we have found that the SEC is likely to succeed on the merits of its claims, the SEC is entitled to an asset freeze that accounts for the maximum possible civil penalty of $23,060,824.84.

As to Kontilai's claim that the value of the Jackie Robinson Contracts should be deducted from the amount of the asset freeze, the Court has recently ruled that the ownership of the Contracts remains in dispute, and it is possible that a trial will result in ownership by a party other than CCI.  See United States S.E.C. v. Collector's Coffee, 2023 WL 3575428 (S.D.N.Y. May 22, 2023), adopted, 2023 WL 3862662 (S.D.N.Y. June 7, 2023).  Thus, it is impossible to say whether the Contracts could be used to satisfy a judgment against CCI, much less whether they could be applied to disgorgement owed by Kontilai personally, and their value warrants no reduction in the amount of the asset freeze.

Kontilai also contends that particular assets should be excluded from the freeze because they were acquired after the initiation of the asset freeze and are therefore "untainted."  Kontilai Proposed Findings at 118-124.  These funds include the proceeds and potential future proceeds of two outstanding lawsuits, one arising from the death of Kontilai's mother and one "arising out of legal malpractice," id. at 120, as well as any future earnings Kontilai may obtain, id. at 123.

As an initial matter, Kontilai is incorrect that "untainted" assets may not be frozen.  As the Court has previously held in this case, "the Court has statutory authority to freeze untainted assets prejudgment in securities actions" because "[t]he Second Circuit has long recognized that

Congress authorized courts to freeze assets unconnected to the fraud pursuant to 15 U.S.C. [§] 78u(d)." United States S.E.C. v. Collector's Coffee, 602 F. Supp. 3d 488, 494 (S.D.N.Y. 2022) (citing Unifund, 910 F.2d at 1035, 1041).  That statute allows the SEC to seek, "and any Federal court [to] grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).  Courts have long recognized that this statutory grant gives the Court "the authority to freeze assets at an amount that will cover the maximum civil penalty available under applicable law should securities law violations be proven at trial."  S.E.C. v. Schiffer, 1998 WL 307375, at *7 (S.D.N.Y. June 11, 1998).  Cases relating to the Court's inherent equitable power to freeze assets are not the appropriate limiting factor where such a statutory grant exists.  See Collector's Coffee, 602 F. Supp. 3d at 504 n.5.[16]  Although Kontilai argues extensively that the Court's prior assessment of the law was incorrect and the statutory authority does not extend to untainted assets, see Kontilai Freeze Mem. at 10-11, he has not identified any intervening change in the law that should cause the Court to revisit its rulings on this point.[17]  Accordingly, the asset freeze appropriately encompasses purportedly untainted assets such as those identified by Kontilai.

---

[16]  Luis v. United States, 578 U.S. 5 (2016), on which Kontilai relies for this point, see Kontilai Proposed Findings at 119-20, held only that "insofar as innocent (i.e., untainted) funds are needed to obtain counsel of choice . . . the Sixth Amendment prohibits the [asset freeze] that the Government [sought]."  Luis, 578 U.S. at 18.  We discuss Kontilai's claimed need for these funds to obtain counsel below.

[17]  Kontilai engages in extensive analysis of Liu, 140 S. Ct. 1936 (2020), a case decided nearly two years before the ruling he now challenges, but identifies no case applying Liu that suggests its holding was intended to alter the SEC's ability to freeze untainted assets where necessary to protect the availability of a civil penalty or otherwise act in the interest of investors.  See Kontilai Freeze Mem. at 11, 13; Kontilai Proposed Findings at 119, 121.  In fact, case law holds the opposite.  See Bronson, 602 F. Supp. 3d at 616 ("Liu did not disturb courts' authority to impose § 5 injunctions under 15 U.S.C. § 78u(d)(1)[.]") (collecting cases)), aff'd, 2022 WL 5237474 (2d Cir. Oct. 6, 2022).

Likewise, we have already determined that the lawsuits and their proceeds identified by Kontilai as "after-acquired" assets were not, in fact, acquired after the commencement of the asset freeze currently in place.  See Collector's Coffee, 602 F. Supp. 3d at 503-04.  As we explained, "[t]he 'property' interest represented by the lawsuits existed before the date the TRO was entered," id. at 503, and thus it was unnecessary to decide whether the asset freeze extended to after-acquired assets, see id.  Despite Kontilai's protest that he is not seeking reconsideration of that order, see Kontilai Freeze Reply at 10, he indeed challenges the Court's determination that the lawsuits and their proceeds are assets acquired before the initial freeze, see Kontilai Freeze Mem. at 4-5.  We decline to revisit the issue in the absence of new facts or an intervening change in law, and continue to hold that the lawsuits represent assets acquired before the asset freeze.

As to Kontilai's speculative future earnings, these would indisputably constitute "after-acquired" assets.  The statutory authority for the asset freeze allows for "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  The SEC has raised the concern that Kontilai may "consume or transfer investor funds under the guise of employment earnings," SEC Freeze Opp. at 4, and has proposed an exception to the freeze that would allow Kontilai to use funds from any future employment subject to a monthly cap and certain safeguards, see Proposed Stipulation, filed Mar. 28, 2023 (Docket # 1189-1) ("Proposed Freeze Modification").  Kontilai has proposed no alternative restrictions and favors an entirely unrestricted ability to use future earnings.  See Kontilai Freeze Mem. at 7-8.  Given that an asset freeze is designed to "ensure that any funds that may become due can be collected," Smith, 653 F.3d at 127 (quoting Unifund, 910 F.2d at 1041), it would be completely contrary to the purpose of the freeze if a defendant were given an avenue under which to potentially spend existing

hidden assets on the pretense that these were expenditures derived from new earnings.  This is of particular concern here given that Kontilai has identified no actual prospective earnings, and in fact is unlikely to earn money prior to trial because he is imprisoned in Germany.  See Notification of Arrest.  Although Kontilai dismisses the SEC's concerns that the exclusion of after-acquired assets may allow Kontilai to disguise the use of allegedly pilfered assets, arguing that "these [after-acquired] assets can easily be segregated into separate accounts," Kontilai Freeze Mem. at 6, Kontilai contends that he is not able to open new bank accounts at present, and will not consent to the SEC's monitoring of any existing accounts, see id. at 7-8.  Under these circumstances, we see no need to make a ruling on the question of new earnings.  If the circumstances change, and Kontilai is in a position to earn money and open a bank account, he will be free to approach the Court with a plan that ensures the freeze of existing assets is maintained.

### 2.     Exceptions to Asset Freeze

Kontilai states that he seeks a release of assets "to pay for any expenses related to his criminal defense" "if and when insurance proceeds are for any reason unavailable."  Kontilai Freeze Mem. at 2.  Kontilai asserts that he "may be forced to hire less expensive counsel if that is the only counsel he is able to afford," Kontilai Proposed Findings at 127, and claims without explanation that the insurance policy upon which he has insofar relied "do[es] not cover all elements of his criminal defense," id. at 128.

When determining whether to release assets from a freeze to accommodate the needs of a criminal defendant, "a court must determine whether (1) the defendant has demonstrated a need for the relief; (2) if so, the [government] has demonstrated that the assets for which release is sought are traceable to criminal activity; and (3) the defendant has shown that the value of the

assets sought to be released is reasonable." S.E.C. v. McGinn, 2012 WL 1142516, at *3

(N.D.N.Y. Apr. 4, 2012)) (citing United States v. Monsanto, 491 U.S. 600, 603 (1989)); S.E.C.

v. Coates, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994)); accord Fed. Tr. Comm'n v. 4 Star

Resolution, LLC, 2016 WL 768656, at *1 (W.D.N.Y. Feb. 29, 2016).  Kontilai accepts that these

factors should be considered, see Kontilai Freeze Mem. at 14 (citing 4 Star, 2016 WL 768656, at

*1), but fails to note the caveat, included on the very same page of the cited case, that "[t]his

requires a full accounting, and not simply general assertions that [the defendant] 'does not have

adequate assets with which to fund his criminal defense apart from' the frozen assets," 4 Star,

2016 WL 768656, at *1 (quoting United States v. All Funds on Deposit, 2012 WL 2900487, at

*1 (S.D.N.Y. July 6, 2012), aff'd, 720 F.3d 126 (2d Cir. 2013)).  Kontilai has provided no such

accounting of his need.  If anything, he has suggested that he has no current need in that he

repeatedly indicates that his insurance policy is currently covering his criminal defense needs,

and avers only that he "may" be forced to hire different counsel "if . . . for any reason" the

insurance policy does not cover certain expenses.  See Kontilai Proposed Findings at 127-29;

Kontilai Freeze Mem. at 2.  This is a far cry from a demonstration of need, and demonstrates no

need at the present moment.  While an application may be appropriate in the future, his request

on the current record is denied.  See United States v. Bonventre, 720 F.3d 126, 131 (2d Cir.

2013) ("[A] defendant's constitutional right to use his or her own funds to retain counsel of

choice. . . . is not implicated unless the restraint actually affects the defendant's right to choose

counsel and present a defense.").[18]

---

[18]  Kontilai's proposed findings ask the Court to release the "funds necessary for any expenses associated with basic necessities, including, but not limited to, food, shelter, and healthcare."  Kontilai Proposed Findings at 126.  However, this request appears nowhere in the memorandum dedicated to the asset freeze issue, see Kontilai Freeze Mem., and it appears that Kontilai's needs with regard to "basic necessities" have drastically changed now that he is in

3.    <u>Veronica Kontilai</u>

Veronica Kontilai contends that "the Court should exclude [her] from any future [preliminary injunction]."  Veronica Kontilai Mem. at 2.  While she presented no evidence at the preliminary injunction hearing, Veronica argues that she did not receive any net gain from CCI, despite her alleged receipt of investor funds, because she "paid, in reverse" an amount greater than she received.  <u>Id.</u>[19]  She further argues that she was entitled to withdraw funds from CCI because she was "entitled to 50% rights for the return and interest on [Mykalai's purported] investment [in CCI]."  <u>Id.</u> at 3.

It is well established that "[t]he plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action."  <u>S.E.C. v. I-Cubed Domains, LLC</u>, 664 F. App'x 53, 55 (2d Cir. 2016).  "Those powers extend as well to a person not accused of wrongdoing, a relief defendant, 'where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  <u>Id.</u> (quoting <u>Cavanagh</u>, 155 F.3d at 136).  Where these conditions are met, the SEC need only show "that it is likely to succeed on the merits."  <u>Cavanagh</u>, 155 F.3d at 136.  "The receipt of property as a gift without payment of consideration does not create a legitimate claim under the <u>Cavanagh</u> test."  <u>I-Cubed Domains</u>, 664 F. App'x at 55.

To prove these elements, the SEC points to bank records compiled by Vranca and summarized by the SEC, which indicate that accounts held by Veronica received more than

---

custody.  Accordingly, we do not assess whether the asset freeze should be modified to allow for such expenses.

[19]  Veronica Kontilai's brief inexplicably fails to cite even once to the appropriate standard under which a relief defendant's assets may be frozen or to discuss that standard in any way.  <u>See</u> Veronica Kontilai Mem.  We address only her arguments that actually bear on that analysis.

$336,000 in cash deposits or transfers between April 2014 and October 2018.  See Veronica

Kontilai Spreadsheet, annexed as Ex. 60 to PHPFF (Docket # 1052-64); see also Bank

Transaction Master File, annexed as App'x C to Vranca Report (Docket # 1094-1).[20]  Vranca's

compilations also establish that Veronica spent more than $29,000 using CCI credit cards in that

period, despite having no role with the company.  See Credit Card Transactions Master File,

annexed as App'x E to Vranca Report (Docket # 1094-1), Lines 2083-2156.  Mykalai Kontilai

has conceded that he had no source of income other than from Collector's Coffee between 2007

and May 2019.  See Request for Admission, filed June 8, 2020 (Docket # 366-1) ("Kontilai

RFAs"), ¶ 38; Order, dated Jan. 27, 2021 (Docket # 768), at 6 ("[A]ll the requests for admission

are deemed admitted.").  Veronica invoked her Fifth Amendment privilege at her deposition as to

all questions regarding the sources of her income.  See Deposition of Veronica Kontilai, annexed

as Ex. 24 to PHPFF (Docket # 1052-24) ("V. Kontilai Dep."), at 21:25-26:13.  Thus, the SEC is

entitled to an adverse inference as to the matter.[21]  See Ahmed, 72 F.4th at 409 n.19 ("[C]ourts in

civil cases can draw adverse inferences against relief defendants should they invoke their Fifth

Amendment privilege not to testify.") (citation omitted).  We find any funds transferred to

Veronica in this period likely came from CCI.  We have already found that Kontilai

---

[20]  Although the Court did not allow the SEC to offer Exhibit 60 at the preliminary injunction hearing, the Court instructed that the SEC could rely upon the totals therein if submitted without objection in briefing.  See Jan. 24 Tr. at 94:16-20.  No defendant has objected to the calculations or submitted an alternate summary.

[21]  At her deposition, Veronica Kontilai was represented by counsel and repeatedly and explicitly invoked her right to remain silent under the Fifth Amendment.  See V. Kontilai Dep. at 21:5-26:13 (stating "I plead the Fifth" in response to at least fifteen questions).  Despite this, Veronica Kontilai now argues that she intended to instead invoke spousal privilege, and thus no adverse inference should be drawn.  Veronica Kontilai Mem. at 14.  This claim is made without citation to any admissible evidentiary matter.  Moreover, the court previously ruled that Veronica was not entitled to invoke spousal privilege with respect to the deposition at issue.  See Order, dated June 19, 2019 (Docket # 43).

misappropriated such funds.  Thus, these funds were "ill-gotten," and Veronica has no legitimate claim to them.

Veronica Kontilai contends that the funds she is alleged to have received "as coming to her from the investors' money[] were surpassed [by] the amounts she paid for CCI's business," and thus Veronica is somehow able to "defeat the SEC's claim to freeze or collect any amount from Ms. Kontilai."  Veronica Kontilai Mem. at 12.  Setting aside the question of whether there is any relationship between alleged contributions by Veronica Kontilai to CCI and the amount the SEC would be entitled to recover from her in disgorgement, we reject the contention that the record shows any sort of "debt" owed by CCI to Veronica.  The calculation used by Veronica is based entirely upon the conclusion drawn by defendants' expert, Vranca, that roughly $327,000 of expenditures by Veronica from personal accounts "appear to be business-related."  Vranca Report at 7, 7 n.17.  Veronica argues that CCI owes this amount to her and thus she properly received the $313,000 in investor funds.  Veronica Kontilai Mem. at 12.  But as noted in Section II.B.1 above, we reject Vranca's conclusions regarding "business-related" expenses because those conclusions were made without any proper methodological basis.  Thus, we similarly reject Veronica's contention that CCI owes her money

More relevant to the <u>Cavanagh</u> test, Veronica argues that the SEC has failed to trace her income, and thus cannot "prov[e] the flow of investors' funds to Ms. Kontilai's use."  Veronica Kontilai Mem. at 3.  But the only evidence in the record as to CCI's inflow of cash during the relevant period is that it came from investors.  CCI's expert identifies no revenues in his report, <u>see</u> Vranca Report, and Kontilai testified that CCI was "a pre-revenue company the entire way through" and was never "dealing with profits," Second Kontilai Dep. Excerpt at 106:19-21.  Additionally, Mykalai Kontilai has conceded that he had no source of income between 2007 and

May 2019 other than payments from CCI.  See Kontilai RFAs ¶ 38.  Thus, any funds contributed

to Veronica by CCI or Mykalai Kontilai in this period were necessarily "ill-gotten" investor

funds.

While Veronica claims that the SEC's conclusion that "all her income came from CCI's

investors" is "overreaching," Veronica Kontilai Mem. at 1, she provided no evidence at the

hearing that she actually received income from any other source.  When deposed, she refused to

testify as to the source of these funds.  See V. Kontilai Dep. at 21:25-26:13.  There is thus no

identifiable source of Veronica's income other than CCI and Mykalai Kontilai.  We find that the

SEC is likely to prove that the funds received by Veronica were derived from CCI and its

investors.

As to the second element, the SEC has demonstrated that Veronica did not have a

legitimate claim to CCI investors' funds.  Mykalai Kontilai admitted that Veronica had no

entitlement to CCI funds and had provided no service to the company.  See Kontilai RFAs ¶¶ 39-

41.  Veronica has not disputed this, and avers that she "was not an officer, shareholder, or

employee" of CCI.  Veronica Kontilai Mem. at 1.  The sole justification Veronica proposes for

her use of CCI funds is that, as Mykalai's spouse, she would be entitled to "half of the

investments made by the couple."  Id. at 18.  To the extent that this can be read as an argument

that Veronica was entitled to use company or investor funds for personal use in repayment of an

investment or loan, we reject it for the same reasons articulated above with respect to Mykalai

Kontilai.  See Section IV.A.1.b.iv.

In sum, we find that the SEC is likely to prove that Veronica Kontilai received ill-gotten

funds and did not have a legitimate entitlement to such payments.  Accordingly, we grant the

SEC's request to freeze Veronica Kontilai's assets up to the amount of $313,622.00.

Conclusion

For the foregoing reasons, the SEC's motion for a preliminary injunction and asset freeze (Docket #141) is granted.  Mykalai Kontilai's motion to modify the terms of the asset freeze (Docket # 1218) is denied.

Defendants Mykalai Kontilai and Collector's Coffee, Inc., are enjoined from future violations of the securities laws of the United States under the terms set forth in Docket # 175.  The assets of Mykalai Kontilai and Collector's Coffee, Inc., are ordered frozen up to the amount of $46,121,649.68, on the terms set forth in Docket # 12.  The assets of relief defendant Veronica Kontilai are ordered frozen up to the amount of $313,622.00, on the terms set forth in Docket # 175.

SO ORDERED.

Dated:  October 4, 2023
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge