TERRY R. MILLER
millerte@sec.gov
MARK L. WILLIAMS
williamsml@sec.gov
SHARAN E. LIEBERMAN
liebermans@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | **19-cv-04355-VM-GWG** |
| Plaintiff, | **ECF CASE** |
| - against - | |
| COLLECTOR'S COFFEE, INC., et al., | |
| Defendants. | |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR REMEDIES**

**Table of Contents**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND.................................................................................2

   A.   Defendants defrauded over two hundred investors with false statements and a
scheme to misappropriate their money ......................................................2

   B.   Defendants employed a scheme to obscure, conceal and cover up their fraud...............8

ARGUMENT ........................................................................................................9

   I.   COURTS DETERMINE THE REMEDIES SOUGHT BY THE SEC ..................9

   II.   DEFENDANTS AND RELIEF DEFENDANTS SHOUD BE ORDERED
TO DISGORGE THEIR UNJUST ENRICHMENT ...........................................10

      A.  The Court should order Defendants to disgorge their profits and pay............12

         1.  $23,035,824 is a reasonable approximation of Defendants'
ill-gotten gains ........................................................................12

         2.  Defendants should be required to pay $2,515,650 in prejudgment
interest.....................................................................................13

         3.  Disgorgement should be imposed against Defendants on a joint and
several basis .............................................................................14

      B.  The Court should order Relief Defendant, Veronica Kontilai to
disgorge the amount of ill-gotten gains she received and pay
prejudgment interest......................................................................15

   III.   DEFEDANTS' CONDUCT WARRANTS SIGNIFICANT CIVIL
PENALTIES ...................................................................................16

      A.  The Court should impose a penalty equal to Defendant's pecuniary
gain from their fraud ....................................................................17

      B.  The Court should impose significant penalties for Defendants'
violations of Rule 21F-17 ..............................................................21

   IV.   INJUNCTIVE RELIEF IS NECESSARY TO GUARD AGAINST FUTURE
VIOLATIONS AND HARM..............................................................24

CONCLUSION..........................................................................................................................25

# Table of Authorities

## Cases

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ................................................................ 10, 12, 13, 14

*SEC v. Ahmed*,
   72 F.4th 379 (2d Cir. 2023) ........................................................ 10, 11, 13

*SEC v. Alpine Sec. Corp.*,
   413 F. Supp. 3d 235 (S.D.N.Y. 2019) ................................................ 9

*SEC v. Altieri, No. 20-cv-6343*
   (JS)(ST), 2022 WL 17820155 (E.D.N.Y. Dec. 9, 2022) ........................ 11, 21

*SEC v. Amerindo Inv. Advs. Inc.*,
   2014 WL 2112032 (S.D.N.Y. May 6, 2014) ...................................... 18

*SEC v. Bajic, No. 20-cv-7-LGS*,
   2023 WL 6289953 (S.D.N.Y. Sep. 27, 2023) .................................... 11, 17

*SEC v. Cavanagh*,
   155 F.3d 129 (2d Cir. 1998) ........................................................ 15, 24

*SEC v. Cavanagh, No. 98-cv-1818*
   (DLC), 2004 WL 1594818 (S.D.N.Y. July 16, 2004) .......................... 24

*SEC v. Coates*,
   137 F. Supp. 2d 413 (S.D.N.Y. 2001) ............................................ 16

*SEC v. Cole*,
   661 F. App'x 52 (2d Cir. 2016) .................................................... 18

*SEC v. Cope, No. 14-cv-7575*
   (DLC), 2021 WL 653088 (S.D.N.Y. Feb. 19, 2021) .......................... 10

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ...................................................... 10, 13, 25

*SEC v. Forest Resources Mgmt. Corp., No. 09-cv-903*
   (JSR), 2010 WL 2077202 (S.D.N.Y. May 18, 2010) ........................ 16

*SEC v. Fowler*,
   6 F.4th 255 (2d Cir. 2021) .......................................................... 10, 11

*SEC v. Govil,*
    86 F.4th 89 (2d Cir. 2023) ............................................................ 12

*SEC v. Kane, No. 97-cv-2931*
    (CBM), 2003 WL 1741293 (S.D.N.Y. Mar. 31, 2003) ...................... 17

*SEC v. Koenig,*
    469 F.2d 198 (2d Cir. 1972) .......................................................... 9

*SEC v. Lorin,*
    76 F.3d 458 (2d Cir. 1996) ........................................................... 25

*SEC v. Mahabub,*
    411 F. Supp. 3d 1163 (D. Colo. 2019) .......................................... 14

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) .................................................. 11, 24

*SEC v. McNulty,*
    137 F.3d 732 (2d Cir. 1998) .......................................................... 25

*SEC v. Owings Grp., LLC, No. RDB-18-2046,*
    2021 WL 1909606 (D. Md. May 12, 2021) ...................................... 14

*SEC v. Palmisano,*
    135 F.3d 860 (2d Cir. 1998) .......................................................... 16

*SEC v. Penn, No. 14-cv-581 (VEC)*
    2021 WL 1226978 (S.D.N.Y. Mar. 31, 2021) .................................. 13

*SEC v. Razmilovic,*
    738 F.3d 14 (2d Cir. 2013) ...................................................... 13, 21

*SEC v. Suman,*
    684 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................................... 15

*SEC v. Tourre,*
    4 F. Supp. 3d 579 (S.D.N.Y. 2014) ............................................... 22

*SEC v. United Am. Ventures, LLC, 10-CV-568 JCH/LFG,*
    2012 WL 13080160 (D.N.M. March 2, 2012) ................................. 14

*SEC v. Warde,*
    151 F.3d 42 (2d Cir. 1998) ...................................................... 10, 13

*SEC v. Williams, No. 14-CV-510-DAK,*
    2016 WL 3645158 (D. Utah June 30, 2016) .................................. 16

*United States v. Carson*,
    52 F.3d 1173 (2d Cir. 1995) ................................................................... 25

**Statutes and Rules**

15 U.S.C. § 6501 ..................................................................................... 10

15 U.S.C. § 77t ................................................................................... 16, 17

15 U.S.C. § 78u ............................................................... 10, 21, 23, 24

26 U.S.C. § 6621 ..................................................................................... 13

17 C.F.R. § 201.1001 ............................................................................. 23

## **INTRODUCTION**

The jury found Defendants liable for a years' long fraud fueled by Defendants' greed. Defendants lied to raise millions of dollars, they misappropriated millions of dollars, and they lied again to cover it up. All these acts had the effect of maximizing and prolonging harm to victims. In roughly four years, over 200 victims lost over $23 million. And no amount of harm to victims was enough for Defendants because this enforcement action is the only thing that prevented them from raising more money—they even continued to lie to raise money and steal money during the SEC's investigation. Defendants have given no reason to believe that they will not engage in further fraud if given the opportunity.

The pervasive and recurrent nature of Defendants' fraud makes their violations even more egregious. To prolong the fraud and harm as many victims as possible, Defendants employed an evolving scheme to obscure and conceal the truth. Defendants used large cash transactions through accounts set up to hide the truth. Defendants paid others to not reveal the truth. Defendants tried to use fabricated documents to lead the SEC and the Court away from the truth. Defendants engaged in abusive litigation tactics to delay the jury's verdict of the truth. And Kontilai fled the United States to avoid the truth.

Defendants' response to investors' loss contains no remorse or acceptance of *any* responsibility. Instead, they deny everything, attack everyone, and delay this case at every step with frivolous and repetitive motions, arguments, and objections. As just one example to highlight the absurdity of these tactics and Defendants' failure to accept any responsibility, Defendants' desperate attempt to blame CCI's demise on a far-reaching conspiracy involving current and former officials at the SEC, DOJ, and even judges and magistrate judges of this

Court, went on for years without acceptance of *any* responsibility. The deflection of blame continued at trial where they argued – without one word of remorse – that everything at CCI was fine until "a few disgruntled investors out of almost 200 complained….," Trial Transcript at 74:5-8 ("Tr."), that there "were four persons who attacked and damaged the corporation. That was Gail Holt and three investors…." Tr. at 1249:1-3, and that "if not [for] the action taken by the U.S. Securities and Exchange Commission, the corporation could have been a very successful venture. It could have doubled or tripled the investments by the investors." Tr. at 85:8-11.

Given the egregious and recurrent nature of Defendants' misconduct, the Court should enter an order:

1. Requiring Defendants to disgorge on a joint and several basis the unjust enrichment they received as a result of their fraud, together with prejudgment interest,

2. Requiring Relief Defendant Veronica Kontilai to disgorge the ill-gotten gains she received, together with prejudgment interest;

3. Imposing civil penalties: $23,035,824 against Kontilai for his fraud violations and $620,928 against Kontilai for his violations of Rule 21F-17; and $23,035,824 against CCI for its fraud violations and $3,079,628 against CCI for violations of Rule 21F-17; and

4. Permanently enjoining Defendants from future violations of the law.

## **FACTUAL BACKGROUND**

### **A. Defendants defrauded over two hundred investors with false and misleading statements and a scheme to misappropriate their money.**

Defendants operated CCI as a "pre-revenue" or "startup" company for over 11 years. From April 2014 through 2018, Defendants repeated the same false and misleading statements,

detailed below, to convince investors that the company was on the edge of receiving large amounts of cash and that Kontilai had financial incentives to quickly get the company over that edge. The opposite was true: because Defendants were stealing investor money, they were motivated to drag out the "pre-revenue" or "startup" phase to maximize both the number of their victims and the size of their harm.

     Revenue from Inventory. Defendants convinced investors that large amounts of revenue were just months away by lying about the amount of inventory committed to the website, claiming there were hundreds of dealers and billions of dollars' worth of collectibles ready to sell on the website. *See, e.g.*, Tr. at 234:20-25 ("580 dealers, 3.5 billion, and ten-year contracts…."); Tr. 281:7-282:7 ("$3.5 billion" and "580" dealers); Tr. at 537:12-538:5 ("billions of dollars of inventory" and "500 dealers"); Tr. at 718:4-18 ("[F]rom what he had said, he had billions of dollars worth of inventory, he had hundreds of dealers."); P. Ex. 12 at 10 ("Collectors Café already has a massive inventory of exclusive collectibles and memorabilia under contract…."); P. Ex. 29 at 4 ¶ 8 ("The Company has executed on an [sic] additional inventory contracts with Master Dealers").

     These statements were not true. Defendants never had more than a handful of dealers committed for a short time. Tr. at 964:18-965:9; Tr. 965:7-9 (Kontilai investigative testimony: "So I don't believe we actually ever offered it to anybody or signed anybody up with it, but we did prepare all of the materials."); Tr. at 569:19-570:17 ("All we needed was inventory, and we had none, none….Having 600 items, it's a joke."); Court Exhibit Transcript of Peter Siegel Video Deposition Testimony at 367:6-369:14 (Kontilai knew that dealers did not want to sign agreements before the website launched); *id.* at 376:20-377:18 (statements that CCI had 580

dealers and 3.5 billion in inventory under ten-year agreements were not accurate); *id.* at 412:15-415:4 (no dealers committed any inventory to CIC under ten-year exclusivity agreements).

Together with statements that the company had "massive" inventory, Defendants repeated to investors that the company was close to launching. These statements were made by February 2015 if not earlier to create the false impression that the company was just months away from tapping a massive source of revenue. Tr. at 852:2-19; Ex. 12 at 14 ("Phase One – Q1 of 2015 to Q2 of 2015, the plan calls for: Launch of a web portal consisting of a global market place and social networking site, partnerships with master dealers and user-generated auction consignments."); Tr. 705:1-706:20; Tr. at 734:3-13 ("It kept getting pushed and pushed for really no reasons that he could tell me when I asked…."). By mid-2018 Defendants had still not launched the promised website, were fabricating evidence for SEC investigators, and continued to raise and steal money even when the company was dormant. P. Ex. 75 rows 223-238 (over $2.14 million raised between March 9, 2018, and June 25, 2018); P. Ex. 73 rows 129-135 (net cash withdrawals of $479,400 between March 15, 2018, and June 1, 2018), *and* P. Ex. 74 rows 58, 60, 61 ($1 million funneled through Gail Holt to Kontilai in July 2018). At trial, Kontilai refused to be confronted on the witness stand with any of this evidence. Instead, Defendants simply accused investors of lying about the oral statements Defendants made and ignored Defendants' own written statements.

Money from Jackie Robinson Contracts. Kontilai and CCI tried to latch their names to Jackie Robinson's legacy for years and used it to raise money from investors. As early as 2015 Kontilai told investors that CCI was attempting to sell contracts signed by Jackie Robinson, which they claimed had been appraised for $36 million by Seth Kaller and $25 million by

Christie's Auction House. *See, e.g.*, P. Ex. 15 at p. 20 ("This asset … is likely to generate millions of dollars of additional cash flow upon its liquidation in 2015.");[1] *id.* at 24 ("Christies Auction House and Seth Kaller Inc…. issued written appraisals of 25 million and 36 million respectively. The Company is currently privately offering the documents for sale and expects significant profit form their sale <u>in 2015</u>" (emphasis added)).[2] They continued to make these false statements into 2018. *See* P. Ex. 75 (identifying dates investors received the "Second Amendment" to the PPM).

   These statements were false and misleading. Seth Kaller never prepared an objective appraisal—as Mr. Keller testified at trial, Kontilai hired him to sell the contracts, and in connection with that work, prepare a marketing brochure for buyers that valued the contracts at no less than $36 million. Tr. at 617:6-618:17, 620:15-20, 622:23-625:4 (Kaller hired to prepare a "marketing appraisal" that included the $36 million number from Kontilai; not an independent appraisal); *see also* Tr. at 622:10-11. The statement that Christie's provided a $25 million appraisal was also false. Tr. at 641:25-643:15. Defendants also omitted negative market information, including that Kaller advocated against marketing the contracts at $36 million, Tr. at 622:12-22, CCI would sell the contracts for half that amount, Tr. at 632:12-24, the only feedback received from buyers about the $36 million figure that Kontilai insisted on was negative, Tr. at 644:24-646:23, and the contracts failed to receive a minimum bid of $15 million at an auction, Tr. at 649:8-650:1. Defendants also omitted that they had promised large amounts of proceeds from the sale of the contracts to others. *See, e.g.*, P. Ex. 62 at 20; *see also* Tr. 656:25-

---

[1] Bates page SEC-CC00041522.
[2] Bates page SEC-CC00041526.

657:19 (CCI would be entitled to "a bit more" than 20% of a sales price of $7.9 million). Thus, like the false statements about proximity to large amounts of revenue, these statements created the false impression that CCI was close to large amounts of proceeds from the sale of the Jackie Robinson contracts that would back up all amounts invested in the company. The statements that the company was close to proceeds from the sale of these contracts was even more misleading because Kontilai made "it difficult to sell these contracts," Tr. at 655:22-656:1, including by refusing advice to lower the asking price from $36 million. Obstructing the sale enabled Defendants to prolong their use of the Jackie Robinson contracts to victimize more investors.

Use of Investor Money. The reason Defendants dragged out the launch of the website and the sale of the Jackie Robinson contracts was to maximize the amount of money they could raise and then steal from investors. Defendants repeatedly told investors that Kontilai took no salary and worked for free. *See, e.g.*, P. Ex. 40 at 11 ("Corporate Update" presentation stating that Kontilai "has invested several million dollars personally & has not taken a salary to-date;"); P. Ex. 75 at column labeled "Bates Number of Cover Email Attaching or Reflecting Attachment of Corporate Update"; Tr. 324:17-20 ("He said he doesn't take a salary, that he works without taking a salary, he works for free."); P. Ex. 35 (Kontilai directing Cutsey to tell investors that he was "[d]oing all of this work for no salary I might add").

The truth is that Defendants took millions from the company for years. The methods used for these transfers over the course of Defendants' scheme show an escalating degree of scienter. In 2014, Defendants disguised payments by transferring money to an account opened by Gail Holt and directing her to withdraw the money in cash for Kontilai. Tr. at 365:1-374:14; Ex. 74 rows 47-57. In 2015 and 2016, Defendants transferred money directly to Kontilai, including by

creating bank withdrawal slips written to "cash" with false notations that the money was supposedly for the purchase of collectibles. P. Ex. 110; P. Ex. 75 rows 70-89. In August 2016, Defendants put $770,000 in a large trash bag and paid Gail Holt $1,000 to $1,500 to walk it out of a bank and into Kontilai's hotel suite, and even directed her to go back to the bank to exchange $60,000 in marked bills for unmarked bills and to meet him at a Red Lobster to give him the unmarked bills. Tr. 385:9-389:13; P. Ex. 31.

Defendants then made wire transfers to Kontilai totaling $1.8 million in just the first four months of 2017: $700,000 on January 12 (P. Ex. 74 row 90), $600,000 on March 21 with a note falsely characterizing the payment as "salary" (P. Ex. 74 row 97), and $500,000 with a note falsely characterizing the payment as "compensation" (P. Ex. 74 row 98), all despite telling investors that Kontilai took no salary. In July 2018, Defendants funneled $1 million through Ms. Holt's accounts to obscure payments again, and even used company funds to buy gold and silver bars to convert into cash to do so. Tr. at 400:7-405:7; *see also* P. Ex. 74 rows 58, 60, and 61.

In sum, without authorization or disclosure to investors, Defendants took at least $6 million in cash and at least another $1.17 million by charging CCI's credit card for personal expenditures. *See* Dkt. 1185 at 3-10. In 2019, the Court ordered Defendants to provide a sworn accounting to explain what happened with this money. Dkt. 12 § III(C)-(D). CCI provided an accounting that confirmed millions went to Kontilai, Dkt. 87, but Kontilai refused to explain what he did with that money. Hiding the payments of investor funds to Kontilai was fraud, and it was also necessary for Defendants to continue that fraud and victimize future investors for years. As one investor testified at trial (Tr. 569 at 11-18):

> If I would have known, if we would have known, I'm speaking on behalf of the shareholders, that this kind of money was coming out

of our investment, we would have never, never in our life's dream invest in a company that cash like this is going out for cash to him. Unbelievably no. We would never touch this with a 10-foot pole, a company of that credibility. We wouldn't.

**B. Defendants employed a scheme to obscure, conceal, and cover up their fraud.**

The concealment of the payments to Kontilai were just part of Defendants' scheme to hide the truth in order to prolong their fraud. When investors began accusing Defendants of fraud, Defendants conditioned the return of their investments on promises that the investors refrain from contacting the SEC about the fraud. Dkt. 976 at 4-6. When the SEC began asking questions about Defendants' use of investor funds, Defendants fabricated two agreements purportedly signed by Gail Holt as the company chair, as well as a bank statement, in a failed attempt to trick investigators into believing the payments to Kontilai were authorized. P. Ex. 57 (phony employment agreement); P. Ex. 58 (phony $5 million note and phony bank statement); *see also* P. Ex. 2 (actual bank statement). Defendants sponsored another fabricated document at the preliminary injunction stage in a failed attempt to show that CCI's payments to Kontilai were legitimate. They did so in a circular fashion by first duping CCI's expert witness that another phony loan document was real,[3] and then quoting the expert's report as supposed proof that the loan exists. *See* Dkt. 1055 ¶ 140 (Defendants quoting Stefano Vranca's report at page 9 to

---

[3] *See* Dkt. 1055-2 at 4 (¶10(d)) & n.3 (Stefano Vranca report asserting that Kontilai made a $1.411 million loan evidenced by an agreement labeled "GHH_00433 – GHH_00446"), *id.* at 9 (¶ 18) (statement about phony agreement quoted by Defendants); *id.* at 10 ("Table 3") (relying on the phony "December 2007 Loan" to derive estimate of purported "Estimated Net Compensation"); *see also* Dkt. 1217-1 (copy of phony $1.411 note labeled "GHH_00433 – GHH_00446" and cited in Vranca report).

support their assertion that "Mr. Kontilai made a 'a $1.411 million loan to predecessor firm Public Media in December 2007….'").[4]

After it became clear that the fabricated evidence would not make investigators go away, Defendants knowingly allowed the deletion of CCI's emails that were created during a time period that Defendants were still raising and stealing millions from investors and fabricating documents about the use of that money. Tr. 802:21-807:6. Kontilai then fled the country and later became a fugitive. At a safe distance from the Court's jurisdiction over him, Kontilai then flouted the Court's power and legitimacy by an abusive litigation strategy to delay this proceeding and drive up costs with frivolous and repetitive arguments that are still ongoing.

## ARGUMENT

### I.    COURTS DETERMINE THE REMEDIES SOUGHT BY THE SEC.

As the Court has previously ruled, district courts determine whether to order disgorgement, civil penalties, and injunctive relief after a jury trial determines liability. Dkt. 1419 at 5-6; *see also* Dkt. 1511 at 2-3. The Court may find additional facts "as long as they do not conflict with any facts the jury happens to have found at trial." *Id.* at 6 n.2. An evidentiary hearing is not necessary for the Court to determine remedies where there is sufficient undisputed evidence in the record, including evidence submitted with the parties' briefs. *See SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 n.17 (S.D.N.Y. 2019) (citing *SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972)).

---

[4]  Dkt. 1284 at 11-12 (summary of Stefano Vranca's reliance on the fabricated document). Judge Gorenstein concluded that "this purported 'convertible note agreement' was fabricated." Dkt. 1284 at 27-28. The procedural history of Defendants' attempts to use this fabricated document to trick the Court into finding that Kontilai loaned CCI money is at Dkt. 1217 at 23-26.

## II.    DEFENDANTS AND RELIEF DEFENDANT SHOULD BE ORDERED TO DISGORGE THEIR UNJUST ENRICHMENT.

**Legal Standard**. Exchange Act Sections 21(d)(5) and 21(d)(7) authorize courts to order disgorgement in Commission enforcement actions. 15 U.S.C. § 78u(d)(5) & 15 U.S.C. § 78u(d)(7); *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020) ("[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] §78u(d)(5).").[5] The "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *see also Liu*, 140 S. Ct. at 1942 ("Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity.").

The amount of disgorgement need only be a "reasonable approximation of profits causally connected to the violation." *Ahmed*, 72 F.4th at 397 (quoting *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021); *see also SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998); *SEC v. Cope*, No. 14-cv-7575 (DLC), 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021) ("[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds[,]…the court need not determine the amount of such gains with exactitude.") (quotation omitted). Defendants violated the law and therefore bear "the risk of uncertainty

---

[5] On January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which includes the disgorgement provision since codified at 15 U.S.C. § 78u(d)(7).  The NDAA applies to "any action or proceeding that is pending on, or commenced on or after" January 1, 2021. *Id.* § 6501(b). Through the NDAA, Congress amended Exchange Act Section 21(d)(3) [15 USC. § 78u(d)(3)] to extend the statute of limitations to ten years for scienter-based violations, including Securities Act Section 17(a)(1) and Exchange Act Section 10(b). *SEC v. Ahmed*, 72 F.4th 379, 398-402 (2d Cir. 2023). Although a ten-year statute of limitations now applies, and consistent with the Court's instructions to the jury, the SEC seeks disgorgement from Defendants based on violations occurring on or after April 1, 2014.

affecting the size of disgorgement." *Ahmed*, 72 F.4th at 398; *see Fowler*, 6 F.4th at 267 ("If the disgorgement amount is generally reasonable, any risk of uncertainty about the amount fall[s] on the wrongdoer whose illegal conduct created that uncertainty." (quotation marks omitted)). "A wrongdoer's unlawful action may create illicit benefits for the wrongdoer that are indirect or intangible. ... [T]o require precise articulation of such rewards in calculating disgorgement amounts would allow the wrongdoer to benefit from such uncertainty." *Ahmed*, 72 4th at 398 (quotation omitted).

Once the SEC has met its burden of presenting a reasonable approximation of profits causally connected to the violation, "the burden shifts to the defendant[ ] to contest the Government's calculations." *SEC v. Altieri*, No. 20-cv-6343(JS)(ST), 2022 WL 17820155, at *4 (E.D.N.Y. Dec. 9, 2022) (quotation omitted); *see also SEC v. Bajic*, No. 20-cv-7-LGS, 2023 WL 6289953, at *3 (S.D.N.Y. Sep. 27, 2023) ("Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant ... who is obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation." (quotation marks omitted)).

Finally, disgorgement normally includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972).

**A. The Court should order Defendants to disgorge their profits and pay prejudgment interest.**

    **1. $23,035,824 is a reasonable approximation of Defendants' ill-gotten gains.**

The jury found Defendants liable for a years' long fraud beginning in April 2014. Since that time, Defendants employed a fraudulent scheme to raise (at least) **$23,035,824** from investors.[6] Declaration of Jacqueline Moessner ¶ 4, attached as **Exhibit 1** ("Moessner Decl.").[7]

Defendants have not produced any evidence that they are entitled to "deductions for 'legitimate expenses,'" that are not "wrongful gains under another name." *Liu*, 140 S. Ct. at 1950 (internal quotation marks omitted). Judge Gorenstein was correct when recently granting the SEC's motion for preliminary injunction, finding that "Kontilai has not offered any competent testimony as to what expenses are actually legitimate." Dkt. 1284 at 48 n.15. Kontilai has refused to testify about CCI's finances multiple times, and the testimony on this and other issues offered by Defendants through their proposed "expert" was properly treated as "essentially worthless" by Judge Gorenstein. *Id.* at 13 ("Vranca testified that his method of determining that CCI expenses were for the benefit of CCI consisted of simply questioning whether such an expense could conceivably be made for the benefit of a company CCI's size, without any sort of investigation

---

[6] At the outset of this case, the SEC calculated that Defendants raised at least $23,060,824 from investors. *See, e.g.,* Dkt. 9 at 2. In finalizing its analysis for purposes of this remedies motion, the SEC determined that $25,000 was inadvertently included in this calculation; as a result, the SEC seeks disgorgement of $23,035,824.

[7] The Second Circuit in *SEC v. Govil* held that a district court at the remedial phase of a Commission action abused its discretion when it ordered disgorgement without finding that the victims suffered pecuniary harm. 86 F.4th 89, 106 (2d Cir. 2023). Here, there can be no question that investors suffered pecuniary harm because they lost the money they invested in Defendants' fraudulent scheme.

or analysis as to whether the expenses were legitimate or actually made for CCI's benefit."). Nor did Defendants, who claim to be sophisticated, keep a ledger or otherwise employ contemporaneous bookkeeping. In fact, Defendants fabricated evidence to mislead SEC investigators and the Court on this precise issue. Because there is no competent evidence of the amounts and dates that CCI supposedly paid legitimate expenses, and because Defendants "bear the risk of uncertainty affecting the size of disgorgement," *Ahmed*, 72 F.4th at 398, **$23,035,824** is a reasonable approximation of the profits causally related to Defendants fraud and the Court should order disgorgement in this amount.

Finally, if the SEC is able to collect the requested disgorgement, it intends to make a distribution to harmed investors, if feasible. *SEC v. Penn*, No. 14-cv-581 (VEC), 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021) (holding that a commitment by the Commission to conduct a feasibility analysis of distribution of any disgorgement funds and to advise the Court for further consideration if distribution was infeasible, was consistent with *Liu*).

### 2. Defendants should be required to pay $2,515,650 in prejudgment interest.

When ordering disgorgement, courts have "discretion to require the defendant to pay prejudgment interest for the period during which he had the use of his unlawful gains." *See SEC v. Razmilovic*, 738 F.3d 14, 35-36 (2d Cir. 2013). Courts have regularly granted prejudgment interest in Commission enforcement actions. *Warde*, 151 F.3d at 50; *First Jersey*, 101 F.3d at 1476. It would not be equitable for Defendants to obtain an interest-free loan from their victims, and prejudgment interest can be included in Commission distributions and paid to victims even where the harmed investors have been fully compensated. Prejudgment interest is calculated based on the Internal Revenue Service's "underpayment rate," which is a floating interest rate

that the IRS uses to determine interest due on underpaid taxes, using the Federal short-term rate

(or period rate) plus the annual rate. 26 U.S.C. § 6621(a)(2); *see First Jersey*, 101 F.3d at 1476

(approving the use of the IRS underpayment rate "for the entire period from the time of

defendants' unlawful gains to the entry of judgment").

The Court should order Defendants to pay prejudgment interest in the amount of

**$2,515,650**. This amount is derived using the interest rate set out above, a conservative violation

date of January 1 of each year for the amounts raised in the prior year, and an end date of May

14, 2019, which is the date the Court froze Defendants' assets. Calculations of prejudgment

interest for each year of Defendants fraud are attached in **Exhibit 2.**

### 3. Disgorgement should be imposed against Defendants on a joint and several basis.

Defendants should be ordered to disgorge the profits of their fraud on a joint and several

basis. Joint and several liability for disgorgement is appropriate here because a court may impose

joint and several liability against persons and entities engaged in "concerted wrongdoing." *Liu*,

140 S. Ct. at 1949. "Both prior to and after *Liu*, [courts] have consistently ordered a person who

controls an entity to disgorge the illegitimate funds received by that entity." *SEC v. Owings Grp.,*

*LLC*, No. RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021) (collecting cases).

Thus, the Court may subject an owner-officer of a firm, like Kontilai, to joint and several

liability for disgorgement where the firm (CCI), receives gains through unlawful conduct and the

owner collaborated and profited from the violations. *Id.*; *see also SEC v. Mahabub*, 411 F. Supp.

3d 1163, 1172-73 (D. Colo. 2019); *SEC v. United Am. Ventures, LLC*, 10-CV-568 JCH/LFG,

2012 WL 13080160, at *5 (D.N.M. March 2, 2012). The Court should therefore order

Defendants to pay disgorgement and prejudgment interest on a joint and several basis.

**B. The Court should order Relief Defendant, Veronica Kontilai, to disgorge the amount of ill-gotten gains she received and pay prejudgment interest.**

The Court may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds. *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). Veronica Kontilai received at least $308,011 in deposits and spent at least $24,511 paid for by CCI's credit cards, for a total of **$332,522**. Moessner Decl. ¶¶ 4-5. Veronica Kontilai had no other source of income and received these funds from CCI, which, together with Kontilai, fraudulently raised those funds. They are therefore ill-gotten gains.

Veronica Kontilai has no legitimate claim to these funds. Veronica Kontilai did not work for CCI. Tr. 315:22-316:2. She provided no goods or services to CCI, nor did she otherwise provide the company any consideration. Dkt. 366-1 at RFA Nos. 39-41; *see also* Dkt. 910 at 7-8 (denying Kontilai's motion to withdraw deemed admissions). At her deposition, Veronica Kontilai invoked her Fifth Amendment right against self-incrimination and refused to answer questions about how she obtained money since 2007, the source(s) of funds she used to live on since 2007, the cash deposits into her accounts, the funds she received from her husband, her use of CCI credit cards, and the assets she currently holds. Dkt. 1052-24 at 21:25-26:13; *see also* Court Exhibit of excerpts of Veronica Kontilai's deposition testimony presented by video to jury. Given her invocation of her Fifth Amendment right against self-incrimination, the SEC is entitled to an inference that the assets she received since (at least) 2014 were ill-gotten funds to which she has no legitimate claim. *See SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) ("[A] court may draw an adverse inference against a party who asserts his Fifth Amendment

15

privilege in a civil matter, because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get.").

Accordingly, the Court should order Veronica Kontilai to disgorge **$332,522**. Using the same method to calculate prejudgment interest described above, with an end date of December 9, 2019 (the date she stipulated to an order freezing her assets at Dkt. 175), and using the IRS underpayment rate, the Court should order Veronica Kontilai to pay **$56,154.09** in prejudgment interest. Calculations of prejudgment interest for each year are attached in **Exhibit 3.** Finally, because investor funds fraudulently raised by Defendants are the source of the funds received by Veronica Kontilai, the Court should order that the disgorgement and prejudgment interest owed by Veronica Kontilai be paid on a joint and several basis with Defendants.

## III.    DEFENDANTS' CONDUCT WARRANTS SIGNIFICANT CIVIL PENALTIES.

**Legal Standard**. Section 20(d)(1) of the Securities Act and Section 21(d)(3)(A) of the Exchange Act authorize civil penalties against Defendants because they violated the federal securities laws. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). Distinct from disgorgement, civil penalties are meant to punish wrongdoers and to deter them and others from committing future violations of securities laws. *SEC v. Forest Resources Mgmt. Corp.*, No. 09-cv-903(JSR), 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010) ("[B]ecause disgorgement represents merely a return of ill-gotten gains, an additional monetary penalty is necessary to appropriately punish and deter these sorts of fraudulent activities."); *SEC v. Williams,* No. 14-CV-510-DAK, 2016 WL 3645158, at *4 (D. Utah June 30, 2016) ("Disgorgement alone is an insufficient remedy because there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught.") (quotation omitted). The

16

deterrence of securities law violations through the imposition of monetary sanctions serves important goals, including encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry. *See SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998); *see also SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001).

"In assessing the appropriate civil monetary penalty, courts have considered the following factors: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation." *Bajic*, 2023 WL 6289953, at *5. Although a court may take defendants' current financial condition into account in considering a civil money penalty, "a defendant's claims of poverty cannot defeat the imposition of a civil penalty by a court." *SEC v. Kane*, No. 97-cv-2931(CBM), 2003 WL 1741293, at *4 (S.D.N.Y. Mar. 31, 2003) ("While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty.").

### A. The Court should impose a penalty equal to Defendants' pecuniary gain from their fraud.

The SEC requests that the Court impose a civil penalty against each Defendant in the amount of their gross pecuniary gain from their fraud: **$23,035,824** for Kontilai and **$23,035,824** for CCI. The Court may impose "third tier" penalties up to a specific amount per each violation or "the gross amount of pecuniary gain to the defendant as a result" of the defendant's securities law violations because the violations involved "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and "resulted in substantial losses" to Defendants' victims.

15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). When imposing penalties based on the gross

amount of pecuniary gain as to each Defendant, and as Judge Gorenstein recognized, it is

appropriate to penalize each defendant for the "same dollar of gain" because Kontilai had total

control of CCI and Kontilai benefited from "investor funds to the same extent" as CCI. Dkt.

1284 at 48-49 (quoting *SEC v. Amerindo Inv. Advs. Inc.*, 2014 WL 2112032, at *11 (S.D.N.Y.

May 6, 2014) *and SEC v. Cole*, 661 F. App'x 52, 55 (2d Cir. 2016) ("multiple defendants can

each benefit from the same dollar of gain, … each can be penalized for that gain.") (quotation

omitted)). The applicable factors justify a penalty for each Defendant measured by the gross

pecuniary gain of their fraud for the following reasons.

**Egregious and Recurring**. Defendants engaged in recurring flagrant conduct for over

four years. They repeated the same lies about the intended use of investor money (they intended

to steal it), Kontilai's personal investments (only fabricated evidence indicates one), and the

supposed sources of money readily available to the company. The flagrant and recurring nature

of the fraud was shown at trial by, among other things, testimony from four investors and a CCI

employee who each made clear that Defendants repeated the same lies over and over. In

addition, Plaintiff's Exhibits 73 to 75 show a chronology of continual theft of money overlaid

with a chronology of continual lies to hundreds of investors for over four years. One example or

particularly egregious and recurring conduct includes Kontilai's lies to induce Rick Coleman's

second investment in CCI—including the lie that Kontilai took no salary even though he

withdrew $600,000 for purported salary days before Coleman's second investment and another

$500,000 for purported salary days after his second investment.

More evidence of egregiousness is that Defendants took over $2 million from investors in 2018, P. Ex. 75 at 6-7; *see also* Exhibit 2 at p. 5, a period when the company was dormant and under investigation, and Kontilai was preparing fabricated documents because he knew he was not entitled to that money. After providing the falsified evidence to the SEC in May 2018, Defendants stole another $1.425 million, P. Ex. 73 and 74, including through a check Kontilai wrote to himself that referenced the phony $5 million note, P. Ex. 61.

**Scienter.** As the jury found, and as the record confirms, Defendants acted with a high degree of scienter. Their intent to defraud investors is evident from the same facts showing the egregious and recurring nature of their fraud above. In addition, the fabrication and production of fake evidence to SEC investigators and the Court is unequivocal evidence of awareness of wrongdoing and scienter. This deceitful conduct was part of long-running and escalating scheme to hide their fraud. That scheme included withdrawals of CCI money through unusual cash transactions with the intent to obscure their existence and purpose from investors, the lack of any ledger or coherent bookkeeping at CCI, paying investors money in exchange for promises to not communicate with the SEC about their fraud allegations, and the intentional destruction of emails containing evidence of their fraud. Defendants resorted to fabricated evidence when those efforts no longer worked, and when it became clear that the fabricated evidence was not going to work, Kontilai fled the country and later became a fugitive. Throughout all these desperate and escalating efforts to conceal his fraud, Kontilai's conduct and scienter are imputed to CCI and therefore both Kontilai and CCI acted with a high degree of scienter.

**Refusal to Admit Wrongdoing.** While Defendants' explanations for their conduct have changed over time, Defendants have not once admitted to any wrongdoing. Instead, they blame

nearly every other person involved with CCI for its problems: disgruntled investors must be lying, at least a half-dozen of their lawyers lied and sabotaged them, the government (and even judges in this district) engaged in a vast conspiracy to benefit former government attorneys that included pressuring Holt to lie, and even Seth Kaller and the Jackie Robinson Foundation wronged Defendants. Defendants' list of actors who caused CCI's problems and investors' losses continues to grow long but never includes Kontilai or CCI.

**Investor losses.** As explained above, investors gave Defendants over $23 million, Defendants stole millions of it. Their investments are now worthless.

**Lack of Cooperation and Dishonesty with Authorities.** Defendants could not have cooperated less or been more dishonest with the SEC or the Court. They destroyed evidence and produced three fake documents during the investigation and a fourth to the Court. Kontilai flouted the Court's power by refusing to comply with the SEC's trial subpoena. And, as the Court has found many times, Defendants have obstructed and delayed the judgment in this case—and relief for their victims—through excessive and frivolous litigation tactics. *See, e.g.*, Dkt. 1409 at 2-3 (citing 11 prior orders criticizing Defendants' conduct) ("This incident does represent, however, the latest and perhaps most extreme example of the excessive litigation tactics defendants have engaged in during the course of this action, thereby imposing undue costs, delays, and other inefficiencies on the Court and the parties. It also reflects complete disregard for a concern the Court and Magistrate Judge Gabriel Gorenstein have repeatedly expressed, conduct which cumulatively borders on the sanctionable").

Finally, Defendants have concealed their true financial condition. Kontilai invoked his Fifth Amendment right against self-incrimination twice when faced with questions about what he

did with the money he stole and then refused to appear at trial to testify about it. Defendants will be unable to show that their financial condition that will warrant a lower penalty.

Accordingly, the applicable factors support a penalty in the amount of Defendants' pecuniary gain. While the circumstances of each case are not the same, this amount resembles penalties imposed in other fraud cases. *See, e.g.*, *Razmilovic*, 738 F.3d at 39; *SEC v. Altieri*, No. 20-cv-6343 (JS)(ST), 2022 WL 17820155, at *6 (E.D.N.Y. 2022), *adopted by* 2023 WL 110373 (Jan. 5, 2023). Thus, the SEC requests that the Court impose a civil penalty against Kontilai in the amount of $23,035,824 and impose a civil penalty against CCI in the amount of $23,035,824.

**B.  The Court should impose significant penalties for Defendants' violations of Rule 21F-17.**

Together with the civil penalties for Defendants' violations of the antifraud provisions of the Securities Act and the Exchange Act, the Court should also impose civil penalties for Defendants' violations of Rule 21F-17 of the Exchange Act.

Defendants entered into two confidentiality agreements to prevent investor-victims from communicating with the SEC and then sued to enforce one of the agreements. The Court found on summary judgment that "[t]he undisputed facts show that (1) the Defendants entered into confidentiality agreements with investors that expressly prevented them from communicating with the SEC regarding securities laws violations and (2) the Defendants actually sued to prevent such communications and advertised those suits in order to chill further communication. These are undoubtedly 'action[s] to impede' communications, especially where the Rule explicitly prohibits 'enforcing, or threatening to enforce' such agreements." Dkt. 976 at 9.

As described above, the Court may impose civil penalties for violations of rules promulgated under the Exchange Act, like Rule 21F-17. 15 U.S.C. §§ 78u(d)(3)(B). The Court

21

has discretion when calculating the number of violations for purposes of penalties. "[C]ourts in this District have calculated the number of violations based upon the number of acts taken that violate the securities laws, and the Second Circuit has endorsed that analysis." *SEC v. Tourre*, 4 F. Supp. 3d 579, 592 (S.D.N.Y. 2014) (quotation omitted). The SEC requests that the Court impose penalties for three violations of Rule 21F-17: (1) entering into the "2015 Investor Agreement;" Dkt. 976 at 4-5; (2) entering into the "2017 Settlement Agreement;" *id.* at 5; and (3) suing investor-victims for breach of the 2017 Settlement Agreement, *id.* at 5-6.

The penalties for each violation warrant third-tier penalties because the violations involved fraud, deceit, manipulation, or reckless disregard of a regulatory requirement and resulted in a substantial loss or created a significant risk of substantial losses to other persons. Defendants entered into the agreement and filed a lawsuit to enforce one of them to conceal a massive ongoing fraud. Even after the fraud was exposed to the public by the SEC's complaint in May 2019, Defendants told investors about the 2017 Settlement Agreement in an effort to chill other investors from communicating with the SEC. Thus, they sought to intimidate and bully witnesses to conceal a fraud. And that fraud caused millions in losses to investors *after* Defendants' violated Rule 21F-17; the fraud continued for nearly three years after the 2015 Investor Agreement and nearly a year after the 2017 Settlement Agreement. Thus, the illegal intimidating and bullying prolonged Defendants fraud, involved deceit, and resulted in substantial risk of loss to the investing public and substantial losses to investors.

For similar reasons, the applicable factors justify the maximum amount of penalty for each of the three violations. After Defendants victimized investors by lying to them and stealing their money, they conditioned the return of their money on a promise to not speak with SEC staff

about the fraud so that Defendants could continue lying and stealing from others. They also advertised their bullying to other to chill speech.

And Defendants again admit no wrongdoing. While they blame their former counsel (again), nearly a year after being charged with violations of Rule 21F-17, Kontilai testified in September 2020 that the only reason he had not continued pursuing the lawsuit against investors for the alleged breach of the 2017 Settlement Agreement—*i.e.,* the only reason he did not continue violating Rule 21F-17—is that he lacked funds to do so:

> **Q:**  All right. So I gather from your answer – just tell me if I got it wrong – that if you did have the money to pursue this lawsuit, you still would.
>
> **A:**  <u>One billion percent</u>.

2020 Mykalai Kontilai Deposition at 223:10-224:4 (emphasis added), attached as **Exhibit 4**. Kontilai then deflected responsibility by accusing the SEC of engaging in a "blackmail" scheme, which is why he says the SEC is "going after me like I'm Osama Bin Laden and Bernie Madoff," and insisting that "I'm a defendant in a case wrongfully accused of things…." *Id.* at 224:5-229:6.

Accordingly, the applicable factors support a third-tier penalty in these amounts: **$620,928** for Kontilai, which is the maximum per penalty for three violations: $160,000 for the 2015 Investor Agreement that occurred prior to November 2, 2015, and $230,464 for the 2017 Settlement Agreement, and $230,464 for the lawsuit enforcing the 2017 Settlement Agreement, which both occurred after November 2, 2015. *See* 15 U.S.C. § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2024);[8] and **$3,079,628** for CCI, which

---

[8] Available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.

is $775,000 for the 2015 Investor Agreement, $1,152,314 for the 2017 Settlement Agreement, and $1,152,314 for the lawsuit enforcing the 2017 Settlement Agreement.

## IV.    INJUNCTIVE RELIEF IS NECESSARY TO GUARD AGAINST FUTURE VIOLATIONS AND HARM.

The SEC requests an injunction that permanently restrains and enjoins Defendants from violating the laws and rules that they violated: Sections 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Rule 21F-17 of the Exchange Act.

**Legal Standard**. The SEC may seek a permanent injunction against future violations of the federal securities laws under Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act. 15 U.S.C. §§ 77t(b) and 78u(d)(1). "Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *Cavanagh*, 155 F.3d at 135. "The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). To determine the likelihood of future violations, courts generally consider these factors:

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, defendant might be in a position where future violations could be anticipated.

*SEC v. Cavanagh,* No. 98-cv-1818 (DLC), 2004 WL 1594818, at *28 (S.D.N.Y. July 16, 2004) (quoting *Cavanagh*, 155 F.3d at 135 (citation omitted)). The facts relevant to these factors are described above in support of the SEC's request for civil penalties. They establish a high degree of scienter, they show a systemic, recurring, and ongoing violations, and they show Defendants'

24

refusal to admit any wrongdoing. In addition to the above, Defendant calls himself an

entrepreneur and has not earned income in a different role for over 20 years. Moreover, the

systemic and ongoing nature of Defendants fraud, coupled with their persistent "refusals to admit

any wrongdoing ma[k]e it rather dubious that [Defendants] are likely to avoid such violations of

the securities laws in the future in the absence of an injunction." *First Jersey*, 101 F.3d at 1477

(quoting *United States v. Carson*, 52 F.3d 1173, 1184 (2d Cir. 1995)); *SEC v. Lorin*, 76 F.3d 458,

461 (2d Cir. 1996) ("[T]he court may properly view a culpable defendant's continued

protestations of innocence as an indication that injunctive relief is advisable."); *see also SEC v.

McNulty,* 137 F.3d 732, 741 (2d Cir. 1998) (affirming injunction based in part on defendant's

efforts to "shift responsibility to others" and "persistent denial" of any wrongdoing).

     Accordingly, a permanent injunction against further violations of these provisions is

necessary to restrain Defendants' future violations.

## <u>CONCLUSION</u>

     The Court should grant the relief requested in the Motion.

Respectfully submitted this 1st day of March, 2024.

<div style="margin-left:40%">

*/s/ Terry R. Miller*

Terry R. Miller (*pro hac*)

Mark L. Williams

Sharan E. Lieberman

SECURITIES AND EXCHANGE COMMISSION

</div>

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 1, 2024, I caused the foregoing to be electronically filed by using the CM/ECF system. I further certify that a copy of the foregoing was served upon all counsel of record via the Court's CM/ECF system.


*/s/  Terry R. Miller*