UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES
AND EXCHANGE
COMMISSION,

              Plaintiff,

    – against –

COLLECTOR'S COFFEE, INC., *et al*.,

          Defendants.

Civil Action No.19-cv-04355-VM-GWG

**DEFENDANT MYKALAI KONTILAI'S MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO PLAINTIFF'S MOTION FOR REMEDIES</u>**

# TABLE OF CONTENTS

Analysis.................................................................................................................1

I.    As Defendants Have Not Have a Fair Opportunity to Present Evidence on Factual Issues that Must Be Resolved to Determine Appropriate Remedies, this Court Should Decline to Rule on the SEC's Motion Without a Second Trial or Evidentiary Court Hearing..................................................................................................1

   A.    Mr. Kontilai Has Had No Opportunity to Present the Testimony of Stefano Vranca, Either As An Expert Witness or As a Lay Summary Witness Similar to Ms. Moessner ...................................................................................4

   B.    Mr. Kontilai Has Had No Opportunity to Present Evidence Related to Legitimate Business Expenses and Other Payments, Such as Funds Recouped By Investors, That Are Crucial to Calculating Disgorgement ......................................6

II.   Even if this Court Finds that the SEC is Entitled to a Remedy, the Remedy Sought by the SEC is Inappropriately Overbroad .......................................................14

   A.    The SEC's Request Fails to Account for Legitimate Business Expenses, which the SEC is Required to Deduct ...................................................................15

   B.    The SEC's Request Fails to Account for the Difference in Liability Between Mr. Kontilai and Collector's Café as Joint and Several Liability is Inappropriate in this Case ...............................................................................................17

   C.    The SEC's Request Fails to Properly Support the Figure that It Contends is the "Reasonable Approximation" of Ill-Gotten Gains, which is the SEC's Burden to Prove ............................................................................................19

III.  The SEC's Request for Civil Penalties is Unwarranted, Unsupported by the Evidence and is in Contradiction with the Eighth Amendment.................................................20

IV.   The SEC Has Failed to Establish Any Basis for Assessing a Penalty for Any Violation of Rule 21F-17 ..............................................................................24

V.    Injunctive Relief is Not Necessary to Guard Against Future Violations or Harm ......25

Conclusion .......................................................................................................25

Request for Evidentiary Trial or Hearing .........................................................26

Certificate of Service ...................................................................................................................26

## TABLE OF AUTHORITIES

### Cases

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)..........................................................................................5

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011)....................................................................................15

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)........................................................................................4

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    327 F. Supp. 3d 606 (S.D.N.Y. 2018).......................................................................5

*Johnson v. Univ. of Rochester Med. Ctr.*,
    642 F.3d 121 (2d Cir.2011).....................................................................................21

*Liu v. Sec. & Exch. Comm'n*,
    140 S. Ct. 1936 (2020) ..................................................................................... passim

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    No. 20-CV-8668-VM, 2023 WL 2403012 (S.D.N.Y. Mar. 8, 2023) ...................... 4-5

*Sec. & Exch. Comm'n v. Aly*,
    No. 16 CIV. 3853 (PGG), 2018 WL 4853031 (S.D.N.Y. Oct. 5, 2018).................22

*Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*,
    No. 16-CV-828 (KMW), 2018 WL 6322145 (S.D.N.Y. Dec. 4, 2018) ....................2

*Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*,
    No. 16-CV-828 (KMW), 2019 WL 4623504 (S.D.N.Y. Sept. 24, 2019)................2

*S.E.C. v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)...................................................................................25

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)...................................................................................14

*S.E.C. v. Credit Bancorp, Ltd.*,
    738 F. Supp. 2d 376 (S.D.N.Y. 2010).....................................................................22

*Sec. & Exch. Comm'n v. Fowler*,
  440 F. Supp. 3d 284 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert.
  denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) .......................................... 14-15, 17, 20, 23

*S.E.C. v. GTF Enterprises, Inc.*,
  No. 10-CV-4258 RA, 2015 WL 728159 (S.D.N.Y. Feb. 19, 2015) .......................................21

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*,
  612 F. Supp. 3d 287 (S.D.N.Y. 2020)....................................................................................2

*Sec. & Exch. Comm'n v. Liu*,
  No. SACV1600974CJCAGRX, 2021 WL 2374248 (C.D. Cal. June 7, 2021) ................ 15-16

*S.E.C. v. Loomis*,
  17 F. Supp. 3d 1026 (E.D. Cal. 2014)....................................................................................22

*Sec. & Exch. Comm'n v. Mahabub*,
  411 F. Supp. 3d 1163 (D. Colo. 2019) ............................................................................ 18-19

*Sec. & Exch. Comm'n v. Manor Nursing Centers, Inc.*,
  458 F.2d 1082 (2d Cir. 1972)................................................................................................25

*S.E.C. v. Pentagon Cap. Mgmt. PLC*,
  725 F.3d 279 (2d Cir. 2013)............................................................................................ 20-21

*SEC v. Razmilovic*,
  738 F.3d 14 (2d Cir. 2013)..............................................................................................14, 17

*SEC v. Tourre*,
  4 F. Supp. 3d 579 (S.D.N.Y. 2014) .......................................................................................20

*Sec. & Exch. Comm'n v. United Am. Ventures, LLC*,
  No. 10-CV-568 JCH/LFG, 2012 WL 13080160 (D.N.M. Mar. 2, 2012)................................19

*S.E.C. v. Wyly*,
  56 F. Supp. 3d 394 (S.D.N.Y. 2014).....................................................................................22

*S.E.C. v. Wyly*,
  71 F. Supp. 3d 399 (S.D.N.Y. 2014)....................................................................................2-3

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001).....................................................................................4

*Tull v. United States*,
    481 U.S. 412 (1987)...........................................................................................1

*Tyler v. Bethlehem Steel Corp.*,
    958 F.2d 1176 (2d Cir.1992).............................................................................5

*United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*,
    413 F. Supp. 3d 235 (S.D.N.Y. 2019), aff'd, 982 F.3d 68 (2d Cir. 2020) .............................22

*U.S. Sec. & Exch. Comm'n v. Owings Grp., LLC*,
    No. CV RDB-18-2046, 2021 WL 1909606 (D. Md. May 12, 2021), aff'd sub nom. *U.S. Sec. & Exch. Comm'n v. Johnson*, 43 F.4th 382 (4th Cir. 2022).......................................................17

*United States v. Sabhnani*,
    599 F.3d 215 (2d Cir. 2010).............................................................................22

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC,
    571 F.3d 206 (2d Cir. 2009).............................................................................5

## Statutes

15 U.S.C. § 77t..................................................................................... 20-21

15 U.S.C. § 78u.......................................................................................20

U.S. Const. amend. VII.................................................................................1

COMES NOW Defendant Mykalai Kontilai, by and through undersigned counsel, and in opposition to the SEC's Motion for Remedies, states as follows:

## ANALYSIS

**I.**     **As Defendants Have Not Have a Fair Opportunity to Present Evidence on Factual Issues that Must Be Resolved to Determine Appropriate Remedies, this Court Should Decline to Rule on the <u>SEC's Motion Without a Second Trial or Evidentiary Court Hearing</u>.**

The Seventh Amendment mandates the right to a jury for suits at "common law." It is well established that securities fraud claims are legal claims for which the Seventh Amendment applies. *See Tull v. United States*, 481 U.S. 412, 414-19 (1987). Pursuant to the Seventh Amendment, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. As this case involves significantly more than twenty dollars, this Court should permit a jury to resolve the key factual issues that remain outstanding.

As Mr. Kontilai previously wrote to this Court, *see* Doc. No. 1496, this issue is currently pending before the Supreme Court. Nonetheless, the SEC itself has acknowledged that this Court could only determine remedies where "there is sufficient undisputed evidence in the record" to support those findings. Doc. No. 1513 at 9. That is not the case here. There are many unresolved factual disputes remaining to determine appropriate disgorgement and civil penalty amounts, including, but not limited to, the amount of legitimate business expenses. As the Supreme Court has held, a disgorgement order ***must*** account for legitimate expenses. *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1949–50 (2020). At trial, this Court excluded evidence related to legitimate business expenses, including all testimony from defendants' expert and summary witness, Stefano Vranca. In reaching that conclusion, this Court noted that Mr. Vranca's testimony would relate to

this question, which was a matter for the remedy phase and not the liability trial. Doc. No. 1440 at 8. This Court had previously determined that any issue related to "the scope of equitable remedies like injunctive relief and disgorgement of ill-gotten gains" was an issue for the Court, not the jury at the liability trial. Doc. No. 1419 at 6. In support, this Court cited three cases. In *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 612 F. Supp. 3d 287 (S.D.N.Y. 2020), the Court determined the amount of disgorgement *only after* sufficient evidence was presented during trial, including expert testimony, and the defendants presented a revenue analysis that was accepted by the SEC. *Id*. at 293. There was no contention between the parties of what sum was "a reasonable approximation of the extent to which the Defendants profited from their fraudulent activities." *Id*.

*Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2018 WL 6322145, at *1 (S.D.N.Y. Dec. 4, 2018), solely involved motions in limine. Later, the Court decided disgorgement based on the parties' stipulation at trial regarding sales on commissions. *Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2019 WL 4623504, at *2 (S.D.N.Y. Sept. 24, 2019).

Finally, this Court cited *S.E.C. v. Wyly*, 71 F. Supp. 3d 399 (S.D.N.Y. 2014), where the Court held multiple evidentiary hearings to determine disgorgement. In *Wyly*, the Court bifurcated liability and remedies and held a jury trial on liability from March 31 to May 7, 2014. *Id*. at 403. The SEC submitted new evidence and calculations regarding disgorgement, including an expert report that included "three different calculations of unlawful gains based on the Wylys' profits on the sale of registered Issuer securities" several months following trial. *Id*. The Court then held a "bench trial on all remedies issues except the SEC's alternative disgorgement calculation based on trading profits from the sale of registered securities" from August 4 to August 12, 2014. *Id*. It was only following this bench trial that the Court issued a disgorgement order. *Id*. When the SEC

pressed its alternative calculation, the Court held *another* three-day evidentiary hearing. *Id.* It was only after all of this—the jury trial on liability, the bench trial on remedies, and the evidentiary hearing on the additional calculation—that the Court issued the opinion that this Court relied upon.

Thus it is clear that for the Court to determine remedies, there must be a sufficient evidentiary record on which to base that decision. This Court declined to permit Mr. Kontilai to build that evidentiary record at the liability trial, strictly limiting the evidence he was permitted to present. As the parties have not stipulated to any amount or agreed upon any calculation as in *Lek* or *Am. Growth*, this Court should proceed as the Court did in *Wyly*—at a minimum, holding a bench trial or evidentiary hearing to permit Mr. Kontilai to present the evidence that was excluded from the liability trial.

Evidence that Mr. Kontilai was not permitted to present during trial include, but are not limited to, "[e]vidence going to the division of ill-gotten investor funds between the two Defendants," Doc. No. 1419 at 14, "[e]vidence going to the proper amount of disgorgement," *Id.* at 16, "the amount of ill-gotten gains, which is not a matter the jury will be charged to decide," Doc. No. 1440 at 8, and evidence demonstrating that CCI was a legitimate business, such as evidence "touting the business's success" and demonstrating "the once-promising nature of Defendants' business," which are relevant and crucial to demonstrating that expenses made using investor funds were for legitimate business purposes. Doc. No. 1440 at 16.[1]

---

[1] In the SEC's brief, the SEC includes a "factual background" section that contains several statements without support that are simply the SEC's interpretation of events. For example, the SEC's assertion that "[t]he reason Defendants dragged out the launch of the website and the sale of the Jackie Robinson contracts was to maximize the amount of money they could raise and then steal from investors" has no evidentiary support—the following sentences relate to salary and has nothing to do with "dragging out" a website launch or sale of the contracts. Doc. No. 1513 at 6. As the SEC's factual background seems primarily set to re-argue liability—a matter already addressed at trial—Mr. Kontilai has not included a repudiation of this "background." However, Mr. Kontilai categorically denies the unsupported characterizations rampant in the SEC's brief.

**A.      Mr. Kontilai Has Had No Opportunity to Present the Testimony of Stefano Vranca, Either As An Expert Witness <u>or As a Lay Summary Witness Similar to Ms. Moessner.</u>**

As more fully explained in Mr. Kontilai's opposition to the SEC's motion *in limine* seeking to exclude Mr. Vranca's testimony at the liability trial, Mr. Vranca is a well-qualified expert in the fields of forensic accounting, fraud investigations, loss/profit analysis, and damages calculations who explicitly defined his methodology and followed a process that is generally accepted in forensic reconstruction. Doc. No. 1313 at 1-7. While this Court previously excluded Mr. Vranca from the liability trial, this ruling does not apply to the primary opinion Mr. Kontilai intends to offer at the remedies stage. The crucial opinion for this stage is Mr. Vranca's calculation that **$25,463,555.47** of expenses made were business-related. Exhibit A at 36. Since 2014, Mr. Vranca calculated that CCI and Mr. Kontilai incurred business expenses totaling **$18,997,515**. Exhibit A at 4 n.9. The SEC's motion in limine—and this Court's order—did not apply to this opinion. Instead, the order was strictly limited to three unrelated opinions. Doc. No. 1440 at 6.

In any event, there is no reason to exclude Mr. Vranca's opinion regarding business expenses on reliability grounds. As explained more fully in Mr. Kontilai's previous brief, Doc. No. 1313, in assessing reliability, the inquiry must focus "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001). This is not an overly demanding standard: "The grounds for the expert's opinion merely have to be good, they do not have to be perfect." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). Expert testimony should be only excluded if it is "speculative or conjectural," or "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20-CV-8668-VM, 2023 WL

4

2403012, at *7 (S.D.N.Y. Mar. 8, 2023) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 213-14 (2d Cir. 2009)). Other "contentions that assumptions are unfounded 'go to the weight, not the admissibility of the testimony.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.1992)). Any issue raised by the SEC alleging that Mr. Vranca mischaracterized a particular expense as "business" when it should have been "personal" is a quintessential example of a challenge that goes to weight, not admissibility.[2]

Crucially, Mr. Vranca is not simply an expert witness—he is also a summary lay witness in the same vein as Ms. Moessner, who this Court permitted to testify. When Mr. Kontilai sought to exclude Ms. Moessner, this Court noted the following:

> The exhibits offered by the SEC centralize voluminous financial records that cannot be conveniently examined in court, and such a compilation does not amount to an offer of expert testimony based on a witness's scientific, technical, or specialized knowledge. The summary charts contain no analysis and are instead simply a distillation of admissible evidence. (See Dkt. No. 1397-1). Further, the SEC can make its foundational showing under FRE 1006 by offering Moessner to testify as to how she prepared the summaries, even if some of that work was delegated to Moessner's staff. See John Wiley & Sons, Inc. v. Book Dog Books, LLC, 327 F. Supp. 3d 606, 631 (S.D.N.Y. 2018). Moreover, Defendants have had years to review the summary documents since they were first produced and have never complained of any inaccuracies.

Doc. No. 1440 at 25-26. In this vein, Mr. Vranca's testimony as a lay summary witness is *identical* to Ms. Moessner's, and there is no legitimate basis for Ms. Moessner's testimony to be permitted while Mr. Vranca's is excluded, despite this Court's prior acknowledgement that this testimony relates "primarily to the amount of ill-gotten gains," which is precisely one of the issues to be

---

[2] Historically, the SEC has contested certain expenditures in the "business development costs" category, including expenses related to travel, entertainment, and dining. These expenses account to just slightly over $2 million of the total $25 million. Exhibit A at 37. Any disputes over these specific expenses do not merit total exclusion.

determined at this stage of the litigation. Doc. No. 1440 at 8. As in *Wyly*, it is appropriate and necessary to—at a *minimum*—hold a bench trial to hear this evidence.

As with Ms. Moessner, Mr. Vranca took "voluminous financial records that cannot be conveniently examined in court" and "centralize[d]" those records into charts. Exhibit A at 49-466. These charts summarize the cash flow in the underlying business records. *Id*. As with Ms. Moessner, Mr. Vranca led the team that compiled these records, "even if some of that work was delegated to [Vranca's] staff." Doc. No. 1440 at 25; *see* Exhibit A at 22. While some of the charts contain notations regarding Mr. Vranca's expert opinions, the majority of the information contained therein is summary only. For example, the chart in Appendix C contains 18 total columns, only *one* of which relates to Mr. Vranca's expert opinion—the "Expense" column, which is either checked or not depending on whether Mr. Vranca included the expense within his calculation of business expenses.

Further, as with Ms. Moessner, the SEC has "had years to review the summary documents since they were first produced and have never complained of any inaccuracies." Doc. No. 1440 at 26. The *only* critiques the SEC has ever raised with respect to Mr. Vranca have related to his expert opinion—never the accuracy of his summary charts. In fact, the SEC has itself credited and used Mr. Vranca's work in their own briefing: for example, the SEC has previously adopted for its own portions of Mr. Vranca's report. *See* Doc. No. 1052-63 and 1052-64.

### B. Mr. Kontilai Has Had No Opportunity to Present Evidence Related to Legitimate Business Expenses and Other Payments, Such as Funds Recouped By Investors, That Are Crucial to Calculating Disgorgement.

As explained above, there is ample evidence that Mr. Kontilai has had no opportunity to present that is relevant to the remedies stage of these proceedings. The testimony that was elicited at trial provides confirmation that this evidence exists and is relevant and crucial—but Mr. Kontilai

was not provided the opportunity to fully produce that evidence as this Court ruled that those issues were for the remedies stage, not for liability. Denying Mr. Kontilai an evidentiary proceeding for the remedies phase, and strictly restricting Mr. Kontilai to a 25-page brief, denies Mr. Kontilai the opportunity to fairly produce this evidence.

Several of the witnesses at trial, including the SEC's own witnesses, confirmed that CCI made numerous expenditures that are self-evidently legitimate business expenses. The investor witnesses continuously testified that they knew about, or personally witnessed, the development of operations that would have been paid for via investor funds and that the investor witnesses acknowledged were a legitimate part of CCI's business plan. These self-evidently legitimate business expenses testified to by trial witnesses include, but are not limited to, expenses involved with (1) developing the innovative authenticity program intended to accompany any purchase on the CCI site, (2) developing the website for use in CCI's operations, (3) developing the television show to be distributed internationally, (4) operations costs including office space, (5) national media campaigns to promote CCI, which was known to investors, and (5) employment of employees and contractors, including salaries, benefits, and equipment. In addition, investor witnesses confirmed that at least *some* investor funds were recouped by investors—an incredibly crucial issue relevant to the heart of the disgorgement calculation.

Self-evidently legitimate business expenses were expended with respect to the television show and website platforms that were central to CCI's business plan and were personally observed by the investor witnesses who testified at trial. Mr. Kontilai and CCI worked to market the television show first to American Public Television, who "really liked it" and "asked us to produce a pilot episode to show us what it would be like." Doc. No. 1487 at 154. Trial witnesses confirmed that the pilot episode was, in fact, produced by CCI, and that the expenses to produce the show

were borne by CCI. Mr. Ferrell testified that CCI originally hired Public Media to "produce the show, pay the actors, the production staff, etc." Doc. No. 1481 at 163. The pilot show was "an hour long," contained items such as "a backdrop that was signed by the Beatles" and "a guitar that was signed by a famous rocker," and was submitted to American Public Television to market future episodes. Doc. No. 1481 at 170. Peter Siegel, who also testified at trial via deposition, confirmed that he was there when the pilot episode of the television show was filmed and that it was filmed on a set constructed like a "little café next to an espresso machine." *Id*. at 125-216. The pilot episode featured Siegel and other experts valuing memorabilia including items brought by Rick Springfield's daughter and Marlon Brando's son. *Id*.

After APT saw the pilot, the company made "a commitment … to distribute the show," writing a "letter of distribution agreeing to distribute the show nationally." Doc. No. 1487 at 155-56. Over time, the concept of the television show developed further to match the developing concept for CCI. Doc. No. 1487 at 156-58. After the idea for the show changed, Mr. Kontilai worked to locate a new distribution partner. Doc. No. 1487 at 168. To develop the series, CCI employed Bite Size Television to "produce the TV series and assist in finding a distribution partner." Doc. No. 1487 at 170. Bite Size was hired to produce "50 plus episodes" that were "either 30 or one-hour episodes." Doc. No. 1487 at 171. Bite Size ultimately produced "somewhere between nine and 15 episodes." *Id*. Mr. Kontilai and CCI successfully marketed the new show to the History Channel and employed ThinkFactory to pre-produce the new show. Doc. No. 1487 at 174. This production included significant costs such as "laying out most of the episodes in advance through Power Point presentations episode by episode, doing an exhaustive search for collectors across the country that would appear on the 24 episodes," and "holding auditions for the cast," all while "coordinating with the television studio in New York." Doc. No. 1487 at 174-75.

SEC witnesses confirmed that episodes of the television show were actually filmed. Mr. Umland personally featured in a filmed episode of the television show, which "was a sitdown talk with Larry King." Doc. No. 1485 at 50. Mr. Cutsey had seen multiple episodes of the television show, which included "Larry King and his wife [as] guests," in which "Larry was promoting the Collectors Café." Doc. No. 1481 at 228. These episodes included "some celebrities that came on board and brought their collectibles, which was beautiful and showed those online." *Id.*

Trial witnesses also confirmed that the website was developed and was operational. Mr. Jensen testified that the features of the website he saw were "very impressive," including features such as a "blogger network" and a "pretty good, extensive search function." Doc. No. 1483 at 97. After multiple companies were contracted by CCI to develop the website, including Mr. Cutsey's company, the website was "up and running, test version." Doc. No. 1481 at 214. It had "social media in it," it had "blogging abilities," there was a site for celebrities, the website had "the payment process through PayPal," it was "all ready to go." Doc. No. 1481 at 223. CCI employed several contractors over the years to develop the site: during its time in development, CCI hired Brand-Knew to "develop the integrated social network," and Wahlrich to "develop the brand and the logos and those types of things," and "Mr. Pete Siegel to help source dealers for the company." Doc. No. 1487 at 158. These expenditures were substantial: CCI paid Brand-Knew alone "seven figures plus" to develop the site. Doc. No. 1487 at 161. CCI also hired individual contractors for software development, including Michael Ni and Cole Merrick. Doc. No. 1487 at 162.

Mr. Siegel confirmed that the website did, in fact, function, although it was never fully launched by the time the SEC's case shut down operations: Mr. Siegel personally sold two items through the website following the Jackie Robinson contract launch. Doc. No. 1487 at 137. It would have taken self-evidently legitimate business expenses to construct a functional website capable

of facilitating sales. Mr. Little confirmed that during the company's tenure it paid for other electronic services as well, including, but not limited to, an email hosting service that hosted many thousands of emails sent and received by CCI employees. Doc. No. 1483 at 202.

Self-evidently legitimate business expenses were also expended with respect to developing the game-changing authenticity insurance, which was well-known to investors and crucial to CCI's business plan. Ms. Newman testified via deposition that Mr. Kontilai was working with Ms. Newman, Aon Insurance, and other industry professionals including Ty Sagalow to develop an innovative authenticity insurance product to offer CCI's customers once the business launched. Doc. No. 1487 at 113-118. She confirmed that Mr. Kontilai and CCI took steps to obtain the insurance product, including meetings with Larry King, his wife Shawn King, and various underwriters, which would self-evidently have required legitimate business expenditures. *Id.* at 118-119. Ms. Newman was also in a filmed interview with Larry King for CCI, which again would have cost funds to produce. *Id* at 121. Ms. Newman confirmed that CCI produced episodes of its television show that she had personally seen and that were "very well done," and that Mr. Kontilai was in discussions with the History Channel to air the show. *Id*. Peter Siegel also confirmed that the authenticity insurance program, "a game changer" in the field, had been underwritten by "major insurance companies"—a product that would obviously require funds to develop. *Id*. at 130-131.

Self-evidently legitimate business expenses were also expended with respect to the national media campaign CCI undertook to market its business and elicit interest in the sale of the Jackie Robinson contracts. Mr. Cutsey confirmed that there was a media campaign for the contracts that included a "soft opening in Times Square here in New York." Doc. No. 1481 at 227. Mr. Kontilai toured with Larry King to promote CCI. Doc. No. 1481 at 234. The tour included multiple stops to present the contracts, including a stop in North Bay, Ontario, Canada where Mr. Cutsey himself

saw the contracts. Doc. No. 1481 at 235. The media campaign included articles published by large national publications including Huffington Post, Morningstar, and ESPN, and Mr. Kontilai made appearances on multiple national TV programs such as on Fox. Doc. No. 1481 at 236.

Self-evidently legitimate business expenses were also expended with respect to the maintenance of office space, including the payment of rent, insurance premiums, utilities, furnishings, and maintenance costs. Mr. Ferrell personally visited a CCI office located in La Jolla, California. Doc. No. 1481 at 179. CCI also had a "small executive office" in San Diego, California. Doc. No. 1485 at 6. There was an office in Los Angeles, California. Doc. No. 1487 at 162. There was an office space in Rockefeller Plaza in New York. Doc. No. 1477 at 176.

Self-evidently legitimate business expenses were also expended with respect to the employment of employees, contractors, and agents, including, but not limited to, salaries, benefits, and equipment for employee use. Witnesses at trial confirmed that many individuals were employed by the company, including, but not limited to, Mr. Siegel as Director of Dealer Relations, Doc. No. 1487 at 134, Robert Sparks as legal counsel, Doc. No. 1485 at 6, David Chapman as the VP of Investor Relations, Doc. No. 1485 at 27; Doc. No. 1477 at 91, Mr. Kaller as a consultant, Doc. No. 1483 at 8, 13-14, Cori Dyer as an employee, Doc. No. 1483 at 130, Mr. Cutsey and his company to provide software and website development consulting services, Doc. No. 1481 at 208-209, other companies paid to develop the website platform, *id.*, Mr. Cutsey as Chief Operating Officer, Doc. No. 1481 at 215, Larry King as Brand Ambassador, Doc. No. 1481 at 234, Chris Shutte to work in dealer relations, Doc. No. 1487 at 162, Lilibeth Feliciano as executive assistant and later VP of Investor Relations, Doc. No. 1477 at 175-77, and Gail Holt, who Ms. Feliciano testified was employed at some point as her boss. Doc. No. 1477 at 181. In addition to salaries, CCI provided equipment such as computers for employee use. Doc. No. 1477 at 203.

All these self-evident legitimate business expenses were known to and accepted by investors and were key parts of CCI's business plan. CCI *could not have functioned* in the way the investors expected had these expenses not been made—and there can be no argument that these expenses were made for Mr. Kontilai's personal benefit. As Mr. Coleman testified, CCI was trying to raise a total of $22 million for "five different uses": (1) "production of international Chinese and Spanish programs," in other words, continuing to develop the television show for international distribution; (2) "to expand a dealer relations department," including, but not limited to, paying consultants such as Mr. Siegel and Mr. Shutte, who were, in fact, hired and did work to connect with dealers; (3) "to expand a website into a global foreign language ready to – ready e-commerce [sic] portal with additional website experience," which CCI did while hiring multiple companies and individual consultants to develop the necessary software and web platform; (4) "to build our collector celebrity portal," which CCI did while engaging those celebrities to appear on the television show; and (5) "for initial activation advertising cushion," which CCI did while engaging in the broad and comprehensive media campaign displaying the Jackie Robinson contracts and setting up the soft launch of the website. Doc. No. 1477 at 128-29.

Finally, and crucially, Mr. Kontilai has so far been denied the opportunity to present evidence regarding investor funds that were ultimately recouped and repaid to certain investors. These funds ***cannot be included*** in any disgorgement calculation—the return of these monies means that these monies cannot be "unjust enrichment" for either CCI or Mr. Kontilai. For example, Mr. Jensen testified to sending a demand letter to CCI to recoup his and Mr. McLaughlin's investments, Doc. No. 1483 at 137. At the preliminary injunction hearing, Mr. Jensen confirmed that he filed a lawsuit against CCI that "were resolved and [he] received some money back." Doc. No. 1129 at 198. But it was unclear how much Mr. Jensen or other investors

personally received as the settlement was a lump sum payment to a group, and this Court did not permit counsel to question Mr. Jensen regarding the amount received. Doc. No. 1129 at 198-202.

These self-evident legitimate business expenses are further confirmed by Mr. Vranca's data compilation, which stands as a lay witness summary of hundreds of thousands of financial records reviewed even if this Court does not accept Mr. Vranca's characterization of certain expenditures as legitimate or not. The primary tables that demonstrate these expenditures, Appendices C through F of Mr. Vranca's report, compile all records related to bank and credit card transactions. Exhibit A at 49-349. This includes 301 pages of charts, most pages listing over a hundred transactions each. In total, Appendix C, which lists bank transactions, lists approximately 20,159 separate transactions, Exhibit A at 209, and Appendix E, which lists credit card transactions, lists approximately 6,812 separate transactions. Exhibit A at 348. This includes many transactions related to the self-evident legitimate business expenses listed above. Given the page limitation of this briefing, Mr. Kontilai can only point to a few that demonstrate the type of expense in each category outlined by Mr. Vranca: (1) Software/website expenses that include payments to Mr. Cutsey's company FDM4 America Inc., which include, but are not limited to, payments of $38,448.90, and $26,000 and many others, Exhibit A at 146, 149, (2) Production expenses related to the television show, including, but not limited to, payments to Bite Size TV, of $28,446.23, $25,000, $10,000, $80,000, $40,528.25, among others, Exhibit A at 49, 52, 146, 153, (3) Real estate expenses, including, but not limited to, a multitude of rent payments, *see* Exhibit A at 52 (payment for $13,000), (4) Consultant expenses, including, but not limited to, many payments to the individuals identified as consultants at trial, Exhibit A at 52 (payment of $10,877 to Cori Dyer), and (5) Insurance expenses, which include a multitude of payments of insurance premiums and other expenses associated with the development of the authenticity insurance program, Exhibit A

at 52 (payment of $10,000 to Innovation Insurance). Other self-evidently legitimate business expenses listed on Mr. Vranca's summary chart include operations costs such as payment for utilities, marketing costs, and legal expenses. Given the complexity of the summary chart—to say nothing of the complexity of the underlying data—which comprises well over 25,000 separate transactions, Mr. Vranca's testimony is necessary to identify with specificity the expenses that are self-evidently legitimate. This is true regardless of whether this Court permits Mr. Vranca to testify as an expert or solely as a lay summary witness ala Ms. Moessner.

In sum, even if this Court concludes that Mr. Kontilai is not entitled to Seventh Amendment rights and a jury trial on all outstanding factual issues for the remedy phase, as the Fifth Circuit has found in the administrative context, this Court should at a minimum follow this Court's process in *Wyly* and schedule a bench trial and/or evidentiary court hearings before addressing these issues. These factual issues (1) can only be settled after introducing into the record evidence this Court excluded from the liability trial, and (2) are too complex to fully address in a 25-page brief.

## II. Even if this Court Finds that the SEC is Entitled to a Remedy, the Remedy Sought by the SEC is Inappropriately Overbroad.

This Court generally has "broad equitable power to fashion appropriate remedies" if the SEC succeeds in proving any federal securities law violations at trial, which includes "ordering that culpable defendants disgorge their profits." *Sec. & Exch. Comm'n v. Fowler*, 440 F. Supp. 3d 284, 295-296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)). For a disgorgement order, there must be "factfinding by a district court to determine the amount of money acquired through wrongdoing." *Fowler*, 440 F. Supp. 3d at 296 (quoting *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006)). The purpose of disgorgement is strictly limited to "forcing a defendant to give up the amount he was unjustly enriched," and is not intended to

14

compensate victims or to punish defendants. *Id*. For disgorgement, the SEC must first meet its burden to "show that its calculations reasonably approximate[ ] the amount of the defendants' unjust gains." *Id*. (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011)).

### A.  The SEC's Request Fails to Account for Legitimate Business Expenses, which the SEC is Required to Deduct.

As the Supreme Court has held, disgorgement orders must account for business expenses:

> Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account." *Goodyear*, 9 Wall. at 804; *see also* Restatement (Third) § 51, Comment h, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5).

*Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1949–50 (2020).

Where there are obvious legitimate business expenses, this Court should discount those expenses from a total disgorgement amount. In *Liu*, the Supreme Court noted that the district court "declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme." *Liu*, 140 S. Ct. at 1950. But even then, the Supreme Court noted that there were some expenses that were so obviously business expenses—such as "lease payments and cancer-treatment equipment"—that the Court remanded the issue to the district court to reconsider "whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)." *Id*. On remand, the district court subtracted administrative expenses and business expenses, expenses that "arguably have value independent of fueling a fraudulent scheme." *Sec. & Exch. Comm'n v. Liu*, No.SACV1600974CJCAGRX, 2021 WL 2374248, at *5 (C.D. Cal. June 7, 2021) (quoting *Liu*, 140 S. Ct. at 1950).

It is astounding that the SEC claims that Mr. Kontilai has "not produced any evidence that they are entitled to 'deductions for "legitimate expenses,"'" given that evidence for such was

elicited from their own witnesses. Doc. No. 1513 at 12. Further, the SEC is incorrect when it claims that "there is no competent evidence of the amounts and dates that CCI supposedly paid legitimate expenses." Doc. No. 1513. There is plenty of such evidence: Mr. Vranca's charts comprehensively summarize **over 25,000 separate transactions**, many of which are self-evidently legitimate business expenses. If this Court were to discard these summary lay charts in their entirety, then this Court should not accept Ms. Moessner's charts which are *inherently the same* type of compilation, which the SEC has once again presented to this Court while simultaneously encouraging this Court to ignore Mr. Vranca. Doc. No. 1513-1.

As explained in Section I.B above, trial witnesses continuously testified to expenses that were expended on business expenses that are self-evidently legitimate, including expenses to develop operations that the investors *knew* and *expected* would be developed. These are expenses that "have value independent of fueling a fraudulent scheme." *Liu*, 2021 WL 2374248, at *5 (quoting *Liu*, 140 S. Ct. at 1950). Similar to the lease payments and cancer-treatment equipment in *Liu*, expenses to develop and produce the television show, develop the website, develop the authenticity insurance program, pay salaries and consultant costs, pay rent, utilities, and equipment and furnishing fees on office space, and the media campaign to build interest in CCI and attempt to facilitate the sale of the Jackie Robinson contracts are all expenses with value independent of fueling a fraudulent scheme. All these expenses resulted in *actual products* that have value. In any event, as confirmed by Mr. Coleman, investors *knew* funds were being raised for these purposes and *expected* that these expenses would be made. These expenses fall squarely within the "five different uses" of funds outlined to Mr. Coleman. Doc. No. 1477 at 128-29.

In addition, the SEC fails entirely to account for funds already recouped by investors—something that the SEC should doubtlessly be aware of and already be considering if the SEC truly

is promising this court to "make a distribution to harmed investors, if feasible." Doc. No. 1513 at 13. In fact, the SEC appears to be **well aware** that at least some monies were returned, and **still** fail to account for it: in another section of its brief, the SEC admits that there was a "return of their money" to certain investors. Doc. No. 1513 at 22. One of the few investors the SEC called at trial has confirmed that he already received a return of at least some of his investment—although given this Court did not permit Mr. Kontilai to question him on this issue at the preliminary injunction hearing and matters of loss and causation were excluded by this Court's order at the liability trial, Mr. Kontilai is unable to determine at this juncture the exact amount of returned investments on the $23,035,824 the SEC is attempting to obtain. These amounts *must be deduced* from the total— funds returned to investors are plainly not "wrongful gains." *See U.S. Sec. & Exch. Comm'n v. Owings Grp., LLC*, No. CV RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021), aff'd sub nom. *U.S. Sec. & Exch. Comm'n v. Johnson*, 43 F.4th 382 (4th Cir. 2022) (SEC's requested disgorgement was properly minus "certain legitimate business expenses" and minus "funds that were returned to investors").

> **B.  The SEC's Request Fails to Account for the Difference in Liability Between Mr. Kontilai and Collector's Café as Joint and Several Liability is Inappropriate in this Case.**

A disgorgement order must be limited to disgorgement of profits. *Sec. & Exch. Comm'n v. Fowler*, 440 F. Supp. 3d 284, 295-296 (S.D.N.Y. 2020), aff'd as modified, 6 F.4th 255 (2d Cir. 2021), cert. denied, 142 S. Ct. 590, 211 L. Ed. 2d 367 (2021) (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)). The purpose of disgorgement is strictly limited to "forcing a defendant to give up the amount he was unjustly enriched," and is not intended to compensate victims or to punish defendants. *Id*. Disgorgement must be calculated *per each defendant*—as the Supreme Court has noted, joint and several liability is often inappropriate. *Liu*, 140 S. Ct. at 1949.

Joint and several liability simply does not apply here and nothing in *Liu* supports penalizing Mr. Kontilai personally for any alleged wrongful profits obtained by the company. In fact, in *Liu*, the Supreme Court explicitly noted that applying joint and several liability in these instances "could transform any equitable profits-focused remedy into a penalty." *Liu*, 140 S. Ct. at 1949.

The Supreme Court refrained from establishing any bright-line rule for when joint and several liability would be impermissibly punitive because it was not necessary given the facts of *Liu*. *Id*. But *Liu* provides a guideline for when joint and several liability *may* be appropriate, and it is easy to distinguish this case from *Liu*. In *Liu*, the "petitioners were married," and both individuals were involved in the business entities that they formed together. *Id*. Crucially, "[p]etitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust." *Id*. By contrast, it is unquestionable that Mr. Kontilai did not personally receive the vast majority of the investor funds raised, and there is no evidence that Mr. Kontilai's personal finances and CCI's finances were ever commingled. There is no evidence that Mr. Kontilai ever personally "enjoy[ed] the fruits of" investor funds the never touched his hands.

The SEC's argument that Mr. Kontilai should be held personally liable for disgorgement many magnitudes greater than any amount he could ever have arguably received is limited to a single paragraph that boils down to: "the Court may subject an owner-officer of a firm, like Kontilai, to joint and several liability," and thus this Court should. Doc. No. 1513 at 14. There is nothing further than this. "The court can so it should" is a stunningly brief argument for an issue where *tens of millions of dollars* are at stake. In any event, the cases cited by the SEC are inapposite. In *Sec. & Exch. Comm'n v. Mahabub*, 411 F. Supp. 3d 1163, 1173 (D. Colo. 2019), the

individual did not "challenge the concept of joint and several liability" and did not contest the amounts of "illicit profits." Here, Mr. Kontilai does contest both the concept, the applicability to this case, and the SEC's calculations. In *Sec. & Exch. Comm'n v. United Am. Ventures, LLC*, No. 10-CV-568 JCH/LFG, 2012 WL 13080160, at \*6 (D.N.M. Mar. 2, 2012), the court concluded that "Hollowell and Thomas *were* UAV," which is not true here, where CCI had a multitude of employees, Mr. Kontilai did not operate CCI alone, and Mr. Kontilai only personally received a small fraction of the total amount sought in disgorgement. Considering the significant disparity between the funds raised by CCI and the amounts Mr. Kontilai received, "circumstances would render a joint-and-several disgorgement order unjust." *Liu*, 140 S. Ct. at 1949.[3]

### C.    The SEC's Request Fails to Properly Support the Figure that It Contends is the "Reasonable Approximation" of Ill-Gotten Gains, which is the SEC's Burden to Prove.

In sum, the SEC has failed to provide a "reasonable approximation" of ill-gotten gains. Despite evidence elicited at trial, including from their own witnesses, the SEC has failed to account for even a single penny of legitimate business expenses. Despite evidence elicited at trial, from their own witness, the SEC has failed to account for funds already returned to investors. Despite evidence at trial, and the weight of case law demonstrating that joint and several liability is not appropriate in this case, the SEC has failed to provide any indication at all of what "wrongful gains" were obtained by Mr. Kontilai specifically. Accordingly, this Court should deny the SEC's motion as it has failed to meet its burden.

---

[3] Further, the SEC should be limited to the asserted claims in the Amended Complaint. Doc. No. 134. Fairly read, the Amended Complaint only puts Mr. Kontilai on fair notice that the SEC alleges he unfairly gained approximately $7 million, not over $23 million. Even if it did, the Amended Complaint fails to plead a theory of joint and several liability, and the SEC is now attempting to recover on an unasserted theory. In addition, the evidence does not support this theory: the witnesses at trial confirmed that multiple people had control over the company's operations and Mr. Kontilai was far from the sole actor the SEC paints him as.

III.    **The SEC's Request for Civil Penalties is Unwarranted, Unsupported
by the Evidence and is in Contradiction with the Eighth Amendment.**

As the disgorgement portion of the asset freeze amount is impermissibly overbroad, the civil penalty calculation is similarly erroneous. Civil penalties may be available under the Securities Act or the Exchange Act. The two Acts assess three tiers of violations depending on the circumstances of the alleged violation. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). Which tier is applied depends on the circumstances of the case. In determining the appropriate amount for a civil monetary penalty, this Court should weigh the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Fowler*, 440 F. Supp. 3d at 299 (quoting *SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014)). This Court has used a variety of methods to count the number of violations for the purposes of civil monetary penalties, *see Fowler*, 440 F. Supp. 3d at 299 (compiling cases), but this Court has generally considered violations involving a single scheme to be a single violation, such as where the "scheme" alleged is "a scheme derived from a single offering." *Id.* at 300.

Once again, the SEC asks this Court to impose the harshest possible civil penalty calculation—the amount of disgorgement. But this determination is incorrect as a matter of law.

The Second Circuit has reversed the imposition of civil penalties assessed jointly and severally. *See S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) ("We also must reverse the district court's decision to impose joint and several liability for the amount of the civil penalty as an error of law."). This is because the language requires any civil penalty to be assessed separately: "The statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the "gross amount of pecuniary gain to such defendant." *Id.*

at 288 (quoting 15 U.S.C. § 77t(d)(2)) (emphasis in original). Accordingly, there is no room in the statutory language for any interpretation where a civil penalty is imposed jointly and severally. *Id.*

The statutes "provide that for each violation **the maximum penalty may not exceed the greater of the maximum pecuniary gain for each defendant** or the statutory maximum penalty as adjusted for inflation." *S.E.C. v. GTF Enterprises, Inc.*, No. 10-CV-4258 RA, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (citing 15 U.S.C. §§ 77t(d), 78u(d)(3), 80b–9(e)). The question, therefore, is twofold: *first*, what each defendant's respective "maximum pecuniary gain" is alleged to be, and *second*, whether Mr. Kontilai can be penalized for CCI's alleged pecuniary gains.

The SEC's analysis presupposes that Mr. Kontilai and CCI are, essentially, the same entity. That CCI's conduct is imputable to Mr. Kontilai the same as if *Mr. Kontilai* had taken that action himself. But that analysis was expressly rejected in *Pentagon Cap.*, where the Second Circuit made clear that civil penalties are calculated *per defendant* based on *that defendant's* alleged conduct:

> We also must reverse the district court's decision to impose joint and several liability for the amount of the civil penalty as an error of law. *See Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir.2011) ("A court abuses its discretion when ... its decision rests on an error of law....") (per curiam). The statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the "gross amount of pecuniary gain *to such defendant*." 15 U.S.C. § 77t(d)(2) (emphasis added). This language does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally.

*Pentagon Cap.*, 725 F.3d at 287–88. To find otherwise would effectively overrule *Pentagon Cap.* and impose a civil penalty on Mr. Kontilai that holds him liable for CCI's conduct.

Accordingly, the appropriate "total pecuniary gain" of Mr. Kontilai cannot be $23,060,824.84. To find otherwise would run contrary to the statutory plain language, Congress's legislative intent, common law, and would be unconstitutional. If Congress's intent had been to hold one defendant liable for the wrongdoing of another, it would have said so. It did not.

Further, a civil penalty award including such a penalty would be untethered from any alleged wrongdoing and violate the Eighth Amendment. A civil penalty award is subject to the Eighth Amendment and is unconstitutional if it is "grossly disproportional to the gravity of a defendant's offense." *United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 250 (S.D.N.Y. 2019), aff'd, 982 F.3d 68 (2d Cir. 2020) (quoting *United States v. Sabhnani*, 599 F.3d 215, 262 (2d Cir. 2010)). In *Alpine*, for example, this Court declined to award the civil penalties requested by the SEC of approximately $22 million, because of its "consideration of several factors, but principally of Alpine's financial condition," instead imposing a lesser penalty of $12 million. *Id*. As in *Alpine*, the magnitude of the penalty requested, combined with Mr. Kontilai's financial condition, his status in German custody, and the criminal indictments that await him counsel that the penalty sought would be grossly disproportionate.

Here, a "penalty would be unduly harsh under the circumstances," because "the disgorgement and prejudgment interest awarded … will be staggering." *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 433 (S.D.N.Y. 2014). The possibility of criminal restitution and incarceration counsels against imposing penalties. *S.E.C. v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010) ("Furthermore, the Court finds that the penalties of disgorgement, criminal restitution, incarceration, and injunction against future violations imposed on Rittweger are sufficient to deter future illegal conduct."); *S.E.C. v. Loomis*, 17 F. Supp. 3d 1026, 1033 (E.D. Cal. 2014). The purpose of a civil penalty is "the dual goal of punishing the individual violator and deterring future violations," both of which are accomplished where there are other penalties. *Sec. & Exch. Comm'n v. Aly*, No. 16 CIV. 3853 (PGG), 2018 WL 4853031, at *4 (S.D.N.Y. Oct. 5, 2018).

The SEC's argument is based in speculation more than fact. It contends that the most stringent penalty is warranted because "the violations involved 'fraud, deceit, manipulation, or

reckless disregard of a regulatory requirement' and 'resulted in substantial losses' to Defendants' victims." Doc. No. 1513 at 17. It is difficult to imagine how the SEC can make this assertion; after all, upon the SEC's motion, this Court held that the question of "whether individual investors lost capital" was not part of the SEC's claims at the liability trial and that Mr. Kontilai could not elicit testimony indicating "that they did not lose their investments." Doc. No. 1419 at 10-11. In other words, the SEC is now claiming that the entirety of the raised investor funds was "lost" when Mr. Kontilai was prohibited from eliciting any testimony or evidence to the contrary. This is patently untrue, in any event: testimony from Mr. Jensen, described above, indicates that at least some of the investors received funds back—how much, of course, is a question that has yet to be resolved.

There is also no evidence that Mr. Kontilai "benefited from 'investor funds to the same extent' as CCI. Doc. No. 1513 at 18. This is, once again, nothing more than rank speculation.

Similarly, it is difficult to contend that any conduct outlined by the SEC was "egregious and recurring." The entirety of the SEC's allegations stem from a single set of private placement offerings: this Court has considered a single scheme to be a single violation, such as where the "scheme" alleged is "a scheme derived from a single offering." *Fowler*, 440 F. Supp. 3d at 300.

The SEC's contention that Mr. Kontilai "concealed [his] true financial condition" and thus "will be unable to show that [his] financial condition … will warrant a lower penalty" is unavailing. Doc. No. 1513 at 20-21. Mr. Kontilai sat for days-long depositions multiple times throughout the course of this proceeding, and the SEC has—and utilized—its subpoena power to turn over every rock and stone and obtain every financial document. As Mr. Vranca has noted, the SEC's database contains *millions upon millions* of financial records. Perhaps at this point, after years of litigation and discovery, and with no evidence at all to demonstrate that Mr. Kontilai is hiding any assets, it is time for the SEC to accept that these imaginary assets *simply do not exist*.

IV.     **The SEC Has Failed to Establish Any Basis for Assessing a Penalty for Any Violation of Rule 21F-17.**

This Court has already ruled that "Defendants' conduct actually violates Rule 21F-17." Doc. No. 976 at 9. However, despite holding that "Defendants are liable on the SEC's fifth claim," this Court has not yet ruled on whether any damages are available for such violation. *Id*.[4] But the SEC itself has failed to produce any evidence relating to any damages caused by the violation.

No damages are warranted for the Rule 21F-17 violation. As the individuals that signed the settlement agreements at issue reported promptly to the SEC, it is difficult to imagine how any damages could have been sustained. Even if a delay occurred it could not possibly warrant damages and it would be nearly impossible to assess a measurable amount of damages to such a nebulous "injury." While the SEC claims a delay allegedly "prolonged" the fraud, any "prolonged" fraud is already accounted for in penalties: the amount of disgorgement and corresponding civil penalty accounts for whatever the SEC believes would not have occurred *but for* the Rule 21F-17 violation.

Not only is there no evidence to prove that this is the case, but this would also result in an impermissible double penalty. Presume that the delay meant one additional investor invested that might not have otherwise (again, not a permissible conclusion, as it is far from certain that reporting earlier would mean that the SEC would act earlier, especially given that the final investment was made, according to the SEC, on September 21, 2018, eight months before the SEC even filed this case. Doc. No. 1513-1 at 9). If this Court assesses a penalty for the delay, Mr. Kontilai would be penalized three times over: once for disgorgement for that investor's investment

---

[4] In addition, Mr. Kontilai has not been permitted to raise any defenses to this claim, including, but not limited to, the advice of counsel defense. Mr. Kontilai should be permitted to raise these defenses at this time and the Court should consider these defenses for both liability and remedies. These defenses are relevant with respect to both phases: defenses such as the advice of counsel defense speak directly to an individual's culpability as required for a remedy determination. If an attorney approved the provisions, it cannot be that Mr. Kontilai violated the rule intentionally.

amount, once for the related portion of the civil penalty, and again for the Rule 21F-17 penalty. Given that the SEC seeks the maximum possible civil penalty and the maximum possible disgorgement, it simply makes no sense for any additional penalty to be assessed.

## V.    Injunctive Relief is Not Necessary to Guard Against Future Violations or Harm.

Finally, the SEC requests that this Court enter an injunction "that permanently restrains and enjoins Defendants from violating the laws and rules that they violated." Doc. No. 1513 at 24. Any such ruling would be unnecessary. An injunction is only appropriate where "the defendant might be in a position where future violations could be anticipated." *S.E.C. v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). In other words, "a reasonable likelihood of future violations." *Sec. & Exch. Comm'n v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).

Mr. Kontilai was arrested in Germany on April 22, 2023. Doc. No. 1209. He has spent an entire year in Germany custody. It is uncertain whether Mr. Kontilai will be extradited to the United States. Either way, it is significantly unlikely that Mr. Kontilai will ever be in a position to violate United States securities laws again. Either Mr. Kontilai will not be extradited, in which case he will likely never return to the United States, or he will, where he will face two criminal indictments that potentially involve lengthy periods of imprisonment. Further, he is facing enormous disgorgement and civil penalty awards, which will inevitably leave him destitute. Amidst this backdrop, there is no rational basis to conclude that Mr. Kontilai will ever "be in a position where future violations could be anticipated." *Cavanagh*, 155 F.3d at 135.

## CONCLUSION

Wherefore, for the foregoing reasons, Defendant Mykalai Kontilai respectfully requests that this Honorable Court deny the SEC's motion.

Respectfully submitted,

HANSEL LAW, PC

April 12, 2024                 /s/ Ashton Zylstra
Cary J. Hansel (*pro hac vice*)
Ashton Zylstra (*pro hac vice*)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:      301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com
azylstra@hansellaw.com
*Counsel for Mykalai Kontilai*

## REQUEST FOR EVIDENTIARY TRIAL OR HEARING

Mr. Kontilai respectfully requests an evidentiary trial or hearing on the SEC's Motion for Remedies.

April 12, 2024                 /s/ Ashton Zylstra
Ashton Zylstra (*pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I caused the foregoing to be electronically filed by using the CM/ECF system.

April 12, 2024                 /s/ Ashton Zylstra
Ashton Zylstra (*pro hac vice*)