USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/10/2025

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

        - against -

COLLECTOR'S COFFEE, INC. and MYKALAI
KONTILAI,

                    Defendants,

            - and -

VERONICA KONTILAI,

                    Relief Defendant.

**19 Civ. 4355 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff United States Securities and Exchange Commission ("SEC") brought this enforcement action against defendants Collector's Coffee, Inc. ("Collector's Coffee" or the "Company") and Mykalai Kontilai ("Kontilai," and together with Collector's Coffee, "Defendants"). The SEC alleges violations of the federal securities laws that resulted in near-total losses by Collector's Coffee's investors. The SEC also named Kontilai's spouse Veronica Kontilai ("V. Kontilai" or "Relief Defendant") as a relief defendant in this action, alleging that V. Kontilai received funds from Defendants' ill-gotten gains, with no legitimate claim to such funds.

As described below in greater detail, the Court granted summary judgment in favor of the SEC on one of the SEC's six

claims. The Court then held a seven-day bifurcated jury trial on the SEC's remaining four claims concerning Defendants' liability. The jury returned a verdict in the SEC's favor on those four claims. At trial, the jury did not consider the appropriate measures of remedies or the SEC's claim concerning the Relief Defendant, which the Court reserved for itself to decide as a legal matter pursuant to well-established Second Circuit precedent.

The Court is now presented two competing requests concerning what should occur next. The SEC asks the Court to determine remedies, including a calculation of Defendants' unlawful profits to be disgorged, an assessment of penalties, and the issuance of a permanent injunction. (See SEC Motion for Remedies, Dkt. No. 1512 [hereafter "SEC Motion"].) Defendants and Relief Defendant — citing the United States Supreme Court's decision in SEC v. Jarkesy, 603 U.S. 109 (2024) — ask the Court to set aside the trial verdict and retry this case before a jury without bifurcating the issues of liability and remedies. (See Amended Notice of Supplemental Authority, Dkt. No. 1537 [hereafter "Defendants' Rule 59 Motion" or "Defs.' Rule 59 Mot."].) Defendants alternatively request that the Court hold a second jury trial on remedies, or at least hold an evidentiary hearing. (See Defendants' Memorandum of Law in Opposition to Motion for

Remedies, Dkt. No. 1523 [hereafter "Defendants' Opposition Memorandum" or "Defs.' Opp'n Mem."].)

For the reasons set forth below, the SEC's Motion is hereby **GRANTED IN PART** and **DENIED IN PART** without prejudice. Defendants' Rule 59 Motion is **DENIED**.

## I.    BACKGROUND

The Court assumes the parties' familiarity with the underlying facts of this case, which has been summarized by the Court on several previous occasions. See SEC v. Collector's Coffee, Inc., 697 F. Supp. 3d 138, 147-155, (S.D.N.Y. 2023) (granting preliminary injunction); SEC v. Collector's Coffee, Inc., No. 19 Civ. 4355, 2021 WL 1956369, at *1-3 (S.D.N.Y. May 17, 2021) (recommending denial of motion to dismiss), report and recommendation adopted, No. 19 Civ. 4355, 2021 WL 3082209 (S.D.N.Y. July 21, 2021).

### A.    FACTUAL AND INVESTIGATIVE BACKGROUND

Kontilai founded and incorporated Collector's Coffee in 2007. (See SEC Trial Exs. 1, 3.) Initially, Collector's Coffee aspired to build brick-and-mortar coffee houses at which collectors could congregate and trade in rare collectibles. (See Answer to Am. Compl., Dkt. No. 241 [hereafter "Answer"] ¶¶ 22, 26.) By 2009, the business abandoned its plan to open brick-and-mortar locations and turned its focus instead to

establishing a website (the "CCI Website") that would serve as a marketplace for collectibles dealers and collectors, with Collector's Coffee collecting fees and commissions on any transactions that its platform facilitated. (<u>See</u> SEC Trial Exs. 12, 14.) As a parallel venture, Collector's Coffee also developed at least one episode of a television show (the "CCI Television Show") that showcased collectors and rare collectible items. (Trial Tr. 516:19-517:7.) Also in parallel, Collector's Coffee began to develop an authenticity insurance offering (the "CCI Authenticity Insurance"). (<u>See</u> SEC Trial Ex. 12; Trial Tr. 855:24-856:5.) There is no evidence that any of Collector's Coffee's several ventures ever came to full fruition or generated any revenue.

Collector's Coffee, largely through the efforts of Kontilai, raised nearly $30 million from approximately 200 investors by issuing convertible notes between 2007 and 2018, with upwards of $23 million raised between April 2014 and December 2018 (the "Relevant Period").[1] (<u>See</u> SEC Trial Exs. 75, 81; Declaration of Jacqueline M. Moessner, Dkt. No. 1513-1 [hereafter "Moessner Declaration" or "Moessner Decl."][2].)

---

[1] Pursuant to a tolling agreement between the parties and the relevant statute of limitations, the SEC did not seek to hold Defendants liable for any conduct that occurred prior to April 1, 2014. (<u>See</u> SEC Mem. at 10 n.5.)

[2] For the Moessner Declaration and supporting exhibits, the Court cites to the ECF page numbers.

Communications to prospective investors — including placement memoranda and Kontilai's verbal and written statements — gave a rosy picture of Collector's Coffee's various collectible-related ventures.

Those communications were materially misleading. In particular, Defendants represented that hundreds of collectibles dealers had committed to dealing collectibles exclusively on the CCI Website. Defendants told investors that, as a result of those commitments, billions of dollars' worth of inventory would become available for sale upon the launch of the CCI Website, and Collector's Coffee would soon earn revenue in fees and commissions when that inventory was purchased or sold using the Collector's Coffee platform. (See Trial Tr. 234:20-25, 281:7-282:7, 537:12-538:5, 718:9-18.) In reality, only a handful of dealers had committed to using the CCI Website platform, and those commitments were tentative or temporary. (Id. at 569:19-570:17, 964:18-965:9.)

Collector's Coffee also represented that it held two original contracts signed by the legendary American baseball player Jackie Robinson ("Robinson"): one contract between Robinson and the Montreal Royals signed in 1945, and one contract between Robinson and the Brooklyn Dodgers signed in 1947 (together, the "Jackie Robinson Contracts"). (See SEC Trial Ex. 13.) As early as 2015, Collector's Coffee touted

that it would sell the Jackie Robinson Contracts – which had been appraised for $25 million and $36 million in separate appraisals - to generate much-needed revenue for the Company. (See SEC Trial Ex. 15 at 20, 24.) This, too, was materially misleading. Collector's Coffee never disclosed to investors the advice it received from industry experts that the Jackie Robinson Contracts would be unlikely to sell for the amounts Kontilai expected (and, indeed, Kontilai's refusal to lower the price of the Jackie Robinson Contracts is one reason why Collector's Coffee was never able to sell them). (See Trial Tr. 617:6-618:7, 622:10-625:4, 641:24-643:15, 655:22-656:1.) Moreover, Collector's Coffee never disclosed that it had promised large amounts of the contract sale proceeds to others. (See SEC Trial Ex. 62 at 17; Trial Tr. 656:25-657:19.)

Finally, Kontilai appropriated millions in investor funds for his personal use and omitted any mention to investors of his unrestrained use of those funds for personal expenses. Kontilai primarily accomplished this plundering of corporate funds by directing an associate to make large withdrawals of cash from company accounts and deliver the cash to Kontilai. (Trial Tr. 365:1-374:14, 385:9-389:13, 400:7-405:7; SEC Trial Exs. 31, 74, 75, 110.) Kontilai further directed that associate to disguise those withdrawals as being related to collectibles purchases or Kontilai's salary,

even though Kontilai represented to investors both that the
Company would never carry collectibles inventory because it
was only a collectibles marketplace, not a collectibles
dealer, and that Kontilai performed all work for the Company
without taking any compensation. (See SEC Trial Ex. 35 at 2,
SEC Trial Ex. 40 at 11; Trial Tr. 324:17-23.) Kontilai and V.
Kontilai also used the Company's credit cards to pay for
personal expenses. (See SEC Trial Exs. 84, 88-90; Moessner
Decl. at 15-16.)

Collector's Coffee's persistent difficulty in generating
any revenue — and, by extension, any meaningful returns to
investors — culminated in email complaints from investors in
2015. Kontilai, acting for Collector's Coffee, entered into
a stock purchase agreement (the "2015 SPA") to repurchase the
complaining investors' shares in Collector's Coffee for
$50,015. (See Dkt. No. 938-1.) The 2015 SPA included promises
by those investors not to contact governmental or
administrative agencies or enforcement bodies for the purpose
of prompting an investigation into Collector's Coffee. (See
id.)

Collector's Coffee faced complaints from investors again
in 2017, this time culminating in a lawsuit filed in Nevada
federal court alleging securities fraud, among other claims.
(See Trial Tr. 744:3-25; SEC Trial Ex. 49.) Collector's Coffee

and Kontilai entered into an agreement (the "2017 Settlement Agreement") to settle the case with plaintiff-investors Ed McLaughlin and Kirk Jensen (the "Nevada Plaintiff-Investors"). (See SEC Trial Ex. 49.) The 2017 Settlement Agreement included promises by the Nevada Plaintiff-Investors not to contact or communicate with any regulatory agencies, including the SEC. (See id.) Pursuant to the 2017 Settlement Agreement, Collector's Coffee promised to return the Nevada Plaintiff-Investors' principal investment of $1,500,000. (See id.)

The 2017 lawsuit in Nevada federal court attracted the attention of the SEC enforcement staff, who then began an investigation into Collector's Coffee for possible violations of the federal securities laws. During the SEC's investigation of the Company, Collector's Coffee and Kontilai supplied the SEC with numerous falsified documents, including fake employment agreements, fake loan agreements, and bank statements that had been altered to give the appearance that outflows of cash to Kontilai were legitimate. (See SEC Trial Exs. 57, 58, 65.)

The SEC also approached the Nevada Plaintiff-Investors, who refused to voluntarily answer questions about Collector's Coffee, citing the 2017 Settlement Agreement. The Nevada Plaintiff-Investors cooperated with the SEC only after the

SEC served them with subpoenas. (<u>See</u> Dkt. No. 1093-4 ¶¶ 17-19.) After learning that the Nevada Plaintiff-Investors supplied information to authorities in response to the SEC subpoenas, Collector's Coffee and Kontilai sued the Nevada Plaintiff-Investors for breach of the 2017 Settlement Agreement. (<u>See</u> Answer ¶ 6.) Collector's Coffee and Kontilai also brought claims for fraud, unjust enrichment, intentional interference with contractual relations, civil conspiracy, and breach of the implied covenant of good faith and fair dealing. (<u>Id.</u> ¶¶ 129-33.)[3]

B.    <u>PROCEEDINGS TO ESTABLISH LIABILITY</u>

The SEC brought this lawsuit against Collector's Coffee and Kontilai in May 2019. (<u>See</u> Compl., Dkt. No. 1.) The Complaint, as amended in November 2019, brings six causes of action under federal securities statutes and regulations: (1) that Collector's Coffee and Kontilai violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Exchange Act Rule 10b-5(b) ("Rule 10b-5"), by making fraudulent misstatements and omissions in connection with the sale or purchase of securities; (2) that Collector's Coffee and Kontilai violated Section 17(a)(2) of the Securities Act

---

[3] The lawsuit against the Nevada Investor-Plaintiffs was ultimately dismissed without prejudice for failure to effect service on the defendants. (Answer ¶ 135.)

of 1933 (the "Securities Act") through the same fraudulent misstatements and omissions; (3) that Collector's Coffee and Kontilai's actions amounted to a prohibited fraudulent scheme under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c); (4) that these same actions violated Section 17(a)(1) and (3); (5) that the 2015 SPA, the 2017 Settlement Agreement, and the lawsuit to enforce the 2017 Settlement Agreement violated Rule 21F-17 of the Exchange Act ("Rule 21F-17"); and (6) that V. Kontilai received funds traceable to Collector's Coffee and Kontilai's violations of the securities laws and those funds must be equitably disgorged. (See Am. Compl., Dkt. No. 134.)

This Court granted summary judgment on the SEC's fifth claim, which alleged Collector's Coffee's and Kontilai's violations of Rule 21F-17. See SEC v. Collector's Coffee, Inc., No. 19 Civ. 4355, 2021 WL 5360440, at *3-4 (S.D.N.Y. Nov. 17, 2021). Rule 21F-17 prohibits "any 'person' from taking 'any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications.'" Id. at *4 (citing 17 C.F.R. § 240.21F-17(a)). The Court found that there was no genuine dispute of material fact that Defendants entered into the 2015 SPA and

the 2017 Settlement Agreement, which "expressly prevented [investors] from communicating with the SEC regarding securities laws violations" in violation of Rule 21F-17. <u>Id.</u> The Court also found that Defendants "actually sued to prevent such communications and advertised those suits in order to chill further communication" in violation of Rule 21F-17. <u>Id.</u>

The SEC's remaining four claims regarding Defendants' liability — brought under Section 17 of the Securities Act and Section 10(b) of the Exchange Act — were tried to a jury in December 2023. Pursuant to standard SEC practice, the Court bifurcated the issues of liability and remedies, and the jury heard only the evidence that was relevant to liability. <u>See</u> <u>SEC v. Collector's Coffee, Inc.</u>, 19 Civ. 4355, 2023 WL 8111865, at *2-3 (S.D.N.Y. Nov. 22, 2023) (excluding evidence relating to the proper amount of disgorgement because "the jury's singular role is to determine Defendants' liability at trial"). The Court heard testimony of eleven live witnesses over the course of the seven-day trial. The Court also received into evidence 104 exhibits for the jury's consideration. The jury returned a verdict in favor of the SEC on all four remaining counts as to both Defendants.

C.    <u>PARALLEL CRIMINAL PROCEEDINGS</u>

In addition to capturing the attention of the SEC's enforcement department, Defendants' conduct captured the attention of the United States Department of Justice (the "Justice Department"), which also began an investigation into potential criminal violations of federal securities laws. As that investigation proceeded in late 2019, Kontilai departed the United States. On September 2, 2019, Kontilai arrived in Russia and sought asylum there on the basis that he feared political persecution by governmental authorities in the United States, in particular the SEC. (<u>See</u> Decl. of Mykalai Kontilai, Dkt. No. 409-1.) More specifically, Kontilai told Russian authorities that he was a journalist who revealed corrupt schemes within the United States government and therefore faced civil charges in retaliation by the SEC. (<u>See</u> Decl. of Mykalai Kontilai, Ex. 5, Dkt. No. 409-6; <u>see also</u> Dkt. No. 1532-1 (certified translation of same).) Kontilai also told Russian authorities that the United States government threatened him with physical reprisal and imprisonment on fabricated charges, and that Kontilai would be subject to degrading punishments and treatment. (<u>See</u> <u>id.</u>) Russian authorities denied Kontilai's asylum request. (<u>See</u> <u>id.</u>)

On March 10, 2020, Kontilai was indicted by a federal grand jury in Colorado for conspiring to obstruct official proceedings, obstructing official proceedings, tampering with documents, and making false statements, all in connection with Kontilai's obfuscation of the SEC's investigation into Collector's Coffee. (See Decl. of Robert Heim, Ex. 1, Dkt. No. 637-1; see also United States v. Kontilai, 20 Cr. 83, Dkt. No. 1 (D. Colo. Mar. 10, 2020).) On June 3, 2020, Kontilai was again indicted — this time by a federal grand jury in Nevada — for securities fraud, wire fraud, money laundering, and willful failure to file tax returns, all in connection with the same conduct that forms the basis of this action. (See Decl. of Robert Heim, Ex. 2, Dkt. No. 637-2; see also United States v. Kontilai, 20 Cr. 109, Dkt. No. 1 (D. Nev. Jun. 3, 2020).)

Although arrest warrants were issued for Kontilai, he remained at large in Europe until German authorities apprehended him on April 22, 2023, pursuant to an Interpol Red Notice. (See Dkt. No. 1209; see also Transfer Report and Certified Translation, Dkt. No. 1532-3.) Kontilai remained in German custody while he contested his extradition to the

United States.[4] (See Dkt. No. 1411 at 2-4; see also Dkt. No. 1463 at 1-2.) Kontilai was eventually extradited to the United States and appeared in the United States District Court for the District of Nevada on May 7, 2024. (See Dkt. No. 1526.)

On November 21, 2024, Kontilai pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 pursuant to a plea agreement. (See United States v. Kontilai, 20 Cr. 109, Dkt. No. 24 (D. Nev. Nov. 21, 2024).) On December 4, 2024, Kontilai was sentenced to 51 months' imprisonment and ordered to pay $6,100,000 in restitution. (See Dkt. No. 1600-1.) As part of the plea agreement, the Justice Department dismissed the pending criminal case in Colorado. (See id.) Kontilai is currently incarcerated. (See id.)

D.  THE INSTANT MOTION

The SEC filed its Motion for remedies on March 1, 2024, pursuant to the Court's so-ordered briefing schedule. (See Dkt. No. 1500.) The SEC Motion was accompanied by a memorandum of law, (see SEC Memorandum of Law in Support of Motion for Remedies, Dkt. No. 1513 [hereafter "SEC Memorandum" or "SEC Mem."]), the Moessner Declaration with three accompanying exhibits thereto, (see Moessner Decl.), and excerpts from

---

[4] Kontilai remained in German custody for the duration of this Court's jury trial. The Court did not permit him to testify remotely. (See Dkt. No. 1411 at 2-4.)

Kontilai's deposition testimony. (See Dkt. No. 1513-4.) Defendants filed an opposition memorandum, (see Defs.' Opp'n Mem.), and an expert declaration (see Declaration of Stefano Vranca, Dkt. No. 1523-1 [hereafter "Vranca Declaration" or "Vranca Decl."]).[5]

The SEC thereafter replied. (See SEC Reply Memorandum of Law in Support of Motion for Remedies, Dkt. No. 1524 [hereafter "SEC Reply Memorandum" or "SEC Reply Mem."].) V. Kontilai filed a separate opposition memorandum, (see (Conditional) Memorandum of Relief Defendant Veronica Kontilai in Response to Motion for Remedies, Dkt. No. 1518 [hereafter "Relief Defendant's Opposition Memorandum" or "Relief Def.'s Opp'n Mem."]), to which the SEC separately replied. (See SEC Reply Memorandum of Law in Support of Motion for Remedies as to Relief Defendant Veronica Kontilai, Dkt. No. 1525 [hereafter "SEC Reply Memorandum to Relief Defendant" or "SEC Reply Mem. to Relief Def."].)

After the SEC Motion had been fully briefed, the SEC filed a notice of supplemental evidence concerning Kontilai's financial condition, particularly admissions made by Kontilai while making a bail application in his criminal case in

---

[5] The Vranca Declaration, to which the Vranca Report is attached, was originally submitted in connection with Defendants' efforts to modify the asset freeze and preliminary injunction in 2022. (See Dkt. No. 1094-1.)

Nevada. (<u>See</u> Dkt. No. 1527.) Defendants supplied a responsive letter, (<u>see</u> Dkt. No. 1529), and Kontilai himself supplied a responsive declaration. (<u>See</u> Dkt. No. 1530-1.) The SEC thereafter replied. (<u>See</u> Dkt. No. 1532.)

While the SEC's Motion was still pending, Defendants filed a notice of supplemental authority concerning the United States Supreme Court's decision in <u>SEC v. Jarkesy</u>; the Court has construed this notice to be a motion to set aside the trial verdict pursuant to Federal Rule of Civil Procedure 59 ("Rule 59"). (<u>See</u> Defs.' Rule 59 Mot.) The SEC thereafter responded, (<u>see</u> SEC Response to Notice of Supplemental Authority, Dkt. No. 1538 [hereafter "SEC Response to Rule 59 Motion" or "SEC Resp. to Rule 59 Mot."]), and Defendants replied. (<u>See</u> Defendants' Letter Motion Requesting a New Trial, Dkt. No. 1540 [hereafter "Defendants' Rule 59 Reply"].)

## II.  <u>**RULE 59 DISCUSSION**</u>

Before considering the merits of the SEC's requests to assess remedies in this case, the Court must first consider whether Defendants are entitled to a new trial under the Seventh Amendment pursuant to the holding in <u>SEC v. Jarkesy</u>, 603 U.S. 109 (2024). Rule 59 permits the Court to "grant a new trial" to any party "for any reason for which a new trial

has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), as long as twenty-eight days have not passed since the entry of judgment. Fed. R. Civ. P. 59(b). Judgment has not been entered in this matter, so Defendants' request for a new trial under Rule 59(a) is timely. However, for the reasons explained below, Defendants are not entitled to a new trial under Jarkesy.

Constitutional infirmities in trial procedures comprise the types of legal errors that may justify a new trial under Rule 59. Defendants contend that the Court's bifurcation of proceedings in this case — and, more specifically, reserving for itself issues of remedies — violated the Seventh Amendment of the United States Constitution. (See Defs.' Rule 59 Mot.)

The Seventh Amendment guarantees a right to a jury determination of facts "[i]n Suits at common law." U.S. Const. amend. VII. The Supreme Court interprets the term "Suits at common law" to refer to "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 347-48 (1998) (citation omitted). The Supreme Court has further held that Seventh Amendment safeguards are not limited to common-law actions that existed at the time of the Amendment's ratification, but

also extend to "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989).

"[T]he close relationship between federal securities fraud and common law fraud confirms" that an SEC enforcement action is "legal in nature" and therefore subject to the jury right embraced by the Seventh Amendment. Jarkesy, 603 U.S. at 126 (citation omitted). Drawing on this language, Defendants contend that their Seventh Amendment rights would be violated if this Court makes its own findings of fact when determining remedies, even after a jury determined liability. (See Defs.' Rule 59 Mot. at 3.) More specifically, Defendants would like a jury to perform the disgorgement calculation in this case and decide what funds Defendants obtained through their frauds, what funds Defendants already restituted to investors, and what funds should not be disgorged because they were spent for legitimate business purposes. (See id.) Defendants misunderstand the holding in Jarkesy, which arose in a procedural posture entirely different from this case.

To be precise, Jarkesy was not a challenge to the practice of federal judges finding facts relating to remedies

in SEC enforcement actions, but instead was a challenge to the statute authorizing the SEC to determine liability and assess penalties against a defendant before an in-house administrative law judge. Jarkesy, 603 U.S. at 119-20. As important background on the SEC enforcement practices challenged in Jarkesy, the SEC may bring an enforcement action in one of two forums: the SEC can either "adjudicate the matter itself" or "it can file suit in federal court." Id. at 116. "[W]hen the SEC adjudicates the matter in-house, there are no juries." Id. at 117. For in-house proceedings, the Commission may "delegate its role as judge and factfinder to one of its members or to an administrative law judge [] that it employs." Id. By comparison, for actions brought in federal court, "a jury finds the facts, depending on the nature of the claim," and "a life-tenured, salary-protected Article III judge presides." Id.

In Jarkesy, the SEC's claims of securities fraud were adjudicated by an administrative law judge employed by the SEC itself, not by a federal court. Id. at 118-19. Indeed, the securities fraud defendants in Jarkesy sought the same treatment that the Defendants received here: adjudication of the SEC's fraud claims in an Article III federal court. See id. at 119-20. Because Jarkesy arose from an in-house SEC assessment of penalties for securities fraud, that case says

little about which (if any) factual questions an Article III court may withdraw from the jury and decide for itself.

Rather, Tull v. United States settled that the Seventh Amendment does not require a jury determination of remedies in enforcement actions brought by a governmental agency in federal court. 481 U.S. 412, 425-27 (1987); id. at 427 ("[A] determination of a civil penalty is not an essential function of a jury trial and [] the Seventh Amendment does not require a jury trial for that purpose in a civil action."); see also SEC v. Tome, 833 F.2d 1086, 1096 n.7 (2d Cir. 1987) ("[T]he Seventh Amendment right to a jury trial does not apply to the equitable actions for disgorgement."); SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 95 (2d Cir. 1978) (same regarding disgorgement and permanent injunction). Moreover, Tull is cited repeatedly with approval by the Supreme Court in Jarkesy, reinforcing this Court's conclusion that Jarkesy did not disturb the holding in Tull. See Jarkesy, 603 U.S. at 120-125, 133-34, 136, 139.

Here, Defendants had a jury trial that conclusively established their liability for violations of the antifraud provisions of both the Securities Act and the Exchange Act. Defendants' Seventh Amendment right to a jury trial has therefore been honored by this Court. See Tull, 481 U.S. at

426-27. Accordingly, Defendants' request for proceedings to determine remedies before a jury is hereby **DENIED**.

### III. <u>REMEDIES DISCUSSION</u>

Turning to the merits, the SEC seeks several remedies against Defendants Kontilai and Collector's Coffee, as well as disgorgement for Relief Defendant V. Kontilai. The Court addresses in turn the remedies seeking disgorgement, civil penalties, and issuance of a permanent injunction.

A.    <u>DISGORGEMENT BY DEFENDANTS</u>

The SEC requests that Collector's Coffee and Kontilai jointly and severally disgorge $23,035,824 in ill-gotten gains and $2,515,650 in prejudgment interest. Upon collection of any disgorgement award, the SEC intends to make a distribution to harmed investors, to the extent feasible. (<u>See</u> SEC Mem. at 13.) For the reasons explained below, the Court finds that Defendants are jointly and severally liable for $21,910,824.84 in disgorgement and $2,444,911.52 in prejudgment interest, and that the SEC is entitled to judgment in those amounts.

1.    Legal Standard

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies," including disgorgement. <u>SEC v. First</u>

Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). The Exchange Act, as amended, states that "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). Section 78u(d)(5) similarly permits "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5); see also Liu v. SEC, 591 U.S. 71, 75 (2020) (holding the SEC may seek disgorgement as a form of equitable relief under Section 78u(d)(5)).

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014); Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990) (recognizing the purpose of disgorgement "is to prevent unjust enrichment"). As an equitable remedy, disgorgement is limited to "a wrongdoer's net profits," meaning "the gain made upon any business or investment, when both the receipts and payments are taken into account." Liu, 591 U.S. at 75, 83 (internal quotation marks omitted and citation omitted); see also SEC v. Ahmed, 72 F.4th 379, 396 (2d Cir. 2023) (holding that Liu's analysis under Section 78u(d)(5) applies to disgorgement under Section 78u(d)(7)).

2.    Disgorgement Calculation Framework

The Second Circuit applies a two-step framework to calculate equitable monetary relief. SEC v. Gallison, No. 15 Civ. 05456, 2023 WL 8813637, at *3 (S.D.N.Y. Aug. 8, 2023). When seeking disgorgement, "the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (citation omitted). Because "separating legal from illegal profits exactly may at times be a near-impossible task," as long as the SEC's disgorgement calculation is reasonable, any risk of uncertainty should "fall on the wrongdoer whose illegal conduct created that uncertainty." Id. (citations omitted).

Once the SEC has met the applicable standard, the burden shifts to the defendant to show that the SEC's disgorgement figure is inaccurate. SEC v. O'Brien, No. 23 Civ. 1071, 2024 WL 2813722, at *2 (2d Cir. June 3, 2024). The defendant satisfies his burden by "demonstrating that he received less than the full amount allegedly misappropriated and sought to be disgorged." SEC v. Benson, 657 F. Supp. 1122, 1133

(S.D.N.Y. 1987). The defendant may also rebut the SEC's calculation by identifying additional "legitimate" business expenses that should be deducted from an otherwise reasonable disgorgement amount. See SEC v. Fowler, 6 F.4th 255, 267 (2d Cir. 2021).

3.    The SEC's Disgorgement Calculation

The SEC seeks a disgorgement award of $23,035,824, arguing that this figure is a reasonable approximation of Defendants' net profits from their unlawful conduct. (SEC Mem. at 12-13; "SEC Resp. December 2024 Order" at 3, Dkt. No. 1587.) The SEC submitted the Moessner Declaration to support its position that Defendants raised $23,035,824 from investors since April 1, 2014. (Moessner Decl. at 5-9.) To calculate Defendants' net profits, the SEC accounted for investments made to Collector's Coffee that appeared in the Company's bank records. (Moessner Decl. at 2-3.) The SEC also accounted for five payments Defendants made to investors, also based on the Company's bank records. (Moessner Decl. at 6, 8.) One of these payments was advanced in connection with the 2015 SPA, by which Defendants repurchased a group of investors' shares in Collector's Coffee for $50,015. (Id. at 6.) However, the SEC did not account for Defendants' payments made to the Nevada Plaintiff-Investors in relation to the

2017 Settlement Agreement. (See "December 2024 Order," Dkt. No. 1584.)

Courts routinely account for money returned to investors in disgorgement calculations. See SEC v. Govil, 86 F.4th 89, 106-07 (2d Cir. 2023); SEC v. Pierre, No. 19 Civ. 10299, 2024 WL 1994051, at *10 (S.D.N.Y. May 6, 2024). Given that disgorgement is an equitable remedy, a defendant is "only required to give back the proceeds of his securities fraud once." SEC v. Palmisano, 135 F.3d 860, 863 (2d Cir. 1998) (citation omitted); Liu, 591 U.S. at 80 (under equitable principles, a wrongdoer "should not profit by his own wrong" but also "should not be punished by paying more than a fair compensation to the person wronged" (citations and alteration omitted)). Otherwise, "forcing a defendant to pay disgorgement twice amounts to a penalty." Govil, 86 F.4th at 107. Based on these equitable principles, the Court directed the SEC to submit a revised disgorgement calculation that accounted for all of Defendants' payments made to investors during the Relevant Period. (See December 2024 Order.)[6]

The SEC's revised net profits approximation of $21,910,824.84 now accounts for the Company's payments to the

---

[6] The SEC submitted its revised disgorgement calculation on January 14, 2025. (See SEC Resp. December 2024 Order.) Defendants submitted a response on January 29, 2025. (See "Defs.' Resp. December 2024 Order," Dkt. No. 1601.)

Nevada Plaintiff-Investors.[7] (SEC Resp. December 2024 Order
at 3.) Nonetheless, the SEC maintains that Defendants'
payments to the Nevada Plaintiff-Investors should not be
considered because the 2017 Settlement Agreement was illegal
and thus those payments constituted illegitimate business
expenses. (SEC Reply Mem. at 3-4; SEC Resp. December 2024
Order at 3.) The SEC appears to "confuse[] deductions for
business expenses . . . with payments in satisfaction of
disgorgement." Govil, 86 F.4th at 110. Moreover, the SEC's
position is contradictory because it accounted for the 2015
SPA payment in the Moessner Declaration, but not the 2017
Settlement Agreement payments, despite both agreements
containing illegal confidentiality clauses. As this Court
previously held, both the 2015 SPA and the 2017 Settlement
Agreement violated Rule 21F-17 because they included
provisions prohibiting investors from contacting or
communicating with regulatory agencies. See Collector's

_____

[7] The SEC submitted that Defendants paid the Nevada Plaintiff-Investors
$1,125,000 of the $1,500,00 owed under the 2017 Settlement Agreement.
(See SEC Resp. December 2024 Order at 1-2; December 2024 Order at 3.) The
first payment of $750,000 was made from Kontilai's personal bank account
at TD Bank to counsel for the Nevada Plaintiff-Investors on June 27, 2017.
(SEC Resp. December 2024 Order at 1.) There are no records of the remaining
payment(s) totaling $375,000; however, Defendants stated in the Nevada
litigation that they had paid the Nevada Plaintiff-Investors $1,125,000
under the 2017 Settlement Agreement and the SEC conferred with counsel
for the Nevada Plaintiff-Investors, who confirmed the same. (Id. at 1-
2.) Defendants did not dispute the SEC's figure of $1,125,000 in their
response. (See Defs.' Resp. December 2024 Order.) Thus, there is no
indication that Defendants ever paid the remaining $375,000 owed to the
Nevada Plaintiff-Investors under the 2017 Settlement Agreement.

Coffee, Inc., 2021 WL 5360440, at *3-4. Thus, to properly account for Defendants' payments back to investors, the Court adopts the SEC's revised net profits approximation of $21,910,824.84.

The Court finds that the SEC's revised net profits approximation of $21,910,824.84 is sufficiently supported by the Company's bank records, as summarized in the Moessner Declaration and the SEC's supplemental submission, and is thus a reasonable calculation of the applicable disgorgement figure. The Moessner Declaration, as revised, accounts for payments from investors to the Company as well as the Company's payments back to investors, including the 2015 SPA and the 2017 Settlement Agreement. (Moessner Decl. at 2-3, 5-9; SEC Resp. December 2024 Order at 3.) See SEC v. Bajic, No. 20 Civ. 7, 2023 WL 6289953, at *3 (S.D.N.Y. Sept. 27, 2023). The Court finds that the SEC has met its initial burden of establishing a reasonable computation of Defendants' disgorgement.

### 4. Defendants' Rebuttal of the Disgorgement Calculation

The burden now shifts to Defendants to dispute the reasonableness of the SEC's disgorgement calculation. See O'Brien, 2024 WL 2813722, at *2. Defendants argue that the SEC did not account for the Company's legitimate business

expenses. (Defs.' Opp'n Mem. at 6-14.) Defendants allege that during the Relevant Period Collector's Coffee made numerous expenditures for legitimate business purposes, as evidenced by the expert report of Stefano Vranca ("Vranca") and anecdotal witness testimony at trial. (Id.) Defendants also contend that many of these expenses were "self-evidently" legitimate. (Id.) Further, Defendants argue that an evidentiary hearing is necessary because this Court has not given them an opportunity to present evidence of these legitimate business expenses. (Id. at 6.) However, as explained below, Defendants have not offered any reliable evidence of legitimate business expenses, nor is an evidentiary hearing necessary.

Attempting to prove the Company's purportedly legitimate business expenses, Defendants primarily rely on Vranca's expert report, which was initially submitted to modify the asset freeze and preliminary injunction in 2022. (See id. at 13-14; Vranca Decl.) At the preliminary injunction stage, Magistrate Judge Gabriel Gorenstein concluded that Vranca's expert report was "essentially worthless" because Vranca's analysis of the Company's business expenses "consisted of simply questioning whether such an expense could conceivably be made for the benefit of a company [of Collector's Coffee's] size, without any sort of investigation or analysis as to

28

whether the expenses were legitimate or actually made for [Collector's Coffee's] benefit." <u>Collector's Coffee, Inc.</u>, 697 F. Supp. 3d at 153. Ultimately, Vranca "ha[d] absolutely no idea" whether expenses were "proper or legitimate" and merely determined that "these expenses, in the grossest sense, are expenses that businesses incur." <u>Id.</u> Magistrate Judge Gorenstein found that Defendants, relying solely on Vranca, "ha[d] not offered any competent [evidence] as to what expenses [were] actually legitimate." <u>Id.</u> at 173 n.15.

In the same vein, this Court granted the SEC's motion *in limine* to exclude Vranca's testimony from trial. (Dkt. No. 1440.) This Court explained that even though Vranca "appear[ed] to have the academic and professional qualifications to testify as an expert," he "d[id] not offer opinions with sufficient reliability." (<u>Id.</u> at 7.) Vranca assumed "that the millions in expenses, loan repayments, and compensation were lawful expenditures that Collector's Coffee incurred in good faith." (<u>Id.</u> at 7.) However, "Vranca d[id] not grapple with the considerable record evidence that contradict[ed] these assumptions," concluding instead "that the expenses were lawful because they [were] conceivably related to the Collector's Coffee business." (<u>Id.</u>) Even though "Vranca purport[ed] to compare Collector's Coffee's expenses to businesses of comparable size," "his report d[id]

29

not explicate his methodology in this respect." (Id. at 7-8.)

Undeterred by the absence of evidence refuting those findings, Defendants now insist that the Court should accept Vranca's report as sufficient evidence to rebut the SEC's calculations regarding legitimate business expenses. (See Defs.' Opp'n Mem. at 12-14.) However, the fundamental flaws of Vranca's report – which were previously identified by this Magistrate Judge Gorenstein and by this Court - remain unchanged. Accordingly, the Court finds that Vranca's expert report is not reliable evidence to identify the Company's legitimate business expenses.

Nor can Defendants escape Vranca's flawed opinions by offering him as a lay witness instead of as an expert.[8] (See Defs.' Opp'n Mem. at 4-6.) Vranca is "clearly an 'expert'" that brought his "technical background to bear" in examining Defendants' accounts and records and was "specifically engaged" for that purpose. Bank Brussels Lambert v. Chase Manhattan Bank, N.A., 175 F.R.D. 34, 42 (S.D.N.Y. 1997).

---

[8] Defendants once again object to the SEC's reliance on Moessner as a lay witness. (Defs.' Opp'n Mem. at 5-6; Relief Def.'s Opp'n Mem. at 11-13.) The Court reiterates its previous holding that Moessner was appropriately presented as a lay witness and that the Moessner Declaration and accompanying exhibits "centralize voluminous financial records" that "contain no analysis and are instead simply a distillation of admissible evidence" that "does not amount to an offer of expert testimony based on a witness's scientific, technical, or specialized knowledge." (Dkt. No. 1440 at 25-26.)

Defendants contend, without reliable support, that Vranca "does not forfeit [his] status as an expert merely because [he] learned 'facts' in the course of its investigation in addition to developing expert opinions." Id. at 42-43.

Defendants also insist that an evidentiary hearing is needed to adequately address the question of legitimate business expenses. No hearing is required here. A district court has broad discretion "in calculating the amount to be disgorged." Contorinis, 743 F.3d at 301 (quoting First Jersey Sec., Inc., 101 F.3d at 1474-75). An evidentiary hearing is unnecessary where there is a "sufficient basis from which to evaluate the fairness of the disgorgement sought by the SEC." SEC v. Boock, No. 09 Civ. 08261, 2014 WL 7641158, at *7 (S.D.N.Y. Oct. 27, 2014) (citation omitted). As explained above, the SEC's submission and supporting evidence are sufficient for this Court to make a remedies determination without conducting a hearing. See SEC v. Becker, No. 09 Civ. 5707, 2010 WL 2165083, at *3 (S.D.N.Y. May 28, 2010).

Nor will an evidentiary hearing cure Defendants' failure to submit reliable evidence bolstering a reasonable disgorgement calculation. Contrary to Defendants' assertions, Defendants were not prevented from submitting evidence of legitimate business expenses at the remedies stage. For example, Defendants could have submitted affidavits and other

corroborating evidence to support their position on various business expenses, including those referenced anecdotally at trial, but failed to do so. See Gallison, 2023 WL 8813637, at *4 (defendants failed to prove any legitimate business expenses because they offered no documentation to support the claimed expenses and did not corroborate the use of funds that were received); SEC v. Amah, No. 21 Civ. 6694, 2024 WL 3159846, at *4 (S.D.N.Y. June 25, 2024) (no deductions for business expenses where defendant merely submitted a list of "purported expenses without any underlying support or explanation for them" such as "corresponding business records" or "a sworn declaration corroborating the information"). Instead, Defendants submitted only Vranca's report, which this Court has repeatedly found was fundamentally flawed, in part because Vranca did not reliably determine whether an expense was legitimate.

The trial testimony Defendants cite, without more, is insufficient to prove the Company's legitimate business expenses. (See Defs.' Opp'n Mem. at 6-11.) Although the Court will not belabor these various shortcomings, the Court provides some illustrative examples. Defendants point to numerous expenses related to the CCI Television Show and CCI Website, but the trial testimony indicates that many of those expenses were incurred before the Relevant Period and are

thus improper for calculating disgorgement. Those referenced expenses include Gary Ferrell's testimony that Kontilai paid $495,000 to produce the pilot of the CCI Television Show sometime in the summer of 2008, (Trial Tr. 503:2-11, 509:22-510:4), Kontilai's deposition testimony, which was read to the jury, that Collector's Coffee entered into an agreement with Bite Size Television to distribute the CCI Television show in 2013, (id. at 1169:1-20), and that Collector's Coffee had spent "seven figures plus" on the CCI Website by 2013. (Id. at 1160:11-1162:9.) Moreover, Defendants' references to broad categories of expenses fall short of the specificity needed to dispel any uncertainty regarding the date, amount, or purpose of each expense. See Razmilovic, 738 F.3d 14 at 31. For instance, even though Collector's Coffee had paid employees, Defendants did not submit any evidence related to their salaries, such as how much the employees were paid or the scope or length of their employment. Defendants also overlooked witness testimony indicating that Kontilai refused to pay at least one employee, and some employees were terminated and re-hired several times. (Trial Tr. 340:17-341:10, 381:16-383:19.) See Gallison, 2023 WL 8813637, at *4; Amah, 2024 WL 3159846, at *4.

Nor did Defendants seek leave to request additional pages under Section II.D of the Court's Individual Practices,

even though Defendants now argue that the page limits prevented them from presenting evidence of expenses. (See Defs.' Opp'n Mem. at 13.) And when given another opportunity to present evidence of funds paid back to investors, (see December 2024 Order), Defendants resubmitted Vranca's report but did not address the SEC's accounting or provide additional evidence of funds returned to investors during the Relevant Period. (See Defs.' Resp. December 2024 Order.)

Given the lack of evidence and the principle that a defendant "will not be allowed to diminish the show of profits by putting in . . . inequitable deductions" where "the entire profit of a business or undertaking results from the wrongful activity," the SEC was not required to deduct any business expenses from the disgorgement calculation. Liu, 591 U.S. at 84 (internal quotations marks omitted). Defendants have failed to prove that any legitimate business expenses should be deducted or that the SEC's calculation of their unlawful gains is inaccurate. The Court finds that the SEC's approximation of Defendants' net profits remains $21,910,824.84.

5.   Restitution in Parallel Criminal Action

Separately, Defendants argue that this Court must limit disgorgement to the restitution ordered in Kontilai's parallel criminal proceeding in Nevada federal court. (Defs.'

Resp. December 2024 Order at 2-3.) The restitution order imposed in that action requires Kontilai to pay $6.1 million in restitution to dozens of investors. (Dkt. No. 1600-1 at 8-19 (investor list with pro rata restitution amounts).) However, this argument fails because Defendants overlook the distinction between criminal and civil remedies.

"The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to protect the separate interest of different federal agencies at the same time." SEC v. Credit Bancorp, Ltd., 738 F. Supp. 2d 376, 389 (S.D.N.Y. 2010) (citation omitted). In terms of remedies, "Congress may impose both a criminal and a civil sanction in respect to the same act or omission," because the Double Jeopardy Clause "protects only against the imposition of multiple *criminal* punishments for the same offense" in successive proceedings. Palmisano, 135 F.3d at 864-65 (citations omitted). Courts have repeatedly found that "disgorgement, Commission penalties, and injunctions are civil" remedies, not criminal, and "thus do not violate the Double Jeopardy Clause." Credit Bancorp, Ltd., 738 F. Supp. 2d at 389 (listing cases). Accordingly, overlapping remedies between criminal and civil actions are permissible – and common - in cases like the one now before the Court.

Defendants argue that Kontilai's liability to investors has already been decided, as evidenced by the $6.1 million restitution order imposed in the Nevada parallel criminal proceeding. (Defs.' Resp. December 2024 Order at 2-3.) According to Defendants, that restitution order precludes this Court from imposing a larger disgorgement award based on the doctrines of collateral estoppel and res judicata. (Id.) Not so. The doctrines of collateral estoppel and res judicata do not require equivalent restitution and disgorgement amounts because restitution and disgorgement are distinct remedies: "[R]estitution aims to make the damaged persons whole, while disgorgement aims to deprive the wrongdoer of ill-gotten gains." SEC v. Drexel Burnham Lambert, Inc., 956 F. Supp. 503, 507 (S.D.N.Y. 1997); cf. Contorinis, 743 F.3d at 306-07 (criminal forfeiture did not limit civil disgorgement because "the two remedies reflect different characteristics and purposes" and "reflect the diversity of corrective action necessary to enforce the securities regime"). "Although disgorged funds may often go to compensate securities fraud victims" such as investors "for their losses, such compensation is a distinctly secondary goal." SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997). Thus, "a district court may order disgorgement

36

regardless of whether the disgorged funds will be paid to such investors as restitution." Id. at 176.

Given that "disgorgement and restitution are separate remedies with separate goals," these remedies "need not be treated the same." SEC v. Smith, 646 F. App'x 42, 44 (2d Cir. 2016) (holding collateral estoppel did not limit the disgorgement amount in a civil action to the restitution amount in the related criminal action); SEC v. Namer, No. 97 Civ. 2085, 2004 WL 2199471, at *7 (S.D.N.Y. Sept. 30, 2004) ("[R]es judicata does not apply in [Defendants'] favor because the remedies available in a civil action are unavailable in a criminal action."). Indeed, courts routinely impose disgorgement awards that are larger than the restitution ordered in the parallel criminal case. See e.g., Palmisano, 135 F.3d at 864. In the instant action, the Court will not reduce the disgorgement award to match the restitution ordered in Kontilai's parallel criminal case in Nevada.

Although not an issue raised by the parties, the Court is mindful that restitution payments in a parallel criminal action are routinely credited towards the disgorgement ordered against the same defendant in a civil enforcement action because a defendant is "only required to give back the proceeds of his securities fraud once." Palmisano, 135 F.3d

at 863 (citation omitted); see id. at 863-64 (holding any payments made towards the $3.7 million restitution order would be applied to the $9.2 million disgorgement order); Credit Bancorp, Ltd., 738 F. Supp. 2d at 391 ("To the extent that [Defendant] has paid or pays the amount owed in restitution, the amount of his disgorgement obligation may be offset accordingly."). Although Defendants make no suggestion that Kontilai has made any restitution payments, to the extent that Kontilai pays or has paid restitution as ordered in the Nevada criminal judgment, such payments will offset his disgorgement obligation in this action. See Opulentica, LLC, 479 F. Supp. 2d at 331.

> 6.    Prejudgment Interest

In connection with a disgorgement award, a district court has discretion to award prejudgment interest "for the period during which a defendant had the use of his illegal profits." Razmilovic, 738 F.3d at 36. Imposing prejudgment interest on a disgorgement award "prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011) (citation omitted). If awarded, prejudgment interest is generally calculated using the Internal Revenue Service ("IRS") underpayment rate set forth

in 26 U.S.C. § 6621(a)(2). See SEC v. Airborne Wireless
Network, No. 21 Civ. 01772, 2024 WL 4891899, at *9 (S.D.N.Y.
Nov. 26, 2024).

Here, an award of prejudgment interest is necessary to
adequately capture the full measure of Defendants' ill-gotten
gains, as Defendants had improper access to those funds for
years until their assets were frozen in May 2019 in connection
with this litigation. See Collector's Coffee, Inc., 697 F.
Supp. 3d at 148; SEC v. Universal Exp., Inc., 646 F. Supp. 2d
552, 566 (S.D.N.Y. 2009). Applying the IRS underpayment rate
to the amount of disgorgement ordered above, the prejudgment
interest totals $2,444,911.52. (See SEC Resp. December 2024
Order at 3.) Defendants do not challenge the SEC's prejudgment
interest calculation, and the Court finds that the SEC's
calculation is sound. (See id.; Dkt. No 1513-2.)

    7.   Joint and Several Liability

The SEC seeks to hold Defendants jointly and severally
liable for the disgorgement and prejudgment interest awards.
When multiple defendants collaborate in the illegal conduct
and liability must be apportioned among them, courts have the
discretion to impose joint and several liability up to the
amount of their combined gains derived from the illegal
conduct. See SEC v. AbsoluteFuture.com, 393 F.3d 94, 97 (2d
Cir. 2004).

Joint and several liability is particularly appropriate where apportionment of the disgorgement award is difficult or practically impossible because the defendants engaged in complex, heavily disguised transactions in an effort to conceal their fraud. See Boock, 2014 WL 7641158, at *3. Like with disgorgement, defendants may be held jointly and severally liable for prejudgment interest because of their collaboration and close relationship in committing the fraud. Becker, 2010 WL 2165083, at *4.

Defendants argue that they cannot be held jointly and severally liable for the disgorgement award under Liu v. SEC, 591 U.S. 71 (2020). (See Defs.' Opp'n Mem. at 17-18.) Defendants misinterpret Liu on this point. Liu did not categorically reject a disgorgement award imposed against multiple parties. See FTC v. Shkreli, 581 F. Supp. 3d 579, 642 (S.D.N.Y. 2022). Rather, the Supreme Court found that disgorgement cannot be applied jointly and severally where such a remedy was not available at common law. Liu, 591 U.S. at 90. As relevant here, the Supreme Court recognized that common law did permit joint and several liability for "partners engaged in concerted wrongdoing." Id. Thus, "[j]oint and several liability for disgorgement is properly imposed when multiple defendants have collaborated in an illegal scheme." Shkreli, 581 F. Supp. 3d at 642.

40

Indeed, courts before and after Liu have found joint and several liability is appropriate where individual and corporate co-defendants were "partners engaged in concerted wrongdoing." Liu, 591 U.S. at 90; First Jersey Sec., Inc., 101 F.3d at 1475 (affirming joint and several disgorgement award "where [the] firm ha[d] received gains through its unlawful conduct" and "its owner and chief executive officer ha[d] collaborated in that conduct and ha[d] profited from the violations"); SEC v. Bronson, 602 F. Supp. 3d 599, 618-19 (S.D.N.Y. 2022) (imposing joint and several liability on individual and company defendants where the individual defendant was "integral to the scheme, which he ran through the companies that he controlled").

Joint and several liability is appropriate here. Courts in this Circuit have imposed disgorgement awards jointly and severally on defendants, including individuals and corporate entities, where the individual defendant was "'primarily liable' for the fraud that created the profits, was 'intimately involved' in the perpetration of the fraud, and was a 'controlling person' of the company." SEC v. Oppenheimer, No. 15 Civ. 5456, 2024 WL 3342098, at *3 (S.D.N.Y. July 8, 2024) (citations and alterations omitted). Kontilai and Collector's Coffee, which Kontilai founded and solely controlled, were partners in wrongdoing. Kontilai was

primarily liable for the fraud that created the resulting net profits, was intimately involved in the perpetuation of the fraud, and was a controlling person of the company. See, e.g., Shkreli, 581 F. Supp. 3d at 642-43 (imposing joint and several liability on individual and company defendant where the individual defendant, who was the company's founder and largest shareholder, "was the mastermind of [the company's] illegal conduct and the person principally responsible for it throughout the years").

For the reasons discussed above, the Court finds that Kontilai and Collector's Coffee are jointly and severally liable for disgorgement in the amount of $21,910,824.84 and $2,444,911.52 in prejudgment interest.

B.    DISGORGEMENT BY RELIEF DEFENDANT

    1.    Legal Standard

A relief defendant is someone who "does not have a legitimate claim to assets that [she] has received as a gift, without payment of consideration," SEC v. Constantin, 939 F. Supp. 2d 288, 311 (S.D.N.Y. 2013), and "may be joined in a securities enforcement action to aid the recovery of relief." CFTC v. Walsh, 618 F.3d 218, 225 (2d Cir. 2010) (citation omitted). Accordingly, "courts may order equitable relief against a person who is not accused of wrongdoing in a

securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." <u>SEC v. Cavanagh</u>, 155 F.3d 129, 136 (2d Cir. 1998); <u>Ahmed</u>, 72 F.4th at 408 (finding relief-defendant liability under <u>Cavanagh</u> applies to disgorgement).

     2.  Disgorgement

The Court first addresses V. Kontilai's assertion that a disgorgement award is improper because the SEC failed to prove her liability during the December 2023 jury trial. (Relief Def.'s Opp'n Mem. at 2-3, 8-9.) The Court previously rejected this argument and reaffirms its ruling here. (<u>See</u> Dkt. No. 1511 at 1.) "[T]he SEC does not have a 'cause of action' against a relief defendant." <u>SEC v. Yin</u>, No. 17 Civ. 972, 2023 WL 2753094, at *8 (S.D.N.Y. Mar. 31, 2023). Rather, a relief defendant is named as a party "solely to effect full relief in the marshalling of assets that are the fruit of the underlying fraud." <u>Id.</u> (citation omitted); <u>SEC v. Aragon Cap. Advisors, LLC</u>, No. 07 Civ 919, 2011 WL 3278907, at *21 (S.D.N.Y. July 26, 2011) ("Because the nominal or relief defendant possesses the funds that are the subject of the litigation, [s]he must often be joined purely as a means of facilitating collection." (citation omitted)).

As the Court previously explained, given that V. Kontilai is a relief defendant, it is inaccurate "to suggest

that the SEC had a burden to introduce evidence concerning wrongdoing by Veronica Kontilai" at trial. (Dkt. No. 1511 at 1.) V. Kontilai was not on trial – and thus her liability was not at issue - because the SEC "d[id] not allege that Veronica Kontilai, herself, violated the securities laws; rather, the SEC allege[d] only that she received the proceeds of others' violations of the securities laws." (Id. at 2.) Naming a relief defendant, and subsequently seeking disgorgement once the named defendants' liability for return of unlawful gains has been established, is a common practice in SEC enforcement actions. (Id. at 2 (citing Cavanaugh, 155 F.3d at 136).) Nor is V. Kontilai entitled to a jury trial at this stage because, as explained above, the Seventh Amendment right to a jury trial does not apply to the Court's determination of remedies. (See also Dkt. No. 1511 at 2-3.) Accordingly, the Court finds that V. Kontilai was properly named as a relief defendant and is now subject to a potential disgorgement award at this stage of the litigation, as assessed by this Court.

Turning to the merits, the SEC contends that V. Kontilai received $332,522 in ill-gotten funds from Defendants to which she had no legitimate claim, as evidenced by deposits and transfers into her bank accounts, as well as charges to her Company credit card during the Relevant Period. (SEC Mem. at 15-16.) In response, V. Kontilai takes two general

positions: (1) V. Kontilai was a housewife and homemaker and had nothing to do with her husband's company Collector's Coffee, and (2) even if V. Kontilai did receive funds from Defendants, she obtained such gains for legitimate business-related expenses, as evidenced by Vranca's report.[9] (Relief Def.'s Opp'n Mem. at 2, 9-15.) The Court first addresses whether V. Kontilai received ill-gotten funds from Defendants, and if so, whether V. Kontilai had a legitimate claim to those funds. See Cavanagh, 155 F.3d at 136.

#### i. Sources of Ill-Gotten Funds

V. Kontilai insists that as a housewife and homemaker, she had no involvement with Collector's Coffee and did not receive any funds that can be traced back to the Company. (Relief Def.'s Opp'n Mem. at 2, 15.) Indeed, the SEC does not specify which persons or entities made the 137 deposits - totaling $308,011 - into V. Kontilai's bank

---

[9] V. Kontilai's arguments concerning the nominee doctrine and the bona fide purchase defense are irrelevant because the SEC does not seek disgorgement on the theory that V. Kontilai "holds bare legal title to an asset" but that Defendants are the true equitable owners of that asset. Ahmed, 72 F.4th at 408-09 (explaining that the nominee doctrine and the bona fide purchase defense are both "necessarily an asset-specific inquiry"). Rather, the SEC seeks disgorgement on the basis that V. Kontilai received ill-gotten funds without consideration to which she does not have a legitimate claim. See Cavanagh, 155 F.3d at 136; Ahmed, 72 F.4th at 408 (recognizing that equitable principles permit finding third-party liability under Cavanagh or the nominee doctrine). The Court also reiterates its prior holding that compelling V. Kontilai to testify against her husband in this action did not violate the marital privilege. (See Dkt. No. 1511 at 3, citing Dkt. No. 45, which granted the SEC's motion to compel V. Kontilai's deposition testimony over marital privilege objections.)

accounts during the Relevant Period.[10] (See Moessner Decl. at
10-14.) Because the SEC has not identified the sources of her
income, V. Kontilai argues that the SEC cannot prove that the
funds she received from Defendants were ill-gotten gains.
(Relief Def.'s Opp'n Mem. at 15.)

The SEC argues that it is entitled to an adverse
inference and asks this Court to find that the funds V.
Kontilai received were ill-gotten gains from Defendants
because V. Kontilai repeatedly invoked her Fifth Amendment
privilege for all questions regarding the sources of her
income. (SEC Mem. at 15-16.) The SEC emphasizes that at
deposition, V. Kontilai refused to answer questions about the
source of any deposits she received since the Company was
founded in 2007, the source of any funds she used for living
expenses since 2007, the funds she received from her husband,
her use of the Company's credit card, and the assets she
currently holds. (Id.) Essentially, the SEC asks this Court
to find that because V. Kontilai was a homemaker and refused
to identify any other income sources, the funds she received
during the Relevant Period derived presumptively from her

---

[10] V. Kontilai does not dispute that she personally incurred the 73 charges
on the Company credit card issued to her, which totaled $25,511. (Moessner
Decl. at 15-16.)

husband and Collector's Coffee, his only source of income established by the record here.

"[C]ourts in civil cases can draw adverse inferences against relief defendants should they invoke their Fifth Amendment privilege not to testify." See Ahmed, 72 F.4th at 409 n.19; SEC v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) ("Such an [adverse] inference may be drawn in a civil disgorgement action."). Even though a civil defendant has the right to remain silent, "[s]he is not entitled to profit by h[er] silence." SEC v. Tome, 638 F. Supp. 596, 610 (S.D.N.Y. 1986). Thus, "[a]n adverse inference may be given significant weight." LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999). Otherwise, "the invocation of the [Fifth Amendment] privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." Suman, 684 F. Supp. 2d at 386. The scope of an adverse inference is within the district court's discretion. See Donoghue v. Retrophin, Inc., 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015).

The Court agrees that the SEC's inability to ascertain the sources of V. Kontilai's funds – specifically, whether such funds originated from Defendants - is largely due to V. Kontilai's refusal to answer any questions regarding the

47

sources of her income.[11] (See V. Kontilai 6/25/19 Dep. Tr. 21:25-26:13, Dkt. No. 1052-24.) Considering V. Kontilai's invocation of her Fifth Amendment privilege, the detailed accounting by the SEC, and that V. Kontilai was a homemaker with no other identifiable sources of income, the Court draws an adverse inference that the funds she received during the Relevant Period were likely from Defendants and thus constituted ill-gotten gains.[12] See SEC v. Durante, No. 01 Civ. 9056, 2013 WL 6800226, at *11 (S.D.N.Y. Dec. 19, 2013) (drawing adverse inference where defendant's spouse asserted her Fifth Amendment privilege on all substantive questions, ranging from her occupation to the "over $1.2 million dollars in deposits into a bank account held solely in her name"); see also SEC v. Fujinaga, 698 F. App'x 865, 867 (9th Cir. 2017) (no abuse of discretion in drawing an adverse inference where the defendant invoked her Fifth Amendment privilege because her testimony "was necessary to determine whether [she] had a legitimate claim to the funds at issue" and she

---

[11] Likewise, Kontilai invoked his Fifth Amendment privilege when asked about V. Kontilai's sources of income since 2007 or if V. Kontilai had used any Company money for personal expenses since 2014. (Mykalai Kontilai 6/24/2019 Dep. Tr. 14:12-17, 22:9-24, Dkt. No. 689-5.)

[12] Any funds transferred to V. Kontilai from Defendants during the Relevant Period were most likely ill-gotten funds: even though Defendants repeatedly told investors that Kontilai did not take a salary, Kontilai's only source of income from 2007 until May 2019 was Collector's Coffee and, as discussed above, all of the profits from Collector's Coffee were ill-gotten gains. See Collector's Coffee, Inc., 697 F. Supp. 3d at 177.

"was the only person in possession of the information regarding the legitimacy of [her] claim to the funds"); SEC v. Colello, 139 F.3d 674, 678 (9th Cir. 1998) (same where the relief defendant "refused to give information necessary to determine whether he still possessed any of the funds or whether he had a legitimate claim to them").

*ii.   Legitimate Claim to Ill-Gotten Funds*

V. Kontilai argues that even if she received any funds from Defendants, those funds were for meant and used for legitimate business expenses, as evidenced by Vranca's report. (Relief Def.'s Opp'n Mem. at 13-14.) But as explained above, Vranca's report does not comprise reliable evidence of Collector's Coffee's legitimate business expenses and will not be considered by this Court. Without any other supporting evidence, V. Kontilai has failed to prove that any funds dispersed to her were used to pay for the Company's legitimate business expenses. Nor does V. Kontilai provide any other basis for her purportedly legitimate claim to such funds from Defendants.

*iii.   Other Equitable Considerations*

V. Kontilai further argues that even if the funds she received were ill-gotten gains from Defendants, she spent the funds more than a year before this action was filed. Thus, according to V. Kontilai, she cannot be ordered to disgorge

those funds because doing so would amount to a penalty. (Relief Def.'s Opp'n Mem. at 11-12, 15.) V. Kontilai also maintains that she "is nearly a pauper," so any disgorgement award would amount to a penalty. (Id. at 11.)

V. Kontilai's argument that ordering disgorgement is improper because she already spent the funds is meritless. V. Kontilai does not cite any legal authority for that proposition. (See id. at 15.) Rather, courts may order disgorgement "without giving consideration to whether or not the defendant may have squandered and/or hidden the ill-gotten profits." SEC v. McCaskey, No. 98 Civ. 6153, 2002 WL 850001, at *5 (S.D.N.Y. Mar. 26, 2002) (citation omitted). Moreover, "to withhold the remedy of disgorgement or penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws." SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002).

Contrary to V. Kontilai's assertions, the disgorgement remedy imposed on her is not punitive. See Off. Comm. Of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) ("Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty." (citations omitted)). Ordering

disgorgement here does not amount to a penalty: The SEC simply seeks to recoup the investor funds that were wrongfully obtained by Defendants and subsequently distributed to V. Kontilai. See id. To allow a wrongdoer to transfer their fraudulent proceeds to others would defeat the disgorgement remedy by "allow[ing] almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving [assets] to friends and relatives." Cavanagh, 155 F.3d at 137.

Moreover, V. Kontilai's argument that disgorgement cannot be imposed because she is a pauper is self-serving and unpersuasive. "In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship." Universal Exp., Inc., 646 F. Supp. 2d at 565; see also McCaskey, 2002 WL 850001, at *5 ("[F]inancial hardship is not grounds for denying disgorgement."). Nor has V. Kontilai presented any evidence about her financial condition. See, e.g., Universal Exp., Inc., 646 F. Supp. 2d at 565 (declining to consider defendant's financial condition because defendant "has provided no evidence of financial hardship other than his own self-serving and conclusory assertions"). The Court will not consider V. Kontilai's financial situation in awarding disgorgement.

Ultimately, the Court finds that a disgorgement award of $332,522 against V. Kontilai as a relief defendant is warranted.

### 3. Prejudgment Interest

The SEC also seeks a judgment of prejudgment interest against V. Kontilai in an amount of $56,154.09. As is the case regarding Defendants, the Court finds that an award of prejudgment interest is warranted here. See SEC v. Garcy, No. 11 Civ. 2282, 2015 WL 13753679, at *4 (E.D.N.Y. June 24, 2015). "[B]ecause the purpose of disgorgement in the context of relief defendants is to deprive the third-party associates, friends and family of those who violate federal securities laws of ill-gotten profits, it is appropriate to account for the prejudgment interest attributable to such profits." Id. (citation and alterations omitted). V. Kontilai does not address prejudgment interest and the Court finds that the SEC's calculation at the IRS underpayment rate is sound. (See Dkt. No. 1513-3.) Accordingly, the Court also imposes an award of $56,154.09 in prejudgment interest against V. Kontilai.

### 4. Joint and Several Liability

Further, V. Kontilai shall be jointly and severally liable with Defendants for her portion of the ill-gotten funds and the accompanying prejudgment interest. See SEC v. Alt.

Green Techs., Inc., No. 11 Civ. 9056, 2014 WL 7146032, at *4
(S.D.N.Y. Dec. 15, 2014) ("Each Relief Defendant received a
portion of the ill-gotten gains and may therefore be held
jointly and severally liable, along with the Named
Defendants, for that portion."). Joint and several liability
is appropriate because V. Kontilai enjoyed the fruits of the
fraudulent scheme, which funded her lifestyle and included
luxury purchases, dining, and travel. (See Moessner Decl. at
15-16.) See Liu, 591 U.S. at 91 (citing SEC v. Hughes Cap.
Corp., 124 F.3d 449, 456 (3d Cir. 1997) (imposing joint and
several liability for disgorgement where relief defendant
benefited from the ill-gotten funds because her defendant-
spouse paid for "all household expenses, their lavish
lifestyle, and expensive automobiles")); SEC v. VerdeGroup
Inv. Partners, Inc., No. 21 Civ. 07663, 2022 WL 2200409, at
*5 (C.D. Cal. Jan. 14, 2022) (same where disgorgement award
accounted for more than $200,000 in "primarily personal
expenses, including jewelry, cruise ship travel, and
dining").

* * *

For the reasons discussed above, Defendants Kontilai and
Collector's Coffee are jointly and severally liable for
$21,910,824.84 in disgorgement and $2,444,911.52 in
prejudgment interest, totaling $24,355,736.40. To the extent

that Kontilai has made or makes payments towards the $6,100,000 ordered in restitution in the parallel criminal case, such payments will offset his disgorgement obligation in this action. Further, Relief Defendant V. Kontilai is jointly and severally liable with Defendants for $332,522 in disgorgement and $56,154.09 in prejudgment interest, totaling $388,676.09.

C.   CIVIL PENALTIES

In addition to disgorgement, the SEC seeks civil penalties for Defendants' respective violations of the antifraud provisions in the Securities Act and the Exchange Act, as well as Defendants' respective violations of Rule 21F-17. For the reasons explained below, the Court imposes civil penalties of $23,035,824 against Kontilai and $23,035,824 against Collector's Coffee for their respective securities fraud violations. The Court also imposes $310,462 in civil penalties against Kontilai and $1,552,316 in civil penalties against Collector's Coffee for their respective violations of Rule 21F-17.

1.   Legal Standard

The Securities Act and the Exchange Act both authorize three tiers of civil penalties, in increasing severity, as remedies for securities law violations. See 15 U.S.C. §

77t(d)(2) (Securities Act); 15 U.S.C. § 78u(d)(3)(B)
(Exchange Act). First-tier penalties may be imposed for any
securities violations. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C.
§ 78u(d)(3)(B)(i). Second-tier penalties may be imposed if
the violations involved fraud, deceit, manipulation, or
deliberate or reckless disregard of a regulatory requirement.
15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii).
Third-tier penalties, which the SEC seeks here, may be imposed
if, in addition to meeting the second-tier requirements, the
violations directly or indirectly resulted in substantial
losses or created a significant risk of substantial losses to
other persons. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C.
§ 78u(d)(3)(B)(iii).

Although the penalty provisions do not define
"violation," courts may "look to the number of investors
defrauded or the number of fraudulent transactions to
determine the number of violations." SEC v. GTF Enters., Inc.,
No. 10 Civ. 4258, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19,
2015). Courts may also consider "whether the violations were
all part of a single scheme." Id. The penalty imposed for
each third-tier violation "shall not exceed the greater of
(I) $100,000 for a natural person or $500,000 for any other
person, or (II) the gross amount of pecuniary gain to such
defendant as a result of the violation." 15 U.S.C.

§ 77t(d)(2)(C); see 15 U.S.C. § 78u(d)(3)(B)(iii) (same). The maximum amount for each civil penalty may be adjusted for inflation based on the date of the violation. See 17 C.F.R. § 201.1001; Inflation Adjustments to Civil Monetary Penalties Administered by the SEC (as of January 15, 2024) ("SEC Inflation Adjustments 2024").[13]

The Securities Act and the Exchange Act both provide for civil penalties in addition to disgorgement because these are distinct remedies with different purposes. Unlike disgorgement, civil penalties are "designed to punish the individual violator and deter future violations of the securities laws." SEC v. Shehyn, No. 04 Civ. 2003, 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (citation omitted). To further this purpose, defendants are not entitled to deduct money returned to victims from a civil penalties award. Otherwise, a defendant who paid back all gains before judgment could practically nullify the disgorgement. See SEC v. Fowler, 440 F. Supp. 3d 284, 298–99 (S.D.N.Y. 2020).

Moreover, civil penalties cannot be awarded jointly and severally. See SEC v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 287-88 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d)(2)). However,

---

[13] Available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments. Because the SEC relies on the inflation adjustments for 2024, the Court also relies on the 2024 adjustments.

"where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations." Fowler, 440 F. Supp. 3d at 299. See also SEC v. Amerindo Inv. Advisors Inc., No. 05 Civ. 5231, 2014 WL 2112032, at *13 (S.D.N.Y. May 6, 2014) (imposing same penalty on individual and entity defendants because they were all involved in the same violations).

The Court first addresses the SEC's requested penalties for Defendants' securities fraud violations before turning to the requested penalties for Defendants' Rule 21F-17 violations.

### 2.    Securities Fraud Civil Penalties

To assess the appropriate civil monetary penalty, courts may consider "the egregiousness of the defendant's conduct, the degree of his scienter, whether his conduct created substantial losses, whether the offense was isolated or recurrent, and whether the penalty should be reduced due to defendant's financial condition." SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547, 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008). Courts may also consider a defendant's "failure to admit wrongdoing," "lack of cooperation with authorities," as well as the "brazenness, scope, and duration of the fraudulent conduct." SEC v. Lek

Sec. Corp., 612 F. Supp. 3d 287, 295-96 (S.D.N.Y. 2020) (citations omitted).

In light of these considerations and the factual record in this case, third-tier penalties are appropriate for each Defendant. The Court finds that Defendants mutually benefited from these gains and that their repeated violations of the securities laws over several years arose from a single scheme. See Rabinovich & Assocs., LP, 2008 WL 4937360, at *6. Because Kontilai and Collector's Coffee mutually "benefit[ed] from the same dollar of gain," they can both "be penalized for that gain." SEC v. Cole, 661 F. App'x 52, 55 (2d Cir. 2016) (citation omitted). For the reasons explained below, the Court imposes the maximum penalty of $23,035,824, the gross amount of pecuniary gain, for each Defendant.[14] (See Moessner Decl. at 5-9.) SEC v. Great Am. Techs., Inc., No. 07 Civ. 10694, 2010 WL 1416121, at *2 (S.D.N.Y. Apr. 8, 2010) (imposing third-tier civil penalty "equal to the scheme's pecuniary gain").

Over the span of four years, Defendants raised over $23 million from investors through various materially misleading communications and ultimately, Defendants' conduct resulted

---

[14] Although not required, the SEC deducted some of Defendants' payments back to investors from its gross pecuniary gains approximation. See Rabinovich & Assocs., LP, 2008 WL 4937360, at *6. Accordingly, the Court will not account for those payments.

in near-total losses by the Company's investors. Defendants acted with scienter, meaning they "acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." SEC v. Haligiannis, 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007) (quoting Grandon v. Merrill Lynch & Co., 147 F.3d 184, 194 (2d Cir. 1998)). Defendants misrepresented the state of the business by telling investors that hundreds of collectibles dealers had committed to selling billions of dollars' worth of inventory on the CCI Website, even though only a handful of dealers had committed to using the CCI Website platform. (See, e.g., Trial Tr. 234:20-25, 964:18-965:9.) Defendants also misrepresented that the Jackie Robinson contracts would generate much-needed revenue for the Company by not disclosing that the contracts were unlikely to sell for the appraised value and that Defendants had promised large amounts of the contract sale proceeds to others. (See SEC Trial Ex. 15 at 20, 24; Trial Tr. 656:25-657:19.) Moreover, Defendants attempted to impede the SEC's investigation of these violations and fabricated evidence, such as fake employment agreements and forged bank records, in support of their position. (See SEC Trial Exs. 57, 58, 65.) See SEC v. Musella, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989) ("This false exculpatory statement evidences

consciousness of guilt and has independent probative value of scienter.").

Kontilai was a fugitive for nearly four years, which also evidences a high degree of scienter and consciousness of guilt. See Haligiannis, 470 F. Supp. 2d at 384, 386; see also SEC v. Sekhri, No. 98 Civ. 2320, 2002 WL 31100823, at *19 (S.D.N.Y. July 22, 2002) (imposing maximum civil penalty where defendant fled the United States to avoid prosecution by the SEC). In late 2019, only a few months after the SEC initiated this action, Kontilai fled the United States and sought asylum in Russia, falsely claiming that he was a journalist that revealed corrupt schemes within the United States government. (See Decl. of Mykalai Kontilai, Ex. 5, Dkt. No. 409-6; see also Dkt. No. 1532-1 (certified translation of same).) Even though Russian authorities denied Kontilai's asylum request in March 2020, (see id.), Kontilai refused to return to the United States and remained at large in Europe until he was arrested in Germany in April 2023. (See Dkt. No. 1411 at 2-4; see also Dkt. No. 1463 at 1-2.) Kontilai then fought his extradition from Germany to the United States for nearly a year and remained in German custody for the duration of the Court's jury trial in December 2023. (See Dkt. No. 1411 at 2-4.) Kontilai's brazen efforts to avoid responsibility for his conduct warrant the maximum civil

penalty. See SEC v. Bahgat, No. 17 Civ. 971, 2023 WL 3491733, at *11 n.7 (W.D.N.Y. May 17, 2023) (imposing maximum civil penalty because defendant's departure from the United States evidenced his refusal to accept responsibility or cooperate with authorities).

The Court declines to impose a lower penalty for Kontilai. In addition to the violations described above, Kontilai appropriated millions in investor funds for his personal use by directing a company employee to make large withdrawals of cash for Kontilai. These withdrawals were disguised as being related to the purchase of collectibles or Kontilai's salary, even though Kontilai represented to investors that the Company would never carry collectibles inventory and that he did not take a salary. (See SEC Trial Exs. 35, 40, 74, 75, 100; Trial Tr. 324:17-23.) See Great Am. Techs., Inc., 2010 WL 1416121, at *2 (imposing third-tier civil penalty on individual defendant equal to the scheme's pecuniary gain of over $2.3 million where the individual defendant diverted $1 million of that sum to himself).

Kontilai also asks this Court to consider his financial condition in assessing a civil penalty against him.[15] (Defs.'

---

[15] At the time of briefing, Kontilai was in the custody of German authorities. (See Defs.' Opp'n Mem. at 22.) Kontilai is now serving 51 months' imprisonment in connection with his parallel criminal case in Nevada. (See Dkt. No. 1600-1.) Defendants do not include any information regarding the Company's current financial state.

Opp'n Mem. at 23.) Although the Court is mindful that Kontilai is currently incarcerated, Kontilai has not submitted any evidence of financial hardship, stating only that he has no substantial assets. (Id.) Moreover, Kontilai has been dishonest about his assets. In Defendants' Opposition Memorandum, which was submitted in April 2024, Kontilai insisted that he had no substantial assets and that there was no evidence that he had hidden any assets since this litigation began in May 2019. (Id.) However, a detention hearing in Kontilai's parallel criminal case in May 2024 revealed that Kontilai had $400,000 worth of cash in his possession when he was arrested by German authorities in April 2023. (See Dkt. Nos. 1527, 1532.) Although Kontilai denies in an affidavit that this was his money, Kontilai's position is contradicted by the findings of the German authorities. (See Dkt. No. 1532 at 3.) Given Kontilai's lack of credibility in his affidavit and the lack of additional supporting evidence concerning financial hardship, the Court declines to reduce Kontilai's civil penalty in light of his purported financial condition. See Universal Exp., Inc., 646 F. Supp. 2d at 565.

### 3. Rule 21F-17 Civil Penalties

The SEC also seeks civil penalties for Defendants' violations of Rule 21F-17 of the Exchange Act, for which

Defendants' liability was established at summary judgment prior to the December 2023 jury trial.

Rule 21F under the Exchange Act provides various incentives and protections to whistleblowers to encourage reporting of possible securities laws violations. See Implementation of the Whistleblower Provisions of Sec. 21F of the Securities Exchange Act of 1934, Exchange Act Release No. 64545, 2011 WL 2045838, at *90 (May 25, 2011) (the "Adopting Release"). To implement Section 21F, the SEC promulgated Rule 21F-17, which prevents any "person" from taking "any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications." 17 C.F.R. § 240.21F-17(a).

This Court previously granted summary judgment in favor of the SEC, holding that Defendants violated Rule 21F-17 because Defendants entered into two confidentiality agreements with investors – the 2015 SPA and the 2017 Settlement Agreement - that expressly prevented investors from communicating with the SEC regarding securities laws violations. Further, Defendants actually sued to prevent communications and advertised those suits to other investors

to chill further communication. See Collector's Coffee, Inc., 2021 WL 5360440, at *4-5.

The SEC now seeks third-tier civil penalties against Collector's Coffee and Kontilai, each for violating Rule 21F-17 in three separate instances: (1) entering into the 2015 SPA, (2) entering into the 2017 Settlement Agreement, and (3) suing the Nevada Plaintiff-Investors for breach of the 2017 Settlement Agreement. (SEC Mem. at 22.) The SEC seeks the maximum penalty amounts for each violation for Kontilai as a "natural person" and Collector's Coffee as "any other person," accounting for inflation.[16] See 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1001. In total, the SEC seeks $620,928 in penalties for Kontilai and $3,079,628 in penalties for Collector's Coffee. (SEC Mem. at 23-24.)

The Court agrees with the SEC that penalties are warranted given that Defendants' egregious conduct was in reckless disregard of a regulatory requirement. (See Collector's Coffee, Inc., 2021 WL 5360440, at *4-5. In

---

[16] Inflation for the 2015 SPA violations, which occurred before November 2, 2015, and the 2017 Settlement Agreement violations, which occurred after November 3, 2015, differ based on the date of violation. Under the 2024 inflation adjustment, the penalty tiers for violations which occurred before November 2, 2015, for a natural person were (1) $7,500, (2) $80,000, and (3) $160,000; the penalty tiers for any other person were (1) $80,000, (2) $400,000, and (3) $775,000. The penalty tiers for violations which occurred after November 3, 2015, for a natural person were (1) $11,524, (2) $115,231, and (3) $230,464; the penalty tiers for any other person were (1) $115,231, (2) $576,158, and (3) $1,152,314. See SEC Inflation Adjustments 2024.

restricting investor communications with regulatory agencies, Defendants' fraudulent scheme went undetected for years and resulted in near total losses for other investors until the SEC brought this action in May 2019. (Id.) However, the Court ultimately "has broad discretion to impose the civil monetary penalties it deems appropriate in the instant case." SEC v. Honig, No. 18 Civ. 8175, 2024 WL 3454840, at *5 (S.D.N.Y. July 18, 2024) (citation omitted). "Despite the severity of [a defendant's] violations and the extent to which those violations should be punished," the Court may also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect." Universal Exp., Inc., 646 F. Supp. 2d at 568 (reducing requested civil penalties where the defendant was required to pay $13 million in disgorgement and prejudgment interest and was permanently enjoined from engaging in future securities laws violations). Here, Defendants have already been ordered to jointly and severally disgorge $24,355,736.40 in ill-gotten gains and prejudgment interest. Further, the Court has awarded $23,035,824 in civil penalties against Kontilai and $23,035,824 in civil penalties against Collector's Coffee. In total, Defendants have been ordered to pay nearly $70.4 million prior to any penalties for the Rule 21F-17 violations.

In light of the relief already awarded, the Court imposes second-tier penalties for the three Rule 21F-17 violations on each Defendant. For Kontilai, as a natural person, this amounts to the following penalties: $80,000 for entering the 2015 SPA, $115,231 for entering the 2017 Settlement Agreement, and another $115,231 for enforcing the 2017 Settlement Agreement, totaling $310,462. See SEC Inflation Adjustments 2024. The penalties for Collector's Coffee, as a non-natural person, amount to the following: $400,000 for entering the 2015 SPA, $576,158 for entering the 2017 Settlement Agreement, and another $576,158 for enforcing the 2017 Settlement Agreement, totaling $1,552,316. See id. Although those penalties are substantially less than the maximum third-tier penalties requested by the SEC, in light of the substantial disgorgement, prejudgment interest, and other civil penalties already awarded, the "punitive and deterrent purposes of the civil penalty statutes can be achieved by these penalties" for the Rule 21F-17 violations. SEC v. Carrillo Huettel LLP, No. 13 Civ. 1735, 2017 WL 213067, at *10 (S.D.N.Y. Jan. 17, 2017) (citations and alterations omitted).

* * *

For the reasons explained above, the Court imposes a civil penalty of $23,035,824 against Kontilai and a civil

penalty of $23,035,824 against Collector's Coffee for their respective securities fraud violations. The Court also imposes $310,462 in civil penalties against Kontilai and $1,552,316 in civil penalties against Collector's Coffee for their respective violations of Rule 21F-17.

D.  PERMANENT INJUNCTION

The SEC seeks a permanent injunction against each Defendant to enjoin Defendants from future violations of Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Rule 21F-17 of the Exchange Act. For the reasons explained below, the Court grants the SEC's proposed injunctive relief against both Defendants.

1.  Legal Standard

Permanent injunctive relief is authorized under Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act. See 15 U.S.C. § 77t(b) (Securities Act); 15 U.S.C. § 78u(d)(1) (Exchange Act). To obtain a permanent injunction, the SEC must show that there is a reasonable likelihood of future violations of the securities laws. See Carrillo Huettel LLP, 2017 WL 213067, at *6.

A district court has broad discretion to enjoin possible future violations of federal securities laws. SEC v. Zwick, No. 03 Civ. 2742, 2007 WL 831812, at *17 (S.D.N.Y. Mar. 16,

2007).  To  evaluate  the  likelihood  of  recurrence  of wrongdoing,  a  court  may  consider  the  degree  of  scienter involved,  the  sincerity  of  the  defendant's  assurances  against future  violations,  the  recurrent  or  isolated  nature  of  the infraction,  the  defendant's  recognition  of  the  wrongful nature  of  his  conduct,  and  the  likelihood,  given  the defendant's  occupation,  that  future  violations  may  occur.  SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976).

A  permanent  injunction  is  particularly  appropriate "where  a  violation  was  founded  on  systematic  wrongdoing, rather  than  an  isolated  occurrence"  and  where  the  defendant's "persistent  refusals  to  admit  any  wrongdoing  make  it  rather dubious  that  the  [defendant  is]  likely  to  avoid  such violations  of  the  securities  laws  in  the  future  in  the  absence of  an  injunction."  SEC v. Alpine Sec. Corp., 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019) (quoting SEC v. Frohling, 851 F.3d 132, 139 (2d Cir. 2016)).

2.    Injunctive Relief Is Warranted

Considering  the  relevant  factors  and  the  totality  of  the circumstances,  the  Court  finds  that  injunctive  relief  is warranted.

As  the  Court  explained  above,  Defendants  acted  with scienter.  Defendants'  fraudulent  scheme  continued  over  a

period of several years and employed numerous measures to evade detection. See SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006). Moreover, Defendants have shown no acceptance of responsibility, no recognition of the wrongfulness of their actions, no remorse, and have given no assurances (sincere or otherwise) of reform and that they will not violate securities laws in the future. See Rabinovich & Assocs., LP, 2008 WL 4937360, at *5. Instead, Defendants have repeatedly blamed nearly everyone else involved with the Company, as well as their former counsel and the SEC, for its misfortunes.

Defendants have also demonstrated that they are capable of engaging in future unlawful acts, as Defendants flouted the law by continuing their misconduct during the SEC's investigation of Collector's Coffee. See SEC v. Softpoint, Inc., 958 F. Supp. 846, 867 (S.D.N.Y. 1997). Beyond the misconduct discussed above, Kontilai stated at deposition that the only reason he did not continue pursuing the lawsuit against the Nevada Plaintiff-Investors for their breach of the 2017 Settlement Agreement was due to lack of funds. (Dkt. No. 1513-4 at 223:10-224:4.) Kontilai also fled the United States – citing the investigations by the Justice Department and the SEC - and was a fugitive for several years while this case proceeded to trial. Haligiannis, 470 F. Supp. 2d at 384.

Extending the injunction to Collector's Coffee is justified, as the Company is still solely controlled by Kontilai and has not given any assurances that it will restrain from future violations. See SEC v. Kinnucan, 9 F. Supp. 3d 370, 375-76 (S.D.N.Y. 2014) (granting permanent injunction barring company and its president from future violations of Section 10(b) of the Exchange Act). Cf. SEC v. Wheeler, 56 F. Supp. 3d 241, 248 (W.D.N.Y. 2014) (denying permanent injunction against the company where the company had been sold and was no longer under the direct control of the individual defendant, who had orchestrated the fraudulent pump and dump scheme).

Kontilai argues that injunctive relief should not be imposed on him because, at the time of briefing, he was not in the United States and thus incapable of committing future violations. (Defs.' Opp'n Mem. at 25.) This argument, while meritless, is moot because Kontilai has since been extradited to the United States. (See Dkt. No. 1526.) That Kontilai was sentenced to 51 months' imprisonment and is currently incarcerated does not preclude an injunction. (See Dkt. No. 1600-1.) See SEC v. Cobalt Multifamily Invs. I, LLC, No. 06 Civ. 2360, 2011 WL 4899909, at *4 (S.D.N.Y. June 14, 2011) ("[C]ourts in this district have repeatedly imposed such [permanent] injunctions on incarcerated defendants."). And

once released, Kontilai – who has been an entrepreneur for the last twenty years - will still have the ability to perpetrate a fraudulent scheme like the one here absent restraint. See Opulentica, LLC, 479 F. Supp. 2d at 329.

Thus, the Court permanently enjoins Defendants from future violations of Section 17(a) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act and Rule 21F-17 of the Exchange Act.

## IV.  ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion for remedies by Plaintiff United States Securities and Exchange Commission ("SEC") (Dkt. No. 1512) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that Defendants Collector's Coffee, Inc. ("Collector's Coffee") and Mykalai Kontilai (together with Collector's Coffee, "Defendants"), shall jointly and severally disgorge $21,910,824.84 in ill-gotten profits and $2,444,911.52 in prejudgment interest, with any restitution paid by Mykalai Kontilai in United States v. Kontilai, 20 Cr. 109 (D. Nev.) to offset his disgorgement obligation in this matter; it is further

**ORDERED** that the Relief Defendant Veronica Kontilai shall disgorge $332,522 in ill-gotten profits and $56,154.09

in prejudgment interest, jointly and severally with Defendants; it is further

**ORDERED** that Defendant Collector's Coffee shall pay a civil penalty of $23,035,824 for violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a)(1)-(3), Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) ("Rule 10b-5") of the Exchange Act, 17 C.F.R. § 240.10b-5; it is further

**ORDERED** that Defendant Collector's Coffee shall pay civil penalties in the amounts of $400,000, $576,158, and $576,158, totaling $1,552,316, for violations of Rule 21F-17 ("Rule 21F-17") of the Exchange Act, 17 C.F.R. § 240.21F-17; it is further

**ORDERED** that Defendant Mykalai Kontilai shall pay a civil penalty of $23,035,824 for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b) of the Exchange Act; it is further

**ORDERED** that Defendant Mykalai Kontilai shall pay civil penalties in the amounts of $80,000, $115,231, and $115,231, totaling $310,462, for violations of Rule 21F-17 of the Exchange Act; it is further

**ORDERED** that a permanent injunction shall be issued against Defendants Collector's Coffee and Mykalai Kontilai

prohibiting future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5 of the Exchange Act, and Rule 21F-17 of the Exchange Act; and it is further

**ORDERED** that the motion by Defendants and Veronica Kontilai pursuant to Federal Rule of Civil Procedure 59 to set aside the trial verdict (Dkt. Nos. 1537, 1539) is **DENIED**.

The SEC shall submit a proposed judgment form within fourteen (14) days of the entry of this Order.

The Clerk of Court is respectfully directed to close Dkt. Nos. 1512, 1528, 1539, and 1540.

**SO ORDERED.**

Dated:     10 March 2025
           New York, New York

                                        _____
                                        Victor Marrero
                                        U.S.D.J.